IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————

No. 26-1225

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

Defendants-Appellees

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO,

Intervenors-Appellees

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION CASE NO. 1-25-cv-01148

———————

UNITED STATES' REPLY TO DEFENDANT-APPELLEES'
RESPONSE IN OPPOSITION TO UNITED STATES' EMERGENCY
MOTION TO EXPEDITE

## ARGUMENT

I. **The requested statewide voter registration list (SVRL) is necessary for core election administration procedures**

The State of Michigan (Michigan) is incorrect in stating that the United States "does not challenge any process related to the administration of an election, such as procedures related to the casting or tabulating [of] ballots." Response in Opp., C.A. Doc. 15 (Opp.), at 8.[1] A SVRL is inherently linked to "casting or tabulating ballots."

The Help America Vote Act (HAVA) requires States to maintain accurate and current voter registration lists. *See* 52 U.S.C. 21083. The National Voter Registration Act (NVRA) and HAVA contain provisions designed to help the federal government ensure that states are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3). Those statutes' requirements include recordkeeping obligations, 52 U.S.C. 20507(i)(1), and the duty to make reasonable efforts to maintain lists of eligible voters that do not include the names of ineligible voters. 52

---

[1] "C.A. Doc. ___, at ___" refers to the docket entry and page number at the bottom of documents filed in this Court. "R. ___, _____, Page ID # ___" refers to the docket entry, title, and Page ID number of documents filed in the district court, No. 1:25-cv-1148 (W.D. Mich.).

U.S.C. 20507(a)(4)(A)-(B), 21083(a)(1)(A). The SVRL must be complete to allow for poll workers to complete their many pre-election day and election day tasks including to "authenticate, prepare, and mail absentee ballots; examine, verify, and count completed absentee ballots as electors return them; . . . compile a list of eligible electors who have not voted early." *See Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir 2020).

II. **The 90-day quiet period does not foreclose systematic removal of individuals who were improperly registered to vote in the first place.**

Michigan argues (Opp. 10) that the United States' request for an expedited appeal comes "too late" because "a state must generally complete any program to remove voters from official lists not later than 90 days before a primary or general election for Federal office" and the 90-day "quiet period" prior to the primary election will carry over to the day right before the 90-day "quiet period" prior to the general election begins. *See* 52 U.S.C. 20507(c)(2)(A) (prohibiting any "program" for the "purpose of" "systematic[] remov[al]" of the "names of ineligible voters from the official lists of eligible voters" within 90 days of "the date of a primary or general election for Federal office").

But this does not apply to efforts by a State to remove noncitizens who could never have qualified as "voters." As this Court held in *Bell v. Marinko*, that the NVRA's quiet period doesn't "bar the removal of names from the official [state voter rolls] of persons who were ineligible and improperly registered to vote in the first place." 367 F.3d 588, 591-592 (6th Cir. 2004); *see id.* at 592 (voters improperly registered because they never resided in the State). The holding in *Bell* applies directly to noncitizens. Because they "were improperly registered to vote in the first place," the NVRA does not "bar the removal" of their names within the 90-day quiet period. *Id.* at 591-592.

**III. The United States has consistently sought an expedited resolution to this matter.**

Michigan states that because the Department of Justice (the Department) did not seek expedited review in the lower court and acquiesced in Michigan's requested extensions of time, that it does not see this as an urgent matter. This is an inaccurate summary of the United States' position.

The United States sought access to Michigan's SVRL under Title III of the Civil Rights Act, which provides an inherently expedited

process. As the United States stressed below, Title III provides "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962); *see* R. 53, Memorandum of Law in Opposition, Page ID # 671-674. The Attorney General may come to court and seek an order to produce the requested records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Lynd*, 306 F.2d, at 225. The special proceeding is "summary" in "nature" and neither "plenary [n]or adversary." *In re Gordon*, 218 F. Supp. 826, 826-827 (S.D. Miss. 1963); *see Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (noting that this procedure "does not amount to the filing of a suit of any kind"). Once the Attorney General provides a "simple statement" that the demand has been made and refused, "[t]he Court, *with expedition*, should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down *without delay* for suitable hearing on the matters open for determination." *Lynd*, 306 F.2d at 226 (emphasis added).

Further, given the United States' decision to proceed under this expedited process, appellees err by viewing the United States' decision

not to oppose individual requests for short extensions of time (matters of days)—an ordinary practice of professional courtesy—as an indication that the United States does not believe this case should proceed with urgency.

