No. 26-1225

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JOCELYN BENSON, in her official capacity as
Secretary of the State of Michigan, *et al.*,

Defendants-Appellees,

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE
FOR RETIRED AMERICANS; DUQUETTE; KEELY CRIMANDO,

Intervenors-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION CASE NO. 1-25-cv-01148
The Honorable Hala Y. Jarbou

_____

BRIEF OF CENTER FOR ELECTION CONFIDENCE, INC., RESTORING
INTEGRITY AND TRUST IN ELECTIONS, INC., AND HONEST ELECTIONS
PROJECT AS *AMICI CURIAE* IN SUPPORT OF APPELLANT AND
REVERSAL

_____

[Counsel Listed on Inside Cover]

Zachary C. Larsen (P72189)
Michael J. Pattwell (P72419)
CLARK HILL PLC
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
zlarsen@clarkhill.com
mpattwell@clarkhill.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* each affirmatively state that no party to this brief is a publicly held corporation, issues stock or has a parent corporation.

Pursuant to Sixth Circuit Rule 26.1, *Amici Curiae* make the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   *Amici Curiae* all state "No."

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   *Amici Curiae* all state "No."


/s/ *Zachary C. Larsen*
Zachary C. Larsen
*Attorney for Amici Curiae*

Dated: March 30, 2026

iii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

TABLE OF AUTHORITIES ...........................................................................v

INTEREST OF *AMICI CURIAE* ..................................................................1

INTRODUCTION ........................................................................................3

ARGUMENT ...............................................................................................5

    I.     Transparency in Voter Registration Is a Core Congressional Purpose of the NVRA and CRA. ................................................................5

          A.     The Transparency Provisions of the NVRA and CRA Are Broad and Mandatory. ...............................................................5

          B.     The District Court's Ruling Countermands the Transparency Requirements of the NVRA and CRA....................................10

    II.    Transparency Is Essential to Advancing the State's Compelling Interest in Election Integrity and Protecting the Right to Vote. .........13

    III.   Transparency Is Essential to Public Confidence in Elections.............18

CONCLUSION...........................................................................................22

CERTIFICATE OF COMPLIANCE................................................................23

CERTIFICATE OF SERVICE ........................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960)................................................................8

*Bellitto v. Snipes*,
302 F. Supp. 3d 1335 (S.D. Fla. 2017)........................................................21

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ............................................................................ 16, 20

*Campaign Legal Ctr. v. Scott*,
497 F.4th 931 (5th Cir. 2022)......................................................................21

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) ....................................................................................21

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ............................................................................ 16, 20

*Democratic Nat'l Comm. v. Wisconsin State Legis.*,
141 S. Ct. 28 (2020) ....................................................................................19

*DOJ v. Reps. Comm. for Freedom of Press*,
489 U.S. 749 (1989) ......................................................................................6

*Durns v. Bureau of Prisons*,
804 F.2d 701 (D.C. Cir. 1986) ......................................................................7

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ....................................................................................13

*FBI v. Abramson*,
456 U.S. 615 (1982) ......................................................................................7

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
105 F.4th 1324 (11th Cir. 2024)..................................................................21

*Griffin v. Breckinridge*,
403 U.S. 88 (1971) ......................................................................................12

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) ..................................................................................3

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968) ................................................................................12

*Judicial Watch, Inc. v. Lamone*,
399 F. Supp. 3d 425 (D. Md. 2019) .......................................................21

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ....................................................................8

*Lamar, Archer, & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ..................................................................................7

*Nat'l Archives & Recs. Admin. v. Favish*,
541 U.S. 157 (2004) ................................................................................20

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*,
152 F.3d 283 (4th Cir. 1998)......................................................................7

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ..................................................................................7

*Ohio Republican Party v. Brunner*,
544 F.3d 711 (6th Cir. 2008)...................................................................15

*Patel v. Garland*,
596 U.S. 328 (2022) ..................................................................................7

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012).......................................................... passim

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ...............................................................8, 16

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ....................................................................... 15, 19, 20

*Republican Nat'l Comm. v. Benson*,
No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025) ...............21

