No. 26-1225

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

 *Plaintiff-Appellant,*

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

 *Defendants-Appellees*

and

MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQETTE; KEELY CRIMANDO,

 *Intervenors-Appellees*.

---

On Appeal from the United States District Court for the
Western District of Michigan, Southern Division
Hon. Hala Y. Jarbou

---

**PROPOSED BRIEF OF *AMICUS CURIAE* THE MICHIGAN HOUSE OF REPRESENTATIVES IN SUPPORT OF APPELLANT**

Charles R. Spies (P83260)
 *Counsel of Record*
DICKINSON WRIGHT PLLC
1825 Eye Street N.W., Suite 900
Washington, D.C. 20006
202-466-5964
cspies@dickinsonwright.com

Jonathan R. Koch (P80408)
Thomas J. Philbrick (P84932)
DICKINSON WRIGHT PLLC
200 Ottawa Ave., NW, Suite 900
Grand Rapids, MI 49503-2427
(616) 336-1076
jkoch@dickinsonwright.com
tphilbrick@dickinsonwright.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

RULE 26.1 DISCLOSURE ............................................................................... vi

INTEREST OF *AMICUS CURIAE*.................................................................. vii

SUMMARY OF ARGUMENT .........................................................................1

FACTUAL BACKGROUND.............................................................................2

ARGUMENT .....................................................................................................2

     A.    Legal Architecture.............................................................................2

     B.    The Attorney General stated a valid "basis and purpose" for its demand for Michigan's statewide voter registration list under 52 U.S.C. § 20703. ..............................................................5

     C.    The district court erred in finding voter registration lists are not "records" subject to disclosure under the CRA.................................11

     D.    Michigan's privacy statutes don't allow Secretary Benson to withhold the records requested by the Attorney General...................20

     E.    List maintenance matters.................................................................22

CONCLUSION.................................................................................................26

CERTIFICATE OF COMPLIANCE WITH WORD-COUNT REQUIREMENTS.............................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. North Carolina*, 560 U.S. 330 (2010) .............................................. 8, 17

*Amera-Seiki Corp. v. Cincinnati Ins. Co.*,721 F.3d 582 (8th Cir. 2013)................. 15

*Barseback Kraft AB v. United States*, 121 F.3d 1475 (Fed. Cir. 1997)................... 18

*Coal. for Open Democracy v. Scanlan*, No. 24-cv-312, 2025 WL 1503937
   (D.N.H. May 27, 2025) ...................................................................... 4

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)................................................. 4, 7

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) .............................. 26

*Davis v. Benson*, Nos. 20-000207-MZ; 20-000208-MM; 2020 WL 9049367
   (Mich. Ct. Claims, Oct. 27, 2020) .....................................................10

*Genetski v. Benson*, No. 20-000216-MM; 2021 WL 1624452 (Mich. Ct.
   Claims, Mar. 9, 2021) ......................................................................11

*Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320
   (N.D. Ga. 2012) ................................................................................ 19

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1
   (2000) ............................................................................................. 18

*Honeycutt v. United States*, 581 U.S. 443 (2017) .................................................... 15

*Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019).......................... 20

*Kennedy v. Benson*, 119 F.4th 464 (6th Cir. 2024)........................................... vii, 11

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ..................................................Passim

*Linden v. Commissioner of Social Security*, 131 F.4th 531 (6th Cir. 2025).............. 8

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ......................................... 3

*Nixon v. City of Detroit*, No. 2:23-cv-11547, 2024 WL 4363117 (E.D. Mich., September 30, 2024) ................................................................................ 18

*O'Halloran v. Benson*, No. 22-000162; 2022 WL 22823114 (Mich. Ct. Claims, Oct. 20, 2022) ....................................................................... 10

*Republican Nat. Committee v. Benson*, No. 24-000041-MZ; 2024 WL 4009745 (Mich. Ct. Claims, July 30, 2024)................................................ 9

*State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960)............. 2

*Towers Watson & Co. v. Nat'l. Union Fire Ins. Co. of Pittsburgh, PA*, 67 F.4th 648 (4th Cir. 2023)................................................................................ 14

*United States v. Ezeta*, 752 F.3d 1182 (9th Cir. 2014) ............................................. 16

*United States v. Laisure*, 460 F.2d 709 (5th Cir. 1972)............................................ 14

*United States v. Lucas*, 68 F.3d 475, 1995 WL 598403 (6th Cir. Oct. 10, 1995) ... 16

*United States v Markwood*, 48 F.3d 969 (6th Cir. 1995) ......................................... 6

**Statutes**

18 U.S.C. § 611 ......................................................................................................... 25

18 U.S.C. § 911 ......................................................................................................... 25

18 U.S.C. § 1015(f)................................................................................................... 25

52 U.S.C. § 20511(a)(2)............................................................................................ 25

52 U.S.C. § 20701 .............................................................................................. Passim

52 U.S.C. § 20703 .............................................................................................. Passim

52 U.S.C. § 20705 ....................................................................................................... 3

52 U.S.C. § 21083(a)(1)-(2)....................................................................................... 5

iv

52 U.S.C. §§ 20507(a), (i)(1) ................................................................... 4

M.C.L. 168.492 ....................................................................................... 26

M.C.L. 168.509gg .................................................................................... 24

M.C.L. 168.509gg(1) ............................................................................... 25

M.C.L. 257.208c(2) .................................................................................. 24

**Constitutional Provisions**

Fed. R. App. P. 29(a)(4)(E) ................................................................... vii

Mich. Const. of 1963, Art. II, §1 ............................................................ 22

## RULE 26.1 DISCLOSURE

*Amicus curiae* the Michigan House of Representatives states that it is a government body and, thus, not a "nongovernmental corporation" subject to Rule 26.1's Corporate Disclosure Statement requirement.

