No. 26-1225

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; and STATE OF MICHIGAN,

*Defendants-Appellees*

MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; and KEELY CRIMANDO,

*Intervenors-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

---

**BRIEF OF INTERVENORS-APPELLEES**

Aria C. Branch
Joshua C. Abbuhl
Branden D. Lewiston
Derek A. Zeigler
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Tel.: (202) 968-4490

Sarah Prescott
**SALVATORE PRESCOTT
PORTER & PORTER**
105 E. Main St
Northville, MI 48167
Tel.: (248) 679-8711

# CORPORATE DISCLOSURE STATEMENT

Pursuant to the Federal Rules of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Intervenors-Appellees certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in its outcome.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT.............................................x

STATEMENT OF ISSUES ...................................................................... xi

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE....................................................................3

    I.   Federal law has long made voter-list maintenance a state responsibility........3

       A. The Civil Rights Act of 1960 ("CRA") ........................................3

       B. The National Voter Registration Act ("NVRA") ............................7

       C. The Help America Vote Act ("HAVA") ......................................9

    II.   DOJ embarks on a campaign to collect voter data held by States. ............11

       A. DOJ sues 30 States and Washington D.C. for private voter data. ...............11

       B. DOJ sues Michigan to demand production of the unredacted Qualified Voter File.................................................................................13

       C. The district court finds DOJ's claims meritless..........................14

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT ........................................................................................17

    I.   The district court correctly held that Michigan's voter list is outside the scope of Title III. ....................................................................17

       A. The QVF is not subject to the CRA, which applies only to records that must be "retained and preserved" and not "altered." ........................18

       B. The QVF is not subject to the CRA because it was *created* by Michigan election officials and thus did not "come[] into [their] possession.".........21

       C. DOJ's contrary interpretation should be rejected. .....................28

    II.   The Court can also affirm the dismissal on other grounds. ......................33

       A. DOJ's purported purpose of investigating Michigan's list-maintenance obligations is outside the scope of Title III..............................33

B. The CRA demand is invalid because DOJ's purported "basis" did not appear in its demand letter and is otherwise insufficient...............................38

C. Title III does not preempt Michigan's voter privacy laws...........................41

D. The Privacy Act prohibits DOJ from collecting Michigan's voter list........43

III. DOJ's arguments regarding the scope of a court's review of a CRA demand are wrong and irrelevant to most issues before this Court...........47

IV. If the Court vacates the dismissal, the proper way forward is to remand for additional proceedings. ..............................................................................51

CONCLUSION .................................................................................................53

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ala. ex rel. Gallion v. Rogers*,
187 F.Supp. 848 (M.D. Ala. 1960).................................................................4, 35

*Alexander v., Sandoval*,
532 U.S. 275 (2001)....................................................................................36

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)................................................................... 3, 4, 43

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) .................................................................34

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024).....................................................................................20

*Donaldson v. United States*,
400 U.S. 517 (1971)...................................................................................50

*Donovan v. FirstCredit, Inc.*,
983 F.3d 246 (6th Cir. 2020).....................................................................21

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)...................................................................................20

*Foster v. Love*,
522 U.S. 67 (1997)................................................................... 3, 4, 5

*Gen. Med., P.C. v. Azar*,
963 F.3d 516 (6th Cir. 2020)......................................................................24

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012).......................................................................9

*Gundy v. United States*,
588 U.S. 128 (2019)...................................................................................25

*Honeycutt v. United States*,
581 U.S. 443 (2017)...................................................................................23

*Huddleston v. United States*,
   415 U.S. 814 (1974) ........................................................................23

*Jud. Watch, Inc. v. Lamone*,
   399 F.Supp.3d 425 (D. Md. 2019) .................................................42

*Kennedy v. Lynd*,
   306 F.2d 222 (5th Cir. 1962) ............................................ 43, 48, 49

*League of Women Voters v. DHS*,
   No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ................ 44, 45, 46

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ...........................................................................22

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .......................................................................33

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   583 U.S. 109 (2018) .......................................................................24

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) .......................................................................40

*OfficeMax, Inc. v. United States*,
   428 F.3d 583 (6th Cir. 2005) .........................................................38

*Ohio Telecom Ass'n v. FCC*,
   150 F.4th 694 (6th Cir. 2025) ........................................................33

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
   97 F.4th 120 (3d Cir. 2024) .............................................................5

*PILF v. Benson*,
   136 F.4th 613 (6th Cir. 2025) .................................................. 41, 53

*Pippinger v. Rubin*,
   129 F.3d 519 (10th Cir. 1997) .......................................................47

*Prewett v. Weems*,
   749 F.3d 454 (6th Cir. 2014) .........................................................25

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012).....................................................8, 36

*Pub. Int. Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) ...........................................................9

*Reichert v. Kellogg Co.*,
  170 F.4th 473 (6th Cir. 2026)......................................................33

*Savarese v. U.S. Dep't of Health, Educ. & Welfare*,
  479 F.Supp. 304 (N.D. Ga. 1979) ...............................................44

*Schwier v. Cox*,
  412 F.Supp.2d 1266 (N.D. Ga. 2005)..........................................45

*Sec'y of Labor v. Timberline S., LLC*,
  925 F.3d 838 (6th Cir. 2019)........................................................34

*Smith v. Doe*,
  538 U.S. 84 (2003)........................................................................35

*Union Pac. R.R. Co. v. United States*,
  865 F.3d 1045 (8th Cir. 2017)......................................................23

*United States v. Adams*,
  777 F.Supp.3d 185 (S.D.N.Y. 2025) ...........................................52

*United States v. Baker*,
  152 F.4th 715 (6th Cir. 2025)......................................................22

*United States v. Clarke*,
  573 U.S. 248 (2014)......................................................................53

*United States v. Erker*,
  129 F.4th 966 (6th Cir. 2025)......................................................27

*United States v. Galvin*,
  No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ........ 1, 39, 44

*United States v. Haynes*,
  55 F.4th 1075 (6th Cir. 2022)......................................................31

*United States v. Hunter*,
  12 F.4th 555 (6th Cir. 2021)................................................................37

*United States v. Markwood*,
  48 F.3d 969 (6th Cir. 1995)............................................... 38, 40, 49, 52

*United States v. Miami Univ.*,
  294 F.3d 797 (6th Cir. 2002)...........................................................34

*United States v. Oregon*,
  No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026) ...............................1, 52

*United States v. Powell*,
  379 U.S. 48 (1964)............................................................ 49, 50

*United States v. Weber*,
  No. 25-cv-9149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026)..................... *passim*

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)...........................................................38

*Voter Reference Found., LLC v. Torrez*,
  160 F.4th 1068 (10th Cir. 2025)............................................ 36, 43

*Williams v. GoAuto Ins. Co.*,
  154 F.4th 324 (5th Cir. 2025)...............................................23

*Wis. Cent. Ltd v. United States*,
  585 U.S. 274 (2018)...........................................................29

*Yates v. United States*,
  574 U.S. 528 (2015)........................................................ 26, 27

**STATUTES**

5 U.S.C. §552a ........................................................... 25, 44, 45, 47

6 U.S.C. §1502 ...........................................................23

7 U.S.C. §12 ...........................................................23

8 U.S.C. §1454 ...........................................................31

18 U.S.C. §3500 ................................................................23

18 U.S.C. §2721 ................................................................43

26 U.S.C. §7604 ................................................................49

30 U.S.C. §1732 ................................................................23

42 U.S.C. §1971 (1958 & Supp. IV) ...............................35

44 U.S.C. §3572 ................................................................31

49 U.S.C. §47124a ............................................................23

52 U.S.C. §20501 ................................................................7

52 U.S.C. §20504 ................................................................8

52 U.S.C. §20505 ................................................................8

52 U.S.C. §20506 ................................................................8

52 U.S.C. §20507 ....................................................... *passim*

52 U.S.C. §20701 ....................................................... *passim*

52 U.S.C. §20702 ......................................................... 18, 58

52 U.S.C. §20703 ....................................................... *passim*

52 U.S.C. §20705 ......................................................... 49, 59

52 U.S.C. §21083 ....................................................... *passim*

52 U.S.C. §21085 ..............................................................10

M.C.L. §168.509r ..............................................................10

M.C.L. §168.509gg .................................................. 14, 41, 42

M.C.L. §168.509o ..............................................................10

M.C.L. §168.509p ..........................................................11, 21

M.C.L. §168.509q ..............................................................10

M.C.L. §257.208c ...................................................................................42

Pub. L. No. 85-315, 71 Stat. 634, 635 (1957).........................................................4

Pub. L. No. 103-31, 107 Stat. 77 (May 20, 1993) ....................................................7

## REGULATIONS

*Privacy Act of 1974; System of Records*,
  68 Fed. Reg. 47610 (Aug. 11, 2003) ............................................................ 46, 47

## OTHER AUTHORITIES

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET),
  https://x.com/AAGDhillon/status/2001659823335616795 ...............................13

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
  Legal Texts* (2012)..................................................................... 20, 24

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
  N.Y. Times (Nov. 16, 2025),
  https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-
  department-staff-attorneys.html.........................................................52

Exec. Order No. 14399 (Mar. 31, 2026) ...................................................... 13, 14

Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 86th Cong.
  700 (1959), https://perma.cc/ET26-FKD9...................................................6

H.R. Rep. No. 86-956 (1959)...............................................................4, 35

H.R. Rep. No. 107-329 (2001)................................................................37

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice
  Department Requests for Voter Information, Brennan Ctr. for Just.* (updated
  Apr. 9, 2026), https://perma.cc/2EWS-UGTU ..............................................11

Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll
  data to Homeland Security, sources say,* CBS News (Mar. 26, 2026),
  https://perma.cc/T62F-J3ZF ..............................................................13

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Intervenors-Appellees agree with the United States that oral argument is appropriate because of the important issues of first impression presented in this appeal. Intervenors-Appellees request that they be allowed separate argument time. The district court's judgment rested on an argument that had been raised below only by Intervenors-Appellees. Intervenors-Appellees are individual voters and the Michigan Alliance for Retired Americans, which has members that reside throughout the State of Michigan. Their privacy rights are directly at stake in this appeal, and the Court would benefit from hearing their unique perspectives. Secretary Jocelyn Benson and the State of Michigan consent to the request. Counsel for the United States informed counsel for Intervenors-Appellees that the United States does not oppose Intervenors-Appellees appearing and speaking at oral argument, but the United States does not consent to Intervenors-Appellees having additional time in excess of the time allotted to the United States.

