No. 26-1225

## In the
## United States Court of Appeals for the Sixth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN
*Defendants-Appellees*

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO
*Intervenors-Appellees.*

On Appeal from the United States District Court for the
Western District of Michigan at Grand Rapids
Hon. Hala Y. Jarbou
1:25-cv-01148

### *Amici Curiae* Brief of Local Election Officials in Support of Defendants-Appellees and Affirmance

Sarah Riley Howard
Elizabeth L. Geary
PINSKY SMITH PC
146 Monroe Center Street NW,
 Suite 418
Grand Rapids, MI 49503-2818
Telephone: (616) 451-8496
showard@pinskysmith.com

Jonathan Miller
Nicholas Harper
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Telephone: (510) 214-6960
jon@publicrightsproject.org

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................. 1

SUMMARY OF ARGUMENT ............................................... 1

ARGUMENT .......................................................................... 3

I.  Courts Must Evaluate the Basis and Purpose of a Demand for Election Records under the CRA .................. 3

    A.  A recent surge in records requests has burdened the offices of local election officials ........................... 3

    B.  Courts may evaluate the CRA's required statement of the basis and purpose ........................... 8

II. DOJ Has Not Provided a Legitimate Basis and Purpose for its Requests for Election Records under the CRA. ......................................................................... 12

    A.  Michigan's list maintenance procedures satisfy the requirements of the NVRA ............................... 13

        1.  Congress passed the NVRA to increase voter registration while maintaining accurate voter rolls. .......................................... 14

        2.  As the Secretary explained to DOJ, Michigan's list maintenance program removes voters who have moved or died in compliance with the NVRA's requirements .... 17

        3.  Michigan's program is reasonable. ................... 23

    B.  The EAVS data does not provide an adequate basis for DOJ's demand ........................................... 25

CONCLUSION ................................................................... 32

APPENDIX A – List of *Amici Curiae* ................................... 34

# TABLE OF AUTHORITIES

**CASES**

*A. Philip Randolph Inst. v. Husted,*
838 F.3d 699 (6th Cir. 2016), *rev'd on other grounds*, 584 U.S. 756 (2018) ........................................... 16

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ...................................... 14

*Detroit Free Press, Inc. v. Dep't of Consumer & Indus. Servs.,*
631 N.W.2d 769 (Mich. Ct. App. 2001 ............................. 7

*Husted v. A. Philip Randolph Inst.,*
584 U.S. 756 (2018) ............................................. 14, 15, 17

*Mich. Fed'n of Tchrs. & Sch. Related Pers., AFT, AFL-CIO v. Univ. of Mich.,*
753 N.W.2d 28 (Mich. 2008) ............................................ 7

*Pub. Int. Legal Found. v. Benson,*
No. 25-437, 2026 U.S. LEXIS 1149 (U.S. Mar. 2, 2026) .................................................................. 24

*Pub. Int. Legal Found. v. Benson,* 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied,* No. 25-437, 2026 U.S. LEXIS 1149 (U.S. Mar. 2, 2026) ............................. *passim*

*United States of America v. Galvin,* No. CV 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) .............. 10

*United States v. Oregon,*
No. 25-cv-01666, 2026 U.S. Dist. LEXIS 25259 (D. Or. Feb. 5, 2026), *appeal filed,* No. 26-1231 (9th Cir. Mar. 3, 2026) ............................................................. 9, 10

*United States v. Powell,*
379 U.S. 48 (1964) ....................................................... 10

*United States v. Weber*,
No. 25-cv-09149, 2026 U.S. Dist. LEXIS 8545 (C.D.
Cal. Jan. 15, 2026), *appeal filed*, No. 26-1232 (9th
Cir. Feb. 25, 2026) ....................................................... 9, 11

**STATUTES**

52 U.S.C. § 20501(a)(2) ........................................................ 1

52 U.S.C. § 20507(a)(3) ....................................................... 15

52 U.S.C. § 20507(a)(4) .................................................. 15, 24

52 U.S.C. § 20507(b) ........................................................... 16

52 U.S.C. § 20507(c) ........................................................... 31

52 U.S.C. § 20507(c)(1)........................................................ 16

52 U.S.C. § 20507(c)(2)........................................................ 15

52 U.S.C. § 20507(d)........................................................... 29

52 U.S.C. § 20507(d)(1) ....................................................... 15

52 U.S.C. § 20703 ................................................................. 8

52 U.S.C. § 20705 ................................................................. 9

52 U.S.C. § 20922 ............................................................... 26

Mich. Comp. Laws § 15.243(1)(a) .......................................... 6

Mich. Comp. Laws § 168.21 ................................................... 1

Mich. Comp. Laws § 168.499 ................................................. 1

Mich. Comp. Laws § 168.509aa(1)–(3) ................................. 20

Mich. Comp. Laws § 168.509aa(3)(c)(i) ................................ 20

Mich. Comp. Laws § 168.509aa(5)......................................... 19

Mich. Comp. Laws § 168.509aa(5)(c)..................................... 19

Mich. Comp. Laws § 168.509dd(1)........................................20

Mich. Comp. Laws § 168.509dd(3)........................................20

Mich. Comp. Laws § 168.509gg(1) ..........................................7

Mich. Comp. Laws § 168.509n ..............................................17

Mich. Comp. Laws § 168.509o(1) ..........................................17

Mich. Comp. Laws § 168.509o(4) ..........................................21

Mich. Comp. Laws § 168.509o(5) ..........................................18

Mich. Comp. Laws § 168.509z(a)–(b)....................................19

Mich. Comp. Laws § 168.510(2)–(3) .....................................21

Mich. Comp. Laws §§ 15.231–.246 .........................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1 ..................................................14

