No. 26-1225

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

JOCELYN BENSON, in her official capacity as
Secretary of the State of Michigan; STATE OF MICHIGAN,

*Defendants-Appellees*,

MICHIGAN ALLIANCE FOR RETIRED AMERICANS;
DONALD DUQUETTE; KEELY CRIMANDO,

*Intervenors-Appellees*.

On Appeal from the United States District Court for the
Western District of Michigan, Southern Division
Case No. 1:25-cv-01148
The Honorable Hala Y. Jarbou

## BRIEF OF *AMICUS CURIAE* LEAGUE OF WOMEN VOTERS OF MICHIGAN IN SUPPORT OF APPELLEES

Mark Brewer (P35661)
GOODMAN ACKER P.C.
Two Towne Square, Suite 444
Southfield, MI 48076
mbrewer@goodmanacker.com

Brent Ferguson (NY4890620)
Daniel S. Lenz (WI1082058)
Sejal Jhaveri (NY5396304)
Renata O'Donnell (NY5767561)
Alexis Grady (DC90017620)
Kate Hamilton (DC90006168)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222

bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
agrady@campaignlegalcenter.org
khamilton@campaignlegalcenter.org

Maura Eileen O'Connor (NY4312302)
Justin Lam (DC 1766514)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

Andrew B. Garber (NY5684147)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu

*Counsel for Amicus Curiae League of Women Voters of Michigan*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, the undersigned counsel submits the following statement of its corporate interests:

*Amicus curiae* the League of Women Voters of Michigan is not a public owned corporation, and has neither a parent corporation nor issues stock. There are no publicly held corporations that own ten percent or more of the stock of the League of Women Voters of Michigan. The League of Women Voters of Michigan is not aware of any public owned corporation or affiliate, not a party to the appeal nor an amicus, which has a substantial financial interest in the outcome of the litigation as defined in Sixth Circuit Rule 26.1(b)(2).

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ......................................................................1

INTRODUCTION ..............................................................................................3

BACKGROUND ................................................................................................5

SUMMARY OF ARGUMENT...........................................................................6

ARGUMENT .....................................................................................................6

I.   The district court correctly applied the 12(b)(6) standard to
     this Complaint.............................................................................................6

II.  This Court should affirm the decision below on alternative grounds, because
     Appellant's demand failed to meet the CRA's requirements.........................10

III. Courts assessing analogous requests for private voter data under the NVRA
     have protected sensitive voter data from disclosure.....................................15

IV.  The United States's justifications for its demand for Michigan's sensitive
     voter information are pretext. ......................................................................17

     A.   The President's Mail Voting Executive Order is the culmination of the
          federal government's campaign to amass sensitive information. .......18

     B.   The administration has engaged in systematic, unlawful efforts to
          centralize Americans' data................................................................20

     C.   The administration's inconsistent reasons for seeking this data cast
          doubt on its justifications for demanding the sensitive voter
          information in this case. ...................................................................25

CONCLUSION .................................................................................................26

**TABLE OF AUTHORITIES**

**Cases**                                                                      **Pages**

*Azar v. Allina Health Services*, 587 U.S. 566 (2019)....................................8

*Becker v. United States*, 451 U.S. 1306 (1981)..............................................9

*California v. U.S. Department of Health & Human Services*, No. 25-cv-05536-VC, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025).................................................22

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 1:25-cv-00457-CKK, 2025 WL 3251044 (D.D.C. Nov. 21, 2025)...........................................21

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 1:25-cv-00457-CKK, 2026 WL 551105 (D.D.C. Feb. 26, 2026) ..........................................21

*Community Economic Development Center of Southeastern Massachusetts v. Bessent*, No. 1:25-cv-12822-IT, 2026 WL 309281 (D. Mass. Feb. 5, 2026)......21

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ................................18

*Donaldson v. United States*, 400 U.S. 517 (1971) ..........................................9

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .......................................... 10-12, 15

*Lake Building Products, Inc. v. Secretary of Labor*, 958 F.3d 501 (6th Cir. 2020)...............................................................................11

*League of United Latin American Citizens v. Executive Office of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025) ...................................................3

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) .........................................15

*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005)............................11

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016).......................16

*Project Vote/Voting For America, Inc. v. Long*, 752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................................................16

*Public Interest Legal Foundation v. Benson*, 721 F. Supp. 3d 580 (W.D. Mich. 2024), *aff'd*, 136 F.4th 613 (6th Cir. 2025), *cert. denied*, Mar. 2, 2026............13

*Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ......16

*Public Interest Legal Foundation, Inc. v. North Caroline State Board of Elections*, 996 F.3d 257 (4th Cir. 2021) ....................................................................16

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) ........................16

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) ...............................................8

*United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023) ...................................................................................................9

*United States v. Bellows*, No. 1:25-cv-00468-KFW (D. Me filed Sep. 16, 2025) ....2

*United States v. Board of Elections of the State of New York*, No. 1:25-cv-01338-MAD-PJE (N.D.N.Y. filed Sep. 25, 2025) ........................................................3

*United States v. Caldwell*, No. 3:26-cv-02025-ZNQ-JTQ (D.N.J. filed Feb. 26, 2026) .....................................................................................................2

*United States v. Galvin*, No. 1:25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ............................................................................................10, 18

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995) ...............................7, 9, 18

*United States v. Morton Salt Company*, 338 U.S. 632 (1950) ................................18

*United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ..........................................................................4, 10, 11, 17, 18

*United States v. Powell*, 379 U.S. 48 (1964) .......................................................8, 9

*United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. filed Sep. 25, 2025) ......................................................................................................2

*United States v. Weber*, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026) ..................... 2-5, 8, 10, 15, 17, 18

**Statutes, Codes, and Rules**

7 U.S.C. § 1632e ..................................................................................... 17

15 U.S.C. § 77s(f) ......................................................................................17

28 U.S.C. § 2072(b) ...................................................................................7

33 U.S.C. § 499(f)(4) ...............................................................................17

38 U.S.C. § 7330D ..................................................................................17

44 U.S.C. § 3501 *et seq.* .........................................................................17

52 U.S.C. § 20507(a)(4) ..........................................................................13

52 U.S.C. § 20507(i) ................................................................................13

52 U.S.C. § 20701 ...................................................................................10

52 U.S.C. § 20703 ...................................................................................10

52 U.S.C. § 20705 .................................................................................7, 8

52 U.S.C. § 21083(a) ...............................................................................14

Fed. R. Civ. P. 1...................................................................................7, 8

**Constitutional Provisions**

U.S. Const. art. I, § 4.................................................................................3

**Other Authorities**

Abby Vesoulis & Ari Berman, *New Docs Show DHS Gathering Driver's License Data in Voter Fraud Crusade*, Mother Jones (Nov. 14, 2025), https://perma.cc/KA7T-N2EK. ......................................................23

*An Assessment of Minority Voting Rights Access in the United States*, U.S. Commission on Civil Rights (2018), https://perma.cc/J923-SHFJ ...................23

Consent Judgment and Order, *United States v. North Caroline State Board of Elections*, 5:25-cv-00283-M-RJ (E.D.N.C. Sep. 8, 2025), https://www.brennancenter.org/media/14474/download/072-09.08.2025-entry-of-stipulated-consent-judgment.pdf?inline=1.....................................14

