UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Appeal No. 26-1225

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

V.

JOCELYN BENSON, in her official capacity as Secretary of the State of
Michigan; STATE OF MICHIGAN

Defendants-Appellees,

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE
FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO,

Intervenors-Appellees.

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids

Case No. 1-25-cv-01148
The Honorable Hala Y. Jarbou

BRIEF OF BIPARTISAN FORMER SECRETARIES OF STATE AS AMICI
CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

Cory M. Carone
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone:  203.389.9000
Facsimile:  503.220.2480
cory.carone@stoel.com

John B. Hill
Nikhel S. Sus
Samantha Susman
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

INTERESTS OF AMICI CURIAE........................................................................1

INTRODUCTION ..............................................................................................2

ARGUMENT .....................................................................................................4

I. DOJ'S DEMAND FOR MICHIGAN'S FULL VOTER ROLLS
VIOLATES SEPARATION OF POWERS PRINCIPLES...........................4

    A. The U.S. Constitution mandates the states' role in regulating
and administering elections. ...............................................................4

    B. The Constitution prioritizes the states' accountability to voters..........6

    C. State officials' election expertise surpasses that of the President........7

    D. The NVRA and HAVA confirm states' authority over voter roll
list maintenance. ..............................................................................8

    E. Countenancing DOJ's proposed use of states' voter rolls here
would violate the separation of powers...............................................11

II. DOJ'S DEMANDS FOR STATES' FULL VOTER ROLLS
VIOLATE THE PRIVACY ACT.............................................................12

III. SOUND POLICY REASONS SUPPORT BARRING DOJ FROM
COLLECTING THE PERSONAL IDENTIFYING INFORMATION
IN STATE VOTER FILES....................................................................17

IV. STATES HAVE GOOD REASON TO COLLECT CONFIDENTIAL
INFORMATION, BUT NOT SHARE THAT INFORMATION
WITH THIRD PARTIES, INCLUDING FEDERAL AGENCIES.............22

CONCLUSION.................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015)..................................................................................2

*Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA"),*
570 U.S. 1 (2013)..................................................................5, 7, 8, 10

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar,*
56 F.3d 791 (7th Cir. 1995) ..............................................................5, 6

*BedRoc Ltd. v. United States,*
541 U.S. 176 (2004)..................................................................................9

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ..............................................................9

*Bellville v. Town of Northboro,*
375 F.3d 25 (1st Cir. 2004)....................................................................21

*Branti v. Finkel,*
445 U.S. 507 (1980)................................................................................14

*Burrage v. United States,*
571 U.S. 204 (2014)..................................................................................9

*Bush v. Gore,*
531 U.S. 98 (2000)..............................................................................5, 8

*California v. Trump,*
786 F. Supp. 3d 359 (D. Mass. 2025), *appeal filed*, No. 25-1726
(1st Cir. Aug. 1, 2025) ............................................................................5

*Chapman v. Houston Welfare Rts. Org.,*
441 U.S. 600 (1979)..................................................................................9

*In re Coleman,*
208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom. Coleman v.*
*Kennedy*, 313 F.2d 867 (5th Cir. 1963) ..............................................22

# TABLE OF AUTHORITIES
(continued)

**Page**

*Commc'ns Ass'n v. Frey*,
  471 F. Supp. 3d 318 (D. Me. 2020) .................................................................21

*Fish v. Kobach*,
  189 F. Supp. 3d 1107 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th
  Cir. 2016) .......................................................................................................10

*Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y
  Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) ..............................................20, 21

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. 1 .........................6

*In re Gordon*,
  218 F. Supp. 826 (S.D. Miss. 1963) ...............................................................21

*Harkless v. Brunner*,
  545 F.3d 445 (6th Cir. 2008) .............................................................................5

*League of United Latin Am. Citizens v. Exec. Off. of President*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ...............................................................4, 7

*League of United Latin Am. Citizens v. Exec. Off. of President*,
  No. 1:25-cv-00946 (D.D.C. Apr. 24, 2025) .......................................................1

*Libertarian Party of Va. v. Alcorn*,
  826 F.3d 708 (4th Cir. 2016) .............................................................................7

*McPherson v. Blacker*,
  146 U.S. 1 (1892) ...............................................................................................5

*Moore v. Harper*,
  600 U.S. 1 (2023) ...............................................................................................5

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016) ............................................................20

# TABLE OF AUTHORITIES
(continued)

**Page**

*Pub. Int. Legal Found., Inc. v. Bellows*,
　92 F.4th 36 (1st Cir. 2024)..................................................................19, 22

*Sandusky Cnty. Democratic Party v. Blackwell*,
　387 F.3d 565 (6th Cir. 2004) .....................................................................10

*Smiley v. Holm*,
　285 U.S. 355 (1932).....................................................................................5

*Storer v. Brown*,
　415 U.S. 724 (1974).....................................................................................8

*Thornhill v. Alabama*,
　310 U.S. 88 (1940)......................................................................................18

*True the Vote v. Hosemann*,
　43 F. Supp. 3d 693 (S.D. Miss. 2014) .......................................................19