**IV. Michigan's assertion that a review is impossible in 35 days is speculative**

Michigan states that it's unlikely that any assessment of 7.3 million voters could be completed in less than 35 days. That is speculation designed to delay the Government's federal authority to inspect Michigan's SVRL. If there is no pattern of anomaly or significant discrepancy, then it would be entirely possible for the Government to complete an initial analysis of Michigan's SVRL in a matter of days using federal resources.[2,3,4] Michigan cannot state with any authority how long it would take the Government to review its SVRL, and as such,

---

[2] https://www.uscis.gov/save/current-user-agencies/news-alerts/optimizing-save-new-options-to-create-cases-with-a-social-security-number-and-by-bulk-upload

[3] https://www.uscis.gov/save/current-user-agencies/news-alerts/save-optimization-new-option-to-create-cases-with-the-last-four-digits-of-an-ssn

[4] https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet

Michigan's speculation should be seen as the "red herring" argument that it is.

## V. The United States is likely to prevail in this action.

Finally, Michigan's arguments that the appeal should not be expedited because the United States is unlikely to prevail in this appeal are misplaced and incorrect. The United States is likely to prevail in this action because the Department is granted express authority under the Civil Rights Act to the SVRL's themselves as it is a part of the procedures in ensuring fair and free elections. The district court erred in finding that there is a difference between the SVRL itself and the procedure used to maintain the SVRL. Regardless, the Department has the authority under federal law to inspect what Michigan refuses to disclose. *See* 52 U.S.C. 20703.

With regard to the merits, the crux of this appeal revolves around one narrow issue: the meaning of the words "come into . . . possession" in 52 U.S.C. 20701. Contrary to the district court, there is no difference between the SVRL in Secretary Benson's possession and the process used in creating it, despite the district court's self-described "pedantic distinction." *United States v. Benson*, No. 1:25-cv-1148, 2026 WL 362789,

at *10 (W.D. Mich. Feb. 10, 2026). The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. 20701, 20703. The plain terms of the statute dictate: an officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). And Secretary Benson acquired the relevant records in the course of carrying out her duties as an officer of election.

Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. Even if someone in the Secretary of State's office generated the requested record and, under the district court's view,

- 8 -

therefore did not "come into . . . possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into . . . possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. 20701. And Secretary Benson, now "having custody, possession, or control of such record or paper," must "ma[k]e [it] available for inspection, reproduction, and copying." 52 U.S.C. 20703.

Even the district court acknowledged, in granting the motion to dismiss, that it went against several courts which did find the government was entitled to voter registration lists. *Benson*, 2026 WL 362789, at *5. Federal courts have previously rejected similar challenges to the scope of voting records requests under other statutes. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records) (citation omitted); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 442 (D. Md. 2019) (finding plaintiff was entitled to registered voter list because a voter list is "a partial compilation of voter registrations"); *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (rejecting defendant's argument that plaintiff could not

obtain voter list). To ascertain whether a jurisdiction engages in practices that violate federal law, the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

It is therefore unsurprising that the United States has frequently requested and obtained these types of records in the past. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers or the last four digits of social security numbers, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[5]

---

[5] *See* Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006). The Court entered a Consent Decree in the Georgia case requiring production of the SVRL. *See* Consent Decree, *Georgia*, *supra* (Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), https://www.justice.gov/media/1173461/dl?inline (last visited March 9, 2026).

In short, the Government is likely to prevail on the merits of its appeal, which provides additional good cause to expedite briefing.

## VI. Michigan will suffer no harm if this appeal is expedited

Expediting this appeal would not harm Michigan. As noted above, the appeal centers on a narrow issue of statutory interpretation following an order granting Michigan's motion to dismiss and does not require evaluating an in-depth factual record. Moreover, as the United States pointed out in its Motion to Expedite (at 16), a prompt resolution of this appeal will enable Michigan to conduct its upcoming election without the specter of ineligible voters remaining on its voter rolls. An expedited appeal therefore serves the interest of both sides.

## CONCLUSION

The court should grant the United States' Motion to Expedite briefing in this matter.

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

s/ Andrew G. Braniff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. MCGEE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 532-3803

Date: March 10, 2026

# CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(C) because the motion contains 1961 words, excluding the parts exempted by Federal Rules of Appellate Procedure 27(d)(2) and 32(f). This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

                                                             s/ Andrew G. Braniff  
                                                          ANDREW G. BRANIFF  
                                                            Attorney

Date: March 10, 2026

# CERTIFICATE OF SERVICE

I certify that on March 10, 2026, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff  
ANDREW G. BRANIFF  
 Attorney

Date: March 10, 2026