*Republican Party v. Degraffenreid*,
  141 S. Ct. 732 (2021) ..............................................................................19

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ......................................................................... 13, 15

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ...............................................................................17

*United States v. Manning*,
  215 F. Supp. 272 (W.D. La. 1963) .........................................................15

*United States v. Saylor*,
  322 U.S. 385 (1944) ................................................................................16

*Virginia Coal. for Immigrant Rts. v. Beals*,
  No. 1:24-cv-1778, 2025 WL 2345822 (E.D. Va. Aug. 12, 2025) .........................21

*Voter Reference Found., LLC v. Balderas*,
  616 F. Supp. 3d 1132 (D.N.M. 2022).....................................................21

*Voter Reference Found., LLC v. Torrez*,
  727 F. Supp. 3d 1014 (D.N.M. 2024).......................................................6

**Statutes**

5 U.S.C. § 552 ...........................................................................................6

52 U.S.C. § 20501(a)(3)...........................................................................19

52 U.S.C. § 20501(b) ...........................................................................3, 15

52 U.S.C. § 20501(b)(3) ..........................................................................19

52 U.S.C. § 20507(i) ......................................................................... 3, 5, 7

52 U.S.C. § 20510(a) .............................................................................3, 5

52 U.S.C. § 20510(b) .............................................................................3, 5

52 U.S.C. § 20703 .......................................................................... 4, 5, 9

## Other Authorities

110 Cong. Rec. 6529 (1964) ..................................................................................9

*Building Confidence in U.S. Elections* 10,
   Comm'n Fed. Election Reform, https://tinyurl.com/mdcef5h3 (Sept. 2005) 13, 14

H.R. Rep. 103-9 (1993) ........................................................................................6

*Inaccurate, Costly, and Inefficient: Evidence That America's Voter Registration
   System Needs an Upgrade*,
   Pew Ctr. on the States, https://tinyurl.com/38favmjr (Feb. 2012). ......................14

Martin Austermuhle, *Data Errors Imperil D.C.'s Participation in Group That
   Cleans Up States' Voter Rolls*,
   DCist, https://tinyurl.com/2ktr496m (Feb. 9, 2022) ..............................................14

*Partisan Split on Election Integrity Gets Even Wider*,
   Gallup, https://news.gallup.com/poll/651185/partisan-split-election-integrity-
   gets-even-wider.aspx (Sept. 25, 2024). ................................................................18

S. Rep. No. 101-140 (1989) ..................................................................................6

S. Rep. No. 103-6 (1993) ................................................................................6, 15

Susan Crabtree, *Calif. Begins Removing 5 Million Inactive Voters on its Rolls*,
   Real Clear Politics, https://tinyurl.com/ysb3tuwu (June 20, 2019) .....................14

*Tracking Attitudes About Voters' Confidence in Elections*,
   States United Democracy Ctr., https://statesunited.org/resources/confidence-poll/
   (May 22, 2025). ....................................................................................................19

## INTEREST OF *AMICI CURIAE*[1]

Center for Election Confidence, Inc. ("CEC") is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. CEC is committed to ensuring that all eligible citizens can vote freely within an election system built on fair procedures that uphold integrity, prevent vote dilution and disenfranchisement, and strengthen public trust in both the process and its outcomes. To accomplish these objectives, CEC conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. CEC is a resource for lawyers, journalists, policymakers, courts, and others interested in the electoral process. CEC also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration. Because public disclosure of state voter registration activities—including the voter lists that are the critical outputs of those activities—is crucial to

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. Counsel for Plaintiff-Appellant consented to the filing of this brief, counsel for Defendants-Appellees and counsel for Intervenor-Appellees Michigan Alliance for Retired Americans, Donald Duquette, and Keely Crimando took no position, and counsel for Intervenor-Appellee League of Women Voters of Michigan declined to respond.

1

ensuring election integrity, accuracy, and public confidence, CEC has a significant interest in this case.