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Michigan House of Representatives (the "Michigan House" or "Amicus") is one half of Michigan's bicameral legislature. It consists of 110 members who are elected by the qualified electors of Michigan's electoral districts. The Michigan House works alongside the Michigan Senate to pass laws, establish a budget, and carry out the legislative powers and duties outlined in the Michigan Constitution. As part of the legislature, the Michigan House is constitutionally responsible for overseeing and implementing key aspects of both state and federal elections. Recently, a senior judge on this Court concluded that "in defiance of the U.S. Constitution and state election law, Michigan Secretary of State Jocelyn Benson manipulated the presidential ballot in Michigan" in a way that "will mislead Michigan Voters." *Kennedy v. Benson*, 119 F.4th 464, 486-488 (6th Cir. 2024) (Statement of McKeague, J.). The Michigan House is the bulwark against such abuse of process.

To that end, the Michigan House has proposed and passed laws relating to election administration, including laws regarding the maintenance of voter registration lists and laws that limit voting rights to eligible citizens. The Michigan

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

House therefore has a strong interest in ensuring that Michigan election officials—including the State's chief election official, Secretary of State Jocelyn Benson—adhere to all applicable state and federal election laws.

*Amicus curiae* Michigan House submits this *amicus* brief to highlight not only the district court's legal errors, but also the problematic consequences of the district court's finding that Michigan's voter registration list is not an election "record" subject to retention, preservation, and disclosure under Title III of the Civil Rights Act. This brief argues that the district court (1) contradicted the plain text of the Civil Rights Act and (2) relied on an incorrect linguistic distinction to reach a conclusion that drastically reduced the scope of records subject to Title III's preservation and retention requirements and, by doing so, made it easier for election officials like Secretary Benson to skirt the clear requirements of the Civil Rights Act. *Amicus curiae* Michigan House seeks to bring to this Court's attention considerations that will contribute meaningfully to this Court's adjudication of the issues.

## SUMMARY OF ARGUMENT

Just before the November 2024 election, it became headline news that a non-citizen had illegally cast a ballot in Michigan. Following investigations revealed additional noncitizens that were illegally registered to vote in Michigan, which casts a dark shadow on the integrity of Michigan's elections (and the state's voter-list maintenance).

To ensure that Michigan is complying with federal election laws, the Attorney General asked Secretary of State Jocelyn Benson to produce an unredacted copy of Michigan's voter registration list pursuant to Title III of the Civil Rights Act (CRA). After Secretary Benson refused to do so, the DOJ filed this suit to compel production of Michigan's voter registration list.

Here, although it largely agreed with the DOJ on the issues raised by Secretary Benson and the intervening defendants, the district court dismissed the DOJ's suit, concluding that, because it is self-generated by her office rather than "acquire[d] . . . from an external source," Michigan's statewide voter list is not a "record" that "comes into" Secretary Benson's possession under 52 U.S.C. § 20701 ECF 67, PgID 909-10.

The district court got it wrong. Its ruling conflicts with the plain meaning of the phrase "comes into . . . possession," as well as with other language in 52 U.S.C.

1

§ 20701, the entire purpose of the CRA, and the factual reality of how Michigan's voter list is compiled.

The bottom line: Michigan's statewide voter registration list qualifies as one of the "records or papers" that Secretary Benson must "retain and preserve" under 52 U.S.C. § 20701 and that the Attorney General may demand under 52 U.S.C. § 20703. The district court was wrong to conclude otherwise. This Court should reverse that ruling and remand for further proceedings.

## FACTUAL BACKGROUND

The Michigan House agrees with and adopts the DOJ's statement of facts.

## ARGUMENT

### A. Legal Architecture

Title III of the CRA was "designed to secure a more effective production of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960). To that end, it requires "officer[s] of election" like Secretary Benson to "retain and preserve" election records for 22 months after any federal election. 52 U.S.C. § 20701. This obligation applies to "*all* records and papers which come into [a state officer of election's] possession relating to *any* application, registration, payment of poll tax, or other act requisite to voting in such election." *Id.* (emphasis added). And "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General . . . be

2

made available for inspection, reproduction, and copying." 52 U.S.C. § 20703. If necessary—i.e., if a state election officer refuses to give the Attorney General access to an election record required to be preserved under Title III—the Attorney General can move in federal court to "compel the production of such record or paper." 52 U.S.C. § 20705.