# STATEMENT OF ISSUES

1.      Did the district court properly dismiss the U.S. Department of Justice's ("DOJ") demand that Michigan produce its statewide voter file pursuant to the Civil Rights Act of 1960 ("CRA"), which requires election officials to "preserve", "retain," and produce only certain records that "come into [their] possession" and that cannot be "alter[ed]"?

2.      In the alternative, should the Court affirm the district court's dismissal because either (a) DOJ's stated purpose in requesting the statewide voter file falls outside the scope of the CRA's purpose of protecting the right to vote, (b) DOJ failed to comply with the facial requirements of the CRA, (c) the CRA does not prohibit Michigan from redacting the highly sensitive information sought by DOJ, or (d) DOJ failed to comply with the requirements of the Privacy Act?

**INTRODUCTION**

DOJ claims it requires sensitive and personal information about every registered voter in Michigan—and indeed, in every State—to assess whether the State makes reasonable efforts to remove ineligible voters from its rolls. Federal law provides DOJ a tool to investigate Michigan's voter list-maintenance activities—the National Voter Registration Act's ("NVRA") inspection provision. However, as every court to have addressed the issue has held, and as DOJ does not contest on appeal, that provision does *not* entitle DOJ to a State's unredacted voter list. Unsatisfied with the tools Congress gave it, DOJ went searching through the federal code for some other hook to get the sensitive data it seeks. It landed on Title III of the Civil Rights Act of 1960 ("CRA"). But that civil-rights-era statute provides no support for DOJ's unprecedented, sweeping, and generalized demand, as the court below correctly held, alongside three other courts that have likewise rejected DOJ's demands for other States' voter lists.[1]

The analysis begins and ends with the statutory text. The CRA commands that any records under its purview must "come into [the] possession" of election officials, be "retained and preserved," and cannot be "altered." But the voter registration lists

---

[1] *United States v. Weber*, No. 25-cv-9149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026). Appeals of the California and Oregon decisions are pending.

DOJ demands are dynamic by design; they are created by election officials and frequently altered to reflect new voter-registration information. In fact, federal law *requires* Michigan's elections officials to regularly alter its voter list, known as the "Qualified Voter File" ("QVF"). It thus makes no sense to read the CRA to extend to such lists. Further, Michigan's QVF is not a record that "comes into" the possession of election officials—it is a record *created* by those officials. The statute's history and purpose buttress this conclusion: Congress enacted the CRA to counteract Jim Crow officials' efforts to thwart federal voting-rights investigations by denying access to or destroying voter application materials. Ordinary principles of statutory construction thus confirm that the district court correctly dismissed DOJ's CRA claim.

DOJ's attempt to fit a square peg into a round hole comes with other terminal defects. DOJ's purported purpose of assessing Michigan's list-maintenance obligations is beyond the CRA's scope, and DOJ provided no basis to investigate Michigan in the first place. Nor does anything in the CRA evince an intent to preempt Michigan's common-sense voter privacy laws. Finally, in its hurried quest to sweep up voter data across the country, DOJ flouted its obligations under the Privacy Act. Each of these defects in DOJ's claim supports affirming the decision below.

**STATEMENT OF THE CASE**

**I.     Federal law has long made voter-list maintenance a state responsibility.**

The Constitution "invests the States with responsibility for the mechanics" of elections, subject only to a decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). It is therefore States that are primarily responsible for determining voter eligibility and maintaining lists of eligible voters, not the federal government. *See Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 17 (2013). Congress has exercised its authority to regulate in the field of voter registration in relatively few instances, and when it has done so, it has reaffirmed the paramount role of the States in managing their own voter lists. Three of those statutes are implicated in this appeal.

**A. The Civil Rights Act of 1960 ("CRA")**

The only authority that DOJ invokes to support its demand for Michigan's QVF is Title III of the Civil Rights Act of 1960. Title III was enacted to ensure the preservation of evidence for use in federal investigations into infringements of individuals' right to vote—a right recognized and protected by earlier civil rights laws. In the Civil Rights Act of 1957, Congress authorized DOJ "to institute civil proceedings for preventive relief from the discriminatory denial of the right to vote," making clear the purpose of that charge was to protect the "right of all qualified

citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7 (1959).

Practical experience, however, revealed the 1957 Act's enforcement scheme to be inadequate. At the time, DOJ had "no existing power in civil proceedings to require the production of [voter registration] records." *Id.* State and local authorities therefore could—and did—obstruct DOJ investigations, both by refusing DOJ access to election records, *id.*, and by destroying them altogether, *see, e.g.*, *Ala. ex rel. Gallion v. Rogers*, 187 F.Supp. 848, 856 n.4 (M.D. Ala. 1960). Congress found that this obstruction had rendered DOJ's ability to protect the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7.

That conclusion was supported by a report to Congress prepared by the U.S. Commission on Civil Rights, which had been created by the 1957 Act to "investigate allegations . . . that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, §104(a)(1), 71 Stat. 634, 635 (1957). To do so, the Commission reviewed voting application forms in Jim Crow jurisdictions to identify patterns of discriminatory denials of voting rights. *See* Rep. of the U.S. Comm'n on Civil Rights, at 87-94 (1959). By comparing registration applications submitted by Black and White applicants, the Commission exposed that officials imposed tests on Black applicants—such as requiring them to "copy article 2 of the U.S. Constitution"—while exempting White applicants. *Id.* at 87. Comparing

4

applications also revealed that "many Negro applicants were denied registration because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register." *Id.* at 91. The Commission thus concluded that reviewing "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137. However, the Commission had repeatedly found its work thwarted by efforts to destroy or restrict access to those records. *See, e.g.*, *id.* at 93, 95, 98-99, 137. It accordingly recommended that Congress enact a law requiring state election officials to retain election records and make them subject to inspection. *Id.* at 137-38. "Congress responded by passing the Civil Rights Act of 1960." *Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 150 n.19 (3d Cir. 2024) (Schwartz, J., dissenting).

The pertinent portion of that Act is Title III, which contains several interlocking provisions that collectively work to ensure the preservation of voter registration application forms and similar documents relating to voting prerequisites. Congress tailored Title III to the problem before it: the need to ensure the preservation and availability of the key evidence that DOJ and the Commission had identified as necessary to investigate voting rights violations. As explained by a principal drafter of Title III, "[t]he purpose of title III is, first of all, to require that

5

States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector."[2]

Consistent with this evidence-preservation purpose, the core provision of Title III imposes a basic obligation on election officials to "retain and preserve" the records most relevant to a State's decision whether someone was qualified to vote. Specifically, §20701 provides:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. Election officers who "willfully fail[]" to comply with this preservation requirement are subject to criminal penalties. *Id.*

The next section of Title III reinforces this "retain and preserve" requirement by prohibiting individuals from tampering with or altering any record that must be retained and preserved under §20701. Specifically, §20702 authorizes criminal fines or imprisonment for "[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* §20702.

---

[2] *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong. 700 (1959) (statement of Rep. William M. McCulloch), https://perma.cc/ET26-FKD9.

Finally, Title III allows the Attorney General—after an appropriate demand that satisfies statutory requirements—to inspect the same set of election records covered by §20701 and §20702. The CRA's inspection provision states:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* §20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

## B. The National Voter Registration Act ("NVRA")

More than three decades after the enactment of the CRA, Congress passed the NVRA. *See* Pub. L. No. 103-31, 107 Stat. 77 (May 20, 1993). In contrast to the CRA, which was specifically tailored to enhance DOJ's ability to investigate and enforce laws that prohibited infringement of an individual's right to vote, the NVRA created an administrative framework to regulate certain voter registration procedures. Congress set out its express purposes in enacting the statute, including to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. §20501(b).

The NVRA streamlines the voter registration process and requires States to make registering to vote simple and accessible. *See generally* Pub. L. No. 103-31,

7

107 Stat. 77. Among other things, the NVRA requires States to allow individuals to register to vote when they apply for a driver's license, 52 U.S.C. §20504, allows for registration by mail, *id.* §20505, and requires States to allow registration at certain state agencies that members of the public frequently visit, *id.* §20506.