**OTHER AUTHORITIES**

Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?* (Aug. 24, 2018)..........................27

ERIC, Inc., *Security*, https://perma.cc/GM4Z-K6FL.............18

ERIC, Inc., *What is ERIC?*, https://perma.cc/7PH6-JVQS .........................................................................18

Jack Williams, MIT Election Data + Sci. Lab, *The Election Administration and Voting Survey* Elections Performance Index (Aug. 16, 2021).................27

Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (July 8, 2025)....................27

Kyle Yoder & Alice Tan, *Election Officials & the Misuse of Public Records Requests*, CEIR (June 14, 2024) ....... 5, 6

Mich. Sec'y of State, Bureau of Elections, Election Officials' Manual - Chapter 2: Voter Registration (Nov. 2024) ....................................................................... 23

Mich. Sec'y of State's Off., *Voter registration cancellations, Move deadline, Upcoming training, and more*, News Update for Election Adm'rs (Mar. 6, 2025) ................................................................... 29

MIT Election Data + Sci. Lab *About*, https://perma.cc/WV27-8J5Y ...................................... 27

Paul Gronke & Paul Manson, *Findings from the Reed College EVIC 2023 Survey of Local Election Officials* (Nov. 16, 2023) ...................................... 4

Paul Gronke et al., *Findings from the 2024 EVIC Local Election Official Survey* (Feb. 2025) ................................. 5

Press Release, Mich. Dep't of State, *Benson: All voters receiving applications to vote by mail* (May 19, 2020) ............................................................... 29

U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests* (Mar. 2023) .............................. 4

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* at 231–233 (June 2025) ........ 26, 29

## STATEMENT OF INTEREST

*Amici* are local election officials representing jurisdictions in Michigan and across the country.[1] They are duty-bound under federal law to promote the exercise of the right to vote. 52 U.S.C. § 20501(a)(2). Many of the *amici*—including Michigan county, city, and township clerks—administer local, state, and federal elections in their respective jurisdictions, including by registering voters. *See, e.g.,* Mich. Comp. Laws §§ 168.21, 168.499. Like local election officials in many states, those in Michigan also maintain the voter registration records for their respective jurisdictions under the supervisory control of the Secretary of State ("the Secretary"). *Id.* § 168.21. Drawing from their vast experience, *amici* write to highlight the lack of a legitimate basis by the Department of Justice ("DOJ") to demand sensitive voter information.

## SUMMARY OF ARGUMENT

The Civil Rights Act of 1960 ("CRA") requires DOJ to state the basis and purpose of any request for election records. That requirement is

---

[1] All parties have consented to the filing of the brief. No party or party's counsel authored this brief in whole or part. No party, counsel, or person—other than *amici curiae* or their counsel—contributed money that was intended to fund preparing or submitting the brief. A list of *amici* is at Appendix A.

meaningful and demands more than a superficial statement from DOJ. To that end, courts may inquire into the basis and purpose of DOJ's request for records in exercising their authority to compel production of those records.

DOJ's initial demand to the Secretary did not include any statement of its basis or purpose. *See* July 21, 2025 Letter from DOJ, RE 39-2, Page ID #492-495. A subsequent letter stated that the "purpose of the request" was to ascertain whether Michigan complied with voter list maintenance obligations in federal law. August 14, 2025 Letter from DOJ, RE 39-4, Page ID #501. DOJ has never provided a statement of the actual basis of its request. Even if the Court assumes that the questions outlined in DOJ's initial demand constitute a statement of the basis for its demand, as the district court did, those questions are insufficient to constitute a legitimate basis. Michigan's list maintenance procedures go far beyond what is required by federal law, and the data cited by DOJ does not suggest otherwise. That data, which comes from standardized national surveys, provides incomplete information about Michigan's list maintenance activities. It cannot be used to support a basis for DOJ to demand sensitive voter information from Michigan election officials.

**ARGUMENT**

## I. Courts Must Evaluate the Basis and Purpose of a Demand for Election Records under the CRA.

Local election officials have first-hand experience dealing with requests for voter information. While *amici* work hard to respond to lawful information requests, they have seen the cost exacted by overbroad and invasive requests that divert staff from their primary responsibilities. Requests can cross the line from burdensome to unlawful when requesters demand sensitive information about voters. That is true whether the demand comes from individuals or the government. In such cases, courts act as a backstop to protect the privacy rights of individuals. Courts should continue to function in that role to ensure that voters' sensitive information is not released unless it is truly necessary. The CRA provides federal courts with that authority, allowing them to inquire into the underlying reasons that DOJ is seeking election records before compelling their production.

### A. A recent surge in records requests has burdened the offices of local election officials.

Local election officials have historically provided voter information to the public through requests for records. State sunshine laws, including Michigan's Freedom of Information Act ("FOIA"), Mich. Comp. Laws §§

3

15.231–15.246, allow the public to access many government records, including certain voter information. Local election officials take their responsibility to ensure election transparency seriously and understand the importance of transparency in ensuring public confidence in the electoral process. A recent surge in public records requests, however, has unduly burdened the offices of local election officials and threatens to impede their ability to conduct elections.