Eli Hager, *DHS Seeks Access to Massive Employment, Salary and Family Database Legally Restricted to Use in Child Support Cases*, ProPublica (Mar. 11, 2026), https://perma.cc/KN7R-ERA8......................................25

Executive Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025)...........................19

Executive Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) .......................19

Executive Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................20

Executive Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ........................19

Hamed Aleaziz, *Immigration Agents Are Using Air Passenger Data for Deportation Effort*, N.Y. Times (Dec. 12, 2025), https://www.nytimes.com/2025/12/12/us/politics/immigration-tsa-passenger-data.html..............................................................................................................22

Transcript from Hearing on Motion to Compel and Motions to Dismiss, *United States v. Amore*, 1:25-cv-00639-MSM (Mar. 26, 2026). ...................................7

Jacob Bogage, Jeff Stein & Perry Stein, *IRS improperly disclosed confidential immigrant tax data to DHS*, Wash. Post (Feb. 11, 2026), https://www.washingtonpost.com/business/2026/02/11/immigrants-irs-dhs-tax-data/. ..............................................................................................................24

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://perma.cc/HN98-8N2Q.................................................................22

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica and Texas Tribune (Feb. 13, 2026), https://perma.cc/T2ER-EDCH .................................................23

Jonathan Shorman, *Homeland Security wants state driver's license data for sweeping citizenship program*, Stateline (Nov. 25, 2025), https://stateline.org/2025/11/25/homeland-security-wants-state-drivers-license-data-for-sweeping-citizenship-program/.........................................................24

Joseph Cox, *Here's the document giving ICE 80 million Medicaid patients' data*, Freedom of the Press Found. (Jan. 5, 2026), https://perma.cc/J9JT-MSHE. ......22

Jude Joffe-Block, *The USDA wants states to hand over food stamp data by the end of July*, NPR (July 19, 2025), https://perma.cc/J3G3-QBSK. ..........................25

Letter from Nancy Morales Gonzalez, Associate General Counsel, Social Security Administration Office of the General Counsel to Jon Sherman, Litigation Director & Senior Counsel, Fair Elections Center, (July 13, 2023), https://perma.cc/Y5U9-UTU8 ..................................................................23

Meryl Kornfield, Elizabeth Dwoskin & Lisa Rein, *Whistleblower claims ex-DOGE member says he took Social Security data to new job*, Wash. Post (Mar. 10, 2026), https://www.washingtonpost.com/politics/2026/03/10/social-security-data-breach-doge-2/. ..................................................................24

Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower. ..................................21

Press Release, Department of Homeland Sec., *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M ..................................................................22

Protect Democracy, *DOGE and state voter rolls*, (July 15, 2025), https://perma.cc/TFD6-J8TC. ..................................................................23

Rachel Siegel, Hannah Natanson & Laura Meckler, *DOGE is collecting federal data to remove immigrants from housing, jobs*, Wash. Post (Apr. 15, 2025), https://perma.cc/JPP7-JJH4. ..................................................................25

Stephen Fowler & Jude Joffe-Block, *The Trump administration admits even more ways DOGE accessed sensitive personal data*, NPR (Jan. 30, 2026), https://perma.cc/3CNL-YHUK ..................................................................24

William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://perma.cc/F2N2-GWNV. ..................................................................21

**INTEREST OF *AMICUS CURIAE*[1]**

The League of Women Voters of Michigan (LWVMI) is the Michigan affiliate of the nationwide, nonpartisan, nonprofit organization, the League of Women Voters (LWV). LWVMI has over 3,000 members, with 33 local Leagues throughout the state. LWVMI works to protect and expand the voting rights of its members and all eligible Michigan voters, including by opposing proposals to require documentary proof of citizenship to register in Michigan and supporting efforts to increase access to voter registration and ensure transparent and accurate state voter rolls. The vast majority of LWVMI's members and volunteers are registered voters whose personal information is at stake in this litigation, including their dates of birth, state driver's license numbers, non-driver photo ID numbers, or the last four digits of their Social Security numbers. As a result, LWVMI has a strong interest in "the confidentiality of its members' personal information, the potential deterrence effects on voter registration, its goal of ensuring that election information is appropriately handled, and the potential resources it may have to expend educating voters about the Appellant's use of their information." (R. 45, Page ID #560–561) LWVMI and its members have an interest in this litigation because they want to protect LWVMI's

---

[1] Counsel for all the parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no other person contributed money intended to fund this brief.

1

mission to work towards a democracy where every person has the desire, right, knowledge, and confidence to participate.

Additionally, LWV and its affiliates have a history of championing and safeguarding the National Voter Registration Act (NVRA), which is implicated in this appeal. LWV founded the Motor Voter Coalition in the 1980s and 1990s and served as a national co-chair of the campaign to pass and implement the NVRA. LMV and LWVMI (together, the League) have an interest in ensuring the NVRA is used to advance the right to vote, not as a pretext to enable the federal government to obtain personal voter data. LWVMI and its members recognize that the relief the United States seeks in this litigation risks disclosing members' protected personal information and risks a negative impact on LWVMI's mission by making Michiganders less likely to register to vote and participate in democracy for fear that their information will be unlawfully used by the United States government. LWV affiliates have moved to intervene in parallel cases Appellant the United States has brought in California, Kentucky, Maine, Minnesota, New Jersey, New York, Oklahoma, Pennsylvania, and Utah.[2] And LWVMI has made consistent efforts to be

[2] *United States v. Weber*, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Bellows*, No. 1:25-cv-00468-KFW (D. Me filed Sep. 16, 2025); *United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. filed Sep. 25, 2025); *United States v. Caldwell*, No. 3:26-cv-02025-ZNQ-JTQ (D.N.J. filed Feb. 26, 2026); *United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-01338-MAD-PJE (N.D.N.Y. filed Sep. 25, 2025).

heard in this litigation. LWVMI sought to intervene in the case when it was in the district court. (R. 17) On December 9, 2025, the district court denied LWVMI's intervention. (R. 46) LWVMI thereafter sought to file an amicus brief in the district court, (R. 48), but the district court denied that motion as moot. (R. 68)[3]

## INTRODUCTION

The Constitution reserves the power to administer federal elections primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. The executive branch has only a small role in elections and enjoys only the authority Congress grants. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 41–42 (D.D.C. 2025) (permanently enjoining parts of executive order on elections). Nonetheless, the Department of Justice (DOJ) has taken the unprecedented step of pressing the State of Michigan, and almost every other state, for its unredacted voter file, which contains, *inter alia*, driver's license numbers, months and days of birth, and the last four digits of voters' social security numbers. DOJ provided no basis and no proper purpose to justify the request for this data under the Civil Rights Act (CRA), both of which are expressly required by the statute.

---

[3] LWVMI respectfully requests to participate in oral argument, scheduled for May 13, 2026. LWVMI will also file a motion to this effect.

The Federal Rules of Civil Procedure (FRCP) applied in the case below, just as they do in nearly every civil action. The district court's decision to dismiss the Complaint should be affirmed, albeit on the alternate grounds that DOJ's demand for information was deficient on its face and the Complaint therefore failed as a matter of law. Dismissal was also appropriate because DOJ's plans for use of the data it seeks plainly have nothing to do with its allegations but would represent a dramatic expansion of the executive's role. In that vein, President Trump recently announced his intention to "take over" and "nationalize" voting in the United States, from which yet another executive order on elections followed. *See infra* Section IV.A.