*U.S. Term Limits, Inc. v. Thornton*,
　514 U.S. 779 (1995).................................................................................4, 5

*United States v. Gradwell*,
　243 U.S. 476 (1917)............................................................................6, 7, 23

*United States v. Weber*,
　-- F. Supp. 3d --, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026)........................3, 6

**Statutes**

5 U.S.C. § 552a(a)(3)...................................................................................14

5 U.S.C. § 552a(a)(5)...................................................................................14

5 U.S.C. § 552a(e)(1)-(12)...........................................................................14

5 U.S.C. § 552a(e)(4).............................................................................14, 15

5 U.S.C. § 552a(e)(4)(C)..............................................................................16

5 U.S.C. § 552a(e)(7)...................................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

5 U.S.C. § 552a(e)(11) ................................................................................15

52 U.S.C. § 20507(i) .............................................................................19, 20

52 U.S.C. § 20507(a)(4) ..........................................................................9, 10

52 U.S.C. § 20507(a)(4)(A) ..........................................................................11

52 U.S.C. § 20510(a) ....................................................................................11

52 U.S.C. § 20701 .........................................................................................20

52 U.S.C. §§ 20701-20706 ...........................................................................21

52 U.S.C. § 20703 .........................................................................................20

52 U.S.C. § 21083 ...................................................................................11, 20

52 U.S.C. § 21083(a)(1)(A) ..........................................................................10

52 U.S.C. § 21083(a)(4)(A) ..........................................................................10

52 U.S.C. § 21083(a)(5)(A) ..........................................................................17

52 U.S.C. § 21111 .........................................................................................11

Civil Rights Act of 1960 ..........................................................................passim

Help America Vote Act.............................................................................passim

M.C.L. § 168.509gg ......................................................................................18

M.C.L. § 168.534 ..........................................................................................14

National Voter Registration Act .............................................................passim

Privacy Act of 1974 ................................................................................passim

**Regulations**

68 Fed. Reg. 47610 (August 11, 2003) .........................................................16

**TABLE OF AUTHORITIES**
(continued)

Page

70 Fed. Reg. 43904 (July 29, 2005)................................................................16

82 Fed. Reg. 24147 (May 25, 2017) ...............................................................16

**Constitutional Provisions**

U.S. Const. amend. I ..................................................................................13, 14

U.S. Const. art. I, § 4, cl. 1...............................................................................4

U.S. Const. art. II, § 1, cl. 2 ...................................................................passim

U.S. Constitution............................................................................................1, 4

**Other Authorities**

Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's
    Voter Purge Machine*, Mother Jones (Dec. 5, 2025),
    https://perma.cc/W8UC-XHRS ..............................................................28

Brian E. Humphreys, Cong. Rsch. Serv., IF10677, *The Designation of
    Election Systems as Critical Infrastructure* (updated Sept. 18,
    2019), https://www.congress.gov/crs-product/IF10677 ...................................24

*Cyber Threat Snapshot*, House Committee on Homeland Security,
    https://perma.cc/R829-ZN25 (last visited Nov. 18, 2025) .................................25

Cybersecurity & Infrastructure Security Agency, *Election Security*,
    https://perma.cc/U6MC-F3C3 (last visited Nov. 18, 2025) ..............................24

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly
    Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9,
    2025), https://tinyurl.com/yc26r3r5........................................................16, 17

*The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter
    ed., 1961) ....................................................................................................7

*Global Malicious Activity Targeting Elections Is Skyrocketing*,
    Resecurity (Feb. 12, 2024), https://perma.cc/KNV2-7EHP ..............................25

# TABLE OF AUTHORITIES
(continued)

**Page**

Jana Winter and A.J. Vicens, *Iran-linked hackers breach FBI director's personal email, publish excerpts online*, Reuters (Mar. 27, 2026) .................................................................................24

Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Mar. 18, 2026), https://tinyurl.com/ypf63y95 ...............16

L2, Inc., *State by State Partisanship (Party)*, https://perma.cc/HE66-KLYY ...............................................................................14

Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025), https://perma.cc/XR9D-ZCRT ...................................25

Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), https://perma.cc/J7TA-ALKV .................................................................26

Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025), https://perma.cc/3U4N-PWXB....................................................27

Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025), https://fedscoop.com/thousands-of-civil-servants-passwords-exposed-since-early-2024-report-says/................................................23

Mitch McConnell, Opinion, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025)....................................................................10

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3..........................................................17, 18

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67....................................15

# TABLE OF AUTHORITIES
(continued)

**Page**

Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home*, https://perma.cc/4YR5-HPMH ...........................19

Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017), https://perma.cc/2AEE-AL4E.......................................................................................................27

3 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911).............7, 23

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 - S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE.........................................................13

Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025) ........................8

*Securing Elections Critical Infrastructure* 3 (2020), https://perma.cc/48MC-C49D...............................................................24

Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1, 2017), https://perma.cc/QF7G-MV8G ....................................26

U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE....................................................12

U.S. Election Assistance Commission, *Availability of State Voter File and Confidential Information* (updated October 29, 2020), https://perma.cc/45W2-XGJZ......................................................18

U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024).............................................23

*US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025), https://perma.cc/Y64D-JMQN/ .................................24

**TABLE OF AUTHORITIES**
(continued)

**Page**

*US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025)......................................................23

William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993* (May 20, 1993), https://perma.cc/AHT3-H4S8 ............................................................................................11

## INTERESTS OF AMICI CURIAE[1]

Amici are a bipartisan group of former state secretaries of state. As the District Court for the District of Columbia concluded in granting Amici leave to file a similar amicus brief in election-related litigation there, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin Am. Citizens v. Exec. Off. of President*, No. 1:25-cv-00946 (D.D.C. Apr. 24, 2025).