Restoring Integrity and Trust in Elections, Inc. ("RITE") is a non-profit organization with the mission of protecting the rule of law in the qualifications for, process and administration of, and tabulation of voting throughout the United States. RITE supports laws and policies that promote secure elections and enhance voter confidence in the election process, including their vigorous enforcement. RITE regularly litigates and files *amicus* briefs in cases involving the National Voter Registration Act.

The Honest Elections Project ("HEP") is a nonpartisan organization devoted to supporting the right of every lawful voter to participate in free and honest elections. Through public engagement, advocacy, and public interest litigation, HEP defends the fair, reasonable measures that legislatures put in place to protect the integrity of the voting process. HEP supports commonsense voting rules and opposes efforts to reshape elections for partisan gain.

## INTRODUCTION

The National Voter Registration Act ("NVRA") serves two principal purposes: to increase voter registration among eligible citizens and to ensure the removal of ineligible individuals from state voter registration rolls. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); 52 U.S.C. § 20501(b). To advance these objectives, Section 8(i) of the NVRA requires that states maintain, for at least two years, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," and further provides that such records "shall" be made available for public inspection. 52 U.S.C. § 20507(i).

This disclosure mandate is not incidental; it codifies a core transparency requirement to ensure accountability in maintaining voter registration lists. By guaranteeing public access to these records, Congress enables both oversight authorities and private citizens to monitor compliance, identify errors, and verify that electoral processes are administered fairly and reliably. To effectuate this purpose, the NVRA authorizes enforcement not only by the Attorney General but also through a private right of action, permitting any aggrieved person to challenge a state's failure to comply with its disclosure obligations. 52 U.S.C. § 20510(a)–(b).

Similarly, the Civil Rights Act of 1960 ("CRA"), enacted pursuant to Congress's enforcement authority under the Fifteenth Amendment, grants the

3

Attorney General the right to inspect "all records and papers" in the possession of election officials relating to any application, registration, or other act requisite to voting. 52 U.S.C. § 20703. Like the NVRA, the CRA reflects Congress's determination that transparency in election administration is essential to federal oversight and the protection of voting rights. Taken together, these statutes codify a comprehensive federal policy of transparency in election administration.

The district court's decision granting the defendants' motion to dismiss, holding that neither the NVRA nor the CRA requires Michigan to provide its unredacted statewide voter registration list to the DOJ, contravenes both the NVRA and the CRA and eviscerates Congress's intent to ensure transparency and accountability in the maintenance of voter registration rolls. This holding is particularly consequential in light of the record before the Court. The DOJ identified specific anomalies in Michigan's Election Administration and Voting Survey ("EAVS") data, including that Michigan sent confirmation notices to verify eligibility "to only 4.5 percent of its voting population—significantly below the national average of 19.5 percent"—and removed "only 4.2 percent of registered voters, well below the national average of 9.1 percent." (Appellant's Br., p. 7.)

The district court's refusal to permit the government to obtain the records necessary to investigate these anomalies not only frustrates Congress's express objectives but also undermines public confidence in the electoral process, which is

4

inextricably linked to the fundamental right to vote and the compelling governmental interest in preserving the integrity of elections. Accordingly, *Amici* respectfully request that this Court reverse the district court's order and hold that the United States may compel Michigan to produce the requested voter registration records.

**ARGUMENT**

**I.    Transparency in Voter Registration Is a Core Congressional Purpose of the NVRA and CRA.**

    **A.    The Transparency Provisions of the NVRA and CRA Are Broad and Mandatory.**

In enacting the NVRA and the CRA, Congress codified a requirement of transparency, mandating that states retain and make available election records, and conferring upon both federal authorities and the public the right to inspect such records. Congress made clear from the outset that transparency is a critical purpose and a legally enforceable obligation, not a mere aspirational or incidental policy. 52 U.S.C. §§ 20507(i), 20510(a)–(b), 20703. Notably, the NVRA imposes no requirement that records be sought for a particular purpose and places no limitation on who may request them; under the statute, all records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" *shall* be made available to the public when requested.  52 U.S.C. § 20507(i).