The CRA thus imposes a "sweeping" obligation for states to preserve and, at the request of the Attorney General, produce "all" election records related to, among other things, voter registration. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962); 52 U.S.C. § 20701. Numerous courts have recognized that an "officer of election['s]" duty to preserve election records relating to voter registration, includes, but is not limited to, voter registration lists. *See, e.g.*, *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (noting Title III has long been understood to "encompass[], among other things, voting registration records"); *Coal. for Open Democracy v. Scanlan*, No. 24-cv-312, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (requiring New Hampshire to produce voter database records and registration lists).

When making such a request, however, the Attorney General must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. This requirement ensures the Attorney General's demand is "made for the purpose of investigating possible violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d

3

867, 868 (5th Cir. 1963). Relevant here, the National Voter Registration Act (NVRA) imposes recordkeeping obligations related to voter registration records and requires states to undertake reasonable efforts to maintain voter lists that do not include ineligible voters. 52 U.S.C. §§ 20507(a), (i)(1). Meanwhile, the Help America Vote Act (HAVA) requires states to maintain a centralized electronic voter registration list and engage in reasonable efforts to maintain that list by, among other things, removing ineligible voters. 52 U.S.C. § 21083(a)(1)-(2).

As the lower court recognized, when a state election officer refuses a demand for "records and papers" under 52 U.S.C. § 20703, the filing of the resulting lawsuit by the DOJ "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Rather, "[i]t is a special statutory proceeding in which the courts play a *limited*, albeit vital, role." *Id.* (emphasis added). A proceeding to enforce 52 U.S.C. § 20703 is "comparable to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency" in which the court's role is "narrowly circumscribe[d]." *Id.*

As a result, the Attorney General is not required to file "pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-226. Rather, "[a]ll that is required is a simple statement by the Attorney General that after a [52 U.S.C. § 20703] written demand for inspection of records and papers covered in [52 U.S.C. § 20701], the person against whom an order for production is

4

sought . . . has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* (citations omitted).

Crucially, in a proceeding under 52 U.S.C. § 20703, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and purpose therefor' as set forth in the written demand." *Id.* at 226. Nor is there a place "either as a part of pleadings, discovery, or trial" to challenge "reasons why the Attorney General considers the records essential." *Id.* Thus, "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, [52 U.S.C. § 20703], *is not open to judicial review or ascertainment*." *Id.*

Consequently, rather than a conventional lawsuit in which the defendants are entitled to test and second-guess each aspect of the plaintiff's case, "the Court is required to treat" an action by DOJ to enforce the Attorney General's demand under 52 U.S.C. § 20703 "as a summary proceeding" akin to an administrative subpoena. *Id.*; *see United States v Markwood*, 48 F.3d 969, 975-976 (6th Cir. 1995).

**B. The Attorney General stated a valid "basis and purpose" for its demand for Michigan's statewide voter registration list under 52 U.S.C. § 20703.**

Here, the district court correctly found the DOJ sufficiently stated the "basis and purpose" for its demand for an unredacted copy of Michigan's statewide voter registration list. ECF 67, PgID 907-908. As the lower court recognized, the DOJ's

5

letters to Secretary Benson "collectively put Michigan on notice of the basis and purpose of its request" by: (1) "cit[ing] the State's obligations under the NVRA and HAVA"; (2) "point[ing] to several purported anomalies within Michigan's voter registration data," including "a high percentage of registered voters, a low confirmation notice rate, a low voter removal rate, and a high duplicate registration rate"; (3) "indicat[ing] that the DOJ had received a complaint regarding Michigan's compliance with HAVA[]"; and (4) "cit[ing] its authority under the CRA." *Id.* And, because a demand under 52 U.S.C. § 20703 may be "made for the purpose of investigating possible violations of a Federal statute," *see Coleman*, 313 F.2d at 868, the district court was right that "the DOJ may use the CRA to investigate possible violations of the NVRA." ECF 67, PgID 909.

On appeal, Secretary Benson, the intervening defendants, and their associated *amici* will likely argue that the DOJ failed to state a valid purpose or basis for demanding an unredacted copy of Michigan's statewide voter registration list. They did so at the trial court level, and their trial-court arguments fell into two buckets, both of which are wrong.

First, they argued that determining Michigan's compliance with NVRA and HAVA cannot be a valid purpose because "[t]he CRA preexisted NVRA and HAVA" and because, in their view, the CRA can only be used to remedy "racially discriminatory voting practices." *See* ECF 39, PgID 466-467. Not so. As the trial

6

court found—and as the DOJ ably argues on appeal—nothing in the text of the CRA supports limiting its application in either of those ways. *See* ECF 67, PgID 908. There is nothing in the text of Title III prohibiting the Attorney General from investigating potential violations of Federal election laws enacted after the CRA or that go beyond racial discrimination. It's axiomatic that courts "can't add words to a statute" and "have to interpret the text as written." *Linden v. Commissioner of Social Security*, 131 F.4th 531, 535 (6th Cir. 2025); *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) (Courts "do not—[and] cannot—add provisions to a federal statute."). Secretary Benson's arguments that Title III only allows the Attorney General to investigate violations of statutes enacted before the CRA that relate to racial discrimination necessarily depends on adding words to the text of 52 U.S.C. § 20703. So, these arguments are invalid.