The NVRA also imposes modest requirements on States related to removing names from their voter rolls under specified circumstances. It requires States to "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either "the death of the registrant" or "a change in the residence of the registrant." *Id.* §20507(a)(4). Consistent with the statute's purpose of encouraging voter registration and voting, the NVRA imposes several procedural protections before a State may remove a name from the rolls. *See id.* §20507.

The NVRA also contains a record inspection provision, requiring States to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* §20507(i). That inspection provision is meant to permit "the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). As many courts have held, this provision does not prevent States from redacting sensitive information like driver's license numbers or social security

numbers. *E.g.*, *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024).

## C. The Help America Vote Act ("HAVA")

More than forty years after the CRA, Congress enacted HAVA in 2002 "in response to the 2000 Presidential election and the ensuing controversial Florida recount." *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012). HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. §21083(a)(1). The list must "contain[] the name and registration information of every legally registered voter in the State," *id.*, and it "shall serve as the single system for storing and managing the official list of registered voters throughout the State," *id.* §21083(a)(1)(A)(i).

HAVA further requires that this list be regularly updated. For instance, it directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* §21083(a)(1)(A)(iv). The State's chief election official must provide any necessary support "so that local election officials are able to enter [that] information." *Id.* §21083(a)(1)(A)(vii). Likewise, HAVA requires the list "be coordinated with other agency databases within the State." *Id.* §21083(a)(1)(A)(iv). States must also "perform list maintenance" "on a regular basis," *id.* §21083(a)(2)(A), and take steps

to ensure that "voter registration records" are "accurate and are updated regularly," *id.* §21083(a)(4). In other words*,* HAVA charges States with regularly changing its single, centralized voter list, so that it reflects the current snapshot of the State's registered voters.

HAVA makes clear that the State's voter list must be "defined, maintained, and administered at the State level," *id.* §21083(a)(1)(A), and "[t]he specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State," *id.* §21085. Unlike the CRA or the NVRA, HAVA contains no disclosure provision. Opinion, R.67, PageID#895.

In Michigan, the HAVA-required statewide voter registration list is known as the QVF. M.C.L. §168.509o(1). Michigan law directs the Secretary of State, along with local election officials, to "compile the qualified voter file" from various sources, *id.* §168.509r(2). Some of that compiled information is derived from voting records submitted by voters; however, other information appears nowhere in those records or papers and, instead, comes from other Michigan agencies, the U.S. Social Security Administration, and other States. Opinion, R.67, PageID#912 (citing M.C.L. §§168.509o(4)-(5), r(2)). It also includes individuals' voting histories. *Id.* (citing M.C.L. §168.509q(f)). Thus, the QVF contains, for example, the voter's name, identifier, precinct and ward number, voting history, and signature. *Id.* §168.509q. Consistent with HAVA, Michigan law allows state agencies and local

10

election officials "to electronically add, change, or delete records contained in the qualified voter file." M.C.L. §168.509p(b).

## II. DOJ embarks on a campaign to collect voter data held by States.

### A. DOJ sues 30 States and Washington D.C. for private voter data.

Last year, DOJ launched an unprecedented campaign to demand access to States' unredacted voter files, which include sensitive information about each registered voter such as their driver's license numbers and partial social security numbers. DOJ has reportedly sent demands to at least 48 States, the large majority of which have refused to turn over their unredacted lists.[3] In response, DOJ has now sued 30 States and the District of Columbia to compel disclosure.

DOJ's legal theories have evolved over the course of these 31 lawsuits. In the first eight—including this one—DOJ focused principally on the NVRA and HAVA, asserting causes of actions under both of those statutes, as well as the CRA. *E.g.*, Compl., *United States v. Bellows*, No. 25-cv-468 (D. Me. Sep. 16, 2025). But in the most recent 23 suits, DOJ abandoned its NVRA and HAVA claims, proceeding under the CRA alone. *E.g.*, Compl., *United States v. Albence*, No. 25-cv-01453 (D. Del. Dec. 2, 2025).

---

[3] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Apr. 9, 2026), https://perma.cc/2EWS-UGTU.

DOJ's factual allegations have also evolved. In the first wave of complaints, DOJ often alleged that its demands were prompted by "anomalies" reported by the States in Election Administration & Voting Survey ("EAVS") reports. More recently, DOJ has stopped claiming that its demands were prompted by any individualized review of a State's EAVS responses or list maintenance program, often failing to assert *any* purported factual basis for its ostensible need for this sensitive data. *E.g.*, Compl., *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla. Feb. 26, 2026).

While DOJ has generally claimed that it seeks unredacted voter lists to assess States' compliance with list maintenance under the NVRA and HAVA, its actions suggest different and more troubling purposes. Rather than merely checking whether States have a "general program" in place that makes a "reasonable effort" at list maintenance, which is all those laws require, DOJ has attempted to set itself up as a federal supervisory authority that can dictate the names that appear on a State's voter list. To that end, DOJ has asked States to sign agreements that seemingly obligate them to cancel the registrations of any voters specified by DOJ. *See, e.g.*, Ex. G at 5, *United States v. Griswold*, No. 25-cv-3967 (D. Colo., Feb. 10, 2025), ECF No. 37-8. The head of DOJ's Civil Rights Division has confirmed that DOJ's goal is to force the removal of "hundreds of thousands of people" from voter rolls.[4] In addition,

---

[4] AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET), https://x.com/AAGDhillon/status/2001659823335616795.

and entirely decoupled from anything related to list maintenance, recent reporting indicates that DOJ and the Department of Homeland Security "are close to finalizing an agreement that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations."[5] And, most recently, President Trump dropped the façade entirely by issuing an Executive Order directing federal agencies to, in effect, create a national registry of voters who are permitted to cast ballots through U.S. Postal Service mail delivery. *See* Exec. Order No. 14399, §3(b)(iii)-(iv) (Mar. 31, 2026).

### B. DOJ sues Michigan to demand production of the unredacted Qualified Voter File.

Michigan was among DOJ's early targets. In a July 21, 2025 letter, DOJ demanded that Secretary Benson produce the unredacted QVF, citing the NVRA and HAVA (but not the CRA) as support. R.39-2, PageID#492-494. DOJ also asked about Michigan's responses on the EAVS report, including questions regarding its rate of removal for ineligible and duplicate-registered voters from its voter rolls. *Id.*, PageID#493. DOJ did not invoke the CRA to support its demand for the QVF until it issued a separate letter on August 14. R.39-4, PageID#500-501.

---

[5] Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/T62F-J3ZF.

13

On September 2, Secretary Benson advised DOJ she would produce a redacted list containing most of the information DOJ demanded, but excluding sensitive voter information protected from disclosure under state law, such as driver's license numbers, social security numbers, and dates of birth. R.39-5, PageID#504-505 (citing M.C.L. §168.509gg(1)-(2)). A week later, the Secretary sent another letter that provided detailed answers to DOJ's questions about Michigan's list-maintenance practices. R.39-6, PageID#507-512. The Secretary explained, for instance, that Michigan had "cancelled more than 1.4 million registrations" since 2019; that 250,000 more registrations are "slated for cancellation in 2027 and 2029"; and that DOJ's questions about Michigan's EAVS responses reflected basic misunderstandings about how voter registration works. *Id.* DOJ never responded or posed any follow-up questions. It filed this lawsuit instead.

**C. The district court finds DOJ's claims meritless.**

DOJ brought three claims in its Complaint, asserting that the NVRA, HAVA, and the CRA each independently required Michigan to produce its unredacted QVF. R.1. The district court concluded that none of these statutes required production and dismissed the Complaint. Opinion, R.67. DOJ does not challenge the district court's rejection of its NVRA and HAVA claims, arguing only that the district court erred in dismissing the CRA claim. Br. 11 n.2.

14

The district court rejected the CRA claim after a thorough analysis of the statutory text. Since the CRA's text only covers documents that "come into [the] possession" of election officials, rather than those that are "in the possession" of those officials, the court concluded the CRA extends only to "documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." Opinion, R.67, PageID#910 (emphases added). The court explained that its conclusion was "bolstered" by the "next words" in Title III's operative provision, which are keyed to registration application materials submitted by voters for an election, not state-created documents like voter lists. *Id.*, PageID#911. Based on these and other indicators, the court concluded that Michigan's QVF does not fall under the CRA and dismissed the CRA claim. *Id.*, PageID#914.

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed DOJ's CRA claim because the text of that statute does not apply to a record like the QVF. Records that are subject to inspection under the CRA must be "retain[ed] and preserve[d]" and cannot be "alter[ed]." 52 U.S.C. §§20701-20703. The QVF, however, is a dynamic database that is *required* by federal law to be constantly updated. It therefore does not fall within the scope of the CRA's inspection provision. To hold otherwise would place the CRA and HAVA into irreconcilable conflict.

In addition, the CRA applies only to records that "come into [the] possession" of election officials. *Id.* §20701. As the district court correctly concluded, the most natural way to read that phrase is to cover records *received* from an outside source, not those (like the QVF) that are *created* by election officials. Dictionary definitions, textual indicia within the statute, and the context and history of the CRA's enactment all support that understanding. DOJ's alternative reading gives no independent content to "come into [the] possession," making the clause entirely superfluous. Accordingly, the CRA does not reach Michigan's QVF.