*Amici* and other local election officials around the country have seen the number of records requests expand significantly in recent years.[2] National surveys of local election officials demonstrate that the vast majority of officials surveyed have begun spending increased time on records requests.[3] Not only has the volume of such requests increased,

---

[2] *See* U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests* at 1 (Mar. 2023), https://perma.cc/2RDL-A6VJ.

[3] The Elections & Voting Information Center ("EVIC") is a non-partisan academic research center focused on election administration. EVIC has conducted an annual survey of local election officials ("LEOs") since 2018. One of its top-line findings from its 2023 survey was that "LEOs are notably impacted by a rapid increase in public records requests and citizen inquiries." Paul Gronke & Paul Manson, *Findings from the Reed College EVIC 2023 Survey of Local Election Officials* at 2 (Nov. 16, 2023), https://perma.cc/55GR-GDVR. Particularly in larger jurisdictions, almost all local election officials surveyed reported an increase in public records requests. *Id.* at 13.

but the requests themselves have become more burdensome.[4] Thus, public records requests are having a significant impact on the ability of local election officials to perform their duties, including the vital work of administering elections.

*Amici* have seen this first-hand in their own offices. In recent years, local election officials received record requests that are different in nature from those they have traditionally received. Those requests may seek a very broad range of records or cover a long period of time.[5] Many of the requests appear to be grounded in misinformation about election

---

[4] In its 2024 survey, EVIC included a new question exploring the challenges posed by record requests. *See* Paul Gronke et al., *Findings from the 2024 EVIC Local Election Official Survey* at 20 (Feb. 2025), https://perma.cc/66YU-CMDV. In response, 72 percent of local election officials surveyed reported that a smaller subset of requests disproportionately consume their time. *Id.* Over 60 percent reported that records requests are unduly burdensome and impede the ability of local election officials to perform their duties. *Id.*

[5] The Center for Election Innovation and Research ("CEIR") is a nonprofit that works with election officials to build confidence in elections. As part of that work, CEIR has researched the recent increase in public records requests and its effect on election administration. In June 2024, CEIR published a research paper focused on that topic and potential solutions. *See* Kyle Yoder & Alice Tan, *Election Officials & the Misuse of Public Records Requests*, CEIR (June 14, 2024), https://perma.cc/3HRM-ULMF.

administration that has proliferated in recent years.[6] Such requests result in significant work for local election officials and their staff. One Michigan local election official reported that public records requests and engaging directly with voters accounted for 25 to 50 percent of the workload of his staff in recent years.[7] The increased staff time required to respond to public records requests has forced local election officials to shift staff responsibilities.

Local election officials are accustomed to receiving requests for public voter registration information and have processes in place to ensure that their responses include permissible information while excluding or redacting individual voter information that should not be disclosed. Michigan's FOIA law contains an exemption for personal information for which disclosure would constitute an "unwarranted invasion of an individual's privacy." Mich. Comp. Laws § 15.243(1)(a). Michigan Election Law also prohibits election officials from releasing certain sensitive information about voters, including an individual's

---

[6] *Id.* at 1.

[7] Jane C. Timm, *Amateur fraud hunters bury election officials in public records requests*, NBC News (Feb. 12, 2022), https://perma.cc/65N9-GJUE.

driver's license or state identification card number, birthdate, and telephone number. *Id.* § 168.509gg(1). While local election officials in Michigan routinely provide certain voter information to members of the public in response to FOIA requests, they have processes in place to ensure that certain sensitive information is excluded.

Some of the records requests are not only burdensome but are also unlawful. In those instances, local election officials may have to rely on courts to determine the duty of local election officials to respond. Courts act as a backstop against unlawful requests and perform an important function in protecting individuals from the release of their sensitive information. For example, Michigan courts have routinely upheld the decisions of public officials to withhold certain sensitive information when responding to FOIA requests to protect the privacy of individuals. *See, e.g.*, *Mich. Fed'n of Tchrs. & Sch. Related Pers., AFT, AFL-CIO v. Univ. of Mich.*, 753 N.W.2d 28, 31 (Mich. 2008); *Detroit Free Press, Inc. v. Dep't of Consumer & Indus. Servs.*, 631 N.W.2d 769, 772, 775 (Mich. Ct. App. 2001).

*Amici* offer their experience in managing burdensome and overbroad requests for voter information to provide context to the review

of the district court's decision. Local election officials rely on courts to act as a backstop to enforce legal prohibitions against disclosing sensitive information about individuals in response to records requests from the public. Courts should perform that same function for requests for records under the CRA.

### B.     Courts may evaluate the CRA's required statement of the basis and purpose.

Although the district court reached the correct conclusion that Appellants failed to state a claim under the CRA, its reasoning was flawed. In particular, the district court concluded that the CRA does not allow a court "to evaluate the substance of the DOJ's purported basis and purpose." District Court Op., RE 67, Page ID #908. That finding is not supported by the statutory text of the CRA or Supreme Court precedent interpreting similar statutes.