Even prior to the President's most recent executive order, Courts addressing these data requests have concluded that Appellant's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026); *see also United States v. Weber*, 2026 WL 118807, at *20. If granted, Appellant's demand would make voters, whose information could be used "in unprecedented ways," *Oregon*, 2026 WL 318402, at *13, less likely to register and turn out to vote, *Weber*, 2026 WL 118807, at *20. "This risk threatens the right to vote which is the cornerstone of American democracy." *Id*.

## BACKGROUND

During the summer of 2025, DOJ sent a series of letters to the State of Michigan demanding various types of data about Michigan voters and elections. Michigan responded to each letter, ultimately providing a copy of the entire state voter file, redacting only a few fields of sensitive information, and answering DOJ's questions. Over the course of the correspondence, DOJ addressed the CRA only in the August 14, 2025 letter. (R. 39-4, Page ID # 501) DOJ maintained "[t]he purpose of the [CRA] request is to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* After Michigan, in compliance with state law, only provided its public file, the United States sued. (R. 1) The district court dismissed Appellant's complaint on February 10, 2026, (R. 68, Page ID # 915), and this appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm the decision below on alternative grounds, because Appellant failed to include the requisite statement of basis and sufficient statement of purpose. Appellants' failure to establish the statutory prerequisites is fatal to its case and resolves the litigation without needing to reach the statutory question that the district court considered. Courts apply the normal rules of civil procedure to the Appellant's claims in these cases, and standard judicial review is appropriate under the CRA. Courts should look closely at the Appellant's unprecedented demand for

the sensitive voting data of millions of Americans, particularly because much of the record in this case and similar cases across the country show that justifications for the requests are pretextual.

## ARGUMENT

**I.    The district court correctly applied the 12(b)(6) standard to this Complaint.**

The district court correctly dismissed Appellant's complaint for failure to state a claim, following the appropriate procedure under the FRCP. As the district court found, Appellant filed its three-count Complaint with claims under HAVA, the NVRA, and the CRA. (R. 67, Page ID # 906).

To the extent that this Court evaluates the district court's application of the FRCP, it should find that the Rules apply, including to Appellant's CRA claim. The CRA provides that a district court "shall have jurisdiction *by appropriate process* to compel the production of" a document that DOJ demands. 52 U.S.C. § 20705 (emphasis added). Nothing in the statute suggests that a court should nonetheless order a state to provide the unredacted voter lists based exclusively on Appellant's representations and without the opportunity to inquire into the nature of its request. Appellant's arguments would make the court's review a mere "rubber stamp" of its requests rather than the appropriate process required by statute. *See* Appellant Br. at 27; *but see Weber*, 2026 WL 118807, at *8 ("[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures"); Ex. A, *United States*

*v. Amore*, No. 1:25-cv-00639-MSM-PAS, (D.R.I. Apr. 17, 2026), ECF No. 51 ("[T]he appropriate standard of review for this case is that common to motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6).") (*Amore*); *see also United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995) ("[A] district court is not a 'rubber stamp' for agency demands for the production of information.").

The Federal Rules "govern the procedure in all civil actions and proceedings in the United States district courts" with limited exceptions not applicable here. Fed. R. Civ. P. 1; *see also* 28 U.S.C. § 2072(b) (providing that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect"). The FRCP were promulgated to "secure the just, speedy, and inexpensive determination of every action," Fed. R. Civ. P. 1, "consistent with fairness to the parties." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966). The CRA does not provide Appellant *carte blanche* to ignore the Rules as it wishes. It requires "appropriate process." 52 U.S.C. § 20705.

"Appropriate process" requires meaningful judicial review, including through compliance with the procedural requirements of the Federal Rules. *See Weber*, 2026 WL 118807, at *8. Four years after Congress enacted the CRA, but after many of the decisions on which Appellant relies, the Supreme Court held that "appropriate process" in a separate statute meant application of the FRCP. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) ("Because § 7604(a) contains no provision specifying

the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply."). Given the similarity between the two statutes, "appropriate process" must carry the same meaning in the CRA as it did in the statute at issue in *Powell*. *See Azar v. Allina Health Servs*., 587 U.S. 566, 574 (2019) ("[The Supreme Court] does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."). This Court subsequently applied *Powell* to federal agency demands for records. *See Markwood*, 48 F.3d 969.

*Donaldson v. United States*, 400 U.S. 517 (1971), on which Appellant relies, does not affect this analysis. In *Donaldson*, the central issue was whether a third party could intervene in a proceeding to enforce an IRS summons. The third party conceded that there were no constitutional issues at play and that the requests at issue were not directed at his records. *Id.* at 522–523. The Court held an unharmed third party has no role in the proceeding. That is not the case here, where this Court is not considering a motion to intervene, but motions to dismiss filed in the district court by both Appellees. The motions raise the exact concern as in *Powell*: the process necessary to protect those who receive pre-litigation information demands. *See Powell*, 379 U.S. at 58 ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused.").

The Supreme Court has repeatedly emphasized that normal procedure attaches when a federal agency seeks to compel the production of records. *See, e.g.*, *Becker v. United States*, 451 U.S. 1306, 1308 (1981). This makes sense because the Federal Rules are "the default rules in civil litigation." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023) (holding that although Congress can exempt a statutory proceeding from the Federal Rules, courts "do not lightly infer that Congress has done so; and silence on the subject is seldom enough."). Thus, the FRCP apply with normal force in this case.

## II. This Court should affirm the decision below on alternative grounds, because Appellant's demand failed to meet the CRA's requirements.

This Court should affirm the decision of the district court on alternative grounds and hold that Appellant failed to state a basis and adequate purpose under the CRA.

This Court need not decide the novel issue of whether Michigan's voter registration list is a "recor[d]" under 52 U.S.C. § 20701, which was the basis of the district court's decision on Appellant's CRA claim. The Attorney General offered no "statement of the basis" for Michigan's sensitive voter data, an explicit requirement under the statute. 52 U.S.C. § 20703. As four district courts have concluded, that ends the inquiry. *See Weber*, 2026 WL 118807, at \*9–10; *Oregon*, 2026 WL 318402, at \*8–9; *United States v. Galvin*, No. 1:25-cv-13816-LTS, 2026 WL 972129, at \*4

(D. Mass. Apr. 9, 2026); *Amore* at 12–13. This Court should reach the same conclusion.

A Title III demand must be accompanied by both "a statement of the basis and the purpose" for the written demand. 52 U.S.C. § 20703; *Oregon*, 2026 WL 318402, at *9; *see also Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). "Basis" and "purpose" in the statute are distinct requirements, and DOJ must meet both when it seeks records under Title III. *Galvin*, 2026 WL 972129, at *3; *Oregon*, 2026 WL 318402, at *9. This accords with basic tenets of statutory interpretation. *See OfficeMax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005) (interpreting "and" in a statute to have a conjunctive meaning); *Lake Bldg. Prods., Inc. v. Sec'y of Lab.*, 958 F.3d 501, 504 (6th Cir. 2020) (same for regulation). Here, Appellant has not met either requirement.