Although Amici may not always have agreed about what constitutes the best election policies, Amici nonetheless share a common commitment to ensuring that elections are free and fair, and Amici are unified in their understanding of states' pivotal role in enacting and executing election laws, as set forth in the U.S. Constitution. Amici are (1) Mary Estill Buchanan, former Republican Secretary of State for the State of Colorado, (2) Miles Rapoport, former Democratic Secretary of State for the State of Connecticut, (3) Ben Ysursa, former Republican Secretary of State for the State of Idaho, (4) Joan Anderson Growe, former Democratic Secretary of State for the State of Minnesota, (5) John Gale, former Republican

---

[1] All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

Secretary of State for the State of Nebraska, (6) Phil Keisling, former Democratic Secretary of State for the State of Oregon, (7) Kathy Boockvar, former Democratic Secretary of the Commonwealth of Pennsylvania, (8) Leigh Chapman, former Democratic Secretary of the Commonwealth of Pennsylvania, and (9) Sam Reed, former Republican Secretary of State for the State of Washington. *See also* Appendix A.

### INTRODUCTION

Amici faithfully oversaw elections across the "laboratories" of electoral democracy—the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states authority to enact election laws and administer elections, as set forth in the Elections Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (citation modified).

In this action, the United States seeks an order directing the Secretary of State of Michigan to turn over to the U.S Department of Justice a computerized

voter registration list of nearly seven million registered voters, inclusive of "all fields." ECF 1 (Complaint ("Compl.")) ¶ 7. That action would upend our constitutional framework by interfering with Michigan's management of its voter registration system and protection of sensitive voter information, including driver's license and social security numbers. The Government's demand is contrary to the federalism and separation of powers principles codified in the Constitution's Elections Clause and contrary to federal law. In dismissing a nearly identical lawsuit against the State of California last year, the District Court for the Central District of California stated, "the Department of Justice seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data. This effort goes far beyond what Congress intended when it passed the underlying legislation." *United States v. Weber*, -- F. Supp. 3d --, 2026 WL 118807, *20 (C.D. Cal. Jan. 15, 2026).

Amici, therefore, submit this brief to protect these fundamental Constitutional principles and to ensure the integrity of Michigan's voter registration records. Amici respectfully request that the Court affirm the District Court's judgment of dismissal.

## ARGUMENT

**I.     DOJ's demand for Michigan's full voter rolls violates separation of powers principles.**

   **A.     The U.S. Constitution mandates the states' role in regulating and administering elections.**

The Constitution explicitly gives states, not the federal government, the primary responsibility to enact election laws and administer elections. The Elections Clause establishes: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added).[2]

The Constitution thus empowers the states with "sweeping" authority to enact election laws, subject only to other provisions of the Constitution and preemption by Congress. *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 780 F. Supp. 3d 135, 158 (D.D.C. 2025). The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for

---

[2] A state's "duty" under the Elections Clause "parallels the duty" described in the separate but related Electors Clause, Article II, Section 1, Clause 2 of the U.S. Constitution. *See U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804-05 (1995).

congressional elections. . . .'" *Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 8-9 (2013) (emphases added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *California v. Trump*, 786 F. Supp. 3d 359, 372 (D. Mass. 2025), *appeal filed*, No. 25-1726 (1st Cir. Aug. 1, 2025) (same). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('*shall be prescribed*') to prescribe the time, place, and manner of electing Representatives and Senators; [and 2] upon Congress it confers the power to alter those regulations or supplant them altogether." *ITCA*, 570 U.S. at 8 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995)); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (states hold "constitutional duty to craft the rules governing federal elections"). "In other words, only Congress has the power to adjust state election rules." *California*, 786 F. Supp. 3d at 379.[3]

In addition to assigning states the primary responsibility to regulate elections, the Elections Clause also "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir.

---

[3] Similarly, the Electors Clause empowers state legislatures—not the President or the federal government—to determine the rules for appointing electors. The state's power under the Elector's Clause is "plenary" within constitutional limits. *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Congress is empowered to determine the time of choosing the electors and the day on which they are to give their votes . . . ; but otherwise the power and jurisdiction of the state is exclusive[.]" *McPherson v. Blacker*, 146 U.S. 1, 35 (1892).

2008) (quoting *Edgar*, 56 F.3d at 796); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures."), *aff'd sub nom. ITCA*, 570 U.S. 1.