The legislative history of the NVRA confirms that the use of the term "shall" was intentional. "The records must be made available for public inspection and,

5

where available, photocopying at reasonable costs." S. Rep. No. 103-6, at 35 (1993) (emphasis added); *see also* H.R. Rep. 103-9, at 19 (1993) (same). Congress, "in attempting to strike the balance between privacy concerns and transparency—chose in favor of transparency" when enacting the NVRA's Public Inspection Provision. *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1235 n.148 (D.N.M. 2024). In attempting to harmonize several policy objectives, Congress understood that "an effective national voter registration program must also include a private civil enforcement . . . [which] can encourage action to assure that reasonable effort is undertaken to achieve its objectives in all States, and indeed, it may be essential to the success of such a program in some areas." S. Rep. No. 101-140, at 13 (1989). Without open disclosure of state registration records, there could be no civil enforcement or accountability.

The NVRA's mandatory public disclosure scheme is, in that respect, analogous to that of the Freedom of Information Act ("FOIA"). *See* 5 U.S.C. § 552 (providing repeatedly that agencies "shall make" specified information available "to the public" or "for public inspection"). The "basic purpose" of FOIA is to "open agency action to the light of public scrutiny," regardless of the "particular purpose for which the document is being requested." *Department of Justice v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 772 (1989) (internal quotation marks omitted). In the FOIA context, "Congress did not differentiate between the purposes for which

6

information was requested," *FBI v. Abramson*, 456 U.S. 615, 631 (1982), and "clearly intended to give any member of the public as much right to disclosure as one with a special interest therein," *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975). As Judge Silberman memorably emphasized, "Congress granted the scholar and the scoundrel equal rights of access to agency records." *Durns v. Bureau of Prisons*, 804 F.2d 701, 706 (D.C. Cir. 1986).

Not only did Congress make clear that these records must be made available, but it was equally explicit in defining their scope: The public has the right to inspect *all* records concerning the implementation of registration-related programs and activities. 52 U.S.C. § 20507(i). The phrase "all records concerning" is expansive. First, "all" is an unqualified term, signaling no exceptions. Second, "concerning," like terms such as "regarding" or "relating to," "in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (quoting *Lamar, Archer, & Cofrin, LLP v. Appling*, 584 U.S. 709, 710 (2018)). In *Patel*, the Supreme Court recognized that "regarding" extends to matters far broader than, and adjacent to, an identified subject. 596 U.S. at 339. Similarly, "[t]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998). The First Circuit recently reinforced this

7

principle, emphasizing Congress's clear intent to promote transparency. Under the NVRA, a voter file is a record "concerning" the implementation of programs and activities designed to ensure the accuracy and currency of official lists of eligible voters. Indeed, the statute itself is titled the National *Voter Registration* Act, and Section 8(i)(1) appears in a section entitled "Requirements with respect to administration of *voter registration*." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 49 (1st Cir. 2024) (emphasis added). Likewise, the Fourth Circuit has held that voter registration applications qualify as "records concerning" the process because "completed applications not only 'concern[]' the implementation of the voter registration process, but are also integral to its execution." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335–36 (4th Cir. 2012).

The CRA operates with equal breadth. Title III of the CRA imposes what courts have described as a "sweeping" obligation on election officials to preserve and, on request, produce voter registration records pertaining to federal elections. *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). The Attorney General's authority under Title III is "purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), and courts play a "limited, albeit vital, role" in reviewing the demand, *Lynd*, 306 F.2d at 225. While the CRA requires the Attorney General to make a "demand in writing . . . directed to the person having custody, possession, or control of such record or paper[,]" it merely requires "a

8

statement of the basis and purpose therefor," at which point the record is to be "made available for inspection, reproduction, and copying." 52 U.S.C. § 20703. Importantly, it does not specify any substantive limitation on the purpose. *Id*. So long as the purpose relates to monitoring or enforcing voting rights, a federal court should credit the legitimacy of the Attorney General's reason for inspecting records and reject a recalcitrant state's resistance to basic election transparency and oversight. Much like that of the NVRA, this broad disclosure provision reflects Congress's deliberate effort to provide federal authorities with a legally enforceable transparency mechanism, enabling inspection of state election records to prevent discriminatory practices. 110 Cong. Rec. 6529 (1964) (explaining the Civil Rights Act of 1960).