Second, they asserted that the DOJ cannot be trusted and that its stated purpose for requesting Michigan's statewide voting registration list—ensuring compliance with NVRA and HAVA—is a sham. For example, citing nothing but partisan biased news articles, Secretary Benson has argued that the DOJ's true purpose for demanding the statewide voter registration list was "to conduct DOJ's own list maintenance program and create a national voter file." ECF 60, PgID 740. Similarly, again citing partisan news articles, *amicus curiae* DNC has asserted that, although the DOJ "suggests it is engaged in routine enforcement of federal civil rights laws,"

7

this is a "deception" that "invalidates the Title III demand" because, they imagine, the DOJ's real reason for requesting Michigan's voter registration list is to "compil[e] a national voter file for its own use." ECF 42-1, PgID 527-529, 531-532. Along the same lines, *amicus curiae* League of Women Voters of Michigan claimed that the DOJ's "plans for this data, reflected nowhere in the Complaint, apparently have nothing to do with the statutes relied upon in the Complaint." ECF 48-1, PgID 628-629.

While Secretary Benson asserted the Attorney General and DOJ cannot be trusted, she simultaneously asked the district court to take her at her word that her office complies with Michigan law. ECF 39, PgID 455, 481. The irony of this is that numerous judges have found that Secretary Benson has repeatedly violated laws related to elections. See, e.g., *Republican Nat. Committee v. Benson*, No. 24-000041-MZ; 2024 WL 4009745, *1 (Mich. Ct. Claims, July 30, 2024) (declaring Secretary Benson's election instructions were "incompatible with the Constitution and laws of the State of the Michigan"); *O'Halloran v. Benson*, No. 22-000162; 2022 WL 22823114, *1, *14 (Mich. Ct. Claims, Oct. 20, 2022), aff'd in part, rev'd in part, vac'd in part *sub nom O'Halloran v. Secretary of State*, 29 NW3d 429 (Mich. 2024) (declaring that Secretary Benson "violated the Michigan Election Law and the APA" by issuing guidance materials); *O'Halloran*, 29 NW3d at 470 (Zahra, J., dissenting) ("[E]very lower-court judge has held that these revisions conflict with the Michigan

8

Election Law. I agree."); *Davis v. Benson*, Nos. 20-000207-MZ; 20-000208-MM; 2020 WL 9049367, \*3-\*4 (Mich. Ct. Claims, Oct. 27, 2020) (stating that a "directive" issued by Secretary Benson "does not merely provide guidance to local election officials on existing state law, as it appears to be partially inconsistent with state law."); *Genetski v. Benson*, No. 20-000216-MM; 2021 WL 1624452, \*6 (Mich. Ct. Claims, Mar. 9, 2021) ("[T]he standards issued by defendant Benson on October 6, 2020, with respect to signature-matching requirements amounted to a 'rule' that should have been promulgated in accordance with the APA. And absent compliance with the APA, the 'rule' is invalid.").

Further, in a case involving Secretary Benson's decision to add Robert F. Kennedy Jr.'s name to the 2024 general election ballot in Michigan after previously removing it, several judges on this Court have recognized that Secretary Benson is willing to bend (or break) the rules—and even to "mislead voters"—if it suits her. *Kennedy*, 119 F.4th at 488 (Statement of McKeague, J.); *Kennedy v. Benson*, No. 24-1799; 2024 WL 4327046, \*5, \*10-\*11 (6th Cir. Sept. 27, 2024) (McKeague, J., dissenting) (stating: "Secretary Benson used her office to intentionally alter the ballot of a presidential election" in an "attempt . . . to influence the upcoming presidential election by manipulating state election procedures" and that her decision to re-add Kennedy's name to the ballot "was unilateral, unauthorized, and likely illegal."); *Kennedy*, 119 F.4th at 471-473 (Thapar, J., dissenting) (Secretary Benson's

9

"reinstatement of Kennedy didn't advance the state's interest in honoring its own laws. In fact, by violating Michigan's statutory deadlines, the reinstatement flouted those laws."); *id.* at 476 (Readler, J., dissenting) ("Without explanation, and in violation of state law, the Michigan Secretary of State belatedly added Robert F. Kennedy Jr.'s name to the 2024 general election ballot for the office of president after previously granting Kennedy's lawful request not to be included on the ballot.").

In any event, *amici*'s arguments about what they perceive to be the motives for the DOJ's request for access to Michigan's statewide voter registration list fail because, as the trial court recognized, the "narrowly circumscribe[d]" role for judges in a proceeding to enforce 52 U.S.C. § 20703, *see Lynd*, 306 F.2d at 225, means that "the CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose." ECF 67, PgID 907-908. Rather, "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand, [52 U.S.C. § 20703], ***is not open to judicial review or ascertainment***." *Lynd*, 306 F.2d at 226. So, Secretary Benson and the intervening defendants are not entitled to second-guess the sufficiency of the DOJ's proffered basis and purpose at the district court level, especially at the pleadings stage.

10

For multiple reasons, therefore, the DOJ complied with the requirement that a "demand" for election records under 52 U.S.C. § 20703 shall contain a statement of the "basis and purpose" for the request.