The Court can also affirm on other grounds. DOJ's purported purpose in demanding the QVF—to ascertain Michigan's compliance with its list-maintenance obligations under the NVRA and HAVA, laws passed many decades after the CRA—is beyond the scope of Title III, a statute designed to facilitate investigations of the infringement of voting rights. DOJ also failed to state a factual basis for its demand for private and sensitive voter data about every registered voter in Michigan and failed to show the CRA preempts Michigan's voter privacy laws. And, in its rush to sweep up voter data from Michigan and nearly every other State in the nation, DOJ flouted its obligations under the Privacy Act. Each of these defects independently justifies affirming.

Finally, DOJ's suggestion that federal courts play only a ministerial role in evaluating CRA demands misreads the statute and conflicts with Supreme Court and

Sixth Circuit precedent. DOJ's request that the Court remand with instructions for the district court to order Secretary Benson to produce Michigan's QVF is likewise entirely procedurally inappropriate. Aside from the fact that DOJ never moved for that affirmative relief below, even if the Court were to remand, Intervenors would be entitled to discovery on, among other things, whether DOJ's purported purpose here is its true purpose—an inquiry blessed by decades of Supreme Court precedent where, as here, there is reason to doubt DOJ's demand was made in good faith.

**ARGUMENT**

## I. The district court correctly held that Michigan's voter list is outside the scope of Title III.

Under its plain text, the CRA does not permit DOJ to demand HAVA-required, statewide voter lists. The CRA's text covers only static records that must be "retained," "preserved," and not "altered." HAVA-required voter lists are not encompassed by that language, because they are dynamic documents that federal law requires to be continuously updated. Further, the CRA applies only to records that "come into [the] possession" of election officials relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. Since Michigan's statewide voter registration list was created by election officials, it is not a record that "came into" those officials' possession. Accordingly, the district court correctly concluded that the CRA does not reach an internally-created, interactive record like the QVF.

17

**A. The QVF is not subject to the CRA, which applies only to records that must be "retained and preserved" and not "altered."**

A record is subject to inspection under the CRA only if it is "required by section 20701 . . . to be retained and preserved." 52 U.S.C. §20703. The CRA further prohibits (and indeed criminalizes) the willful "alter[ing]" of any record subject to the "retain and preserve" requirement. *Id.* §20702 (providing criminal penalties for "[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved"). Thus, if a record does *not* need to be "retain[ed] and preserv[ed]," or if it *may* be "alter[ed]," it falls outside the scope of §20703. *See* Opinion, R.67, PageID#912 ("[A]ny document subject to disclosure under the CRA must also be preserved.").

Under a straightforward application of these provisions, the QVF is not a record subject to the CRA, because federal law *requires* that it be regularly altered. State voter file lists like the QVF are mandated by HAVA, which requires that it "contain[] the name and registration information of every legally registered voter in the State," 52 U.S.C. §21083(a)(1), and "serve as the single system for storing and managing the official list of registered voters throughout the State," *id.* §21083(a)(1)(A)(i). HAVA further requires that Michigan election officials "perform list maintenance with respect to [that] computerized list" "on a regular basis." *Id.* §21083(a)(2)(A). They must "make[] a reasonable effort to *remove* registrants who are ineligible to vote from the [QVF]," *id.* §21083(a)(4) (emphasis added), and they

18

must also *add* data to the QVF whenever a new voter is registered in Michigan, *see id.* §21083(a)(1). Following HAVA's commands, Michigan also regularly updates substantive information about registered voters, such as when they change addresses, update their driver's license number, or whenever they vote, after which the QVF must be updated to reflect their voting history. M.C.L. §168.509q. Indeed, adding and removing names from the QVF goes to the core purpose of that record: serving as the "single" and "centralized" repository of the list of Michigan's eligible voters. Because Michigan election officials *must* substantively update the QVF on a regular basis, the QVF *cannot* be understood to be subject to the CRA's requirements that it be "retain[ed] and preserve[d]" and not "alter[ed]." 52 U.S.C. §§20701-20702. And it therefore is not subject to mandatory inspection under §20703.

If the Court were to hold otherwise and find that the CRA extends to HAVA-required voter lists, it would place HAVA and the CRA into direct conflict and subject election officials to irreconcilable obligations. Under the CRA, election officials would be required to preserve the QVF and would be subject to criminal punishment if they altered it. 52 U.S.C. §§20701-20702. But under HAVA, election officials are required to alter the list every time they receive new or updated voter-registration information. *Id.* §21083(a)(1)-(2).

The Court should avoid an interpretation of the CRA that would introduce this legal discord. "The body of the law should make sense," and "it is the responsibility

of the courts, within the permissible meanings of the text, to make it so." Scalia & Garner, *Reading Law* 252 (2012). Accordingly, courts should "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Courts therefore "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). Applying these principles, the CRA cannot be read to reach a dynamic record like the QVF; otherwise, the CRA's requirements to "retain and preserve" and to not "alter" the record would be unavoidably inconsistent with HAVA's requirements to regularly update the list.

Practical considerations also compel the conclusion that the QVF cannot be subject to Title III. If it were, and even if one ignored the CRA's prohibition on "alter[ing]" the QVF, Michigan would be required to "retain and preserve" *every* iteration of the QVF whenever it changes. But that would be unworkable. To do so, Michigan would need to save a copy of the QVF whenever a name is removed (such as when someone moves out of state, dies, or loses voting rights upon incarceration), whenever a name is added (such as when someone moves into the state or reaches voting age and registers), or any time Michigan updates *any* data in the list to reflect new information about *any* individual voter (such as a change of address, an updated driver's license number, or a person's vote history). In a large State like Michigan

20

(with a population of more than 10 million people), there will be *enormous* numbers of such changes every year. It simply is not plausible to conclude Secretary Benson is required (with criminal penalties for willful violations) to "preserve" every version of the QVF when it is subject to such a vast number of changes. That is even more true given that Michigan allows state agencies and local election officials to directly access and change the list. M.C.L. §168.509p(b); *see* 52 U.S.C. §21083(a)(5)(B)(i).

Because "alternative interpretations consistent with the legislative purpose are available," the Court should reject DOJ's expansive reading of Title III and its "absurd results." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 254 (6th Cir. 2020).

## B. The QVF is not subject to the CRA because it was *created* by Michigan election officials and thus did not "come[] into [their] possession."

Title III only extends to "records and papers" that "come into [the] possession" of election officials relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. The district court correctly held that the phrase "come into [their] possession" "naturally refers to a process by which someone *acquires* an item from an external source." Opinion, R.67, PageID#910. Since Michigan's statewide voter list is a record created and maintained by election officials, rather than a record that came into their possession, Title III does not reach that voter list.

21

The district court's definition of "come into possession" is the "natural" and "ordinary" meaning of the phrase. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their 'ordinary or natural' meaning."). "In determining [ordinary] meaning, dictionaries are a good place to start." *United States v. Baker*, 152 F.4th 715, 723 (6th Cir. 2025) (quotation omitted). Here, dictionaries link the phrase "come into possession" to receiving, obtaining, or acquiring something from an outside source. *See, e.g.*, Receive, Black's Law Dictionary (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"); *Come into possession*, Cambridge Dictionary, https://dictionary.cambridge.org/thesaurus/come-into-possession-of (last visited Apr. 12, 2026) (listing synonyms of "come into possession" as "obtain," "acquire," and "receive"). That aligns with common usage. For instance, one comes into possession of a letter they receive in the mail, but not a letter they write themselves.

Though the court below was the first to interpret this statutory language in Title III, federal courts interpreting other statutes—many relying on dictionaries published contemporaneously with the CRA—have equated "com[ing] into possession" of something with receiving, acquiring, or obtaining that thing. *E.g., Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the Eng. Language 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word

22

'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New Int'l Dictionary (3d ed., 1966))); *Williams v. GoAuto Ins. Co.*, 154 F.4th 324, 328 (5th Cir. 2025) (defining "receive" as "to come into possession of or get from some outside source" (quoting Black's Law Dictionary (12th ed. 2024))).

This reading is buttressed by the "obvious alternative" language Congress had at its disposal. *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1050 (8th Cir. 2017). Congress could have, for instance, written Title III to cover papers and records "*in* the possession" of election officials, or simply "records" without qualification (as Congress did in the NVRA, *see* 52 U.S.C. §20507(i)(1)), rather than those that "come into" possession of such officials. Indeed, Congress frequently employs the phrase "in the possession of" when it means to do so. *See, e.g.*, 30 U.S.C. §1732(b); 6 U.S.C. §1502(a); 18 U.S.C. §§3500(a)-(b), 1968(f)(3)-(4); 7 U.S.C. §12(e); 49 U.S.C. §47124a(b)(1). By contrast, as noted by the district court, "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." R.67, PageID#910.

To collapse any distinction between these alternative phrases—as DOJ seeks—would render the statute's inclusion of "come into possession" meaningless. Indeed, the CRA's text would align with DOJ's proposed interpretation only if the Court were to delete the phrase "which come into his possession" as follows:

> Every officer of election shall retain and preserve . . . all records and papers ~~which come into his possession~~ relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. §20701. But "[c]ourts are required to give effect to Congress' express inclusions and exclusions, not disregard them." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018). As the district court recognized, DOJ's interpretation would eliminate any meaning from the phrase "come into . . . possession," Opinion, R.67, PageID#910-911, in violation of the canon against surplusage, *see Gen. Med., P.C. v. Azar*, 963 F.3d 516, 621 (6th Cir. 2020) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" (citation omitted)); Scalia & Garner, *supra*, at 176 (courts should "avoid a reading that renders some words altogether redundant"). This surplusage problem is avoided by giving the phrase "come into . . . possession" its natural and ordinary meaning: that it limits the scope of the CRA only to documents that election officials acquire from an external source.