The CRA allows the Attorney General to demand certain election-related records and papers from state election officials. 52 U.S.C. § 20703. When making such a demand, the Attorney General must provide "a statement of the basis and the purpose therefor." *Id.* If a recipient does not comply with a demand from the Attorney General, federal courts "shall have jurisdiction *by appropriate process* to compel the production

of such record or paper." *Id.* § 20705 (emphasis added). By failing to give effect to the term "appropriate process" in the statute granting jurisdiction, the district court incorrectly concluded that it lacked authority to inquire into the basis and purpose for the demand.

The district court's determination that it lacked authority to evaluate the substance of DOJ's request stands in isolation. DOJ has filed federal lawsuits against 30 states and the District of Columbia seeking to compel election officials to provide sensitive voter data. Although most of those lawsuits are still working their way through the trial courts, three other district courts have reached decisions on the merits of DOJ's claim. *United States v. Oregon*, No. 25-cv-01666, 2026 U.S. Dist. LEXIS 25259 (D. Or. Feb. 5, 2026), *appeal filed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 25-cv-09149, 2026 U.S. Dist. LEXIS 8545 (C.D. Cal. Jan. 15, 2026), *appeal filed*, No. 26-1232 (9th Cir. Feb. 25, 2026). Two dismissed DOJ's claims, concluding that DOJ had not provided an adequate statement of the basis and purpose of its request. *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *24-31; *Weber*, 2026 U.S. Dist. LEXIS 8545 at *28-29. One did not reach the question of the adequacy of the basis and purpose, finding that it had not asserted a basis at all.

*United States of America v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129, at *4 (D. Mass. Apr. 9, 2026).

The district court in *Oregon* soundly rejected DOJ's assertion that courts are precluded from examining the stated basis and purpose of a demand under the CRA. *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *22. The court started with the language of the statute, which provides that a district court has jurisdiction "by appropriate process to compel the production of" records and papers demanded by the Attorney General. *Id.* at *22. Because the term "appropriate process" is not defined, the court looked to a statute that provided courts with jurisdiction to compel "by appropriate process" the production of records demanded by the IRS. *Id.* at *23. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court concluded that the Federal Rules of Civil Procedure applied to actions under that statute and that courts could "inquire into the underlying reasons" for record demands. *Id.* Relying on that precedent, the district court concluded that it had the authority to evaluate whether DOJ's demand under the CRA stated an adequate basis and purpose, and thus whether it constituted a valid demand. *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *24.

The district court in *Weber* came to a similar conclusion. *Weber*, 2026 U.S. Dist. LEXIS 8545, at *23-24. That court also determined that the Federal Rules of Civil Procedure allowed the court to evaluate whether DOJ had met the statutory requirement to state the basis and purpose for its request. *Id.* at *24. Moreover, as the court explained:

> The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute. Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand.

*Id.* at *28.

The district court erred in failing to give meaning to the words "appropriate process" in the statutory text granting district courts with jurisdiction to compel production. In doing so, it reached the incorrect conclusion that it lacked authority to evaluate DOJ's asserted basis and purpose. The conclusions of other district courts to examine the issue, in contrast, are consistent with the text and purpose of the CRA. Accordingly, *amici* urge this Court to seriously consider their analysis.

11

## II. DOJ Has Not Provided a Legitimate Basis and Purpose for its Requests for Election Records under the CRA.

DOJ's demand did not specifically identify the basis for its demand. *See* July 21, 2025 DOJ Letter RE 39-2, Page ID #492-495. Nonetheless, the district court concluded that DOJ's stated basis included "purported anomalies" in Michigan's voter registration data, including "a high percentage of registered voters, a low confirmation notice rate, a low voter removal rate, and a high duplicate registration rate."[8] District Court Op., RE 67, Page ID #907. That basis is insufficient in numerous ways.

*Amici* have extensive experience with state list maintenance practices. They take their responsibilities to maintain accurate, up-to-date voter registration records seriously. They follow the requirements of federal and state law, which require local election officials to balance list maintenance responsibilities with prohibitions on removing voters from the rolls without first providing notice and sufficient process. The

---

[8] The district court also cited DOJ's assertion that it had received a complaint regarding Michigan's compliance with federal requirements relating to the provision of unique voter identifiers. District Court Op., RE 67, Page ID #907. DOJ has not address why sensitive voter data is necessary, as the complaint appears to be unrelated to the sensitive data.

"purported anomalies" raised by DOJ are taken out of reports from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS") and do not provide an accurate picture of Michigan's compliance with the list maintenance requirements of the National Voter Registration Act ("NVRA"). EAVS data can be used to identify trends, but cherry-picked data from a few categories is not a reliable or sufficient basis to suspect that Michigan is violating the NVRA.

## A. Michigan's list maintenance procedures satisfy the requirements of the NVRA.

The NVRA imposes an obligation on states to maintain accurate voter registration lists while also ensuring that voters are provided with sufficient notice before removal. The statute does not mandate specific procedures for states to meet those obligations; it merely requires states to utilize programs that make a reasonable effort to remove ineligible voters. States need not have a perfect program, but merely one that makes a rational and sensible attempt to remove ineligible voters. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, No. 25-437, 2026 U.S. LEXIS 1149 (U.S. Mar. 2, 2026). Michigan's list maintenance program as executed by the state and local election officials far exceeds that mandate.