First, Appellant has not stated a factual basis in its written demand. Appellant relies heavily on *Lynd*,[4] but that case only highlights the deficiency of Appellant's claim. There, the Attorney General's letter made a "statement of the basis"

---

[4] This Court is not bound by *Lynd*, an out-of-circuit case from over 60 years ago with dramatically different facts. Even if this Court considers *Lynd* persuasive, it does not support Appellant's claims here. For example, Appellant never addresses *Lynd*'s directive, that "Title III provides 'an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles.'" *Lynd*, 306 F.2d at 225 (citation omitted). Appellant has only argued that it needs the documents to engage in statutory list maintenance not to evaluate any constitutional violations. *Id.*

identifying that the demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n.6. Here, by contrast, neither Appellant's July 21, 2025, letter (R. 39-2), nor its August 14, 2025, letter (R. 39-4) state a factual basis for its request for Michigan's unredacted voter file. Unlike the demand in *Lynd*, Appellant's July 21, 2025 letter demanding Michigan's statewide voter registration list never mentions the CRA. (R. 39-2, Page ID # 492) (citing only HAVA and the NVRA). Similarly, the August 14 2025 letter includes no factual basis. Rather it states that the basis for the request is the CRA itself. (R. 39-4, Page ID # 501) That is not a factual basis.

The district court found that Appellant's August 14, 2025, letter, July 21, 2025 letter, and other communications "collectively put Michigan on notice of the basis and purpose of its request," but cited no statutory language or case law to explain how collectively putting a state on notice is "sufficient to comply with the CRA." (R. 67, Page ID # 908, n.3) A patchwork of letters and other sources are insufficient to meet Appellant's statutory requirement to include a written demand with a statement of basis. *Oregon*, 2026 WL 318402, at *9.

Second, even if Appellant had provided a basis, its request would still fail for a deficient statement of purpose. *See Amore* at 13–14. The *Lynd* court concluded that the Attorney General's letter gave a valid "statement of the . . . purpose" under the

11

CRA when it stated "[t]he purpose of this demand [wa]s to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." 306 F.2d at 229 n.6 (internal citation omitted). Nowhere in the record here, however, did DOJ explain the "purpose" of seeking the unredacted information. Neither the July 21 or August 14 letters nor the Complaint explain why driver's license numbers, months and days of birth, and partial social security numbers are necessary for DOJ to determine compliance with the NVRA and HAVA's list-maintenance requirements. They are not necessary, and Appellant's subsequent inability to articulate the basis and purpose for its demand is fatal to its CRA claim.

To enforce the NVRA, the Attorney General needs information about a state's list maintenance program, not every voter's driver's license and partial Social Security number. The NVRA limits Appellant's enforcement authority to ensuring a state "conduct[s] a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" in uniform and nondiscriminatory ways. *See* 52 U.S.C. § 20507(a)(4). DOJ is not tasked with conducting the same matching exercises that the states conduct and that are governed by state statutes—that would displace the state's authority to conduct elections which is guaranteed by the Constitution. And the NVRA has its own disclosure mechanism, which provides access to certain information to review list maintenance

12

programs, not the sensitive voter data Appellant seeks. *See* 52 U.S.C. § 20507(i). Michigan provided its redacted voter file in compliance with this requirement, and this Court has recently confirmed that Michigan is meeting its obligations under the NVRA. *See Pub. Int. Legal Found. v. Benson*, 721 F. Supp. 3d 580 (W.D. Mich. 2024), *aff'd*, 136 F.4th 613 (6th Cir. 2025). Appellant has what it needs to fulfill its limited enforcement authority, so its belated arguments about purpose fail.

Appellant also cites two provisions of HAVA, neither of which support its statement of purpose. One requires the use of a computerized state voter registration list. *See* 52 U.S.C. § 21083(a). Enforcement of that provision would allow Appellant to review the state's procedures for keeping the list up to date and general policies for adding and removing voters, not to obtain the private data of Michigan voters. 52 U.S.C. § 21083(a). Appellant also refers to the requirement for HAVA identifiers, *see* 52 U.S.C. § 21083(a), but does not explain why the private information of Michigan voters is needed to determine whether a state is properly collecting HAVA identifiers. Indeed, just weeks before Appellant initiated this case, it settled a HAVA enforcement action against North Carolina that it brought without demanding the state's unredacted voter rolls.[5]

---

[5] *See* Consent Judgment and Order at 10-11, *United States v. N.C. State Bd. of Elec.*, 5:25-cv-00283-M-RJ (E.D.N.C. Sep. 8, 2025), https://www.brennancenter.org/media/14474/download/072-09.08.2025-entry-of-stipulated-consent-judgment.pdf?inline=1.

Because Appellant lacks a "statement of the basis" required under the CRA, and the haphazard rationales Appellant provides for its purpose also fail to satisfy the CRA, this Court need not decide whether Michigan's unredacted state voter list qualifies as a "record."

**III.    Courts assessing analogous requests for private voter data under the NVRA have protected sensitive voter data from disclosure.**

When the CRA was passed in 1960, concerns related to data privacy were in their infancy. At least one court, however, found that the CRA was not necessarily meant to encompass requests for private information. *Weber*, 2026 WL 118807, at *9. While it is unnecessary for this Court to decide whether the CRA covers private information, the Court should take note of analysis under the NVRA demonstrating that courts are hesitant to allow the release of sensitive voter data—a cautious approach that this Court should adopt here.

Although the district court's NVRA analysis was faulty, and Appellant does not challenge the dismissal of its NVRA claim, this Court should consider how Congress balanced the need to obtain information to analyze list maintenance with privacy concerns in the NVRA, including by permitting redaction of sensitive information. The district court, despite reviewing extensive caselaw confirming this principle, erroneously concluded otherwise. (R. 67, Page ID # 899–903) The court erred by ignoring the plain meaning of the statute and significant persuasive authority on the question. *Cf. Niz-Chavez v. Garland*, 593 U.S. 155, 168–89 (2021).

14

The district court's conclusion is out of step with the body of caselaw consistently finding that the NVRA does not require states to release sensitive information. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information"); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014) ; *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1343–44 (N.D. Ga. 2016).

In analyzing Appellant's similar demands, *Weber* and *Oregon* followed this basic principle. *Weber*, 2026 WL 118807, at *12–13 ("There is longstanding precedent that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls."); *Oregon*, 2026 WL 318402, at *6.

There is no evidence that Congress intended the absence of an explicit redaction provision in the NVRA to function as preemption of other federal privacy laws. When Congress wants part of a statute to be exempt from other laws that regulate government operations, it knows how to say so. For example, it routinely exempts agencies from the Paperwork Reduction Act. 44 U.S.C. § 3501 *et seq.*; s*ee,*

*e.g.*, 33 U.S.C. § 499(f)(4); 15 U.S.C. § 77s(f); 38 U.S.C. § 7330D; 7 U.S.C. § 1632e.

Here, there is no reason to upset the balance Congress struck between the need to analyze list maintenance procedures and protection of voters' sensitive information.