"There is an inherent level of trust that comes along with Americans voting locally. This is why, since our nation's founding, the Elections Clause has constitutionally prevented the centralization of election management in the Executive by affording states the power to determine the 'times, places and manner of holding elections.'" *Weber*,. at *2. In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," subject only to Congress' power "to regulate such elections . . . by positive and clear statutes." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

**B.    The Constitution prioritizes the states' accountability to voters.**

The Elections Clause reflects the Framers' view that, given state officials' accountability and proximity to local needs, states are well-situated to regulate and administer federal elections, subject only to Congressional preemption. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch."

*Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787* 391 (Max Farrand ed., 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." *The Federalist* No. 59, at 363 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord Gradwell*, 243 U.S. at 484-85; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 780 F. Supp. 3d at 159. Although the Constitution allows Congress to act as a check on a runaway state legislature's regulation of elections, nowhere does it authorize the President to do so without clear authorization from the legislative branch. *See generally Gradwell*, 243 U.S. at 484–85. There is no such authorization here. In fact, as discussed below, Congress has prohibited the federal government's attempted actions.

C. **State officials' election expertise surpasses that of the President.**

In practice, the Elections Clause creates a regime in which state officials, like Amici, possess unique expertise in local election procedures that the federal government, including the President, does not have. "[T]here must be a substantial

regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Unlike the federal government, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* Consequently, state and local officials like Amici—*i.e.*, those charged with developing and enforcing those comprehensive election codes—possess the "expertise" necessary to implement such complex systems. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

> **D.   The NVRA and HAVA confirm states' authority over voter roll list maintenance.**

Congress and the President recognized this truth when they adopted the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). The NVRA, enacted in 1993, helps increase voter registration by, among other things, requiring states to offer voter registration opportunities when individuals apply for or renew a driver's license. *See, e.g.*, Sarah J. Eckman, Cong. Rsch. Serv., R45030, Federal Role in Voter Registration: The National Voter Registration Act of 1993 (NVRA) and Subsequent Developments (updated Feb. 7, 2025). HAVA, enacted in 2002, helps states modernize their election systems in response to voting problems in the 2000 presidential election. *Id.* at 12. Both

statutes reaffirmed the states' authority over election management. Although the NVRA and HAVA provide federal assistance to state election officials, they do not limit the states' plenary authority over election management.

Under both the NVRA and HAVA, the states—not federal agencies—are responsible for voter roll list maintenance. In interpreting the NVRA and HAVA, the courts must "interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 608 (1979); *see also Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." (citation omitted)). A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Here, the text of both the NVRA and HAVA is unequivocal: *States* are responsible for voter roll list maintenance. The NVRA provides that "each ***State*** shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). The NVRA's "text unambiguously mandates that the *states* maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019)

- 9 -

(emphasis added) (quoting 52 U.S.C. § 20507(a)(4)). The same is true regarding HAVA, which requires states to define, maintain, and administer voter lists. 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A).

Because the text of the NVRA and HAVA makes clear that states are charged with voter roll list maintenance, any interpretation to the contrary must be rejected. Further, "[n]owhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).[4] The NVRA, which primarily achieves its objectives by "creating national registration requirements for federal elections," *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1113 (D. Kan. 2016), *aff'd*, 840 F.3d 710 (10th Cir. 2016), likewise authorizes, and relies on, the states to implement and facilitate its provisions. Specifically, the very "purpose of the federal [voter registration] form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J.,

---

[4] As Senator Mitch McConnell explained: "[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols." Mitch McConnell, Opinion, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's elections.").

dissenting) (emphasis added); William J. Clinton, *Remarks on Signing the National Voter Registration Act of 1993* (May 20, 1993), https://perma.cc/AHT3-H4S8 (describing NVRA's "implementation by States").

In short, through the NVRA and HAVA, Congress granted *states,* not the federal government, authority to administer voter roll lists. This Court must give full effect to Congress' intent.

### E.    Countenancing DOJ's proposed use of states' voter rolls here would violate the separation of powers.

According to DOJ, it is seeking full voter rolls from Michigan to ascertain the state's "compliance with the requirements of the NVRA and HAVA." Compl. ¶ 7. Neither the Elections Clause, the NVRA, HAVA, nor any other statute contemplates DOJ conducting voter roll list maintenance on behalf of the states. And to the extent the NVRA and HAVA permit DOJ to play a supervisory role, it may enforce states' *programmatic* list maintenance obligations through litigation, not by fly-specking states' voter registration *lists*. *See* 52 U.S.C. §§ 20507(a)(4)(A), § 20510(A) (under the NVRA, permitting DOJ to bring litigation for declaratory or injunctive relief to carry out states' obligation to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters"); 52 U.S.C. §§ 21083, 21111 (under HAVA, permitting DOJ to bring litigation for declaratory or injunctive relief to carry out states' obligation to "implement . . a single, uniform, official, centralized,

- 11 -

interactive computerized statewide voter registration list" and "perform list maintenance with respect to the computerized list on a regular basis").

At bottom, permitting DOJ to sift through Michigan's entire voter registration list would not only violate the Elections Clause, but also the voter roll list maintenance regime the states and Congress have erected pursuant to their Constitutional prerogative.