By granting the government, as well as private individuals and organizations, access to voter registration records, Congress sought to ensure that the public could monitor electoral processes, verify the integrity of state-maintained voter lists, and hold election officials accountable. In other words, the very use of these records by the public to engage in speech, advocacy, and oversight directly fulfills the NVRA's statutory objective of transparency in the administration of elections. It is outside the province of the judicial system to "strike the proper balance between transparency and voter privacy," as that is a policy question that has already been answered by NVRA Section 8(i)(1). *Project Vote*, 682 F.3d at 339.

9

**B.     The District Court's Ruling Countermands the Transparency Requirements of the NVRA and CRA.**

The district court's decision is diametrically opposed to Congress's clear and unequivocal mandate of transparency. Its conclusion that the NVRA's public disclosure provision reaches only records that *describe* list-maintenance processes—and not the records generated by those processes—rests on an unduly cramped understanding of the statute's transparency mandate. By construing the word "concerning" to exclude voter registration lists themselves, the court effectively severs the means of evaluating list-maintenance activities from the very outputs that make such evaluation possible. This reasoning is irreconcilable with the core purposes of the NVRA and CRA: ensuring public accountability in how states maintain accurate, up-to-date voter rolls and administer elections. Transparency, in this context, is not satisfied by abstract descriptions of procedures alone. Rather, it depends on meaningful access to the data that reflects how those procedures operate in practice. A voter registration list is not merely a byproduct of list-maintenance activities; it is the most concrete and verifiable manifestation of those activities. Without access to the list itself, the public cannot assess whether eligible voters are being improperly removed, whether ineligible registrations persist, or whether the state's processes are functioning as intended.

The district court's decision also introduces a false dichotomy between records "describing implementation" and those "produced by implementation." In

10

reality, records generated through list maintenance inherently "concern" that maintenance because they embody its results. To say otherwise is to elevate form over function, allowing states to disclose procedural narratives while withholding the substantive evidence needed to test their accuracy. Accepting such an approach would render the NVRA's disclosure requirement hollow, permitting compliance in name while frustrating its substantive goal of transparency.

Regarding the CRA, the district court concedes that the statute is capacious— rejecting temporal and purposive limits on its use and recognizing its role in facilitating federal oversight of election administration—but ultimately retreats to a cramped reading grounded in the phrase "come into [the State's] possession," construing the requirement to reach only records that election officials receive, rather than those they create. But that received-versus-created distinction finds no support in the text. The phrase "come into [the State's] possession" is naturally broader than "submitted by voters," and governments routinely bring records into their possession by generating them—lists, annotations, database entries, audit logs, and eligibility determinations all "come into" possession when they are created and retained. If Congress meant to limit the statute to third-party submissions, it knew how to say so; reading that limitation into the text adds a constraint that is not there.

Nor does such a narrowing construction comport with the statute's purpose. The CRA is designed to enable meaningful federal oversight of election

11

administration, an objective that would be seriously undermined if states could disclose only raw submissions while withholding the very records that reflect how those submissions were processed—such as rejection codes, list maintenance flags, or internal determinations. Those "created" records are often the only way to evaluate whether discrimination or improper practices occurred. A voter registration list, after all, is not created *ex nihilo*; it is the direct product of materials that indisputably did "come into" the State's possession. Treating the compiled list as categorically distinct from those underlying records elevates formalism over reality and defeats the statute's core commitment to transparency.

Indeed, under the district court's reading, a state could evade disclosure obligations simply by transmuting information from a "received" document into a newly generated record and then discarding the original—precisely the kind of formalism that civil rights legislation is designed to prevent. *See Griffin v. Breckinridge*, 403 U.S. 88, 97 (1971) (civil rights statutes are to be construed as broadly as their language permits); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968) (same). And even if the immediate catalyst for the CRA involved destroyed applications, that history cannot justify narrowing clear, expansive statutory language, particularly where doing so would frustrate the statute's overarching remedial aim of ensuring transparency in the administration of voting rights.