## C. The district court erred in finding voter registration lists are not "records" subject to disclosure under the CRA.

After finding the DOJ provided a sufficient basis and purpose for its demand, the district court nevertheless held that Secretary Benson was not required to produce Michigan's statewide voter registration list to the DOJ because the list is self-generated by Secretary Benson's staff and thus (in the district court's view) not "records" that "come into" Secretary Benson's possession and defined by 52 U.S.C. § 20701.  ECF 67, PgID 909-11 (quoting § 20701). According to the district court, "the phrase 'come into [the state's] possession' naturally refers to a process by which someone acquires an item from an external source." *Id.* at 910.

The district court was wrong for several reasons.

First, the district court's conclusion that records created, generated, or compiled by Secretary Benson's office do not "come into" her possession lacks merit for all the reasons stated by the DOJ. *See* DOJ Br., Doc. 24, pgs. 25-33. It is also inconsistent with the plain meaning of the phrase "come[] into . . . possession" in 52 U.S.C. § 20701. Citing definitions of "obtain," "receive," and "acquire," the district court concluded that "[t]he phrase 'come into [their possession]' naturally refers to

11

a process by which someone acquires an item *from an external source*." ECF 67, PgID 910 (emphasis added). No so.

The primary flaw in the district court's conclusion is that it reads meaning into § 20701—the notion that "comes into possession" means gaining possession "from an external source"—that is not implicit in the text. The word "possession" means "the act of having or taking into control." *Merriam-Webster's Collegiate Dictionary* (14th ed. 2020). The phrase "come into" means "to acquire as a possession or achievement." *Merriam-Webster's Collegiate Dictionary* (14th ed. 2020). In turn, the word "acquire"—which, to be clear, is not part of the statute—means "to come into possession or control of *often by unspecified means*." *Merriam-Webster's Collegiate Dictionary* (14th ed. 2020); *Towers Watson & Co. v. Nat'l. Union Fire Ins. Co. of Pittsburgh, PA*, 67 F.4th 648 (4th Cir. 2023) (citations omitted) ("The word 'acquire,' in turn, means 'to come into possession [or] control . . . of often by some uncertain or unspecified means.'"); *United States v. Laisure*, 460 F.2d 709, 712 (5th Cir. 1972) (citations omitted) (defining "acquire" as "to come into possession, control, or power of disposal of, often by some uncertain or unspecified means"); *Amera-Seiki Corp. v. Cincinnati Ins. Co.*, 721 F.3d 582, 586 (8th Cir. 2013) (defining "acquire" as "'to come into possession, control, or power of disposal of often by some uncertain or unspecified means'"). Thus, the plain meaning of phrase "come

12

into possession" is to acquire the state of having or taking control *by unspecified means*.

The "by unspecified means" language is key because it directly contradicts the district court's conclusion that "coming into possession" of an item means acquiring it "from an external source." ECF 67, PgID 910. The district court overlooks that the "unspecified means" by which an officer of elections can "come into possession" of an election record includes creation, compilation, or generation of the record. In other words, while Secretary Benson can "come into possession" of an election record from an external source, it's equally true—and fatal to the district court's conclusion—that Secretary Benson can "come into possession" of an election record by generating, creating, or compiling it.

By the same token, the word "obtain" is defined as "to come into possession." *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (citation omitted) (defining "obtain" as "to come into possession of" or to "get or acquire."). Thus, contrary to the district court's conclusion, the definition of "obtain" does not require an *external source*. For example, the Ninth Circuit defined "obtain" as "'[t]o come into the possession or enjoyment of (something) *by one's own effort*, or by request.'" *United States v. Ezeta*, 752 F.3d 1182, 1185 (9th Cir. 2014) (citations omitted, emphasis added). Similarly, this Court defined "obtain" as "to get hold of by effort; to get possession of; to procure; to acquire, *in any way*." *United States v. Lucas,* 68 F.3d

13

475, 1995 WL 598403 at *8 (6th Cir. Oct. 10, 1995) (unpublished table opinion) (per curiam) (citations omitted, emphasis added). Thus, to the extent that "come into possession" and "obtain" are synonymous, a person can come into possession of an election record "in any way," including "by one's own efforts"—a meaning that includes self-generation, compilation, or creation. *See Ezeta*, 752 F.3d at 1185.

All of this goes to say that because the text of 52 U.S.C. § 20701 does not limit the means by which an officer of election may "come[] into . . . possession" of an election record, the preservation and retention obligations imposed by that statute are not limited to election records that "come[] into [an election officer's] possession" by a select universe of means (i.e., from external sources only). As a result, the district court's conclusion that 52 U.S.C. § 20701's retention and preservation requirements only extend to records acquired or obtained by specific means—"from an external source"—and, thus, does not extend to self-generated or compiled records like Michigan's statewide voter registration list, is inconsistent with the plain language of the statute. ECF 67, PgID 910. Accordingly, the extra-textual restrictions the district court added to 52 U.S.C. § 20701 are invalid under the well-established principle that courts "do not—[and] cannot—add provisions to a federal statute." *Alabama*, 560 U.S. at 352.