Comparing the CRA to the NVRA—another statute that requires the production of election records—bolsters this understanding of "come into . . . possession." The CRA is intended to preserve records upon which the State bases its decision on whether to register a voter. *Supra* 3-6. The NVRA, by contrast, is intended to preserve and make transparent records relating to those decisions themselves. That is why it requires States to "make available for public inspection

. . . all records concerning the *implementation* of programs and activities conducted for the purpose" of ensuring accurate voter lists. 52 U.S.C. §20507(i)(1) (emphasis added). Congress conspicuously omitted the "come into possession" construction and instead employed language tailored to reaching internal records. "Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) (citation omitted). Here, the necessary inference is that "come into . . . possession" *cannot* simply mean—contrary to DOJ's view—that the CRA reaches all records in Secretary Benson's possession that relate to acts requisite to voting.[6]

Additional textual indicators reinforce the conclusion that Title III extends only to materials submitted to the State from an outside source. *See Gundy v. United States*, 588 U.S. 128, 141 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context."). "Accompanying words" are key context because "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). Here, accompanying words specify that the CRA applies to records that come into officials' possession

---

[6] The Privacy Act provides an example of another construction Congress could use when it means to reach internal records, covering records "in the control of" government officials rather than records that had "come into" their possession. 5 U.S.C. §552a(a)(5).

"relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. As the district court recognized, the meaning of "come into possession" is "clarified" by this accompanying text, "which indicates the sorts of records covered by the statute: namely, records that election officials *receive*, rather than *create*." R.67, PageID#911.

Similarly, the CRA requires retention only "for a period of twenty-two months" from the date of a covered election for those documents received "relating to any application, registration, payment of poll tax, or other act requisite to voting *in such election*." 52 U.S.C. §§20701-20702 (emphasis added). That temporal limitation makes sense when applied to individual, static records that are received from an external source to enable an individual to vote in any single election, but it does not make sense to place those requirements on an internally-generated list like the QVF that compiles voter information across many elections and is intended to be perpetually maintained and updated. Classifying a decades-old and constantly-updated list like the QVF as a record under the CRA would thus render nugatory that temporal clause as well.

Further, DOJ's contrary reading would ascribe "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543. If DOJ were correct that the CRA reaches internally-generated documents, every email, memo, handwritten note, or any other

record created by an employee of the Secretary of State's office (or any election official across Michigan)—including drafts—would need to be "retained and preserved" and not "altered," so long as it "relat[es] to" a voter's application, registration or other voting prerequisite in a particular election. 52 U.S.C. §§20701-20703. Those unlikely consequences, however, are avoided if "comes into . . . possession" is given its more natural reading of reaching only records obtained from an external source. *See* Opinion, R.67, PageID#913 ("[N]othing in the CRA's text implies an intent to require states to preserve every election-related record that they *create*.").

Finally, this natural reading of the text is confirmed by the context and history leading up to the CRA's enactment. *See United States v. Erker*, 129 F.4th 966, 976 (6th Cir. 2025) (statutory interpretation is a "'holistic endeavor,' which requires looking to text, context, and history"). Congress enacted Title III of the CRA to deal with a specific problem: to preserve the key evidence necessary for DOJ investigations into infringements on the right to vote, which had been threatened by Southern localities' withholding and destruction of voter registration applications and other documents concerning voting prerequisites. *Supra* 3-6; *see Hearings*, *supra* n.2, at 700 ("The purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the *records upon which is based the decision of whether or not a person is a qualified elector*[.]" (emphasis added)). In

27

light of this context, it is unsurprising that Congress selected language tailored to this purpose. Opinion, R.67, PageID#911 ("Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications.").

In short, all relevant interpretive indicators support the district court's conclusion that the CRA covers certain election records that the State obtains from an external source, not internal records that election officials create themselves. DOJ's demand for Michigan's QVF therefore falls outside the scope of the CRA.

### C. DOJ's contrary interpretation should be rejected.

Nothing in DOJ's brief alters the conclusion that the best reading of the CRA covers only records that election officials receive from an outside source.

*First*, DOJ points to other cases in which courts have ordered production of (redacted) voter lists, but DOJ admits these decisions were based on "other statutes," specifically the NVRA. Br. 15. Indeed, these NVRA decisions cut against DOJ's analysis. The text of the CRA and the NVRA are crucially different. Most notably, the phrase "come into . . . possession" does not appear in the NVRA, 52 U.S.C. §20507(i), and so it only makes sense that the scope of records covered would be different, too. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'").

In fact, the NVRA's inspection provision makes clear that Congress knows well how to draft disclosure obligations that extend to internal documents created by election officials—but when it does so, the language it employs differs markedly from that in the CRA. 52 U.S.C. §20507(i)(1) (covering "all records concerning the implementation of programs and activities" relating to list maintenance).

*Second*, DOJ cites a dictionary defining "come into" as, among other things, to "get" or "acquire" something. Br. 16 (quoting *Webster's New World Dictionary of the Am. Language* 291 (8th ed. 1960)). But getting or acquiring something is quite different from *creating* the thing. Someone may acquire a cake from the store, but it would grate on the ear if someone said they "acquired" a cake by making it from scratch at home. The difference between "acquiring" versus "creating" highlights the problem with DOJ's reference to various ways in which a voter can submit voter registration information to the State (such as through electronic means, at the DMV, or at a voter registration drive). Br. 16-17. DOJ contends that "[b]y coming into possession of those individual records, Secretary Benson merely aggregates them together into a simple record, the [QVF]." *Id.* at 17. But this precisely illustrates the distinction drawn by the CRA: it is true the "individual records" sent by the voter to the Secretary "c[a]me into [her] possession," and thus are covered by the CRA and must be retained and preserved, but no reasonable speaker of English would use that phrase to describe the QVF, which is a database that was created *by* the Secretary. In

any event, this aggregation argument rests on a faulty premise because, as the district court recognized, much of the information within the QVF does not come from any record or paper submitted by voters under §20701, Opinion, R.67, PageID#912. Thus, election officials do far more than compile individual CRA records into an aggregate record when generating the QVF.

*Third*, DOJ argues that "come into possession" "focus[es] on *how* and *when* the officer gains possession of the records," and that "the distinction between records 'coming into one's possession' and being 'in one's possession,' is a temporal one— not a distinction between obtaining records from an outside source and through self-generation." Br. 18 (cleaned up). To the extent DOJ's reference to a "temporal" distinction is meant to show that "come into possession" clarifies that an election official's duty to "retain and preserve" a record is triggered only *after* they take possession of a record—such as when the election official comes into office—that is a distinction without a difference. Any election official, of course, can only retain and preserve records *currently* in their possession. And even if this were a technically permissible reading as a matter of grammar, it still would not avoid the point that this reading would be identical to one where the phrase "which come into his possession" is erased from the statute, rendering that clause meaningless in violation of the "cardinal principle" of statutory interpretation that courts "must give effect, if possible, to every clause and word of a statute." *United States v. Haynes*, 55 F.4th

30

1075, 1080 (6th Cir. 2022) (citation omitted). Unlike DOJ's interpretation, where "come into his possession" can be deleted without changing the suggested meaning of the statute, Intervenors' interpretation—that "comes into his possession" means the records must be acquired from an external source—gives the phrase independent content and avoids surplusage.[7]

DOJ contends that even if the CRA did not apply to self-generated records, it would make little practical difference. Specifically, DOJ conjectures that if an employee in the Secretary's office "generated the requested record," but then a different person in the Secretary's office later acquired the record, it would "come into [the] possession" of the second person and become subject to the CRA. Br. 19-20. This argument overlooks the nature of Michigan's QVF. Unlike an individual document submitted by the voter to the Secretary, the QVF is not an individual record that is transferred from one person to another. Rather, it is a "single," "interactive," "centralized" database that many persons can access and change. It thus does not "come into [the] possession" of different individuals in the way DOJ

---

[7] Further, none of the statutes DOJ cites in this portion of its brief are inconsistent with Intervenors' argument. *See* Br. 18 n.4, 19. For example, 8 U.S.C. §1454(a) draws an explicit distinction between a person who "ha[s]" a record (it is "in" his possession) versus someone who "may come into possession of it" (he obtains it later). And the statutes DOJ cites generally concern information that was obtained by an agency from an external source. *See, e.g.*, 44 U.S.C. §3572(a)(1) (relating to "information *supplied by* individuals or organizations *to* an agency" (emphasis added)).

describes. Indeed, other language in Title III emphasizes the difference between a dynamic database that is maintained and updated by multiple people and a static document that one election official passes along to another. 52 U.S.C. §20701 (providing that if records are appropriately "deposited" with another custodian, then the duty to retain and preserve "devolve[s] upon such custodian"). It would be redundant, then, if all the phrase "come into possession" did was address such situations.