**1. Congress passed the NVRA to increase voter registration while maintaining accurate voter rolls.**

The Constitution's Election Clause empowers the states to regulate and administer elections but also allows Congress to preempt state laws governing elections. U.S. Const. art. I, § 4, cl. 1. For most of the nation's history, states retained the sole authority to determine how to maintain their voter registration rolls. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). In 1993, Congress passed the NVRA, which created a limited role for the federal government related to voter registration systems. "The Act has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). The statute thus balances "competing interests" in "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls[.]" *Id.*

The NVRA requires states to ensure that all eligible applicants are registered to vote and that voters are not removed from the voter rolls except under the following specified circumstances: (1) the voter has requested removal; (2) the voter has been convicted of a crime or is mentally incapacitated, if provided by state law; (3) the voter has died; or

(4) the voter has moved outside the election jurisdiction. 52 U.S.C. §§ 20507(a)(3)–(4). The statute further requires states to "conduct a general program that makes a *reasonable effort* to remove" voters who no longer belong on the rolls because they have died or moved. *Id.* § 20507(a)(4) (emphasis added).

The NVRA imposes procedural requirements on states to ensure that eligible voters are not removed from voter rolls without sufficient process. 52 U.S.C. §§ 20507(b)–(d). Before the enactment of the NVRA, some states removed registrants without first providing notice. *Husted*, 584 U.S. at 762. The NVRA changed that by requiring prior notice before removing a voter from the rolls. 52 U.S.C. § 20507(d)(1). Under the statute, a state may only remove a voter from the rolls on change-of-address grounds if the voter confirms in writing they have moved, or the voter has failed to respond to a confirmation notice sent by the election official and has failed to vote in the two federal elections following the notice. *Id.* The NVRA further prohibits states from using a program intended to "systematically" remove voters from the rolls in the 90 days leading up to a primary or general federal election with very few exceptions. *See id.* § 20507(c)(2).

Under the NVRA, any program to remove voters from the rolls must be non-discriminatory and must not remove a voter solely due to their failure to vote. 52 U.S.C. § 20507(b). The NVRA does not require any specific program to remove ineligible voters, but it does spell out a procedure that states *may* use to identify and remove voters who have moved that would comply with the NVRA. *Id.* § 20507(c)(1). The relevant provision of the NVRA, often referred to as the safe harbor provision, makes clear that states may satisfy the statute's list maintenance requirement by establishing a program under which election officials send confirmation notices to voters who appear to have moved based on the information contained in the National Change of Address ("NCOA") database maintained by the United States Postal Service ("USPS"). *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 n.2 (6th Cir. 2016) ("Because that subsection describes the NCOA Process as one way in which states 'may' comply with their obligation under the NVRA to identify and remove voters who are no longer eligible due to a change of residence, the NCOA Process is sometimes referred to in this litigation as the 'Safe–Harbor Process.'" (citation omitted)), *rev'd on other grounds*, 584 U.S. 756 (2018). The safe harbor provision does not require states to

utilize the outlined procedure. *Husted*, 584 U.S. at 777. States may instead establish their own procedures to comply with the NVRA, which Michigan has done.

### 2. As the Secretary explained to DOJ, Michigan's list maintenance program removes voters who have moved or died in compliance with the NVRA's requirements.

Following the enactment of the NVRA, the Michigan legislature amended the Election Law to ensure compliance with the federal statute. As the state's top election official, the Secretary is responsible for ensuring the state's compliance with the NVRA. Mich. Comp. Laws § 168.509n. As part of that responsibility, the Election Law requires the Secretary to develop and supervise the establishment of a statewide qualified voter file, known as the QVF. *Id.* § 168.509o(1). The Department of State's Bureau of Elections ("BOE"), as well as municipal and county clerks like the *amici* from Michigan, maintain the QVF and ensure that it is kept up to date. Together, state and local election officials in Michigan complete several processes designed to keep their lists up to date while preserving eligible voters' status as registered voters.

Michigan Election Law requires the Secretary to participate with other states in one or more "recognized multistate programs or services"

to assist its efforts in maintaining up-to-date records of the addresses and registration status of voters. Mich. Comp. Laws § 168.509o(5). The Secretary satisfies that mandate by working with the Electronic Registration Information Center ("ERIC"), a non-profit membership organization that aims to help states improve the accuracy of voter rolls. *See Pub. Int. Legal Found.*, 136 F.4th at 628 ("Yet Michigan goes further by also actively employing a third party, ERIC, to assist in identifying deceased registrants. This additional effort only further enhances the reasonableness of Michigan's efforts to maintain accurate voter rolls."). The members of ERIC, which include 25 states and the District of Columbia, share voter registration data with one another to keep voter rolls accurate and up to date.[9]

The Secretary receives information indicating a voter has moved out of Michigan through notifications from other states and ERIC. The Secretary receives notice from other states when a registered voter has surrendered their Michigan driver's license. Through its member states,

---

[9] ERIC, Inc., *What is ERIC?*, https://perma.cc/7PH6-JVQS. States apply a cryptographic one-way hash to sensitive elements of voter data before sending data to ERIC, keeping the sensitive data private and secure. ERIC, Inc., *Security*, https://perma.cc/GM4Z-K6FL.

ERIC receives information about voters who have registered to vote in another state and provides that information to the Secretary. In both instances, the BOE will send a confirmation notice to the voter's Michigan address. *See* Mich. Comp. Laws § 168.509aa(5). The mailing of that notice starts the cancellation "clock" that is required by the NVRA. *See* 52 U.S.C. § 20507(d)(1). If the voter does not respond to the notice and does not vote during the next two federal November elections, the voter's registration is cancelled, and their name is removed from the QVF. *Id.* § 168.509aa(5)(c).