**IV.  The United States's justifications for its demand for Michigan's sensitive voter information are pretext.**

In addition to the legal deficiencies in Appellant's arguments, its demand for Michigan's sensitive voter data is based on thin and obvious pretext, which further undermines its contention that it provided sufficient information to support its demand for records. Public actions and statements from federal officials reveal DOJ's true objective: "a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 2026 WL 118807, at \*10; *see also Oregon*, 2026 WL 318402, at \*11 (quoting *Weber*). The district court erred when it nonetheless accepted the administration's justification for seeking this data without further interrogation. (R. 67, Page ID # 908–909) In reviewing agency action, the Supreme Court has emphasized that judicial review is "more than an empty ritual" and that "[a]ccepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 784–85 (2019). Courts need not "ignore the disconnect between the decision made and the explanation given," nor are they "required to exhibit a naiveté from which ordinary citizens are free." *Id.* (internal citation and quotations omitted). Federal agency demands for information warrant the same scrutiny. *See United States v. Morton Salt*

*Co.*, 338 U.S. 632, 640 (1950); *Markwood*, 48 F.3d at 978. The four courts to consider this issue in parallel cases have accordingly rejected Appellant's contrived justification for uses of "the sensitive information of millions of Americans." *Weber*, 2026 WL 118807, at *10; *see also Oregon*, 2026 WL 318402, at *11; *Galvin*, 2026 WL 972129, at *1; *Amore* at 13–14.

**A. The President's Mail Voting Executive Order is the culmination of the federal government's campaign to amass sensitive information.**

Appellant's actions reveal that their arguments regarding list maintenance are pretextual. Most recently, the President's March 31, 2026 Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections" (the Mail Voting EO), directed the Department of Homeland Security to create lists of citizens eligible to vote using information from USCIS, SSA, and "other relevant Federal databases" Exec. Order No. 14,399, 91 Fed. Reg. 17125, § 2(a) (Mar. 31, 2026). In addition, it directs the postal service and other federal agencies to create a list of those who are eligible to receive mail ballots and directs the postal service to not mail ballots to those not on that list. The Mail Voting EO is only the latest in a series of orders designed to enable an extraordinary consolidation of data by the federal government. In January 2025, the President issued Executive Order No. 14,158 (DOGE EO), which "establish[ed]" a "Department of Government Efficiency" (DOGE or USDS) and provided that "Agency Heads shall take all necessary steps . . . to the maximum extent consistent with law, to ensure USDS has full and prompt

access to all unclassified agency records, software systems, and IT systems." 90 Fed. Reg. 8441, 8442 §§ 1, 4(b) (Jan. 20, 2025).

Shortly after, in March 2025, President Trump issued Executive Order No. 14,243 (the Information EO), requiring federal agencies to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases." 90 Fed. Reg. 13681, §§ 3(b), (c) (Mar. 20, 2025).

Days later, President Trump issued Executive Order No. 14,248 (the Elections EO), directing the Department of Homeland Security (DHS) to provide state and local officials access to government systems for verifying citizenship and to coordinate with DOGE to review various data sources "for consistency with Federal requirements" and to "identify unqualified voters registered in the States." 90 Fed. Reg. 14005, 14006–07 §§ 2(b), 2(b)(iii) (Mar. 25, 2025). The DOGE EO, Information EO, and Elections EO marshaled federal resources toward a unified, unprecedented goal: giving federal agencies and DOGE broad access to federal and state data about ordinary Americans. The Mail Voting EO is the culmination of these efforts to unlawfully and hastily build a nationwide citizenship database. The demands at issue in this case, along with similar demands to nearly every state, should be viewed in the context of this larger data consolidation project.

**B. The administration has engaged in systematic, unlawful efforts to centralize Americans' data.**

The administration has repeatedly established it will not use the information it is compiling lawfully or appropriately. Instead, it has reappropriated and centralized that information, engaging in unauthorized "secondary use[s]" of data, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's consent."[6] This has included directing the Internal Revenue Service (IRS) to provide confidential tax information to Immigration and Customs Enforcement (ICE), data-sharing which the court found unlawful.[7] *See Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 1:25-cv-00457-CKK, 2025 WL 3251044, at *2 (D.D.C. Nov. 21, 2025); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 1:25-cv-00457-CKK, 2026 WL 551105, at *3 (D.D.C. Feb. 26, 2026) (internal quotations omitted); *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*, No. 1:25-cv-12822-IT, 2026 WL 309281, at *1 (D. Mass. Feb. 5, 2026) (enjoining ICE's use of taxpayer addresses provided by IRS).

---

[6] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://www.americanprogress.org/article/the-trump-administration-is-using-americans-sensitive-data-to-build-a-digital-watchtower.

[7] William Turton, Christopher Bing & Avi Asher-Schapiro, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://perma.cc/F2N2-GWNV.

The Transportation Security Administration is reported to be providing names and birthdates of travelers to ICE for use in immigration enforcement.[8] And the Centers for Medicare & Medicaid Services agreed to provide extraordinary levels of detail about Medicaid recipients, including "social security number (SSN), date of birth, sex, phone number, locality, ethnicity and race,"[9] only to have that agreement narrowed following litigation. *See California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025).

At the same time that the administration has engaged in this unprecedented effort to gather Americans' data, it has centralized data across the government. DHS and DOGE transformed the Systematic Alien Verification for Entitlements (SAVE) program from a relatively limited system into one which searches multiple databases, including SSA data—a notoriously unreliable source of citizenship information.[10] During the same hearing DOJ admitted plans to share voter data with DHS, it confirmed plans to run voter data through SAVE. R.I. MTD Hearing Tr. at

---

[8] Hamed Aleaziz, *Immigration Agents Are Using Air Passenger Data for Deportation Effort*, N.Y. Times (Dec. 12, 2025), https://www.nytimes.com/2025/12/12/us/politics/immigration-tsa-passenger-data.html.

[9] Joseph Cox, *Here's the document giving ICE 80 million Medicaid patients' data*, Freedom of the Press Found. (Jan. 5, 2026), https://perma.cc/J9JT-MSHE.

[10] *See* Press Release, Dep't of Homeland Sec., *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://perma.cc/HN98-8N2Q.

50:17–23. But SAVE has made "persistent mistakes" where it has been used to review state voter rolls, erroneously identifying eligible U.S. citizen voters as noncitizens.[11] SSA itself states that its data does not provide "definitive information about an individual's citizenship status."[12] The demonstrated risks of false negatives and wrongful voter purges jeopardize voters' rights and can be used to support debunked claims of noncitizen voting.

Recent examples of Appellant's mishandling of sensitive information about Americans cast doubt on any assurances it may make about the security of voter files. In ongoing litigation over SSA data—which includes private information about the health, income, and assets of millions of Americans—the United States disclosed that DOGE team members "were potentially outside of SSA policy and/or noncompliant with the [court's] temporary restraining order." Notice of Corrections to the Record, *Am. Fed'n of State, Cnty., and Mun. Emps. v. SSA*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), ECF No. 197. This included potentially transferring personally identifiable information to DOGE employees and executing a "Voter Data

---

[11] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica and Texas Tribune (Feb. 13, 2026), https://perma.cc/T2ER-EDCH. In one Missouri county, more than half of the voters identified by SAVE as noncitizens were actually U.S. citizens. *Id.* DHS has also had to correct information provided to five states after SAVE misidentified U.S. citizen voters as noncitizens. *Id.*

[12] Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns., SSA Off. of Gen. Couns. to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/Y5U9-UTU8.