## II. DOJ's demands for states' full voter rolls violate the Privacy Act.

The Privacy Act of 1974 restricts a state's ability to share sensitive information with federal agencies. Congress passed the Privacy Act in response to the Watergate and Counterintelligence Program (COINTELPRO) scandals, which exposed the dangers of unchecked government domestic surveillance and data collection. The Privacy Act was designed to place "limits upon what the Government can know about each of its citizens." U.S. Dep't of Just., Overview of the Privacy Act of 1974 at 1 (2020 ed.), https://perma.cc/26QS-5WHE (citation omitted). Accordingly, the Privacy Act "sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy." *Id.*

To that end, the Privacy Act sought to prevent the federal government from creating "formal or *de facto* national data banks" or "centralized Federal information systems" that would consolidate sensitive personal data of Americans

stored at separate agencies. S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 168 (1976), https://perma.cc/DZ4J-Y2TE. Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." *Id.* at 884, 217.

DOJ's efforts to maintain and use Michigan voter data contravene many of the Privacy Act's requirements. First, the Privacy Act forbids federal agencies from collecting or maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7).[5] Here, DOJ explicitly requested "all fields" from Michigan's electronic Voter Registration List (Compl. ¶ 7)—including, for example, voters' party

---

[5] Although § 552a(e)(7) includes an exception for collecting records "pertinent to and within the scope of an authorized law enforcement activity," nothing in DOJ's complaint identified such a specific "authorized law enforcement activity." To the contrary, the complaint made clear that "the purpose of the demand under the CRA was to determine Michigan's compliance with both the NVRA's and HAVA's voter list maintenance requirements." Compl. ¶ 43.

- 13 -

affiliation,[6] one way in which an individual exercises rights guaranteed by the First Amendment. *See Branti v. Finkel*, 445 U.S. 507, 519 (1980) (political party affiliation is protected under First Amendment). The request thus violated the Privacy Act.

Second, the Privacy Act imposes procedural guardrails on what federal agencies like DOJ must do prior to establishing or modifying a "system of records," defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). Any time the federal government "maintain[s], collect[s], use[s], or disseminate[s]" such, records, it *must* abide by notice-and-comment requirements and safeguards against data misuse, and follow information-security mandates. *Id.* at § 552a(a)(3), (e)(1)–(12). Critically, when an agency establishes or revises any system of records, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records," *id.* § 552a(e)(4), called a System of Records Notice ("SORN"). At least 30 days *prior* to such publication, an agency must publish a "notice of any new use or intended

---

[6] *See* M.C.L. § 168.534 (limiting participation in partisan primary elections to registered voters of the political party); *see also* L2, Inc., *State by State Partisanship (Party)*, https://perma.cc/HE66-KLYY ("Michigan voters do not register by party. However, when those voters participate in a partisan presidential primary, that ballot choice is recorded and reported on the state voter file").

use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

Issuance of a SORN is not mere window-dressing. SORNs "shall include" nine categories of information. *Id.* § 552a(e)(4). These crucial details provide much needed transparency about how the federal government is protecting both the information in the system of records and how it intends to use the information. And publishing a SORN is mandatory. Guidance issued contemporaneously with the Privacy Act is unequivocal: "*In no circumstance* may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following *Federal Register* publication." Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act at 7 (2016), https://perma.cc/QZZ3-EB67 (emphases added). Moreover, agencies "shall" not only solicit but also review any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* The "requirement for agencies to publish a SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering agency accountability through public notice." *Id.* at 5. Here, DOJ has not published a SORN nor any other notice describing how it intends to use the state voter roll data it is attempting to collect. In its opening brief, DOJ confirmed

- 15 -

it is compiling the voter data in a system of records at the Civil Rights Division titled "JUSTICE/CRT – 001, Central Civil Rights Division Index File and Associated Records". DOJ Br. 40. DOJ cited three pertinent SORNs for that system: 68 Fed. Reg. 47610, 611 (August 11, 2003), 70 Fed. Reg. 43904 (July 29, 2005), and 82 Fed. Reg. 24147 (May 25, 2017). DOJ contends "the SORN cites NVRA, HAVA, and the Civil Rights Act of 1960." DOJ Br. 40. That is insufficient to identify the "the categories of records maintained in the system," 5 U.S.C. § 552a(e)(4)(C), *i.e.*, millions of Americans' confidential voter data. And in any event, to the best of Amici's knowledge, DOJ is incorrect that the aforementioned SORNs reference the statutes cited by DOJ.