*   *   *

12

In summary, it is clear from the text of the CRA and the NVRA, as well as their respective histories, that they are to be interpreted broadly, with transparency serving as their central aim—ensuring that the public and federal authorities have full access to the records and processes underlying voter registration and election administration. Accordingly, the district court's decision, which flies in the face of the codified purpose of transparency, improperly narrows the scope of the CRA and NVRA.

## II.    Transparency Is Essential to Advancing the State's Compelling Interest in Election Integrity and Protecting the Right to Vote.

A State unquestionably has a compelling interest in preserving the integrity of its electoral process. As the Supreme Court recognized in *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, that interest is both substantial and enduring. 489 U.S. 214, 231 (1989). This principle reflects the fundamental nature of voting rights themselves, which the Court has repeatedly described as "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

A state's voter registration practices directly impact election integrity. As the bipartisan Carter-Baker Commission observed, "registration lists lie at the root of most problems encountered in U.S. elections."[2] Voter rolls containing "ineligible, duplicate, fictional, or deceased voters" are "an invitation to fraud." *Id*. While

---

[2] *Building Confidence in U.S. Elections* 10, Comm'n Fed. Election Reform, https://tinyurl.com/mdcef5h3 (Sept. 2005).

13

election fraud remains "difficult to measure," and many cases go undetected, uninvestigated, or unprosecuted, nevertheless "it occurs." *Id*. at 45. And the stakes are high: "In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference." *Id*. at 18. Yet many states have failed to devote adequate resources to maintaining accurate and current voter registration lists.

The evidence is stark: a 2012 Pew Center on the States study revealed that approximately 24 million voter registrations—one in eight—were invalid or contained significant inaccuracies, including 1.8 million registrations of deceased persons.[3]   In 2019, California identified millions of inactive registrants who had moved or died.[4] In 2020, 11 percent of ballots mailed to registrants in the District of Columbia were returned undeliverable.[5] In 2023, Virginia uncovered nearly 19,000 deceased registrants still on its rolls.[6] And in 2026, Oregon officials acknowledged longstanding deficiencies in maintaining and canceling inactive registrations,

---

[3] *Inaccurate, Costly, and Inefficient: Evidence That America's Voter Registration System Needs an Upgrade*, Pew Ctr. on the States, https://tinyurl.com/38favmjr (Feb. 2012).

[4] Susan Crabtree, *Calif. Begins Removing 5 Million Inactive Voters on its Rolls*, Real Clear Politics, https://tinyurl.com/ysb3tuwu (June 20, 2019).

[5] Martin Austermuhle, *Data Errors Imperil D.C.'s Participation in Group That Cleans Up States' Voter Rolls*, DCist, https://tinyurl.com/2ktr496m (Feb. 9, 2022).

[6] Nick Iannelli, *Virginia Discovers Nearly 19,000 Dead People on Voter Rolls*, WTOP News, https://tinyurl.com/ms6y7w6c (Apr. 19, 2023).

14

leaving 800,000 inactive registrants on its rolls after when the NVRA required their removal.[7]

The NVRA and the CRA are precisely the tools Congress enacted to address these risks. 52 U.S.C. § 20501(b); *see* S. Rep. No. 103-6, at 18 (1993) ("An important goal of [the NVRA], to open the registration process, must be balanced with the need to maintain integrity of the election process. . . ."); *United States v. Manning*, 215 F. Supp. 272, 284 (W.D. La. 1963) ("In adopting the [CRA], Congress attempted to preserve the integrity of elections."). Election integrity is indispensable to securing the fundamental right to vote, which can be denied "by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds*, 377 U.S. at 555). As the Sixth Circuit has said: "Enabling the casting of one vote does little good if another voter fraudulently cancels it out." *Ohio Republican Party v. Brunner*, 544 F.3d 711, 713 (6th Cir. 2008) (en banc). And Congress was concerned about election integrity when it passed the NVRA, explaining that accurate voter rolls are "the hallmark of a national system seeking to prevent voter fraud." S. Rep. No. 103-6, at 18 (1993).