Second, the district court's ruling is also inconsistent with the remaining language of 52 U.S.C. § 20701, which broadly imposes record preservation and

14

retention requires on "*all* records and papers which come into an [officer of election's] possession relating to *any* application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. § 20701 (emphasis added).

The statute's use of the words "all" and "any" to refer to the range of election records that fall under its retention, preservation, and disclosure requirement demonstrates Congress's intent that the requirements were intended to be maximally broad. *See Lynd*, 306 F.2d at 226 (referring to the CRA's disclosure requirement as "sweeping"); *Nixon v. City of Detroit*, No. 2:23-cv-11547, 2024 WL 4363117, at *12 (E.D. Mich., September 30, 2024) (noting that "all" refers to every one of a referenced item); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive.") (quotations omitted). Given that language, nothing in the text of 52 U.S.C. § 20701 indicates Congress intended to limit the range or type of election records subject to preservation, retention, and disclosure. When interpreting a statute, a court's only function is "to enforce [statutory language] according to its terms, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quotation marks and quotations omitted). Yet, by manufacturing a self-admittedly "pedantic" distinction between records "in" Secretary Benson's possession and records that "come into" her possession from an

15

external source, the district court interpreted 52 U.S.C. § 20701 contrary to the statutory text. ECF 67, PgID 911-12.

Even Secretary Benson appears to recognize this reality. Below, she did not dispute that Michigan's voter registration list is an election "record" that comes into the possession of the election officers. *See* ECF 39; *see also* ECF 53, PgID 675. And she previously provided a (redacted) copy to the DOJ. *See id*.

Third, the district court's distinction between records created internally and those received from external sources is inconsistent with the factual realities of Michigan's statewide voter registration list. The district court reasoned that Michigan's voter registration list is not an election "record" subject to the CRA's disclosure requirement because it did not "come into [the state's] possession." ECF 67, PgID 910. But the CRA is not concerned with *how* the State obtains a particular election record or whether the party who provides that record to the State is a voter. This is because the CRA is concerned with *information*, not the form in which that information is stored or aggregated. *See, e.g., Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012). Here, the information sought by the Attorney General is in the list of voter registrations submitted to the State in advance of a federal election. That list is nothing more than a compilation of information pulled (ostensibly by state employees) from the voter registrations that are submitted to the State by voters. *See, e.g., Jud. Watch, Inc. v.*

16

*Lamone*, 399 F. Supp. 3d 425, 440–42 (D. Md. 2019) ("[A] voter list is simply a partial compilation of voter registrations."). Indeed, every bit of information that makes up the voter registration list comes, at one point or another, into Secretary Benson's possession from an external source—either from a voter or a local election officials.[2] Indeed, the district court noted that Michigan's voter registration list is not simply a compilation of voter registrations received by the State but also a synthesis of information from the United States Social Security Administration and other state government agencies. ECF 67, PgID 912.

As a result, Michigan's statewide voter registration is simply a compilation of information from documents that were not created by Secretary Benson but, rather, were "acquire[d]…from an external source." *See* ECF 67, PgID 909-10. So, even if the district court's distinction between created records and records from an external source was legally correct (it's not), the distinction should not preclude disclosure of Michigan's statewide voter registration list.

Finally, the district court's conclusion is inconsistent with the purposes of the CRA. As noted above, Title III of the CRA was "designed to secure a more effective production of the right to vote." *Rogers*, 187 F. Supp. at 853. To that end, it imposes a "sweeping" obligation on officials like Secretary Benson to "retain and preserve"

---

[2] Whether the information contained within those voter registrations are kept as separate documents in a single database or saved as a single aggregate document is immaterial.

17

election records for 22 months after any federal election and to produce those records to the Attorney General upon demand. *Lynd*, 306 F.2d at 226; 52 U.S.C. § 20701. The records subject to this requirement include "*all* records and papers which come into [a state officer of election's] possession relating to *any* application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. (emphasis added).

In the trial court, Secretary Benson focused on arguing that the DOJ failed to trigger the disclosure requirement embodied in 52 U.S.C § 20703. To be sure, she also argued 52 U.S.C. § 20703 did not require unredacted copies of certain records. But none of Secretary Benson's arguments asked the district court to drastically restrict the scope of records subject to the preservation and retention obligations of 52 U.S.C. § 20701.

By finding records that are created, compiled, or generated by a state officer of elections are not "records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," the district court effectively—and *drastically*—reduced the universe of records that a state officer of elections is required to "retain and preserve for a period of twenty-two months from the date of any general, special, or primary election" at which federal candidates are elected. 52 U.S.C. § 20701.

18

It's bad enough that under the district court's ruling state election officials will be able to withhold election records from the Attorney General under the justification that those records were produced or generated—even in part—by the State. But, beyond that, under the district court's ruling, state election officials like Secretary Benson won't be required to retain or preserve election records that were created, generated, or compiled by their own offices.

That result—a drastic reduction in the election records that must be retained and preserved—cuts directly against the plain language of 52 U.S.C. § 20701 and against the entire purpose of Title III because it makes it easier for bad actors to avoid oversight and disguise violations of Federal election law. Further, the district court's ruling will result in a patchwork system in which some states adhere to broader record-retention practices and increase transparency of their electoral processes while other states hide their electoral processes behind a shroud of self-generated, judicially-sanctioned secrecy—precisely what the NVRA and CRA are designed to avoid. Moreover, the CRA's requirement that States retain election records—which goes hand-in-hand with the production requirement—would be rendered meaningless if state election officials could sidestep the retention requirement by compiling information received from external sources into self-generated records.