DOJ's proposed interpretation would also be an odd way for Congress to reach self-generated records: under this theory, when an election official first creates a new record, it would not be subject to the CRA until it was transmitted to or came under the purview of a *different* election official—until that point, the created record had not yet "come into" anyone's "possession." The unlikelihood that Congress meant to reach self-generated records in this way, plus the other textual indicia supporting Intervenors' interpretation, as well as the historical context in which the CRA was drafted, all point to the conclusion that "come into his possession" is best understood to refer to records that election officials acquire from other sources and therefore excludes the QVF. *See Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 707 (6th Cir. 2025) ("[W]e rely on our 'traditional tools of statutory construction' to determine a statute's 'single, best meaning.'" (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024))).

*Finally*, DOJ turns to policy arguments, complaining it would "paralyze" the United States's ability to enforce voting laws if the CRA did not reach the QVF. Br. 21. "Pure policy considerations, of course, do not constitute a proper method of statutory interpretation," and "they certainly cannot override a statute's unambiguous text." *Reichert v. Kellogg Co.*, 170 F.4th 473, 487 (6th Cir. 2026). In any event, nothing would be "paralyzed." DOJ has never before tried to obtain unredacted statewide voter registration lists covering nearly every registered voter in the country, and yet it has been able to enforce federal voting laws without this sweeping and previously unasserted power.

## II.  The Court can also affirm the dismissal on other grounds.

Even if the Court concluded that the QVF is subject to the CRA, the Court still should affirm the dismissal. DOJ failed to assert a permissible "purpose" under the CRA, and it failed to state *any* "basis" in its demand letter. DOJ's demand for the unredacted QVF also fails because the CRA does not preempt Michigan privacy laws. And the federal Privacy Act independently bars DOJ's claim for relief. Any of these grounds are sufficient to affirm the judgment.

### A. DOJ's purported purpose of investigating Michigan's list-maintenance obligations is outside the scope of Title III.

Government agencies are "not afforded 'unfettered authority to cast about for potential wrongdoing.'" *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). Rather, agencies may demand documents only to the

extent authorized by statute. *Cf. United States v. Miami Univ.*, 294 F.3d 797, 807 (6th Cir. 2002) ("If Congress does not expressly grant or necessarily imply a particular power for an agency, then that power does not exist."). Here, DOJ stated that the "purpose" of its CRA demand for the QVF was "to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA." Aug. 14, 2025 Ltr., R.39-4, PageID#501; *see* 52 U.S.C. §20703 (requiring DOJ to provide "the basis and the purpose" of its demand). The Court should affirm the dismissal because multiple tools of interpretation demonstrate that auditing list maintenance is not an allowable purpose under the CRA.

First, the context surrounding its passage makes plain that Congress enacted Title III of the 1960 CRA to assist DOJ investigations into efforts to impede the right to vote, which had been given substantive protections in earlier statutes, but where enforcement had been obstructed when Southern localities prevented DOJ from obtaining voting records. *Supra* 3-7; *see Sec'y of Labor v. Timberline S., LLC*, 925 F.3d 838, 845 (6th Cir. 2019) (when interpretating statutes, courts may consider "legislative history, policy rationales, and the context in which the statute was passed" (quotation omitted)). Nothing surrounding the statute's enactment indicates Congress intended the CRA to go beyond the purpose of investigating efforts to obstruct the right to vote, and certainly not to authorize DOJ to manage the administrative aspects of election regulation. To the contrary, a principal drafter of

Title III made clear "[i]t is not the purpose of title III to supervise State elections." *Hearings*, *supra* n.2, at 700. Other contemporary sources also recognized that Congress's objective was "to secure a more effective protection of the right to vote." *Gallion*, 187 F.Supp. at 853; *see* H.R. Rep. No. 86-956, at 7.

The framework of Title III confirms that the CRA creates an enforcement tool to investigate violations of voting rights—not a general review power over state elections. Congress codified Title III in the chapter titled "Elective Franchise," alongside substantive voting protections it had previously enacted. *See* 42 U.S.C. §§1971-1974 (1958 & Supp. IV) (later recodified in Title 52). That structure indicates Congress intended Title III to be an enforcement mechanism to protect federal voting rights, not a mandate to supervise state election regulation. *Smith v. Doe*, 538 U.S. 84, 85 (2003) (statutory codification is "probative of the legislature's intent").

The statutory text points in the same direction. The CRA directs States to preserve records "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. §20701, categories that are keyed to the substantive guarantees codified alongside it, which prohibit deprivations of "the opportunity to register to vote," 42 U.S.C. §1971(e) (1958 & Supp. IV). Likewise, requiring DOJ to state "the basis and the purpose" of its demand is consistent with a rights-enforcement tool designed for discrete

investigations but makes little sense if it confers freestanding access to state election data for any purpose or no purpose at all, as DOJ contends.

Finally, if Congress had intended to give DOJ authority to supervise state efforts to comply with the NVRA's and HAVA's list-maintenance efforts, one would have expected it to do so *in the NVRA or HAVA themselves*. But Congress did not do so. In fact, Congress created a *different* mechanism meant to ascertain States' compliance with list-maintenance obligations: the NVRA inspection provision located at 52 U.S.C. §20507(i); *see Alexander v., Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Congress "envisioned" this inspection to allow for "critical scrutiny and public audits of voter data"—but nonetheless permitted the redaction of the sensitive voter data DOJ seeks here. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1082 & 1083 n.14 (10th Cir. 2025); *see also Project Vote*, 682 F.3d at 339 (explaining the NVRA's inspection provision is meant to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls"). Congress specified that records subject to inspection under that provision must include the "names and addresses" of certain voters, 52 U.S.C. §20507(i)(2), but stopped short of requiring States to go beyond that and disclose sensitive voter information. As for HAVA, it contains no inspection provision at all and, instead, confirms that voter registration lists must be

36

"maintained" and "administered at the State level"—not by the federal government. *Id.* §21083(a)(1)(A).

DOJ concedes Congress did not provide it with access to the data it seeks here when it enacted the NVRA or HAVA but contends "a better inference" is that Congress did not do so because the CRA already allowed DOJ to seek that data. Br. 33-34. That inference is erroneous. Both the NVRA and HAVA reflect a strong congressional intent to *avoid* an appearance of federal overreach. *See* H.R. Rep. No. 107-329, at 31-32 (2001) ("Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved."). Authorizing the federal government to seek the sensitive information of every registered voter in the country would work a fundamental shift in traditional understanding of the federal-state balance in voter registration, and it is unlikely Congress would have indicated that preference via such a cryptic implication. *See United States v. Hunter*, 12 F.4th 555, 566 (6th Cir. 2021) (Congress does not "hide elephants in mouseholes" (quotation omitted)).

In short, DOJ's attempt to invoke the CRA to allow it to manage nationwide list-maintenance efforts is unprecedented, and when "an agency claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is amply warranted here. Because traditional tools

of interpretation indicate that the CRA should not be read to allow DOJ to set itself up as a nationwide auditor of states' list-maintenance efforts, the Court can affirm the dismissal on the ground that DOJ's stated purpose for its demand is not authorized by the CRA.

## B. The CRA demand is invalid because DOJ's purported "basis" did not appear in its demand letter and is otherwise insufficient.

Dismissal is also warranted because DOJ's demand letter is facially defective. To demand production, the CRA requires the Attorney General to make a "demand in writing," and specifies that "[t]*his demand* shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. §20703 (emphasis added); *see OfficeMax, Inc. v. United States*, 428 F.3d 583, 584, 588 (6th Cir. 2005) (applying "presumption that Congress uses 'and' conjunctively"). To be entitled to enforcement of a document demand, an agency must have "met the statutory requirements pertaining to . . . enforcement." *United States v. Markwood*, 48 F.3d 969, 977 (6th Cir. 1995). Because DOJ failed to specify the "basis" for its request in its demand letter, DOJ has not satisfied the CRA's plain requirements.

Although DOJ sent several letters to Michigan regarding its QVF prior to this lawsuit, DOJ never mentioned the CRA until its final letter dated August 14, 2025. R.39-4. Accordingly, nothing prior to that letter can constitute a "demand in writing" pursuant to the CRA. 52 U.S.C. §20703. And while the August 14 letter expressly stated "[t]he *purpose* of the request is to ascertain Michigan's compliance with the

list maintenance requirements of the NVRA and HAVA," the letter says nothing at all about DOJ's factual "basis" for its demand. R.39-4, PageID#500-502 (emphasis added). Instead, DOJ's purported concerns about Michigan's EAVS submissions appeared only in earlier correspondence.

The district court waved away this problem in a footnote, stating that "DOJ's communications *collectively* put Michigan on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." R.67, PageID#908 n.3 (emphasis added). But neither the statutory text nor binding precedent authorize such a lax approach to DOJ's obligations under the CRA. *See Galvin*, 2026 WL 972129, at *3-6 (dismissing DOJ's parallel lawsuit in Massachusetts for failure to adhere to CRA requirements).

DOJ's failure to state its "basis" in a CRA demand letter is fatal to its claim. Congress was unequivocal: "*This demand*"—*i.e.*, the "written demand" required under the CRA—"shall contain *a* statement of the basis and the purpose therefor." 52 U.S.C. §20703 (emphases added). "Congress's decision to use the indefinite article 'a' . . . suggests that the government must issue a *single* statutorily compliant document." *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) (emphasis added). In *Niz-Chavez*, the Supreme Court was clear that similar statutory instructions require the government to provide "'a' single document containing the required information, not a mishmash of pieces with some assembly required." *Id.* at 161. DOJ's failure to

provide all required information in a single written demand likewise violates the plain terms of the CRA and suffices to affirm the dismissal. *See id.* at 172 ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

Alternatively, even if DOJ could rely on the letters that predated its CRA demand, any purported "basis" derived from those letters is insufficient. Government document demands must at a minimum be reasonably relevant to the government's investigation, *see Markwood*, 48 F.3d at 977-79, and DOJ's demand is not.