County and municipal clerks, including *amici* from Michigan, take an active role in ensuring that the QVF has up to date addresses for registered voters. The Election Law requires the Secretary to notify local clerks upon receipt of certain information indicating that the residents or former residents of the clerk's city or township have moved. Mich. Comp. Laws § 168.509z. The Secretary must provide such notice when a registered voter changes the address for their driver's license or state ID or is issued a driver's license in a different state. *Id.* § 168.509z(a)–(b).

Local clerks also receive other types of residency information that triggers their obligation to engage in voter list maintenance procedures.

When a local clerk receives other "reliable information" that a registered voter has moved outside the election jurisdiction, the clerk sends a confirmation notice to the voter's address. Mich. Comp. Laws §§ 168.509aa(1)–(3). The clerk may receive different forms of reliable information, including election mail returned by the USPS as undeliverable or other information from the USPS indicating a change of address. If the voter does not respond to the notice and does not vote during the next two federal November elections, the voter's registration is cancelled, and their name is removed from the QVF. *Id.* § 168.509aa(3)(c)(i).

Local clerks are also empowered to operate other programs to remove voters who are no longer qualified in their election jurisdictions. Mich. Comp. Laws § 168.509dd(1). Clerks may engage in various activities as part of those programs, including house-to-house canvassing, sending a "general mailing to voters for address verifications," participating "in the national change of address program established by the postal service," or "[o]ther means the clerk considers appropriate." *Id.* § 168.509dd(3).

The Election Law requires the Secretary to utilize a process to cancel the voter registration of deceased voters using the Social Security Administration's "death master file" for driver licenses and state identification cards. Mich. Comp. Laws § 168.509o(4). Under that process, the Secretary receives reports from the death master file on a regular basis, and the BOE cancels all registered voters who appear on those reports. *Id.* The BOE also provides the cancelled voter information to the clerks of each county, city, or township to assist with their obligations to maintain the QVF. *Id.*

However, the steps that local election officials take to ensure that deceased individuals are removed from the QVF go beyond review of the death master file. County clerks must provide every city and township clerk in the county with monthly reports of all deceased individuals of voting age in the county. Mich. Comp. Laws § 168.510(2)–(3). This belt-and-suspenders approach ensures that deceased individuals are removed from the registration rolls if there is any data missing from the death master file. City and, in some cases, township clerks may receive information from the county clerk before transmission from the Social Security Administration, which can prove useful close to an election. City

and township clerks can also cancel voter registrations when they learn through other means that a voter has died. If a clerk has an obituary or local death notice or receives a written notice from the deceased voter's next of kin, the clerk will cancel the voter's registration before information is received through the Social Security Administration. This ensures that the QVF can be updated with accurate information in the days leading up to an election.

The Secretary also uses procedures beyond those required by statute and data beyond what the federal government maintains to identify deceased individuals. *See Pub. Int. Legal Found.*, 136 F.4th at 618–20. The Secretary's office employs information from the state's "CARS" system, a software system that manages the database of individuals with driver's licenses and state identification. *Id*. at 618–19. The CARS system receives information about Michigan resident deaths from federal agencies and members of the public. *Id*. at 619. That information is used to update the QVF. *Id*. The Secretary also receives bi-monthly reports of potentially deceased individuals from ERIC, which is also used to remove individuals from the QVF.

Finally, additional voter registration and list maintenance practices are described in the Secretary of State's Election Officials' Manual.[10] The Secretary and local clerks employ multiple practices to ensure that the voter registration rolls are kept accurate and up to date. They promptly remove the names of deceased individuals and begin the process to cancel voters upon receipt of information indicating that a voter may have moved. Some of the practices employed by election officials are mandated by the Election Law, but election officials often go beyond statutorily mandated procedures to ensure accurate voter registration rolls.

### 3. Michigan's program is reasonable.

Michigan's list maintenance program employs the safeguards in the NVRA aimed at ensuring that voters are not removed without notice, while also satisfying the statute's requirements for list maintenance. Michigan's program far exceeds the requirements set forth in the NVRA's safe harbor provision and satisfies the statute's "reasonable effort" requirement.

---

[10] Mich. Sec'y of State, Bureau of Elections, Election Officials' Manual - Chapter 2: Voter Registration (Nov. 2024), https://perma.cc/YQM3-BWGC.

The NVRA requires only that states conduct a program that makes a "reasonable effort" to remove voters who are ineligible because they have moved or are deceased. 52 U.S.C. § 20507(a)(4). This Court has recently concluded that Michigan's program for removing deceased voters satisfies the "reasonable effort" standard. *Pub. Int. Legal Found.*, 136 F.4th at 625–28.[11] Because "reasonable effort" is not defined in the statute, the Court consulted dictionary definitions. *Id.* at 625. The Court concluded that "a fairly straightforward definition of 'reasonable effort' can be constructed: a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Id.* Thus, the Court explained, "a state must establish a program that makes a rational and sensible attempt to remove dead registrants; a state need not, however, go to 'extravagant or excessive' lengths in creating and maintaining such a program." *Id.*

Michigan's list maintenance procedures constitute a "reasonable effort" to remove voters who have died or moved. Those procedures go

---

[11] After the district court issued its opinion in the instant case, the Supreme Court declined to grant the petition for writ of certiorari in *Public Interest Legal Foundation*, 136 F.4th 613. *See Pub. Int. Legal Found. v. Benson*, No. 25-437, 2026 U.S. LEXIS 1149 (U.S. Mar. 2, 2026).

beyond the "safe harbor" procedures outlined in the NVRA and employ additional methods to identify and remove individuals who have died or moved from the voter registration rolls. This Court has already concluded that Michigan meets that standard regarding deceased voters, and there is no reason to find otherwise for its procedures to remove voters who have moved.