Agreement" with a non-governmental group looking to "find evidence of voter fraud and to overturn election results in certain States." *Id.* at 2–3, 5. Whistleblower reports have similarly exposed how DOGE employees mishandled SSA data.[13] The IRS illegally and inadvertently shared taxpayer information with DHS—beyond even what DHS requested.[14] Despite its demonstrated inability to handle this information properly, the administration has sought to gather driver's license,[15] Supplemental Nutrition Assistance Program (SNAP),[16] Department of Housing and Urban Development,[17] and child support[18] data, including social security numbers.

---

[13] Stephen Fowler & Jude Joffe-Block, *The Trump administration admits even more ways DOGE accessed sensitive personal data*, NPR (Jan. 30, 2026), https://perma.cc/3CNL-YHUK; Meryl Kornfield, Elizabeth Dwoskin & Lisa Rein, *Whistleblower claims ex-DOGE member says he took Social Security data to new job*, Wash. Post (Mar. 10, 2026), https://www.washingtonpost.com/politics/2026/03/10/social-security-data-breach-doge-2/.

[14] Jacob Bogage, Jeff Stein & Perry Stein, *IRS improperly disclosed confidential immigrant tax data to DHS*, Wash. Post (Feb. 11, 2026), https://www.washingtonpost.com/business/2026/02/11/immigrants-irs-dhs-tax-data/.

[15] Jonathan Shorman, *Homeland Security wants state driver's license data for sweeping citizenship program*, Stateline (Nov. 25, 2025), https://stateline.org/2025/11/25/homeland-security-wants-state-drivers-license-data-for-sweeping-citizenship-program/.

[16] Jude Joffe-Block, *The USDA wants states to hand over food stamp data by the end of July*, NPR (July 19, 2025), https://perma.cc/J3G3-QBSK.

[17] Rachel Siegel, Hannah Natanson & Laura Meckler, *DOGE is collecting federal data to remove immigrants from housing, jobs*, Wash. Post (Apr. 15, 2025), https://perma.cc/JPP7-JJH4.

[18] Eli Hager, *DHS Seeks Access to Massive Employment, Salary and Family Database Legally Restricted to Use in Child Support Cases*, ProPublica (Mar. 11, 2026), https://perma.cc/KN7R-ERA8.

**C. The administration's inconsistent reasons for seeking this data cast doubt on its justifications for demanding the sensitive voter information in this case.**

The administration has sought Americans' private data in lawsuits against 30 states and the District of Columbia but has been unable to maintain a consistent stated reason for doing so. And despite making the same request to each of these states, DOJ's basis and purpose for these requests has changed between its letters and lawsuits, and over time. While DOJ initially claimed that it was entitled to sensitive voter information under the NVRA and HAVA, DOJ now proceeds only under the CRA. And while DOJ initially claimed that the "purpose of [its] request is to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA," DOJ in later hearings stated more vaguely that its purpose in these lawsuits "has to be something related to the governance of federal elections," Me. MTD Hearing Tr. at 66:12–24, and most recently admitted that it planned to share the data with DHS for citizenship checks, R.I. MTD Hearing Tr. at 65:1–11. This has been the pattern in its other cases: Appellant continues trying on new justifications for demanding sensitive voter information when its original reasons are rejected or shown to be implausible. Appellant's pattern indicates that any reason it may provide is pretextual, and this Court need not accept such justifications without appropriate inquiry.

There is every reason for this Court to believe that the federal government would misuse the voter data sought here just as it has misused other sensitive data over the past year. Despite asserting that the sensitive data it seeks is not being compiled in "a nationwide voter registration database" and is being used "solely for the purposes that [the United States] stated in the letters," Me. MTD Hearing Tr. at 104:11–22, the administration admitted in another hearing the same day that it planned to share this data with DHS to find non-citizens on the voter rolls, R.I. MTD Hearing Tr. at 65:1–11. Before even receiving any of the information it seeks, DOJ has already publicly stated that the data will be used for an entirely different purpose than that which it alleges here.

## CONCLUSION

For the reasons stated above, the League of Women Voters of Michigan asks that the Court affirm the district court's dismissal of the Complaint in this matter on alternative grounds.

Dated: April 17, 2026         Respectfully submitted,

*/s/ Mark Brewer*

Brent Ferguson (NY4890620)
Daniel S. Lenz (WI1082058)
Sejal Jhaveri (NY5396304)
Renata O'Donnell (NY5767561)
Alexis Grady (DC90017620)
Kate Hamilton (DC90006168)
Campaign Legal Center

24

1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org

agrady@campaignlegalcenter.org
khamilton@campaignlegalcenter.org

Mark Brewer (P35661)
Goodman Acker P.C.
Two Towne Square, Suite 444
Southfield, Michigan 48076
MBrewer@goodmanacker.com

Maura Eileen O'Connor
Justin Lam (DC 1766514)
Brennan Center for Justice
at NYU School of Law
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

Andrew B. Garber (NY5684147)
Brennan Center for Justice
at NYU School of Law
120 Broadway, Suite 1750
Tel: (646) 292-8310
Fax: (212) 463-7308
garbera@brennan.law.nyu.edu


*Counsel for Amicus Curiae League of Women
Voters of Michigan*

25

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of April 2026, I caused to be served a copy of the above document on all counsel of record and parties via the ECF system.

/s/ *Mark Brewer*
Mark Brewer

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief includes 6492 words including headings, footnotes, citations, and quotations, and not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits. The word count above was determined using the word count function of Microsoft Word, version 2510.

/s/ *Mark Brewer*
Mark Brewer

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　Plaintiff,<br><br>　　v.<br><br>GREGG M. AMORE, in his official<br>capacity as Secretary of State for the<br>State of Rhode Island,<br>　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　C.A. No. 25-cv-00639-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

On September 8, 2025, the United States Department of Justice ("DOJ") sent a letter to Rhode Island Secretary of State Gregg Amore requesting an unredacted electronic copy of Rhode Island's statewide voter registration list. (ECF No. 2-2 at 5–7.) This list would include the last four digits of registered voters' Social Security numbers and their Rhode Island driver's license numbers. *Id.* at 5. DOJ has, over the last year, made similar demands to nearly every other state. When Secretary Amore refused to provide a voter registration list containing that sensitive information, the United States sued. (ECF No. 1.)

Before the Court is the United States' Motion to Compel Production (EFC No. 2) of an unredacted copy of Rhode Island's voter registration list. Also before the Court are the Motions to Dismiss of Secretary Amore (ECF No. 26), Intervenors Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches (ECF No.

25), and Intervenors SEIU District 1199NE, the Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Michael "Zack" Mezera (ECF No. 28) (collectively, "Defendants"). For the following reasons, the Court DENIES the United States' Motion to Compel Production (ECF No. 2) and GRANTS Defendants' Motions to Dismiss (ECF Nos. 25; 26; 28).

## I.    BACKGROUND

The Elections Clause of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. Const. art. I, § 4, cl. 1. The authority delegated to the states in managing elections includes the authority to oversee "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Thus, except where federal law provides otherwise, states have substantial discretion in regulating elections, including maintaining voter registration lists. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013).

Two federal laws require each state to undertake a "reasonable effort" to maintain the accuracy and currency of its statewide voter registration list. First, the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, requires states to "conduct a general program that makes a reasonable effort to remove the names of

2

ineligible voters from the official lists of eligible voters" who die or change their residence, as well as to send confirmation notices to voters following any change in residence. *Id.* § 20507(a)–(f). To facilitate public oversight, each covered state must "maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject to specific exemptions. *Id.* at § 20705(i). Nothing in the NVRA "prohibits the appropriate redaction of uniquely or highly sensitive personal information" from voting registration records. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).