Failure to issue such a notice is, itself, a Privacy Act violation. DOJ's lack of transparency also raises serious privacy concerns for Michigan voters, who entrusted their personal information to the state—not to the federal government. This privacy concern is not confined to Michigan. DOJ has sent at least 48 states and Washington, D.C., requests for their complete voter registration lists, and DOJ has already sued 30 states and D.C. for declining to provide such data. *See* Kaylie Martinez Ochoa, Eileen O'Conner, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Mar. 18, 2026), https://tinyurl.com/ypf63y95. These actions are consistent with DOJ's broader effort to build a "national voter roll." Devlin Barrett & Nick Corasaniti,

- 16 -

*Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times at 1 (Sept. 9, 2025), https://tinyurl.com/yc26r3r5. But doing so contravenes the Privacy Act's prohibition on national data banks and violates its transparency requirements. *See id.* ("The effort to essentially establish a national voting database, involving more than 30 states, has elicited serious concerns among voting rights experts . . . . The initiative has proceeded . . . seeking data about individual voters across the country, including names and addresses, in a move that experts say may violate the law.").

### III.  Sound policy reasons support barring DOJ from collecting the personal identifying information in state voter files.

There is no question that each state's voter files contain sensitive nonpublic information about voters, which states have both a right and an obligation to protect. Federal law requires that every voter registration application for registration in a federal election contain *at least* the voter's driver's license ("DL") number, the last four digits of the voter's social security number ("SSN"), or other unique identifying information. 52 U.S.C. § 21083(a)(5)(A). In addition, voter files commonly include additional nonpublic information about voters, such as addresses, phone numbers, birth dates, and full SSNs. *See, e.g.*, National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3 (aggregating information about the contents of state voter rolls). This information generally is not publicly

available; states have an interest in protecting such information from disclosure. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) ("[T]he duty of the State" to protect privacy of its residents "cannot be doubted.").[7]

Many states have enacted statutes either prohibiting disclosure of confidential information contained in the voter file or limiting the use of such information, including four of the states from which Amici hail.[8] As the Michigan Secretary of State made clear here, "state law prohibits disclosing the day and month of birth, driver's license numbers, and social security numbers." ECF 38 at 1; *see also* Mich. Comp. Laws § 168.509gg. Requiring disclosure of confidential information contained in the voter file would thus violate not only voters' privacy rights, but also state privacy laws.

In addition, 44 states and the District of Columbia have either an address confidentiality program ("ACP") or a "Safe at Home" law that provides additional

---

[7] Furthermore, as the district court acknowledged, requiring disclosure of confidential information contained in the voter file would contradict the NVRA's objective of increasing voter participation. Opinion, ECF 67 at 6. Put bluntly, "the risk of having one's personal information misused will deter people from registering to vote." *Id.*

[8] National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3; *see also* U.S. Election Assistance Commission, *Availability of State Voter File and Confidential Information* (updated October 29, 2020), https://perma.cc/45W2-XGJZ.

confidentiality protections for certain groups of voters, such as victims of domestic violence, sexual assault, stalking, and other crimes. *See* Office of the Minnesota Secretary of State, *Other States with Programs Like Safe at Home*, https://perma.cc/4YR5-HPMH (listing states that have created ACPs or enacted Safe at Home laws). These voter groups are at elevated risk of harassment, violence, and other harms if the confidential information in their voter files is disclosed, and states have a heightened interest in protecting their citizens from these harms by keeping confidential voter information private.

Moreover, there is nothing in the NVRA or HAVA that supersedes—or even conflicts with—these state confidentiality rules. The NVRA's public disclosure provision contains no mention of confidential information and no requirement that such information be disclosed. *See* 52 U.S.C. § 20507(i) (public disclosure provision of NVRA, which contains no mention of production of voters' confidential information). To the contrary, as the district court explained, every federal appellate court to consider the issue "has concluded that [52 U.S.C.] § 20507(i) does *not* require states to disclose voters' sensitive information." ECF 67 (citing cases). The district court in this case reached the same conclusion. [9]

---

[9] Other federal courts have found that sensitive personal information is exempt from the disclosure requirements of the NVRA, *see, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *see also True the Vote v. Hosemann*, 43

Nor does HAVA conflict with state confidentiality rules. That statute does not even contain a public disclosure requirement, let alone a requirement that state agencies turn over confidential voter information to the federal government. *See generally* 52 U.S.C. § 21083 (no disclosure requirement). Thus, states can comply with their obligations under the NVRA and HAVA without acceding to federal demands for confidential information.

Similarly, states need not disclose confidential information about their voters to comply with the Civil Rights Act of 1960 ("CRA"). The CRA allows the United States Attorney General to request inspection of state voter rolls for the purpose of investigating "alleged discriminatory practices." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also* 52 U.S.C. §§ 20701, 20703 (retention and inspection provisions of the CRA). But the federal government did not allege any discriminatory practices. Even assuming the Attorney General can

---

F. Supp. 3d 693, 736 (S.D. Miss. 2014) ("[T]he Public Disclosure Provision [of the NVRA] . . . does not, as a general proposition, prohibit a State from protecting voter registrants' SSNs and birthdates as highly personal and sensitive information."); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns."). The district court here identified a separate, independent basis upon which sates can refuse to turn over sensitive personal voter information to the federal government: "a natural reading of [§ 20507(i)] encompasses only records about the process that states use to maintain their voter list[s]—not the underlying list itself." ECF 67 at 9.

request inspection of voter rolls in these circumstances, there is no reason to believe that states cannot comply with the CRA's inspection provision while also protecting the confidentiality of sensitive voter information. Nothing in the text of the CRA's records provisions preempts state privacy protections, and preemption is not implied. *See generally* 52 U.S.C. §§ 20701-20706 (no mention of preemption). There is "a strong presumption against implied federal preemption of state law," which is strongest "in fields of traditional state regulation." *ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 325 (D. Me. 2020) (citation omitted). "Privacy regulation is just such a field." *Id*.; *see also Bellville v. Town of Northboro*, 375 F.3d 25, 31 (1st Cir. 2004) ("The states, of course, are free to accord their citizens rights beyond those guaranteed by federal law."). There is no authority suggesting that a state cannot take appropriate steps to protect confidential information about its residents while also complying with the CRA.