---

[7] Nigel Jaquiss, *Oregon Election Officials to Begin Purging Rolls of Inactive Voters*, Wweek, https://www.wweek.com/news/state/2026/01/09/oregon-election-officials-to-begin-purging-rolls-of-inactive-voters/ (Jan. 9, 2026).

The threat of vote dilution underscores the urgency of this principle. Federal courts have long recognized that illegitimate or fraudulent votes dilute the effect of legitimate ballots. *See, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021) ("[F]raudulent votes dilute the right of citizens to cast ballots that carry appropriate weight."); *United States v. Saylor*, 322 U.S. 385, 389 (1944) (The right to vote encompasses "the personal right of the elector to cast his own vote and to have it honestly counted."). By requiring the maintenance and disclosure of voter registration records, the NVRA and CRA ensure that states' list-maintenance efforts are subject to meaningful scrutiny—transforming an abstract commitment to electoral integrity into an enforceable system of accountability that preserves the fundamental right to vote.

Congress understood that these goals cannot be achieved without transparency. Section 8(i) "evinces Congress's belief that public inspection . . . is necessary to accomplish the objectives behind the NVRA." *Bellows*, 92 F.4th at 54. The Fourth Circuit has likewise emphasized that "[p]ublic disclosure promotes transparency in the voting process," cautioning that courts "should be loath to reject a legislative effort so germane to the *integrity of federal elections*." *Project Vote*, 682 F.3d at 339–40 (emphasis added); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192 (2008) (opinion of Stevens, J.) ("In the [NVRA], Congress established procedures that would . . . protect the integrity of the electoral process.").

16

These transparency requirements directly protect eligible voters' ability to exercise their franchise—a right that cannot be left vulnerable to administrative error, manipulation, or neglect. Disclosure of voter registration rolls is not a peripheral feature of these statutes; it is indispensable to ensuring that elections are administered with integrity, accountability, and fidelity to the law. "It is self-evident that disclosure will assist the identification of both error and fraud" in maintaining voter rolls. *Project Vote*, 682 F.3d at 339. Public access enables verification that the State maintains accurate and current voter lists and provides a critical check on whether officials are fulfilling their "duty of accountability to the public" in including eligible voters and excluding ineligible ones. *Id*.

Indeed, Congress enacted Title III of the CRA for the express purpose of empowering the Department of Justice to protect the voting rights of American citizens and, by extension, the integrity of American elections. The CRA was passed to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against interference with the right to vote on racial grounds," but which had proven insufficient because the federal government lacked the means to investigate violations in the first instance. *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (discussing the CRA's "perfecting" amendments that "gave the Attorney General access to local voting records"). To deny the Attorney General access to election records is thus to limit the investigative

17

authority that Congress deemed indispensable to the enforcement of voting rights—an authority without which the DOJ's mandate to protect the right of every citizen to cast an effective ballot cannot be maintained.

In sum, permitting Michigan to withhold its voter registration rolls would jeopardize election integrity—and, consequently, the fundamental right to vote—by undermining the transparency and accountability essential to a functioning democratic process.

## III. Transparency Is Essential to Public Confidence in Elections.

The need for robust federal oversight of election records is underscored by the sustained erosion of voter confidence across the political spectrum. A September 2024 Gallup poll found that only 57% of Americans were confident that votes for president would be accurately cast and counted, with the share of adults reporting they were "not at all confident" having risen from 6% in 2004 to 19% in 2024.[8] Critically, the crisis of confidence cuts across partisan lines, as States United Democracy Center reports that, as of March 2025, only 52% of Republicans and

---

[8] *Partisan Split on Election Integrity Gets Even Wider*, Gallup, https://news.gallup.com/poll/651185/partisan-split-election-integrity-gets-even-wider.aspx (Sept. 25, 2024).

only 45% of Democrats were "very confident" in their 2024 general election vote counting as intended.[9]