19

In sum, the district court erred in finding that voter registration lists are not "records" subject to retention, preservation, and disclosure under the 52 U.S.C. § 20701. That conclusion contradicts the plain text of the CRA, and it relies on a meaningless factual distinction that has real-world consequences for the integrity of America's elections. This Court should therefore reverse the district court's findings and remand for further proceedings.

**D. Michigan's privacy statutes don't allow Secretary Benson to withhold the records requested by the Attorney General.**

In the trial court, Secretary Benson and the intervening defendants argued that the DOJ's request for an unredacted copy of Michigan's statewide voter registration list violated federal and state privacy law. *See, e.g.*, ECF 39, PgID 468-470, 485-489. In its Brief on Appeal, the DOJ ably explains why its demand complied with the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. DOJ Br., Doc. 24, pgs. 49-56. The Michigan House agrees with the DOJ's arguments on these points.

The Michigan House also agrees that Michigan statutes do not prohibit disclosure of the records sought by the DOJ. Aside from being preempted by federal law, the Michigan Motor Vehicle Code expressly provides that "personal information in a record maintained under" the Motor Vehicle Code "shall be disclosed if required to carry out the purposes of federal law or federal regulations." M.C.L. 257.208c(2). Further, personal information in records maintained under the Motor Vehicle Code

20

"may be disclosed by the Secretary of State . . . [f]or use by a federal . . . government agency . . . in carrying out the agency's functions." M.C.L. 257.208c(2).

M.C.L. 168.509gg is likewise not an obstacle to disclosure of Michigan's statewide voter registration list to the DOJ. On the one hand, M.C.L. 168.509gg is preempted by federal law to the extent it would restrict the disclosure of records that the Attorney General is otherwise entitled to demand under 52 U.S.C. § 20703. *See Lamone*, 399 F. Supp.3d at 443-445. On the other hand, M.C.L. 168.509gg is, by its plain terms, irrelevant to these proceedings. It provides that, among other things, information related to a voter's driver license number, social security number, and birth date "contained in a [voter] registration record" is "exempt from disclosure under [Michigan's] freedom of information act." M.C.L. 168.509gg(1). But, significantly, the DOJ did not request public disclosure of Michigan's statewide voter registration list under *either* the Michigan *or* Federal Freedom of Information Acts. Rather, as part of its investigative authority, the DOJ requested private disclosure—subject to privacy and disclosure restrictions—of an unredacted copy of Michigan's statewide voter registration list *under 52 U.S.C. § 20703*. So, put simply, M.C.L. 168.509gg is irrelevant to this case and does not provide a basis for Secretary Benson to withhold the records demanded by the DOJ.

21

### E. List maintenance matters.

The Constitution and laws of the United States limit the right to vote to citizens of the United States. *See* 18 U.S.C. § 611 (prohibiting non-citizens from voting); 18 U.S.C. § 1015(f) (prohibiting non-citizens from making false statements about their citizenship in order to register to vote); 52 U.S.C. § 20511(a)(2) (making it a crime to knowingly and willfully procure a materially false or fraudulent voter registration application); and 18 U.S.C. § 911 (making it illegal to knowingly and willfully make a false assertion of U.S. citizenship). So do the laws of most, if not all states, including Michigan. *See* Mich. Const. of 1963, Art. II, §1 (a person must be a "citizen of the United States" to "be an elector and qualified to vote in any election" in Michigan); M.C.L. 168.492. That shouldn't be controversial. After all, as the Carter/Baker Commission on Federal Election Reform recognized, "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or confirm the identify of voters." *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (opinion of STEVENS, J.) (citation omitted).

Ongoing voter registration list maintenance is a key tool in preventing non-citizen voting. In the trial court, Secretary Benson claimed that "Michigan's list-maintenance program makes more than a reasonable effort to remove ineligible voters" and there is no evidence to "suggest any deficiency in [Michigan's]

22

maintenance activities." ECF 39, PgID 455, 481. But recent events in Michigan call her statement into question.

In October 2024, just days before the November 2024 general election, news broke that "[a] University of Michigan student who is from China and not a U.S. Citizen" voted in Ann Arbor, Michigan, even though "he couldn't legally cast a ballot."[3] The individual registered to vote using a student identification card.[4] And, although he made "false statements regarding his citizenship on his voter registration application and his early voting application" in order to vote, the individual's ballot was still counted as part of the November 2024 election.[5] In fact, he was only caught because *he* contacted the local elections clerk and asked for his ballot back—i.e., *because he turned himself in*.[6]

---

[3] *See* Craig Mauger and Kim Kozlowski, *Chinese student to face criminal charges for voting in Michigan. Ballot will apparently count*, THE DETROIT NEWS (October 30, 2024), https://www.detroitnews.com/story/news/politics/elections/2024/10/30/chinese-university-of-michigan-college-student-voted-presidential-election-michigan-china-benson/75936701007/.