DOJ's purported "basis" for its CRA demand was perceived deviations of Michigan's EAVS responses from the survey's average responses as well as a single, unidentified complaint related to a concern about duplicate registrations. R.67, PageID#908; R.39-2, PageID#493-494. It is not reasonable, based on those purported concerns, to request Michigan's entire, unredacted voter file. The QVF reflects Michigan's present snapshot of its registered voters, and the data within it would become outdated almost immediately after production. Obtaining the QVF would simply not be helpful in determining whether Michigan complied with its list-maintenance obligations. *See* 52 U.S.C. §20507(a)(4) (requiring Michigan to "conduct a general program" that "makes a reasonable effort" to remove voters from the rolls because of death or change of residence). Any EAVS-related concerns that

might reflect upon Michigan's list-maintenance efforts would be better investigated through targeted questions and narrative answers—or even records requests—about Michigan's programs and procedures relating to list maintenance. Secretary Benson provided detailed information about those programs and procedures, R.39-6, which DOJ ignored. The same would be true for whatever concerns DOJ might have based on the single, unidentified "complaint" it received. R.39-2, PageID#494. Particularly in light of this Court's recent holding that Michigan's "multilayered efforts" at list maintenance were "more than reasonable," *PILF v. Benson*, 136 F.4th 613, 628 (6th Cir. 2025), DOJ's demand for sensitive information of millions of voters cannot be considered reasonable on such a flimsy "basis."

### C. Title III does not preempt Michigan's voter privacy laws.

Michigan law commands that election officials "shall not release" sensitive categories of information in a registration record, including the voter's driver's license number, partial social security number, and full date of birth. M.C.L. §168.509gg(1)-(2). Accordingly, for DOJ to obtain Michigan's unredacted voter file, it must show that the CRA preempts Michigan's voter privacy laws. It does not.

DOJ first suggests that Michigan law does not prohibit disclosure of sensitive voter information because §168.509gg only excludes that information from Freedom of Information Act ("FOIA") requests. Br. 45. But in addition to specifying that covered information does not need to be disclosed under the State's FOIA, the state

statute goes further and mandates in plain terms that officials "shall not release" records containing protected voter registration information—with no qualifier relating to FOIA requests. *See* M.C.L. §168.509gg(1).[8]

DOJ next observes that courts have held the NVRA preempts certain aspects of state laws restricting access to voter lists.[9] Br. 46. But the relevant question here is whether federal law preempts state law protections for particularly sensitive information, and courts have consistently held that such protections are *not* preempted. *See, e.g.*, *PILF*, 92 F.4th at 56 (holding "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in [state voter files]" (collecting cases)); *Torrez*, 160 F.4th at 1082 & 1083 n.14 (similar). Congress's preemptive authority extends only "so far as it is exercised, and no farther," *ITCA*, 570 U.S. at 9 (quotation omitted), and—just like the NVRA—nothing in the CRA's text prohibits such redactions. Again, if Congress had thought that it was necessary to preempt state voter privacy laws to further DOJ's list-maintenance investigations, it would have done so in the NVRA or HAVA—the

---

[8] The other provisions referenced by DOJ apply to records maintained under Michigan law relating to motor vehicle records and thus do not override §168.509gg's general protection of registration records. Br. 45-46; *see* M.C.L. §257.208c(3).

[9] For example, DOJ cites a case holding the NVRA preempted a Maryland law that permitted only *Maryland voters* to inspect its public voter list. *Jud. Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 443-45 (D. Md. 2019).

statutes that actually relate to list maintenance. It makes no sense to say that Congress intended the CRA to preempt privacy laws protecting highly sensitive information so the government could assess compliance with voter list maintenance under the NVRA and HAVA, when those statutes (passed decades later) reflect a congressional judgment *not* to preempt such laws.

Finally, DOJ claims that the CRA preempts Michigan law because state statutes protecting highly sensitive voter information present an "obstacle" to Congress's purpose in enacting the CRA. Br. 47. They do not. As *Kennedy v. Lynd*— the central case DOJ relies on—recognized, the CRA was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d 222, 231 (5th Cir. 1962). In contrast, the information DOJ demands here is safeguarded under both federal and state privacy laws. *See, e.g.*, 5 U.S.C. §552a; 18 U.S.C. §2721. Indeed, driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. §21083(a)(5)(A)(i), so Congress's purpose in the CRA could not have possibly extended to requiring disclosure of such information.

### D. The Privacy Act prohibits DOJ from collecting Michigan's voter list.

Congress enacted the Privacy Act to "control . . . the unbridled use of highly sophisticated and centralized information collecting technology." *Savarese v. U.S.*

*Dep't of Health, Educ. & Welfare*, 479 F.Supp. 304, 308 (N.D. Ga. 1979), *aff'd sub nom. Savarese v. Harris*, 620 F.2d 298 (5th Cir. 1980). The Act, codified at 5 U.S.C. §552a, "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. §552a(a)(5), (e)). In its rush to sweep up the sensitive information of every registered voter in Michigan, DOJ ignored the Privacy Act's basic procedural requirements. The Act prohibits DOJ from obtaining the QVF and is an independent ground to affirm the dismissal.

DOJ demonstrates a fundamental misunderstanding of how the Privacy Act operates. It asserts "the Act only applies to a federal agency's *disclosure* of private information," and that the Act therefore has no bearing on DOJ's collection of private information from Michigan. Br. 39. That is wrong. The Privacy Act imposes obligations on any agency that "maintains" a "system of records." 5 U.S.C. §552a(e). Both of those terms are given precise statutory definitions. A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.*

44

§552a(a)(5); *see also id.* §552a(a)(4) (defining "record"). Michigan's voter list, which contains the names and other identifying information of all registered voters in the State, qualifies as a "system of records" under the Act. *Weber*, 2026 WL 118807, at *17 (holding California's voter list is a system of records under the Privacy Act); *Schwier v. Cox*, 412 F.Supp.2d 1266, 1271-72 (N.D. Ga. 2005) (similar, for Georgia), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). The term "maintain" is defined to include "maintain, collect, use, or disseminate." 5 U.S.C. §552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" Michigan's QVF, the obligations imposed by §552a(e) are triggered. And that is precisely the relief DOJ seeks here: an order to collect Michigan's QVF.

Most relevant here, "when an agency 'establish[es] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *League of Women Voters*, 2025 WL 3198970, at *2 (quoting 5 U.S.C. §552a(e)(4)). A SORN must include, among other things, the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, how records are retrieved within the system, and all "routine uses" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.*

DOJ claims it satisfies the publication requirement by pointing to a SORN identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records." Br. 40. DOJ states this SORN authorizes collection of Michigan's QVF because it "cites NVRA, HAVA, and the [CRA]." *Id.* DOJ is incorrect: the Federal Register notices cited by DOJ do not include any specific mention of those statutes. In any event, the Privacy Act requires substantially more disclosure than "citing" an enforcement statute and, as *Weber* held, this SORN is insufficient many times over. 2026 WL 118807, at *18. It notifies the public that the categories of individuals covered include "[s]ubjects of investigations, victims, [and] potential witnesses," in addition to other categories not relevant here. *Privacy Act of 1974; System of Records*, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). It is not plausible to understand that language to countenance the compilation of records for *every* registered voter in Michigan (and, if DOJ is successful, every registered voter in the country). Similarly, the SORN describes the categories or records in this system to "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *Id.* While this language would cover run-of-the-mill files maintained for specific investigations and litigation matters, it would be a startling construction of these terms to find that they extend to a statewide (or nationwide) voter registration list that has never before been compiled by the federal government.

In short, the SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level." *Weber*, 2026 WL 118807, at *18.

If DOJ wishes to take the radical step of compiling a federal database of registered voters in the United States, the Privacy Act requires (at a minimum) that DOJ give the public adequate notice of its intention to do so by publishing a SORN that accurately discloses the system of records it intends to maintain and the uses to which it will put that information. *See Pippinger v. Rubin*, 129 F.3d 519, 527 (10th Cir. 1997) (noting the Privacy Act "requir[es] publication of the establishment and existence of a government-maintained 'system of records'" and that agencies "publish in the Federal Register notice of revisions in the *character* of existing systems of records"); *see also* 5 U.S.C. §552a(e)(4); *id.* §552a(e)(11) (requiring 30-day notice "of any new use or intended use of the information in the system" to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency"). Since DOJ has not done so, the Privacy Act prohibits its collection of Michigan's QVF.

## III. DOJ's arguments regarding the scope of a court's review of a CRA demand are wrong and irrelevant to most issues before this Court.

DOJ contends a court's role in evaluating a CRA demand is largely ministerial, relying principally on out-of-circuit authority from the 1960s. Br. 23-30. That argument is both wrong and largely irrelevant.

As an initial matter, the district court dismissed the Complaint because the QVF is not a CRA-covered record, and even DOJ's main authority recognizes courts are "open for [] determination" if there is a "genuine dispute" whether the statute encompasses a "particular paper or record." *Lynd*, 306 F.2d at 226. Accordingly, the district court had authority to determine that the QVF fell outside the reach of the CRA.