**B.    The EAVS data does not provide an adequate basis for DOJ's demand.**

Although DOJ did not state the basis for its demand, the district court found that the "purported anomalies" in Michigan's voter registration data cited by DOJ constituted part of the basis. *See* District Court Op., RE 67, Page ID #907; July 21, 2025 DOJ Letter RE 39-2, Page ID #492-495. Those "purported anomalies" were pulled from the EAVS data for the 2024 election. *Amici* write to contextualize the EAVS and its data and to demonstrate why cherry-picked datapoints from the survey are not a sufficient basis for demanding Michigan's unredacted voter registration list.

The EAVS is a survey of state and local election officials conducted on a biennial basis by the U.S. Election Assistance Commission ("EAC"). The use of the EAVS dates back to the passage of the Help America Vote

Act ("HAVA"), which created the EAC to serve "as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections[.]" 52 U.S.C. § 20922. The EAC uses data from the EAVS to fulfill that mandate.

The EAVS is divided into six sections covering voter registration, overseas and military voting, domestic absentee voting, election administration, provisional ballots, and Election Day activities.[12] Each section includes standardized survey questions designed to gather data from states. State election officials use data from local officials and state-level databases to complete the survey questions. The chief election official of each state submits and certifies the response for each state. The EAC reports its findings to Congress and releases them to the public in the year following each election.

The EAVS data may be helpful in identifying general trends in voting. It cannot, however, be used effectively to make specific findings about individual jurisdictions. U.S. elections are conducted at the local

_____

[12] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* at 231–233 (June 2025), https://perma.cc/5YR6-YNPJ.

level, and jurisdictions employ widely varying election practices, many of which have changed over time.[13] Those differences are not easily translated to the standard response categories of the survey. While the data is useful for gaining initial insights on voting patterns and procedures, it may not be as detailed or comprehensive as the data maintained by states.[14] As one researcher aptly described it, the EAVS data is "close enough for social science, but not close enough for the court house."[15]

---

[13] Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* at 2 (July 8, 2025), https://perma.cc/A746-9A35 ("[S]ome data may not be straightforwardly comparable across years, states, or localities. Changes in the EAVS survey instrument from one year to another and changes or differences in data collection practices or election laws, procedures, or definitions complicate comparisons.").

[14] The MIT Election Lab aims to support advances in election science by collecting, analyzing, and sharing election data and findings. *See* MIT Election Data + Sci. Lab *About*, https://perma.cc/WV27-8J5Y. It identifies itself as a "[p]ower user" of the EAVS data. Jack Williams, MIT Election Data + Sci. Lab, *The Election Administration and Voting Survey* Elections Performance Index (Aug. 16, 2021), https://perma.cc/9Z8G-S2B7. The MIT Election Lab notes the need to strike a balance between "valuing what the survey can bring to the table with cautions about scrutinizing the data before using it." *Id.* It also notes that the EAVS data may differ from administrative data maintained by the states "for many reasons that are justified." *Id.*

[15] Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?* at 3 (Aug. 24, 2018), https://perma.cc/9MXY-DWK5.

DOJ has cherry-picked certain EAVS data to call Michigan's voter list maintenance procedures into question. With so many data points measured by the survey, DOJ will always be able to identify some areas where a state has higher or lower rates than the average. Indeed, with the number of states that DOJ has sued now up to 30, it is evident that DOJ has done just that.

DOJ has focused on specific categories within the EAVS to make it appear that Michigan is not keeping up with other states in performing list maintenance. A focus on different categories of data within the EAVS, however, paints a different picture. In certain areas, Michigan's activity in removing ineligible voters from the registration rolls exceeds that of its peers. As this Court recently recognized:

> Michigan is consistently among the most active states in cancelling the registrations of deceased individuals; despite the fact that Michigan ranks 10th in voting-age population, the U.S. Election Assistance Commission reported that Michigan removed the sixth largest total number of registrations based on death in the 2016 election cycle; the fourth most in the 2018 cycle; the fifth most in the 2020 cycle; and the fifth most in the 2022 cycle.

*Pub. Int. Legal Found.*, 136 F.4th at 619.

Moreover, the EAVS data only presents a snapshot of the previous year and fails to take account of surrounding circumstances, including

activities in prior years. For instance, DOJ asserted that Michigan sent fewer confirmation notices to voters in 2024 than other states. What the data fails to recognize, however, is that Michigan engaged in extensive list maintenance activities prior to that. In 2020, the Michigan Secretary of State mailed absentee ballot applications to all registered voters.[16] Through that statewide mailing, election officials were able to identify a significant number of registered voters who appeared to have changed their addresses. State and local election officials used applications that were returned as undeliverable to send a significant number of confirmation notices in 2021.[17] The voters who did not respond or vote in the next two elections—those in 2022 and 2024—were removed from the voter registration rolls. *See* 52 U.S.C. § 20507(d). This resulted in more than 357,000 voter registrations being cancelled in 2024.[18] The reason that Michigan sent fewer confirmation notices in 2024 was likely because

---

[16] Press Release, Mich. Dep't of State, *Benson: All voters receiving applications to vote by mail* (May 19, 2020), https://perma.cc/K4LX-UD3Y.