Second, the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, requires each state to develop a single, computerized official statewide voter registration list that includes a unique identifier for reach registered voter. *Id.* § 21083(a)(1)(A). As part of this requirement, states must also adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(4)(A). HAVA has no public disclosure requirements and provides DOJ with no subpoena authority. *See id.* § 21111. HAVA expressly provides that the "specific choices on the methods of complying with [its] requirements . . . shall be left to the discretion of the State." *Id.* 21085.

In 2005, the Rhode Island Secretary of State implemented a statewide central voter register called the Central Voter Registration System ("CVRS"). R.I. Gen. Laws § 17-6-1.2. A person seeking to register to vote must complete a Voter Registration Form, which collects a range of confidential and sensitive personally identifiable information. 410-RICR-20-00-19.5(A). No voter may have more than one voter registration. R.I. Gen. Laws § 17-9.1-19. Registrants must confirm their United States citizenship, residence in Rhode Island, and that they are at least 16 years of age. *Id.* §§ 17-9.1-11, 17-9.1-33. Registrants must provide a Rhode Island driver's license or State ID card number or the last four digits of their Social Security number. 410-RICR-20-00-19.5(A)(1)(d)(1). All registrants must "swear or affirm" that they are a U.S. citizen, live at the address listed on the form, and will be at least eighteen years old before voting in next general election. 410-RICR-20-00-19.5(A)(1)(k). These attestations must be signed under penalty of perjury, and Rhode Island law criminalizes providing false voter registration information. R.I. Gen. Laws § 17-9.1-12.

Rhode Island uses several different methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from its voter registration list. Voter information, which is by default automatically updated anytime a voter updates their address with the Rhode Island Department of Motor Vehicles, is electronically transmitted daily to the CVRS. R.I. Gen. Laws § 17-9.1-7(d). An online voter registration portal allows citizens to update their voter information at any time. *Id.* § 17-9.1-34. The state requires each city or town's local

4

board to confirm registered voters' addresses through the mail, and it engages in a confirmation process where mailed confirmation forms are returned as undeliverable. *Id.* §§ 17-9.1-25, 17-9.1-26. Rhode Island verifies voter information through verification mailings conducted each year. *Id.* § 17-9.1-27(b).

The Rhode Island Office of the State Registrar of Vital Records electronically transmits a list of deceased persons eighteen years of age or older monthly, *see id.* § 23-3-5(a)(6); 100-RICR-20-00-5(C)(2), and local boards of canvassers update the list using information provided by the federal Social Security Administration's Death Master File, *see* R.I. Gen. Laws § 17-10-1(c). Rhode Island participates in the Electronic Registration Information Center ("ERIC"), which uses a variety of datasets, including state voter registration and DMV records, to determine the accuracy of states' voter rolls. *See* ECF No. 2-1 at 11 (acknowledging Rhode Island's participation in ERIC). Rhode Island also updates the CVRS to ensure that people who are ineligible to vote because they are incarcerated for a felony conviction are removed from the voter registration list. 100-RICR-20-00-2(2.4)(C)(1-2); 100 RICR-20-00-5(C)(3).

In its September 8, 2025, letter to Secretary Amore (the "Demand Letter"), DOJ stated that the purpose of its demand for an unredacted copy of Rhode Island's statewide voter registration list was "to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and the HAVA." (ECF No. 2-2 at 6.) The Demand Letter did not identify any facts suggesting that Rhode Island has not complied with the NVRA and HAVA, and it did not otherwise expressly identify any

factual basis for DOJ's demand. *See id.* The Demand Letter states that DOJ's authority to request Rhode Island's voter registration list was made pursuant to (1) "the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions"; (2) HAVA . . . via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements"; and (3) Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq. Id.* at 5–6.

In response to the Demand Letter, on September 16, 2025, Secretary Amore sent a letter to DOJ offering to supply DOJ with a copy of Rhode Island's publicly available voter registration list but declining to supply the unredacted information specified by DOJ in its demand. *Id.* at 9–10. Secretary Amore's response contended that the authorities cited by DOJ did not authorize its demand. *Id.* Specifically, Secretary Amore asserted that the CRA "allows access to voter records only in connection with an investigation into the infringement or denial of constitutional voting rights" which was not the purpose stated in DOJ's letter. *Id.* at 10.

The United States filed suit against Secretary Amore in his official capacity on December 2, 2025, alleging that his refusal to provide the unredacted voter registration list violated the CRA. (ECF No. 1.) That same day, the United States filed a Motion to Compel Production (ECF No. 2), requesting the Court order Secretary Amore turn over the unredacted voter registration lists pursuant to a "special statutory proceeding" purportedly authorized by the CRA.

The Court subsequently granted unopposed Motions to Intervene (ECF Nos. 5; 15) by two groups of Intervenors. The first group consists of Common Cause—a "non-partisan, good-government organization dedicated to grassroots voter engagement in Rhode Island"—and three Rhode Island voters. (ECF No. 5 at 8.) The second group consists of SEIU District 1199NE and the Rhode Island Alliance for Retired Americans—Rhode Island membership-based organizations asserting an interest in preventing sensitive personal information on Rhode Island's statewide voter list from being disclosed to the federal government—and two Rhode Island voters. Secretary Amore and the Intervenors all move to dismiss the United States' Complaint. (ECF Nos. 25; 26; 28.)

The Court held a hearing on the parties' Motions on March 26, 2026. *See* ECF No. 47 (hearing transcript). In that hearing, the United States proposed that its unprecedented demands for unredacted voting rolls are the result of its "trust but verify" approach to the states' list maintenance efforts. *Id.* at 49. Despite some references to a 2024 Election Assistance Commission report purportedly showing that Rhode Island could conduct more kinds of voter registration list audits than it currently does, *see id.* at 46, 68, 86, the United States acknowledged that the Demand Letter stated no factual basis for DOJ's request, *id.* at 63.

While the present Motions were pending, four other federal district courts issued decisions on nearly identical cases brought by the United States seeking unredacted voter registration information from California, Oregon, Michigan, and Massachusetts. *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL

7

118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026). All four courts dismissed the United States' lawsuits.

## II.    STANDARD OF REVIEW

The parties dispute the appropriate standard of review for this case. According to the United States, it is entitled under Title III of the CRA to a "special statutory proceeding" on its Motion to Compel Production, under which the Court is restricted to a "severely limited" inquiry. (ECF No. 33 at 5.) Title III's text does not expressly provide for such a proceeding and instead provides that district courts have jurisdiction over voting records demands "by appropriate process." 52 U.S.C. § 20705. The sole support for the United States' position is a line of Fifth Circuit cases from the 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).