The CRA and voter confidentiality protections are not contradictory and are properly read in harmony. The purpose of the CRA was to allow the Attorney General to investigate the alleged disenfranchisement of voters based on race. *Gallion*, 187 F. Supp at 854. It does not give federal officials an unfettered right of access to confidential information about voters in general. *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("It is . . . a mistaken view to assume that [an]

investigation of [state voting] records is an unlimited discovery device which may be employed and used without restraint . . . ."); *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (recognizing exception to inspection right "when the purpose is speculative, or from idle curiosity"), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). As courts have repeatedly recognized in other contexts, states can comply with the CRA while also protecting confidential voter information. *See, e.g.*, *Pub. Int. Legal Found.*, 92 F.4th at 56 (allowing redaction of sensitive personal information in voter file when complying with disclosure requirements of NVRA). This principle applies here as well, allowing states to comply with appropriate inspection requests by the Attorney General while also redacting or withholding confidential information in the voter file in accordance with state privacy rules.

## IV.    States have good reason to collect confidential information, but not share that information with third parties, including federal agencies.

As described above, because states administer elections, state law governs the circumstances and authorized officials who must collect voters' confidential information as part of the voter registration process. It does not follow that just because states possess voters' confidential information, the federal government is authorized to access it, nor that voters want that information shared with any other third parties, including the federal government.

- 22 -

As the founders recognized, state governments are "best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity and prevent its own dissolution." *Gradwell*, 243 U.S. at 484 (quoting 3 *Records of the Federal Convention of 1787* 311 (Max Farrand ed., 1911)). There are also practical concerns with states sharing and the federal government aggregating sensitive voter information. There always is a risk that electronically stored data could be hacked, breached, or stolen. But each time data is shared, that risk necessarily increases, both during the transfer process and because each custodian of records adds an additional target.

The federal government's efforts to create a first ever national voter roll compound the risk of exposing private voter information. Moreover, the federal government is an especially attractive target for hackers, particularly for those working on behalf of nation-states. Federal agencies reported over 30,000 security incidents in fiscal year 2022 alone. U.S. Gov't Accountability Off., GAO-24-107231, *High-Risk Series: Urgent Action Needed to Address Critical Cybersecurity Challenges Facing the Nation* 1 (2024). The threat of such attacks is only growing. *See US Warns That Hackers Using F5 Devices to Target Government Networks*, Reuters (Oct. 15, 2025), https://perma.cc/E8E2-ZEGX; *see also* Miranda Nazzaro, *Thousands of Civil Servants' Passwords Exposed Since Early 2024, Report Says*, FedScoop (Oct. 15, 2025),

https://fedscoop.com/thousands-of-civil-servants-passwords-exposed-since-early-2024-report-says/ ("A new report . . . is challenging the idea that federal institutions are more secure than local governments against cybersecurity threats."). Indeed, recently, both the U.S. Congressional Budget Office and FBI Director were breached by hackers. *US Congressional Budget Office Hit by Cybersecurity Incident*, Reuters (Nov. 7, 2025), https://perma.cc/Y64D-JMQN/; Jana Winter and A.J. Vicens, *Iran-linked hackers breach FBI director's personal email, publish excerpts online*, Reuters (Mar. 27, 2026), https://tinyurl.com/4e9myyva.

In addition to federal targets being particularly sought after by hackers, the Department of Homeland Security designates election infrastructure as "critical infrastructure," which "recognizes that the United States' election infrastructure is of such vital importance to the American way of life that its incapacitation or destruction would have a devastating effect on the country." Cybersecurity & Infrastructure Security Agency, *Election Security*, https://perma.cc/U6MC-F3C3 (last visited Nov. 18, 2025). In making that designation, DHS "cited cyberattacks on American systems as potentially more sophisticated and dangerous than ever, and elections as a primary target of cyber criminals." White Paper delivered to National Association of Secretaries of State, *Securing Elections Critical Infrastructure* 3 (2020), https://perma.cc/48MC-C49D; *see also* Brian E.

Humphreys, Cong. Rsch. Serv., IF10677, *The Designation of Election Systems as Critical Infrastructure* (updated Sept. 18, 2019), https://www.congress.gov/crs-product/IF10677.