These trends are unsurprising when states refuse to release election and voter registration records. It has long been recognized that transparency and election integrity are essential to the public's confidence in elections. *See, e.g.*, *Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."); 52 U.S.C. § 20501(a)(3), (b)(3). "[E]lections enable self-governance only when they include processes that giv[e] citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *See Republican Party v. Degraffenreid*, 141 S. Ct. 732, 734 (2021) (Thomas, J., dissenting from denial of certiorari) (citing *Democratic Nat'l Comm. v. Wisconsin State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay)). As part of that effort, voters must trust that their registrations are accurately recorded so they can cast their ballots without difficulty. Equally critical, they must trust that registration systems are properly maintained—that deceased and ineligible registrants are promptly removed to prevent misuse of their names, particularly as remote voting through mail and

---

[9] *Tracking Attitudes About Voters' Confidence in Elections*, States United Democracy Ctr., https://statesunited.org/resources/confidence-poll/ (May 22, 2025).

drop boxes has expanded. Without such assurances, honest citizens will be driven out of the democratic process and distrust will be bred. *Purcell*, 549 U.S. at 4.

Beyond actual fraud, "the perception of possible fraud contributes to low confidence in the system." *Id.*; *see also Brnovich*, 594 U.S. at 672 ("Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome."). Indeed, "[p]ublic confidence in the integrity of electoral system has independent significance, because it encourages citizen participation in a democratic process." *Crawford*, 553 U.S. at 197.

The transparency embedded in the text and history of the NVRA and the CRA reflects a foundational democratic principle: Without access to information about how elections are administered, "public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339. Transparency is not an abstract value—it is the mechanism that enables accountability. Without it, citizens have no meaningful way to evaluate whether states comply with federal law. It is imperative, then, that states provide election data and documents in response to proper public requests. Open government like this "should not be dismissed as a convenient formalism." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004). Instead, "it is a structural necessity" for any thriving republic. *Id.* at 172.  Public records, "by their very nature[,] are of interest to those concerned with

20

the administration of government," and providing the true contents of those records serves a public benefit. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975).

The inability to obtain such records has direct constitutional consequences. Without access to the records necessary to assess list maintenance practices, neither the DOJ nor citizens and organizations can effectively enforce the NVRA. This inevitably undermines confidence in the electoral process. To be sure, reported decisions confirm that organizations from across the political and ideological spectrum have relied on the NVRA's public-inspection mandate to obtain records for a wide range of purposes—all of which serve to reinforce public confidence in elections. These uses include supporting get-out-the-vote efforts, facilitating voter registration, confirming the accuracy of voter lists purchased from states, holding state officials accountable for list maintenance practices, and informing the public about how their elections are administered. *See, e.g.*, *Bellitto v. Snipes*, 302 F. Supp. 3d 1335 (S.D. Fla. 2017); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324 (11th Cir. 2024); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019); *Project Vote*, 682 F.3d 331; *Republican Nat'l Comm. v. Benson*, No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025); *Virginia Coal. for Immigrant Rts. v. Beals*, No. 1:24-cv-1778, 2025 WL 2345822 (E.D. Va. Aug. 12, 2025); *Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132 (D.N.M. 2022); *Campaign Legal Ctr. v. Scott*, 497 F.4th 931 (5th Cir. 2022).

21

In other words, transparency is the predicate for both legal enforcement and informed public discourse. Depriving the DOJ and public access to these records does not merely limit information; it disables the very tools by which citizens vindicate their rights and hold the government accountable—thereby eroding the public confidence that the NVRA and CRA were designed to protect.

## CONCLUSION

For the reasons discussed above, the Court should reverse the district court's judgment and permit the United States to compel Michigan to produce its unredacted voter registration file.

Respectfully submitted,

*/s/ Zachary C. Larsen*
Zachary C. Larsen (P72189)
Michael J. Pattwell (P72419)
CLARK HILL PLC
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
zlarsen@clarkhill.com
mpattwell@clarkhill.com

*Attorneys for Amici Curiae*

Dated: March 30, 2026

22

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,804 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Zachary C. Larsen*
Zachary C. Larsen
*Attorney for Amici Curiae*

Dated: March 30, 2026

23

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of March, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using its CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ _Zachary C. Larsen_
Zachary C. Larsen
_Attorney for Amici Curiae_

Dated: March 30, 2026