[4] *See US says student fled to China after being charged with voting illegally in Michigan*, AP NEWS (May 30, 2025), https://apnews.com/article/chinese-student-illegal-voting-michigan-674cff347c275fd2f1ca6cc5645e195b.

[5] *See Chinese National at the University of Michigan Charged with Illegally Voting in the 2024 Election*, UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF MICHIGAN (June 3, 2025), https://www.justice.gov/usao-edmi/pr/chinese-national-university-michigan-charged-illegally-voting-2024-election.

[6] *See supra*, n. 4.

23

Although the number of other non-citizens that voted without subsequently confessing their misrepresentations to the authorities remains an open question, it's undisputed that the Chinese national wasn't the only non-citizen who voted in Michigan. A subsequent investigation by Secretary Benson revealed that at least sixteen non-citizens voted in Michigan during the November 2024 presidential election.[7] However, the investigation was limited to comparing Michigan motor vehicle records to voting records in the state's Qualified Voter File (QVF).[8] There is no indication that Secretary Benson did anything to identify any other voting non-citizens by, for example, comparing the QVF with any federal databases like USCIS' Systematic Alien Verification for Entitlements (SAVE) database.[9] Thus, Secretary Benson's limited "investigation" could identify only those individuals who fraudulently self-identified themselves as citizens on their voter registration application and illegally cast a ballot *after* having self-identified themselves as noncitizens on their motor vehicle records.[10] Given the cursory nature of Secretary Benson's investigation, it's extremely likely that list of sixteen noncitizen voters is

---

[7] *See Michigan Department of State review confirms instances of noncitizen voting are extremely rare*, MICHIGAN DEPARTMENT OF STATE (April 3, 2025), https://www.michigan.gov/sos/resources/news/2025/04/03/michigan-department-of-state-review-confirms-instances-of-noncitizen-voting-are-extremely-rare.
[8] *Id.*
[9] *See SAVE*, U.S. CITIZENSHIP AND IMMIGRATION SERVICE, https://www.uscis.gov/save.
[10] *See supra*, n.11.

incomplete—of course, the cursory investigation and the relatively low number of non-citizen voters found benefits Secretary Benson who has a vested interest in not conducting a full investigation and in not revealing a larger number of noncitizen voters. Indeed, after a county clerk claimed that he "found more than a dozen [additional] noncitizens on his count's voter rolls,"[11] even though she maintained that at least three of the individuals are in fact citizens, Secretary Benson admitted that at least one was a noncitizen with a voting history,[12] while at least four were "apparent noncitizens" who are nonetheless registered to vote.[13]

There may be many more individuals who voted in the 2024 election but who never self-identified as a non-citizen voter. Regardless, the presence of multiple noncitizens on Michigan's voter rolls is proof positive that Secretary Benson's list maintenance is less robust than she claims. It also confirms the importance of the

---

[11] *See Michigan clerk claims he found 15 noncitizens registered to vote. Some are dubious*, Bridge Michigan (January 19, 2026), https://bridgemi.com/michigan-government/michigan-clerk-claims-he-found-15-noncitizens-registered-to-vote-some-are-dubious/.

[12] Michigan Secretary of State gives update on review after Macomb County voter concerns, UpNorthLive (January 29, 2026), https://upnorthlive.com/news/local/macomb-county-voting-concerns-michigan-secretary-state-jocelyn-benson-anthony-forlini-noncitizens-voting-politics-government-election.

[13] Secretary Benson: Macomb County clerk's reckless accusations put eligible Michigan voters at risk, Michigan Department of State (January 29, 2026), https://www.michigan.gov/sos/resources/news/2026/01/29/secretary-benson-macomb-county-clerks-reckless-accusations-put-eligible-michigan-voters-at-risk.

25

Attorney General's efforts to investigate Secretary Benson's compliance with federal election and voting laws.

## CONCLUSION

The district court erred in concluding that Michigan's voter registration list was not a "record" subject to retention, preservation, and disclosure to the Attorney General under the CRA. This Court should reverse the district court's findings and remand for further proceedings.

Respectfully submitted,

*/s/ Charles R. Spies*
Charles R. Spies (P83260)
*Counsel of Record*
DICKINSON WRIGHT PLLC
1825 Eye Street N.W., Suite 900
Washington, D.C. 20006
202-466-5964
cspies@dickinsonwright.com

*Counsel for Amicus Curiae*

*/s/ Jonathan R. Koch*
Jonathan R. Koch (P80408)
Thomas J. Philbrick (P84932)
DICKINSON WRIGHT PLLC
200 Ottawa Ave., NW, Suite 900
Grand Rapids, MI 49503-2427
(616) 336-1076
jkoch@dickinsonwright.com
tphilbrick@dickinsonwright.com

## CERTIFICATE OF COMPLIANCE WITH WORD-COUNT REQUIREMENTS

As required by Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g)(1), I hereby certify that the following *amicus curiae* brief contains 6,389 words, including footnotes, and thus complies with the applicable word limit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 30, 2026.

*/s/ Charles R. Spies*
CHARLES R. SPIES
*Counsel of Record for Amici Curiae*

27