Most of Intervenors' other arguments are also unaffected. DOJ does not (and could not) argue that the scope of a district court's review of a Title III demand has any bearing on whether the CRA preempts state law or whether the Privacy Act poses an independent bar to relief. Additionally, ascertaining whether a State's compliance with the NVRA and HAVA is an allowable purpose under the CRA does not involve evaluating any individual demand but rather presents a question of statutory interpretation about Congress's authorization to DOJ. And while DOJ seems to suggest that the district court's statement that a court must "decide whether the agency has met the statutory requirements" for a document demand "goes further than appropriate," Br. 30, DOJ does not explain why, and it is hard to see how a court could *not* be allowed to evaluate whether an agency's demand satisfies statutory requirements (such as whether DOJ included a "basis" in its demand letter) before ordering production. *See, e.g., United States v. Powell*, 379 U.S. 48, 58 (1964)

48

(agency making document demand must show "that the administrative steps required by the Code have been followed").

DOJ contends that courts are entirely forbidden from any evaluation of the "factual support" or the "sufficiency" of DOJ's statement of its basis and purpose. Br. 24 (citing *Lynd*, 306 F.2d at 226). That is also wrong. The Supreme Court has made clear that an agency must show its "investigation will be conducted pursuant to a legitimate purpose" and that the agency's "inquiry" (*i.e.*, its demand for documents) "may be relevant to the purpose." *Powell*, 379 U.S. at 57. It has also held that where (as here) an agency must invoke a court's process to enforce its demand, a "court may not permit its process to be abused," which would occur if the demand was not made in "good faith." *Id.* at 58. *Powell*'s holdings apply here because the relevant text of the statute in *Powell* (26 U.S.C. §7604(a)) is identical to the text of the CRA (52 U.S.C. §20705), providing that federal courts "shall have jurisdiction by appropriate process to compel" the production sought. *See Markwood*, 48 F.3d at 978-79 (discussing *Powell* and later concluding that "a district court is not a 'rubber stamp' for agency demands for the production of information"). A court must be allowed to assure itself that a government demand has "factual support" or "sufficiency," because, if it does not, enforcing the demand would be an abuse of the court's process.

DOJ is also wrong about the proper procedure for a Title III claim, which would be relevant if the Court remanded this case. *Infra* 51-53. If the Court does so, it should reject DOJ's suggestion that Title III creates a "special statutory proceeding" where the Federal Rules do not apply. Br. 23-24. That position is irreconcilable with *Powell*, which held that where a statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction"—as is true of the CRA—"the Federal Rules of Civil Procedure apply." 379 U.S. at 58 n.18. Nor would it be appropriate to otherwise truncate the proceedings, as DOJ suggests. Br. 24-25. The case DOJ cites for that proposition *allowed* shortened procedures but did not *require* them. *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971). It also involved a run-of-the-mill IRS investigation of a taxpayer and was thus fundamentally different than the unprecedented facts of this case, where DOJ invokes newfound authority to seek sensitive voter information about every registered voter in America and raises substantial federalism concerns relating to the proper role of the federal government vis-à-vis the States in voter registration. Summary proceedings are not appropriate for such an impactful case. But even if this Court were to think *some* form of shortened procedures were appropriate, at a minimum Intervenors would be entitled to appropriate discovery and further hearing.

**IV. If the Court vacates the dismissal, the proper way forward is to remand for additional proceedings.**

There are multiple grounds on which the Court can affirm. If, however, the Court were to vacate the Judgment, further proceedings in district court are necessary, and the Court should reject DOJ's audacious request to "remand with instructions . . . to produce" the QVF. Br. 2. DOJ never moved for summary judgment or for an order to compel production in the district court—even though they did so in many other cases, *see, e.g.*, Mot. to Show Cause, *United States v. Bellows*, No. 25-cv-468 (D. Me. Sep. 18, 2025), ECF No. 5. The only motions before the district court were motions to dismiss, and a denial of a Rule 12(b) motion does not mean the plaintiff wins the case. Even if this Court vacates the Judgment because it finds DOJ's Complaint to state a facially plausible claim, Defendants and Intervenors would still be entitled to seek appropriate discovery and to raise affirmative defenses.

For example, even if the Court were to conclude that DOJ's correspondence contained statements regarding DOJ's basis and purpose that, if true, would satisfy the CRA, Intervenors are entitled to discovery into whether DOJ's asserted "basis" and "purpose" were accurate, or whether DOJ otherwise acted in good faith. A government demand should not be enforced if it was made in "bad faith," which could include "a conscious decision . . . to pursue a groundless allegation without hope of proving that allegation." *Markwood*, 48 F.3d at 978. DOJ's demand would

51

also be made in bad faith if its asserted basis and purpose were pretextual, since "a request grounded in pretext cannot be made in good faith." *United States v. Adams*, 777 F.Supp.3d 185, 232 (S.D.N.Y. 2025). The district court recognized the potential availability of a "bad faith" defense but declined to consider it because "that contention goes to the truth of the DOJ's allegations and cannot be addressed on a motion to dismiss." R.67, PageID#908.

There are plenty of reasons to suspect that DOJ's demands may have been made in bad faith. *See Weber*, 2026 WL 118807, at *10-12 (concluding DOJ's stated purpose in demanding California's voter list was "pretextual" and "contrived"); *Oregon*, 2026 WL 318402, at *11 (expressing "serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data"). Among other things, (1) there is public reporting that DOJ's asserted purpose for these demands is "dishonest",[10] (2) DOJ claims it has a "basis" to seek *Michigan*'s voter list specifically, even as it made essentially carbon-copy demands to nearly every other State, and (3) DOJ has provided no coherent explanation—or consistent explanation of its "purpose"—as to why it needs Michigan's unredacted QVF, notwithstanding that it received (and ignored)

---

[10] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

Michigan's detailed explanations regarding its compliance with the NVRA, and in the face of this Court's recent holding that "Michigan's multi-layered efforts" at list maintenance were "more than reasonable." *Benson*, 136 F.4th at 628; *see supra* 13-14. Accordingly, even if the Court finds that outright dismissal was error, Intervenors are entitled to further proceedings. *United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into the government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). In addition, because Intervenors have raised serious questions about the lawfulness of DOJ's actions—and every court to have reached the issue so far has dismissed DOJ's complaints—there is no basis to grant DOJ's request that the mandate issue expeditiously or to shorten the time to petition for further review. Br. 49.

## CONCLUSION

The decision below should be affirmed.

April 13, 2026

Respectfully submitted,

*s/ Aria C. Branch*
Aria C. Branch
Joshua C. Abbuhl
Branden D. Lewiston
Derek A. Zeigler
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
abranch@elias.law
jabbuhl@elias.law
blewiston@elias.law
dzeigler@elias.law

Sarah Prescott
**SALVATORE PRESCOTT PORTER & PORTER**
105 E. Main St.
Northville, MI 48167
Telephone: (248) 679-8711
prescott@spplawyers.com

*Counsel for Intervenors*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Sixth Circuit Rule 32(b) because it contains 12,900 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word version 2603.

*s/ Aria C. Branch*
Aria C. Branch

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2026, I electronically filed the above document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF System, which will provide electronic copies to counsel of record. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*s/ Aria C. Branch*
Aria C. Branch

# DESIGNATION OF DISTRICT COURT RECORD

Intervenors-Appellees, pursuant to Sixth Circuit Rule 30(g), designate the

following documents from the district court's electronic records:

| R. No. | Document Description | PageID# Range |
|---|---|---|
| 1 | Complaint | 1-19 |
| 39 | Defendants Michigan Secretary of State Jocelyn Benson's and State of Michigan's Brief in Support of Motion to Dismiss | 440-489 |
| 39-2 | July 21, 2025 Letter from Michael E. Gates (DOJ) to Secretary of State Jocelyn Benson | 491-495 |
| 39-4 | August 14, 2025 Letter from Harmeet K. Dhillon (DOJ) to Secretary of State Jocelyn Benson | 499-502 |
| 39-5 | September 2, 2025 Letter from Khyla D. Craine (Secretary of State's Office) to Michael E. Gates (DOJ) | 503-505 |
| 39-6 | September 9, 2025 Letter from Khyla D. Craine (Secretary of State's Office) to Michael E. Gates (DOJ) | 506-512 |
| 47 | Motion to Dismiss of Defendant-Intervenors Michigan Alliance for Retired Americans, Donald Duquette, and Keely Crimando | 563-597 |
| 53 | United States' Memorandum of Law in Opposition to Defendants' Motion to Dismiss | 664-685 |
| 58 | Intervenors' Reply in Support of Motion to Dismiss | 709-727 |
| 60 | Defendants Michigan Secretary of State Jocelyn Benson's and State of Michigan's Reply Brief in Support of Motion to Dismiss | 729-748 |
| 67 | Opinion | 892-914 |
| 68 | Order | 915 |
| 69 | Judgment | 916 |
| 70 | Notice of Appeal | 917-919 |

# ADDENDUM

**52 U.S.C. §20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**52 U.S.C. §20702. Theft, destruction, concealment, mutilation, or alteration of records or papers; penalties.**

Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**52 U.S.C. §20703. Demand for records or papers by Attorney General or representative; statement of basis and purpose.**

Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

**52 U.S.C. §20705. Jurisdiction to compel production of records or papers.**

The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.