[17] *See* Mich. Sec'y of State's Off., *Voter registration cancellations, Move deadline, Upcoming training, and more*, News Update for Election Adm'rs (Mar. 6, 2025), https://perma.cc/R9G6-BU2B.

[18] *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* at 185 (June 2025).

its registration rolls had fewer voters with outdated addresses. Michigan's voter list maintenance practices are unlike the average state not because they are inadequate but because the practices are *above average*.

DOJ's purported concerns about duplicate registrations further demonstrate the limits of using EAVS data to identify list maintenance issues in a particular jurisdiction. DOJ asserted that the number of duplicate registrations comprised almost half of all registration transactions completed, implying that Michigan had an issue with duplicate voter registrations. *See* July 21, 2025 Letter from DOJ, RE 39-2, Page ID #493. DOJ's allegation, however, was based on an improper conflation of two separate data points—voter registration *records* and voter registration *transactions*. *See* September 9, 2025 Letter from the Secretary, RE 39-6, Page ID #510-11. A duplicate transaction typically occurs with a motor vehicle transaction, such as when a voter who is already registered updates their digital signature on file in conjunction with a driver's license renewal or other motor vehicle transaction. *Id.* A duplicate registration transaction does not, however, create a duplicate voter registration record—it simply updates the record. *Id.*

30

The data must also be viewed in the context of the NVRA's notice requirements. The protections enshrined in the NVRA mean that the removal of a voter can take time. Even under the safe harbor provision, voters who have moved can remain on voter rolls for years if they fail to answer a confirmation notice. If a state conducts special federal elections, that must delay systematic removal processes due to the 90-day quiet period mandated by the NVRA. 52 U.S.C. § 20507(c). The processes for removal mandated by the NVRA may mean that data in a particular category gives the appearance of slow list maintenance, when in fact jurisdictions are simply adhering to their legal obligations.

The data cited by DOJ simply does not provide a basis to believe that Michigan's list maintenance procedures fail to comply with the NVRA. Under DOJ's reasoning, any report of data related to registrations or removals that differs from the national average would call a state's list maintenance procedures into question. This ignores the fact that elections are administered at the state and local level, and there will always be differences between the states. The NVRA does not require that states operate identically, but merely that they utilize programs

protecting voters from being removed without notice while engaging in reasonable efforts to remove voters who are no longer eligible.

## CONCLUSION

The CRA requires DOJ to submit more than a superficial basis when it demands sensitive voter information. In exercising their authority to compel states to turn over election records, courts should examine DOJ's purported basis. DOJ has failed to assert a sufficient basis in this case. Michigan engages in list maintenance procedures that satisfy the requirements of the NVRA, and there is nothing in the data cited by DOJ that demonstrates otherwise. The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Jonathan B. Miller*
Jonathan B. Miller
Nicholas Harper
PUBLIC RIGHTS PROJECT
490 43rd Street
Oakland, CA 94609

Sarah Riley Howard
Elizabeth L. Geary
PINSKY SMITH PC
146 Monroe Center Street NW,
     Suite 418
Grand Rapids, MI 49503-2818
Telephone: (616) 451-8496
showard@pinskysmith.com

Counsel for *Amici Curiae*

Dated: April 13, 2026

## APPENDIX A – List of *Amici Curiae*

Lisa Brown
*Clerk & Register of Deeds, Oakland County, Michigan*

Bill Burgess
*Clerk, Marion County, Oregon*

Barb Byrum
*Clerk, Ingham County, Michigan*

Gabriella Cázares-Kelly
*Recorder, Pima County, Arizona*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Mary Clark
*Elected Clerk, Delta Township, Michigan*

Domonique Clemons
*Clerk & Register of Deeds, Genesee County, Michigan*

Cynthia Cornejo
*Interim Registrar of Voters, Alameda County, California*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Cathy M. Garrett
*Clerk, Wayne County, Michigan*

Lynn Goya
*Clerk, Clark County, Nevada*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Kirk McDonough
*Cranston Board of Canvassers Chairperson*
*City of Cranston, Rhode Island*

Cheryl Neilsen
*Clerk, Montmorency County, Michigan*

Dawn Marie Sass
*Clerk/Deputy Treasurer, City of Exeter, Wisconsin*

Michael Siegrist
*Clerk, Canton Township, Michigan*

Chris Swope
*Clerk, City of Lansing, Michigan*

**CERTIFICATE OF COMPLIANCE**
with type-volume limitation, typeface requirements,
and type-style requirements

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this *amici curiae* brief contains 6,498 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Jonathan B. Miller*
Jonathan B. Miller
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609

Counsel for *Amici Curiae*

Dated: April 13, 2026

# CERTIFICATE OF SERVICE

I certify that this day, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Sixth Circuit and served through CM/ECF upon all counsel of record in this case.

*/s/ Jonathan B. Miller*
Jonathan B. Miller
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609

Counsel for *Amici Curiae*

Dated: April 13, 2026