Defendants argue that the Federal Rules of Civil Procedure govern this case, and that DOJ is not entitled to any sort of summary or abbreviated procedures for obtaining the information it seeks. (ECF No. 23–26.) The Court agrees. Two years after *Lynd*—a decision that is not binding on this Court and is steeped in the context of 1960s racial discrimination in voter registration—the Supreme Court held that a demand made pursuant to a similar statute authorizing the production of documents by "appropriate process" could be challenged "on any appropriate ground," and that the Government was required to show that they had met all of the statutory criteria

8

for their request.  *See United States v. Powell*, 379 U.S. 48, 57–58 (1964); *see also*

*Weber*, 2026 WL 118807, at *8 ("Contrary to the position the DOJ takes, Title III

cannot transform an election records request by the federal government from an

ordinary civil action into an action comparable to an order to show cause."); 

*United States v. Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding

in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").[1]

As such, the appropriate standard of review for this case is that common to

motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6).  Under that standard,

to avoid dismissal, a plaintiff must set forth a "plausible claim."  The reviewing court

must assume the truth of all "well-pleaded facts and give the plaintiff the benefit of

all reasonable inferences therefrom."  *Thomas v. Rhode Island,* 542 F.3d 944 (1st Cir.

2008).  However, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.   DISCUSSION

Defendants challenge the United States' demand as failing to state a claim

under Title III of the CRA, exceeding the scope of production required by the CRA,

and in violation of both state and federal privacy laws.  (ECF No. 26-1 at 25–50.)

---

[1] The Court also shares the *United States v. Oregon* court's doubt that *Lynd* could be applicable here where—unlike *Lynd*, which "appears to contemplate an application directly to the court for the records—the United States "made an affirmative choice to file a complaint and proceed through ordinary litigation."  2026 WL 318402, at *8 (citing *Lynd*, 306 F.2d at 225).

Because this case is resolved by the first of these grounds, the Court focuses its analysis there.

To begin, the Court turns to the context of Title III of the CRA, as explained in *Weber*:

> Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot. Black Americans risked intimidation and violence every time they tried to access the polls.  To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register.  The bipartisan Commission on Civil Rights lamented in 1958 that even when records were not destroyed, states refused to turn them over, thwarting efforts by the federal government to investigate whether there was a pattern and practice of disenfranchising Black Americans. Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes.

2026 WL 118807 at *1.

Based on this context, Title III's purpose is to enable the federal government to detect voting-related racial discrimination.  *Id.* at *8.  To accomplish this, Title III sets out certain requirements regarding federal election records, and penalizes the theft, destruction, or alteration of those records.  *See* 52 U.S.C. §§ 20701, 20702.  Title III further authorizes the Attorney General to compel the production of those voting records upon a written demand.  *Id.* § 20703.

At issue in this case is whether the Attorney General may use § 20703 to demand voting records for purposes unrelated to voting-related racial discrimination. The statute itself does not cabin its application solely to that context.  But it does

10

impose one crucial requirement on any voting records demand by the Attorney General: the demand "shall contain a statement of the basis and the purpose therefore." *Id.*

The United States' position is that "the basis for the demand was Title III of the [CRA]," and that "the purpose was 'to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA.'" (ECF No. 33 at 4.) But the Court finds that neither the basis nor the purpose proposed by the United States for its demand is legally sufficient to support a claim under Title III.

First, the Court agrees with *Weber*, *United States v. Oregon*, and *Galvin* that the "basis" contemplated by Title III is a factual, not legal basis. *See Weber*, 2026 WL 118807, at *9; *United States v. Oregon*, 2026 WL 318402, at *8–9; *Galvin*, 2026 WL 972129, at *4.[2] To read "basis" as meaning a legal basis would conflate that requirement with the required statement of the demand's "purpose." As explained in *United States v. Oregon*, "[i]f the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose." 2026 WL 318402, at *9; *see also Galvin*, 2026 WL 972129, at *5 ("If Congress sought to direct the Attorney General to include a citation to Title III in demand letters, requiring the letter to contain a 'statement of

---

[2] *Benson* also appears to have contemplated "basis" as meaning a factual basis, but—unlike here—the demand letter there actually did contain at least some factual basis for the records request. *See* 2026 WL 362789, at *8 (reviewing how DOJ's demand letter "pointed to several purported anomalies within Michigan's voter registration data: a high percentage of registered voters, a low confirmation notice rate, a low voter removal rate, and a high duplicate registration rate").

the basis and the purpose therefor' would not be the obvious way to do so."). While the United States suggests that Title III essentially authorizes factually groundless "fishing expeditions," *see* ECF No. 47 at 63, Congress could not have intended Title III to be interpreted in this redundant and circular manner.

This reading is consistent with the line of Fifth Circuit cases, most notably *Lynd*, upon which the United States presses the Court to rely here. In *Lynd*, for example, the court noted that the Attorney General's demand letter made the following statement of basis and purpose:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred

306 F.2d at 226 n.6; *see also id.* at 226 (referring to the "factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand"). *Lynd* thus seems to contemplate a factual basis and a legal purpose under Title III.

With that understanding, the Court finds that the Attorney General's demand lacks a legally sufficient basis to satisfy Title III's requirements. Absent from the demand are any factual allegations suggesting that Rhode Island may be violating

12

the list maintenance requirements of the NVRA and HAVA, let alone the CRA. This alone would be enough to foreclose judicial enforcement of the demand.[3]

Following *Galvin*'s dismissal of the United States' suit in Massachusetts, the United States requested that, should the Court follow *Galvin*, DOJ be permitted leave to send Secretary Amore a "curing elaboration letter" presumably containing some factual basis for its Title III demand. But even were the Demand Letter to contain a factual basis, it would still fail to state a claim under Title III because it lacks a legally sufficient purpose. The Court again finds itself in agreement with both *Weber* and *United States v. Oregon* in determining that Congress cannot have intended Title III as permitting such a demand based on a statement of *any* purpose. *See Weber*, 2026 WL 118807, at *9 (noting that the fact that Title III precedes the NVRA means that it cannot have been passed "as a tool for NVRA compliance"); *United States v. Oregon*, 2026 WL 318402, at *9–10 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function.") (emphasis in original).

Instead, the Court finds persuasive *United States v. Oregon*'s conclusion that, "[r]eading Title III's text within its larger statutory and historical context, and consistent with . . . case law and legislative history . . . the 'purpose' required in a

---

[3] This would likely be true even were the Court to apply the "special statutory proceeding" described in *Lynd*. Based on *Lynd*, the United States proposes that the Court's review is limited to, *inter alia*, assessing the following question: "did the Attorney General make a written demand for federal records stating the basis and purpose." (ECF No. 33 at 5) (citing *Lynd*, 306 F.2d at 225–26). But if the written demand contains *no* statement of a basis within the meaning of 52 U.S.C. § 20703—that is, a factual basis—then that threshold requirement is not satisfied.

13

demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." 2026 WL 318402, at *10. With that established, the purpose stated in the Attorney General's demand—purportedly, to ensure compliance with the NVRA and HAVA—does not plausibly relate to individual voting rights. As such, even were the Court to grant DOJ leave to send its requested "curing elaboration letter" containing a factual basis for its allegation that Rhode Island might be falling short of its obligations under the NVRA or HAVA, that letter would remain legally insufficient to support a Title III records demand because its purpose would fall outside Title III's intended scope.

## IV.    CONCLUSION

Neither the NVRA nor HAVA authorize DOJ to conduct the kind of fishing expedition it seeks here. As such, for the foregoing reasons, the Court DENIES the United States' Motion to Compel Production (ECF No. 2) and GRANTS Defendants' Motions to Dismiss (ECF Nos. 25; 26; 28).

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

April 17, 2026

14