Unsurprisingly, even since that designation, critical infrastructure remains squarely in the crosshairs of hackers. In 2024, roughly 70 percent of all cyberattacks involved critical infrastructure. *Cyber Threat Snapshot*, House Committee on Homeland Security, https://perma.cc/R829-ZN25 (last visited Nov. 18, 2025); *Global Malicious Activity Targeting Elections Is Skyrocketing*, Resecurity (Feb. 12, 2024), https://perma.cc/KNV2-7EHP. And concerns about the security of American election infrastructure are even more pronounced now after the federal government recently downsized and cut funding for the Cybersecurity and Infrastructure Security Agency, which is tasked with protecting—among other things—election infrastructure. *See* Lauren Feiner, *America's Cybersecurity Defenses Are Cracking*, The Verge (Nov. 10, 2025), https://perma.cc/XR9D-ZCRT. Experts, including current Arizona Secretary of State Adrian Fontes, are sounding the alarm that changes during the current administration are further weakening the country's already strained cyber election protection apparatus. *Id.* As a result, by trying to force multiple states to send their otherwise disparate sets of sensitive voter information to the same repository at the DOJ, the federal

government is only making the bullseye brighter for bad actors, while at the same time removing obstacles between hackers and their targets.

The concerns do not end there. The federal government has a long and checkered history of infringing on individuals' privacy rights, including confidential voter information. In 2017, the Presidential Advisory Commission on Election Integrity—similarly in pursuit of vague allegations of election vulnerabilities and voter fraud—sent letters to state election officials across the country seeking all publicly available voter roll data, including all registrants' full first and last names, middle names or initials, addresses, dates of birth, political party, last four digits of Social Security numbers if available, voter history from 2006 onward, information regarding any felony convictions, voter registration in another state, and military status. Letter from Kris W. Kobach, Vice Chair, Presidential Advisory Commission on Election Integrity, to Hon. Elaine Marshall, Secretary of State, North Carolina (June 28, 2017), https://perma.cc/J7TA-ALKV. State officials—sometimes colorfully—expressed grave concerns. Kentucky Secretary of State Alison Lundergan Grimes said there was "not enough bourbon here in Kentucky to make this request seem sensible. . . . Not on my watch are we going to be releasing sensitive information that relate to the privacy of individuals." Tom Loftus, *Grimes: 'Not Enough Bourbon' in Kentucky to Make Commission's Voter Data Request Seem Sensible*, Courier J. (last updated July 1,

2017), https://perma.cc/QF7G-MV8G. She explained, "I'm not going to risk sensitive information for 3.2 million Kentuckians getting in the wrong hands, into the public domain and possibly for the wrong reasons, to keep people away from the ballot box." Pam Fessler, *Dozens of States Resist Trump Administration Voter Initiative*, NPR (last updated July 5, 2017), https://perma.cc/2AEE-AL4E. Mississippi Secretary of State Delbert Hosemann emphasized that states "conduct[] our own electoral processes," and suggested "[the Commission] can go jump in the Gulf of Mexico and Mississippi is a great State to launch from." *Id.*

The same concerns about sharing voters' sensitive and confidential information with the government apply with equal force now, as to states' justifications for choosing not to do so. Indeed, in a letter to former Attorney General Pam Bondi and former Homeland Security Secretary Kristi Noem, secretaries of state from Arizona, California, Colorado, Maine, Minnesota, Nevada, New Mexico, Oregon, Vermont and Washington—all of which oversee elections in their states—demanded answers on how private voter data was being used by the federal government. Letter from Sec'ys of State to A.G. Bondi and Sec'y Noem (Nov. 18, 2025), https://perma.cc/3U4N-PWXB. The secretaries noted, among other concerns, that their states' voter registration lists include sensitive voter information, including dates of birth, state driver's license numbers, and the last four digits of Social Security numbers. *Id.* Alarmingly, recent reporting

- 27 -

suggests that DOJ is considering sharing the state voter rolls DOJ obtains—including voters' confidential information—with partisan organizations such as the Election Integrity Network. *See* Abby Vesoulis & Ari Berman, *Your Private Data Is Building Trump's Voter Purge Machine*, Mother Jones (Dec. 5, 2025), https://perma.cc/W8UC-XHRS (quoting employee of EagleAI, a mass voter registration challenge system, as stating "[w]e demonstrated the software to the DOJ. . . . I am in conversation with them about letting us have a task, a federal task, to bring their data into what we're doing and then be able to use the federal data, SAVE data, Social Security data, other data in here as well.").

## CONCLUSION

For the reasons stated above, Amici respectfully request that the Court affirm the District Court's judgment of dismissal.

DATED:  April 17, 2026                STOEL RIVES LLP

/s/ *Cory M. Carone*
Cory M. Carone
Stoel Rives LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone:  208.389.9000
Facsimile:  503.220.2480
cory.carone@stoel.com

John B. Hill
Nikhel S. Sus
Samantha Suman
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,500 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED:  April 17, 2026                    STOEL RIVES LLP

/s/ *Cory M. Carone*
Cory M. Carone
*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using its CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: April 17, 2026    STOEL RIVES LLP

/s/ *Cory M. Carone*
Cory M. Carone
*Attorney for Amici Curiae*

- 31 -