**No. 26-01225**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,
*Defendants-Appellees,*

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO,
*Intervenors-Appellees.*

On Appeal from the U.S. District Court for the Western District of Michigan
No. 1:25-cv-01148
Hon. Hala Y. Jarbou

**BRIEF OF *AMICI CURIAE* LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NAACP MICHIGAN STATE CONFERENCE, NATIONAL URBAN LEAGUE, and LEAGUE OF UNITED LATIN AMERICAN CITIZENS IN SUPPORT OF APPELLEES AND AFFIRMANCE ON ALTERNATE GROUNDS**

EDWARD G. CASPAR
ROBERT WEINER
LEAH FRAZIER
GILLIAN CASSELL-STIGA
CATHERINE MEZA
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 26.1, *amici curiae* certify that they have no parent corporation, that no publicly held corporation owns ten percent or more of their stock, that they are not a subsidiary or affiliate of a publicly held corporation, and that they are unaware of any publicly owned corporation, not a party to the appeal, that has a substantial financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF AMICUS CURIAE ..........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT ...................................................................................................5

I.    Congress Limited Title III of the Civil Rights Act of 1960 to Remedying Racially Discriminatory Voting Practices. ................................5

    A.    The Context, Structure, History, and Purpose of Title III Illuminate Congress's Clear Intent That Title III Be Used Solely to Curb Disruption or Denial of the Franchise by Racially Discriminatory Practices. ......................................7

    B.    The Eisenhower Administration Recommended Title III for the Express Purpose of Curbing Racial Discrimination in Voting, Not to Aid in Enforcing Any Federal Law. .........................................10

    C.    Congress Expressly Intended to Limit Title III to Curbing Racial Discrimination in Voting, Not to Enact a New Catch-all Über-Subpoena Power to Aid Enforcement of Disparate Federal Laws. ......................................11

II.    The DOJ's Demand for the Sensitive Data of Every Michigan Voter Exceeds Its Authority under Title III. ...............................16

III.    Disclosing Sensitive Voter Information to DOJ Compromises Voter Privacy and Risks Disenfranchising Eligible Voters. ..................................18

    A.    DOJ Lacks Adequate Privacy Safeguards to Protect Voter Information. ......................................20

    B.    Disclosure of Sensitive Voter Information Will Harm Marginalized Groups and Eligible Voters. .........................................24

IV.    DOJ's Attempt to Loot and Consolidate Voter Rolls for Broad Investigative and Enforcement Purposes Puts the First Amendment Right to Vote at Grave Risk. ......................................25

CONCLUSION ......................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)..................................15

*Allied Erecting & Dismantling Co. v. Genesis Equip. Mfg., Inc.*,
   805 F.3d 701(6th Cir. 2015) .......................................................................18

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999)..................................26

*Burdick v. Takushi*, 504 U.S. 428 (1992)..................................................26

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................27

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ...................................14

*In re Wallace*, 170 F. Supp. 63 (M.D. Ala. 1959) ............................... 8, 14

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)..................................15

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) .......................................7

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).......................................17

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) ......................................17

*Owen v. Kennedy*, 84 S. Ct. 12 (1963)......................................................17

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ......................18

*Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*,
   996 F.3d 257 (4th Cir. 2021) .....................................................................24

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)....................................26

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ....................................... 5, 6, 8

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ................14

*United States v. City of Philadelphia*, 482 F. Supp. 1248 (1979) ...........................15

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)........................................17

*United States v. Mayton*, 335 F.2d 153 (5th Cir. 1964)..............................................6

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ...........................................17

*United States v. Oregon*,
   No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026) .............................. 6, 24

*United States v. Weber*,
   No. 2:25-CV-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026).............. 26, 27

*Warda v. Comm'r of Internal Revenue*, 15 F.3d 533 (6th Cir. 1994)......................18

*Wesberry v. Sanders*, 376 U.S. 1 (1964).................................................................26

*Williams v. Rhodes*, 393 U.S. 23 (1968).................................................................27

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..............................................................26

**Statutes**

40 U.S.C. § 11331 ....................................................................................................20

42 U.S.C. § 3611 ......................................................................................................15

42 U.S.C.A. §  2000d-1............................................................................................15

44 U.S.C. § 3554......................................................................................................20

52 U.S.C. § 20701 ....................................................................................................16

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

52 U.S.C. § 20703 ................................................................... 7, 16

52 U.S.C. § 20705 ........................................................................16

52 U.S.C. § 21083(a)(5)(A) ........................................................19

Pub. L. No. 86-449, 74 Stat. 86 (1960) .....................................10

**Regulations**

28 C.F.R. §  42.106 .....................................................................15

**Legislative History**

H.R. Doc. No. 86-75 (1959) ......................................................10

H.R. Rep. No. 86-956 (1959) ................................................ 6, 9, 12, 15

Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 86th Cong. (1959) ........................................................................ 11, 12, 13

**Congressional Record**

106 Cong. Rec. 3683 (1960) ........................................................8

106 Cong. Rec. 5208 (1960) .......................................................8, 9

**Other Authorities**

*Access to and Use of Voter Registration Lists*, NAT'L CONF. OF STATE LEGISLATURES (last updated July 17, 2025), https://www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists. ...................................19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Alexander Castro, *Providence Federal Judge Grills DOJ Lawyer over Reasons for Demanding RI's Voter Data*, RHODE ISLAND CURRENT (Mar. 26, 2026) https://rhodeislandcurrent.com/2026/03/26/providence-federal-judge-grills-doj-lawyer-over-reasons-for-demanding-ris-voter-data/............................................25

Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee, *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36 (2024) (No. 23-1361), 2023 WL 4882397 ......................................................................................................19

Clarence Mitchell, Jr., 6 THE PAPERS OF CLARENCE MITCHELL, JR.: THE STRUGGLE TO PASS THE 1960 CIVIL RIGHTS ACT, 1959-1960 (Denton L. Watson ed., 2021) ..............................................................................................................................15

*Data Minimization*, ELEC. PRIV. INFO. CTR., https://epic.org/issues/consumer-privacy/data-minimization/...................................................................................22

Eileen O'Connor, *"Confidential" Agreements Show Trump Administration's Plans for States' Voter Data*, BRENNAN CTR. FOR JUST. (Feb. 5, 2026), https://www.brennancenter.org/our-work/analysis-opinion/confidential-agreements-show-trump-administrations-plans-states-voter..............................20

Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ..........................22, 27

*FISMA Gap Analysis of the U.S. Department of Justice's Collection of State Voter Registration List Data*, ELEC. PRIV. INFO. CTR. (2026), https://epic.org/wp-content/uploads/2026/02/FISMA-Gap-Analysis-Explanation-and-Appendix.pdf ..............................................................................................................................21

*How Federal Efforts to Access Voter Data Affect Our Privacy, Civil Liberties, and Democracy*, CTR. FOR DEMOCRACY & TECH., LEADERSHIP CONF.'S CTR. FOR C.R. & TECH., AND PROTECT DEMOCRACY (Dec. 12, 2025), https://civilrights.org/wp-content/uploads/2025/12/How-Federal-Efforts-to-Access-Voter-Data-Affect-Our-Privacy-Civil-Liberties-and-Democracy.pdf....19

Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks*, PROPUBLICA (Oct. 30,

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

2025), https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump ...................................................................................................23

Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP ..............................22

Jude Joffe-Block & Miles Parks, *33 Million Voters Have Been Run Through a Trump Administration Citizenship Check*, NPR (Sept. 11, 2025), https://www.npr.org/2025/09/10/nx-s1-5477367/save-election-citizenship-data-trump ......................................................................................23

Jude Joffe-Block, *The Justice Department Plans to Share Sensitive Voter Data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs ......22

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens..25

Kabbas Azhar & Abigail Kunkler, *DOJ Wants Sensitive Voter Data But Can't Be Bothered to Protect It*, ELEC. PRIV. INFO. CTR. (Mar. 12, 2026), https://epic.org/doj-wants-sensitive-voter-data-but-cant-be-bothered-to-protect-it/ ...................................................................................................20

Lisa J. Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, BRENNAN CTR. FOR JUST. (Feb. 25, 2026), https://www.brennancenter.org/our-work/analysis-opinion/justice-departments-security-measures-collecting-voter-rolls-are ......................................................21

Proposed Confidential Memorandum of Understanding, Dep't of Just. (Dec. 1, 2025), https://www.brennancenter.org/media/14806/download/2025-12-01-doj-mou-to-colorado.pdf?inline=1. ................................................................ 20, 21, 22

*Risk Management Framework for Information Systems and Organizations*, NIST (Dec. 2018), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-37r2.pdf ...................................................................................................21

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

U.S. COMM'N ON C.R., *Report of the United States Commission on Civil Rights* (1959) ...................................................................................................8, 9

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

*Amici*, the Lawyers' Committee for Civil Rights Under Law, National Association for the Advancement of Colored People, NAACP Michigan State Conference, National Urban League, and League of United Latin American Citizens are nonpartisan, nonprofit organizations dedicated to protecting and advancing civil rights. *Amici* have a significant interest in this case because it raises important voting rights issues central to their missions of ensuring the equal opportunity to participate in the electoral process without fear of discrimination, reprisal, or encroachment on constitutional and privacy rights.

The Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the leadership and resources of the private bar in combating racial discrimination. Since that time, the Lawyers' Committee has actively participated in the voting rights arena, fighting to ensure that all Americans have an equal opportunity to participate in the electoral process. In advancing this mission, the Lawyers' Committee has represented litigants and participated as *amicus curiae* in

---

[1] Pursuant to Fed. R. App. P. 29(a)(2) and 29(a)(4)(E), *amici curiae* state that all parties have consented to the filing of this brief and that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the brief's preparation or submission; and no other person except *amici*, their counsel, and/or their members contributed money to fund the brief's preparation or submission.

numerous significant voting rights cases throughout the nation. Representing individual voters and civil rights groups, the Lawyers' Committee has moved to intervene in ongoing lawsuits filed by the DOJ, in which the federal government has demanded unredacted voter rolls. In addition, through its Digital Justice Initiative ("DJI"), which works at the intersection of racial justice, technology, and privacy, the Lawyers' Committee has advocated for the enactment of comprehensive privacy and data protection laws that prioritize civil rights and regularly participated as an *amicus* in cases involving online discrimination, election disinformation, and privacy.

The National Association for the Advancement of Colored People ("NAACP") is a nonpartisan organization that maintains many units, including state and state-regional conferences that cover every state and the District of Columbia. The NAACP has over two thousand local branches, college chapters, prison chapters, and youth councils. In total, the NAACP has approximately 200,000 members. The NAACP has a long-standing history of its members and constituents facing legal retaliation for their advocacy around civil rights and voting rights. Accordingly, the NAACP has a rich tradition of fighting for and protecting its members, constituents, and the Black community and all persons of color from legal retaliation. The NAACP plays a vital role for its members and constituents as the

Black community's most trusted messenger and the county's oldest and largest civil rights organization.

The NAACP Michigan State Conference, which has over 18,000 members, is a nonpartisan organization operating in Michigan and is affiliated with the NAACP. Like all of the other state conferences within the NAACP, the Michigan State Conference carries out the NAACP's mission to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." The Michigan State Conference, along with the NAACP, plays a critical role for its members by serving as a trusted beacon for fighting for voting rights issues.

National Urban League ("NUL"), founded in 1910, is a historic, nonpartisan civil rights and economic empowerment organization dedicated to advancing equity and opportunity for Black people and other marginalized communities.

League of United Latin American Citizens ("LULAC") is the largest and oldest Latino civil rights organization in the United States. Established in 1929 and headquartered in Washington, D.C., LULAC is a nationwide, non-profit, non-partisan, membership-based organization with more than 400 councils (local chapters) and over 570,000 members, with members in every state in the country.

3

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case is about whether the Administration can weaponize the Civil Rights Act of 1960, enacted to combat racist denial of the right to vote, to achieve the very opposite purpose.

The Department of Justice did not seek the sensitive data of every voter in Michigan to investigate whether state and local election authorities discriminatorily denied them access to the ballot. Rather, based solely on debunked theories of rampant voter fraud, with no authority from Congress, the Administration seeks to create a national voter database to remove voters from the voter rolls. This initiative, an artifice to wrest control of election administration from the states and consolidate executive power over elections, bears no resemblance to, and in fact contravenes, the purpose of the Civil Rights Act.

Permitting the Department of Justice to apply Title III of the Civil Rights Act of 1960 ("Title III"), as it has done so here, would flout the will of Congress to preserve and protect the right to vote against racially discriminatory efforts to deny it. Congress enacted Title III as a narrow exception to state governance of election processes to address tactics by state and local election authorities to thwart enforcement of civil protections against racially discriminatory voting practices by destroying voting records or otherwise impeding access to them.

On its face, the Department of Justice's demand for the sensitive personal data of every Michigan voter bears no relation to the purpose of the Civil Rights Act and therefore bears no relation to the authority Congress granted the Department of Justice to request voting records. Finally, permitting this illegal data grab by the Department of Justice would disenfranchise voters, endanger the privacy of every voter from disclosure of personal information protected by law and regulation, chill conduct protected by the First Amendment, and place sensitive data at risk of misuse by those with partisan, antidemocratic, or even fraudulent objectives. This unauthorized, careless and overly broad grab by the executive branch of private voter information maintained by state election officials warrants judicial vigilance, not deference.

## ARGUMENT

**I.     Congress Limited Title III of the Civil Rights Act of 1960 to Remedying Racially Discriminatory Voting Practices.**

The Civil Rights Act of 1960 was designed to overcome racially discriminatory barriers to voting so that more citizens could vote. It closed loopholes in the Civil Rights Act of 1957 and strengthened voting rights protections. *See South Carolina v. Katzenbach*, 383 U.S. 301, 310–13 (1966) (detailing how through the Civil Rights Acts of 1957 and 1960, "Congress has repeatedly tried to cope with the problem by facilitating case-by-case litigation against voting discrimination," and describing the 1960 Act as containing "perfecting amendments" to the 1957 Act);

5

*see also United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402, at \*3 (D. Or. Feb. 5, 2026) (describing how "Congress first enacted voting provisions in the Civil Rights Act of 1957 to aid the federal government in carrying out its responsibilities under the Fourteenth and Fifteenth Amendments [and then] 'found it necessary to legislate again in 1960 with respect to this problem of assuring full rights of suffrage to all Americans'") (citing *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964)). Congress addressed the loopholes in the 1957 law by: (1) "permit[ing] the joinder of States as parties defendant," (2) "g[iving] the Attorney General access to local voting records," and (3) "authoriz[ing] courts to register voters in areas of systematic discrimination." *Katzenbach*, 383 U.S. at 313.

The legislative history of Title III makes clear that a demand to inspect election records must be grounded in concerns regarding racially discriminatory voting practices. H.R. Rep. No. 86-956 at 7 (1959) (stating that "the purpose of Title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race").[2] Where, as here, the Attorney General asks a court to compel the inspection of election records, the court must determine whether the federal government's demand satisfies the statutory requirement that the "basis and purpose" of the request fall under Title III. *See*

---

[2] Copies of all legislative history cited in this brief are included at Appendix A.

6

52 U.S.C. § 20703. The reviewing court should summarily reject a demand to inspect records that lacks a "basis" or "purpose" reflecting the congressional concerns manifest in Title III.

> **A.    The Context, Structure, History, and Purpose of Title III Illuminate Congress's Clear Intent That Title III Be Used Solely to Curb Disruption or Denial of the Franchise by Racially Discriminatory Practices.**

Congress did not grant unrestrained authority under Title III for the federal government to inspect voting records across the country for any conceivable "basis or purpose" (as the Administration would have it). Instead, Congress intended to remedy racially discriminatory practices without broadly encroaching on states' authority over the maintenance of their elections. *See also Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (Evidence of discrepancies in the voting rolls showing more registered white voters than white citizens in a county suggested "failures to purge voters who have moved away or have died," not Title III violations. The discrepancies "d[o] not bear any particular importance" to the racial discrimination claims under Title III.). Because the Administration's purported "demand" to Secretary Benson failed to include a demand with a "basis and purpose" in line with Title III's specific goals, the Administration fails to satisfy Title III's statutory requirements.

Title III was enacted to address obstacles blocking efforts to enforce the Civil Rights Act of 1957's prohibitions on racial discrimination in voting. *See* 106 Cong.

7

Rec. 5208 (1960). Through the 1957 Act, Congress codified its intent to remedy the widespread disenfranchisement of Black citizens. *See In re Wallace*, 170 F. Supp. 63, 67 (M.D. Ala. 1959) ("The provision in the Act [of 1957] providing for investigation of alleged discriminatory practices, including inspecting of voting and other pertinent records" was "'appropriate legislation' within the meaning of Section 2 of the Fifteenth Amendment."). After the passage of the 1957 Act, however, systematic disenfranchisement of Black citizens continued unabated across much of the South with the employment of literacy tests, arbitrary and discriminatory registration procedures, poll taxes, and acts of intimidation to keep Black citizens from the polls. *See Katzenbach*, 383 U.S. at 310–13. Among the tactics states enacted to restrict access to voter registration and the ballot to Black voters were laws requiring the destruction of voting records. 106 Cong. Rec. 3683 (1960) (describing an Alabama state law providing that voter registration records are not public records and that registrars could dispose of records pertaining to unsuccessful applicants); U.S. COMM'N ON C.R., *Report of the United States Commission on Civil Rights* 137 (1959) (reporting that Louisiana state officials interpreted state law to prohibit examination of voting records and that the Alabama legislature passed a bill expressly permitting the destruction of application forms of persons denied registration specifically to obstruct ongoing voting discrimination investigations).

8

The destruction of voting records by local officials significantly obstructed the federal government's civil rights investigations and attempts to enforce the anti-discrimination provisions of the Civil Rights Act of 1957. H.R. Rep. No. 86-956, at 7 (1959) ("So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective."). As explained in the congressional record, proof of denial or threatened denial of the right to vote because of racial discrimination required "access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting," the only source of which was voter registration records. 106 Cong. Rec. 5208 (1960) (quoting the testimony of Attorney General William P. Rogers before the House Judiciary Committee). In turn, however, "proposed, pending, or passed in the legislatures of some States [we]re measures authorizing the destruction of voting records soon after elections in order to prevent their inspection and use by Federal investigators." 106 Cong. Rec. 5208 (1960).

The 1959 report of United States Commission on Civil Rights also served as a catalyst for the Civil Rights Act of 1960 and specifically supported the inclusion of a voting records retention provision. U.S. COMM'N ON C.R., *Report of the United States Commission on Civil Rights* 134–38 (1959) (concluding "that lack of uniform provision for the preservation and public inspection of all records pertaining to

9

registration and voting hampers and impedes investigation of alleged denials of the right to vote by reason of race, color, religion, or national origin," and recommending that Congress put forth a voter records retention provision).

**B.** **The Eisenhower Administration Recommended Title III for the Express Purpose of Curbing Racial Discrimination in Voting, Not to Aid in Enforcing Any Federal Law.**

In response to intense local resistance to civil rights enforcement and recognizing the need to do more to protect the right of Black citizens to vote, the Eisenhower administration planted the seed of Title III over a year before the President ultimately signed the 1960 Act into law. On February 5, 1959, President Eisenhower transmitted to Congress his administration's "recommendations pertaining to civil rights." H.R. Doc. No. 86-75, at 1 (1959). The statutory scheme outlined in the message closely tracked what ultimately became the Civil Rights Act of 1960. *See* Pub. L. No. 86-449, Title III. The President insisted that Congress pass legislation "to give the Attorney General power to inspect Federal election records" because "[a]ccess to registration records is essential to determine whether the denial of the franchise was *in furtherance of a pattern of racial discrimination.*" H.R. Doc. No. 86-75, at 2 (1959) (emphasis added).

Appearing before the House Judiciary Committee during consideration of the provisions of the 1960 Act, Attorney General William Rogers testified that the "purpose" of Title III was "to make possible more effective protection of the right

10

of all qualified citizens to vote ***without discrimination on account of race.***" Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 86th Cong., at 211 (1959) (hereinafter "House Judiciary Subcomm. Hearings") (emphasis added). Inspection of records retained pursuant to Title III would make it "possible to determine who has been ***permitted*** to register or vote and who has not, and to make a ***breakdown on the basis of race***." *Id.* (emphasis added). According to the Attorney General, "the only source of such comparative information . . . is the records of registrations or other action required for exercise of the franchise." *Id.*

### C. Congress Expressly Intended to Limit Title III to Curbing Racial Discrimination in Voting, Not to Enact a New Catch-all Über-Subpoena Power to Aid Enforcement of Disparate Federal Laws.

The congressional record, including testimony about hindrances to the Department of Justice from accessing records necessary to enforce voting rights protections, as well as broader alternatives Congress considered, shows that Title III had a targeted purpose: to enable enforcement of federal law prohibiting racially discriminatory voting practices.

For example, civil rights leader Clarence Mitchell, Jr. testified for the NAACP's Washington Bureau before the House Judiciary Subcommittee regarding Alabama legislation requiring the destruction of electoral records, the "sole purpose" of which was "to destroy the evidence [of racial discrimination] before the Federal Government can get in." House Judiciary Subcomm. Hearings at 782. According to

11

Mitchell, "[w]here most of the discrimination takes place is when the colored people seek an opportunity to register, Mr. Counsel, so your questions really, if it is pursued, will reveal that the whole purpose of that law is to destroy the evidence before the election takes place." *Id.*

In early hearings before the House Judiciary Subcommittee, Representative William McCulloch—sponsor of H.R. 4457 (the House bill containing the language that would ultimately become Title III)—stated his reasoning for sponsoring robust voting rights legislation:

> I, however, very strongly feel that we should take every proper step to implement the right of the elective franchise in America, and to me there has been no satisfactory explanation of why people in certain sections of the United States of a certain single class in some precincts and in some wards, and even in some counties, cast not a single vote in the selection of the officials of a representative government, and I am awaiting with interest the comment and the explanation of that phenomena.

House Judiciary Subcomm. Hearings at 811. The House Report accompanying H.R. 8601—a version of the bill ultimately signed by President Eisenhower—suggests that Representative McCulloch's understanding had become communal among the bill's supporters. Before passage of Title III, "the Department of Justice ha[d] no existing power in civil proceeding to require the production of [election] records during any investigation it may conduct on ***complaints of a denial to vote because of race.***" H.R. Rep. No. 86-956, at 7 (1959) (emphasis added). The need for Title III

12

was "evident from the refusal of some State and local authority to permit such inspection" in response to those complaints. *Id.*

Even dissenting views expressed in the House Report accompanying H.R. 8601 reflect the House-wide understanding that Title III was designed to prevent racial discrimination at the voting booth. In a joint statement in the "Additional Views" section of the House Report (the section containing criticism of the bill as passed), Representatives John V. Lindsay and William T. Cahill noted that "Title III [was] a necessary supplement to part IV of the Civil Rights Act of 1957, which prohibits threats or intimidation designed to prevent persons from exercising their right to vote." *Id.* at 26.

Thus, the context of Title III illuminates the contemplated "basis and purpose" required to be described in an Attorney General's demand for inspection of election records. Representative McCulloch clearly delineated both the purpose of Title III (and provided a proposed standard of judicial review) in hearings before the House Judiciary Subcommittee:

> The purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector and then to inspect those records, if need be, ***if reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right***.

House Judiciary Subcomm. Hearings at 700 (emphasis added).

13

Federal courts interpreting the language of Title III were also clear to note Congress's intent. In an early opinion addressing the freshly enacted Title III and whether a state court could enjoin a Title III inspection demand from the Attorney General, the Middle District of Alabama noted that the legislative history of the Civil Rights Act "reflects that it was and is designed to provide a means of enforcing the basic federally guaranteed rights of citizenship (to vote) against state action." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). According to the court, "[t]he legislative history leaves no doubt but that it is designed to secure a more effective protection of the right to vote." *Id.* at 853. The Southern District of Mississippi noted that it is "a mistaken view to assume that such investigation of such records is an unlimited discovery device which may be employed and used without restraint and in the place and stead of a Rule 34 motion with its less restrained facilities for a complete discovery of any relevant irregularities and improprieties in the administration of the registration and voting laws of the state." *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963).

The NAACP advocated broader enforcement provisions that ultimately did not make it into the final bill. A provision that would have authorized the Attorney General to initiate broad civil actions to enforce civil rights and seek injunctive relief on behalf of persons denied their rights in voting rights, school desegregation, and

14

other civil rights cases appeared originally in the proposed Civil Rights Act of 1957, but was ultimately struck from the bill, and Congress passed a narrower statute. *See United States v. City of Philadelphia*, 482 F. Supp. 1248 (1979). Civil rights advocates, including the NAACP,[3] tried and failed to revive and include this provision in the 1960 legislation. *See id.*; H.R. Rep. No. 86-956 at 2 (1960).

Later statutes included civil rights enforcement provisions related to education and housing, with their own enforcement mechanisms. *See* 42 U.S.C. § 3611; 42 U.S.C.A. § 2000d-1; 28 C.F.R. § 42.106; *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). These later mechanisms of investigative authority would have been unnecessary had Title III applied broadly to violations of any federal law.

The historical context and purpose of Title III could not be clearer: the "basis and purpose" required to support a demand for investigation under Title III must always be grounded in concerns regarding racially discriminatory practices by custodians of electoral records.

---

[3] Clarence Mitchell, Jr., 6 THE PAPERS OF CLARENCE MITCHELL, JR.: THE STRUGGLE TO PASS THE 1960 CIVIL RIGHTS ACT, 1959-1960, at 439–43 (Denton L. Watson ed., 2021).

15

## II.   The DOJ's Demand for the Sensitive Data of Every Michigan Voter Exceeds Its Authority under Title III.

Title III requires any "officer of election" to retain and preserve certain voting records "which come into his possession" for 22 months after a federal election. 52 U.S.C. § 20701. To inspect records retained and preserved in accordance with Title III, the Attorney General must make a demand in writing to the records' custodian that "contain[s] a statement of the basis and purpose" for the demand. 52 U.S.C. § 20703 (emphasis added). Should the custodian refuse to produce, the district court where the § 20703 demand is made or for where the demanded record is located "shall have jurisdiction by **appropriate process** to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

At a minimum, "appropriate process" must include a determination that the purported "basis and purpose" for the demand comports with the goals of Title III—*i.e.*, to remedy racially discriminatory voting practices. Even if a federal district court's review of a Title III demand is limited to the review it can conduct of an agency's request for an administrative subpoena (as DOJ interprets Title III's "appropriate process" clause), a reviewing court still must "decide whether the agency **has met the statutory requirements** pertaining to the issuance and enforcement of the subpoena . . . ." *United States v. Markwood*, 48 F.3d 969, 975–76 (6th Cir. 1995) (emphasis added). Courts may not grant an administrative

16

subpoena when the agency's inquiry is not "within the authority of the agency." *Id.* at 977 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).

Further, the legislative history and context of Title III make clear that requests to inspect documents fail to satisfy Title III's plain language when the statement of "basis and purpose" veers away from or, as here, wholly neglects to invoke Congress's statutory goal of enforcing prohibitions against racial discrimination in voting. The district court here, relying on *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), which is not binding in this Circuit, misinterpreted Title III, determining that "the CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose." Opinion, R. 67, Page ID ## 907-908. Bolstering the conclusion that the district court misread the precedent is Justice Black's contemporaneous recognition, in declining to stay the disclosure of election records in *Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963), that the Fifth Circuit's order did not empower the Attorney General to issue wildly errant demands. Rather, it "only require[d] [states] to make available to the Attorney General or his representative, ***under fair and reasonable conditions***, records of which movants are not the owners but are only custodians for the State or its agencies." *Owen v. Kennedy*, 84 S. Ct. 12, 13 (1963) (emphasis added). The power to compel investigative disclosure has never been absolute; the district court interpreted Title III to confer unprecedented and constitutionality unsound roving authority to intrude on state sovereignty.

17

Although the district court misinterpreted Title III to permit records demands untethered to the Civil Rights Act's purpose, this Court should affirm the district court's dismissal of the government's complaint on other grounds. The government's request exceeds the scope of Title III, as Defendants raised on the record below. *See, e.g.*, Mot. to Dismiss, R. 39, Page ID ## 15–19; *Warda v. Comm'r of Internal Revenue*, 15 F.3d 533, 539 n.6 (6th Cir. 1994) ("[A]n appellate court may affirm on any ground supported by the record, even though the ground relied on by the lower court was different from the one chosen by the appellate panel."). *See also Allied Erecting & Dismantling Co. v. Genesis Equip. Mfg., Inc.*, 805 F.3d 701, 709 (6th Cir. 2015) ("Though we rely on different grounds for the dismissal, the district court's judgment need not be disturbed.").

## III. Disclosing Sensitive Voter Information to DOJ Compromises Voter Privacy and Risks Disenfranchising Eligible Voters.

States' voter information databases contain sensitive, nonpublic information about voters, provided under a guarantee of nondisclosure. The disclosure requested here raises serious privacy concerns. *See Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (recognizing that voter information includes sensitive private information that "implicates special privacy concerns"). Under federal law, applications for voter registration in federal elections must contain, at minimum, either the applicant's driver's license number or the last four digits of the applicant's Social Security number ("SSN"). 52 U.S.C. § 21083(a)(5)(A). Moreover,

18

many states' voter information databases, including Michigan's, also include sensitive and nonpublic information that go beyond what federal law mandates, including full SSNs, birth dates, and contact information, such as address and phone number, among other personal information.[4] While most states maintain publicly available voter files containing voter eligibility information (such as a voter's address, age, district, precinct, and polling location), *no state's* publicly available files disclose a voter's full SSN, driver's license number, or state ID number.[5]

DOJ has conceded that the privacy concerns are "substantial." Br. for the United States as Amicus Curiae in Support of Plaintiff-Appellee, *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36 (2024) (No. 23-1361), 2023 WL 4882397, at *27. Yet DOJ continues to seek disclosure of nonpublic voter information and disregards the consequences of accessing and aggregating voter data. Such readily foreseeable consequences include the compromise of confidential voter information, a further erosion of privacy rights, the unfair targeting of marginalized groups,

---

[4] *Access to and Use of Voter Registration Lists*, NAT'L CONF. OF STATE LEGISLATURES (last updated July 17, 2025), https://www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists.

[5] *How Federal Efforts to Access Voter Data Affect Our Privacy, Civil Liberties, and Democracy*, CTR. FOR DEMOCRACY & TECH., LEADERSHIP CONF.'S CTR. FOR C.R. & TECH., AND PROTECT DEMOCRACY (Dec. 12, 2025), https://civilrights.org/wp-content/uploads/2025/12/How-Federal-Efforts-to-Access-Voter-Data-Affect-Our-Privacy-Civil-Liberties-and-Democracy.pdf.

continued disenfranchisement of eligible voters, and, ultimately, the demise of public trust in elections.

### A. DOJ Lacks Adequate Privacy Safeguards to Protect Voter Information.

Despite DOJ's unprecedented attempt to collect and aggregate voter information, its deficient security protection measures fail to meet the minimum requirements under federal law. The Federal Information Security Modernization Act ("FISMA") requires federal agencies to implement information security programs to protect their systems and the data the systems store. 44 U.S.C. § 3554. FISMA subjects agencies' security programs to mandatory standards and requires agencies to regularly monitor their security programs as well as those of their contractors.[6] 40 U.S.C. § 11331 (referring to the standards promulgated by the National Institute of Standards and Technology ["NIST"]).

In December 2025, DOJ proposed a "confidential memorandum of understanding" to states relating to the requested disclosure of voter information.[7]

---

[6] Kabbas Azhar & Abigail Kunkler, *DOJ Wants Sensitive Voter Data But Can't Be Bothered to Protect It*, ELEC. PRIV. INFO. CTR. (Mar. 12, 2026), https://epic.org/doj-wants-sensitive-voter-data-but-cant-be-bothered-to-protect-it/.

[7] Eileen O'Connor, *"Confidential" Agreements Show Trump Administration's Plans for States' Voter Data*, BRENNAN CTR. FOR JUST. (Feb. 5, 2026), https://www.brennancenter.org/our-work/analysis-opinion/confidential-agreements-show-trump-administrations-plans-states-voter; *see also* Proposed Confidential Memorandum of Understanding, Dep't of Just. (Dec. 1, 2025) [hereinafter *DOJ Security Proposal*],

20

DOJ's proposed agreement regarding the transfer and retention of sensitive voter information reveals that its security plans wholly fail to meet FISMA security standards.[8] Recent evaluations identify numerous flaws in DOJ's prospective security plan. For instance, DOJ's security program fails to provide adequate data encryption, which would allow hackers to easily access and obtain nonpublic voter information.[9] Nor does DOJ's security program provide an audit log analysis or a defined reporting process, indicating that DOJ does not intend to review or track who accesses the data.[10] Put differently, DOJ's security program provides no system to detect problems. Should a data breach or unauthorized access occur, DOJ provides no deadline to report the issues.[11] And DOJ's proposal raises other privacy and

---

https://www.brennancenter.org/media/14806/download/2025-12-01-doj-mou-to-colorado.pdf?inline=1.

[8] *See id.*; *see also FISMA Gap Analysis of the U.S. Department of Justice's Collection of State Voter Registration List Data*, ELEC. PRIV. INFO. CTR. (2026), https://epic.org/wp-content/uploads/2026/02/FISMA-Gap-Analysis-Explanation-and-Appendix.pdf (evaluating the adequacy of security protections in place for registration list data obtained by the DOJ); Lisa J. Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, BRENNAN CTR. FOR JUST. (Feb. 25, 2026), https://www.brennancenter.org/our-work/analysis-opinion/justice-departments-security-measures-collecting-voter-rolls-are.

[9] *See* Danetz, *supra* note 8; *see also Risk Management Framework for Information Systems and Organizations*, NIST, at 14 (Dec. 2018) [hereinafter NIST Standards], https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-37r2.pdf.

[10] *See* Danetz, *supra* note 8; NIST Standards, *supra* note 9, at 23.

[11] *See* Danetz, *supra* note 8.

security concerns, including deficient access and data minimization controls,[12] and lack of systematic oversight of data access and use by independent government contractors.[13]

DOJ's plan to share the voter information with other federal agencies further exacerbates the dangers of the deficient security controls.[14] DOJ intends, for example, to provide the data to DHS—ostensibly to conduct a citizenship check.[15] But DHS's program also fails to meet mandatory federal standards. For instance,

---

[12] Data minimization refers to "the idea that entities should only collect, use, and transfer personal data that is 'reasonably necessary and proportionate'" to the purpose of the data collection. *Data Minimization*, ELEC. PRIV. INFO. CTR., https://epic.org/issues/consumer-privacy/data-minimization/. Here, the DOJ's security proposal permits password-only access to the data rather than two-factor authentication and does not limit the sharing of voter information beyond the DOJ's stated purpose. *See DOJ Security Proposal*, *supra* note 7, at 5–6.

[13] The DOJ explicitly plans to share the data with its contractors. *See DOJ Security Proposal*, *supra* note 7, at 6–7. But the proposal includes no explanation regarding how these contractors are vetted and how they safeguard voter data privacy.

[14] On March 31, 2026, the Trump Administration issued an executive order directing the DHS, USCIS, and SSA prepare a "State Citizenship List" that purportedly identifies individuals confirmed to be U.S. citizens. Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026). The executive order directs the DOJ to prioritize prosecution of election officials who provide mail-in ballots to voters deemed ineligible and orders the U.S. Postal Service to refrain from transmitting mail-in ballots from individuals not included on the list. Multiple lawsuits have challenged the constitutionality of this executive order.

[15] *See* Jude Joffe-Block, *The Justice Department Plans to Share Sensitive Voter Data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE (Sept. 12, 2025), https://perma.cc/C6RQ-6ATP.

DHS policy requires the agency to retain for ten years any sensitive voter information run through the citizenship check software.[16] Federal security standards established by the National Institute of Standards and Technology direct agencies to restrict the processing and retention of sensitive and personally identifiable information to limit the risk of unauthorized disclosure or data breaches.[17] Thus, both DOJ and DHS should limit the collection, processing, and retention of data to only what is necessary. Retaining the entire voter lists for 10 years contravenes such principles.

The Administration's unlawful seizure of voter information not only demonstrates a flagrant disregard for the Civil Rights Act's purpose, but also exhibits a reckless indifference to potential privacy and security risks to voters. The Administration attempts to justify collecting millions of voters' private information by relying on a 62-year-old statute, for an entirely different purpose, that does not contemplate cybersecurity and other data privacy concerns in the modern era or the fears of unauthorized executive misuse of information and ignores a spate of

---

[16] Jude Joffe-Block & Miles Parks, *33 Million Voters Have Been Run Through a Trump Administration Citizenship Check*, NPR (Sept. 11, 2025), https://www.npr.org/2025/09/10/nx-s1-5477367/save-election-citizenship-data-trump; *see also* Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks*, PROPUBLICA (Oct. 30, 2025), https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump.

[17] *See FISMA Gap Analysis*, *supra* note 8, app. A, at xi.

statutory data protection reforms and judicial vigilance of private information. Given the Administration's severely defective purported security protocols, the Court must allow the state to retain and safeguard voter information.

### B. Disclosure of Sensitive Voter Information Will Harm Marginalized Groups and Eligible Voters.

Moreover, DOJ intends to use sensitive voter information for enforcement of criminal and immigration laws.[18] But incorrect conclusions drawn from this data, which was not collected for such purposes, will likely lead to errors. As explained by the Fourth Circuit:

> It is possible that a registrant could have been "flagged" . . . as a potential noncitizen, simply for failing to correctly complete the citizen status "check box" on the voter registration application. Being improperly identified as a noncitizen for such an oversight could have long-standing personal and professional repercussions.

*Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021). Tellingly, DOJ has not only been vague regarding the security protocols governing this sensitive data; it has also failed to specify exactly how the Government

---

[18] *See supra* note 15; *see also United States v. Oregon*, 2026 WL 318402, at \*13 ("Plaintiff [United States]'s words and actions outside of the four corners of its Complaint in this case, including statements that it intends to create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling. The possibility that [the state's] voter registration list could be used to further these efforts in the absence of congressional action, may very well lead to an erosion of voting rights and voter participation.").

identifies noncitizen voters—especially as DHS's SAVE tool has continually erroneously flagged U.S. citizens as noncitizens, leading to improper cancellation of eligible voters' registrations.[19] The Government's mishandling and weaponization of voter information demonstrates that further disclosure will only continue to erode voter privacy protections and undermine the public's trust in elections.

## IV. DOJ's Attempt to Loot and Consolidate Voter Rolls for Broad Investigative and Enforcement Purposes Puts the First Amendment Right to Vote at Grave Risk.

In seeking sensitive voter data, DOJ has not limited use of this information to ensure access to the vote—quite the contrary. In fact, DOJ seeks the sensitive voter data to *deny* access to the vote. The agency has stated its intent to use the information to direct states to purge unilaterally flagged voters.[20] Leveraging Title III to coerce states to purge voters without adherence to safeguards is an impermissible perversion of the Civil Rights Act. The agency has also broadcast the intent to share sensitive voter files with DHS,[21] and to support other unspecified investigative

---

[19] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

[20] *See* O'Connor, *supra* note 7.

[21] *See* Joffe-Block, *supra* note 15; Alexander Castro, *Providence Federal Judge Grills DOJ Lawyer over Reasons for Demanding RI's Voter Data*, RHODE ISLAND CURRENT (Mar. 26, 2026) https://rhodeislandcurrent.com/2026/03/26/providence-federal-judge-grills-doj-lawyer-over-reasons-for-demanding-ris-voter-data/.

activities and enforcement goals.[22] Electoral participation by voters of color is particularly chilled when unrelated enforcement activities encroach into the sacrosanct domain of voter registration. These activities chill the exercise of First Amendment rights and constitute an unconstitutional burden on the right to vote.

"Voter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment." *United States v. Weber*, No. 2:25-CV-09149, 2026 WL 118807, at \*17 (C.D. Cal. Jan. 15, 2026) (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999) and *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)). The Supreme Court has repeatedly recognized the vital role the First Amendment plays in our constitutional order and how the First Amendment protects the right to vote:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.

*Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (recognizing First Amendment interests in the Right to Vote); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (right to vote is "preservative of all rights"); *Carrington v. Rash*, 380 U.S. 89, 96 (1965) (applying Equal Protection Clause of the Fourteenth Amendment to protect the right to vote). Indeed, "the right

---

[22] *Id.*

26

of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively . . . rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

At a minimum, the Administration's seizure of voter rolls across the country "stands to have a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used." *Weber*, 2026 WL 118807, at *2. By consolidating sensitive voter information and seeking to distribute it across several state and federal agencies,[23] the "chilling effect on voter registration . . . [will] inevitably lead to decreas[ed] voter turnout as voters fear that their information [will be] used for some inappropriate or unlawful purpose." *Id.* at 20; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Because DOJ has conceded its plan to use this data to target and purge voters, the harm is no longer speculative—DOJ's conduct will chill the civil participation of people of color. *See Weber*, 2026 WL 118807, at *2, *20 (recognizing that DOJ's request for sensitive voter information "stands to have

---

[23] Exec. Order No. 14399, *supra* note 14.

27

a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used"). The chilling effect of DOJ's actions on voter registration and electoral participation cannot continue.

DOJ's attempt to seize and consolidate voter rolls threatens the right to vote—as well as our entire electoral system—in ways antithetical and indeed harmful to the First Amendment and our constitutional order. At bottom, the Administration's pernicious interpretation of federal law subverts the purpose of the Civil Rights Act and the fundamental values that our election laws and Constitution seek to protect.

## CONCLUSION

For all the forgoing reasons, the judgment of the district court should be affirmed on the grounds that the DOJ's request exceeds the scope of Title III and the Civil Rights Act of 1960.

Dated:  April 17, 2026                    Respectfully submitted,


                                          /s/ Gillian Cassell-Stiga
                                          EDWARD G. CASPAR
                                          ROBERT WEINER
                                          LEAH FRAZIER
                                          GILLIAN CASSELL-STIGA
                                          CATHERINE MEZA
                                          LAWYERS' COMMITTEE FOR CIVIL RIGHTS

28

UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
gcassell-stiga@lawyerscommittee.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,479 words, excluding the parts of the brief exempted by Rule 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  April 17, 2026                    /s/ Gillian Cassell-Stiga
                                          Gillian Cassell-Stiga

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2026, a copy of the foregoing was filed electronically through this Court's CM/ECF system, which sent a notice of electronic filing to counsel of record.


Dated:  April 17, 2026                          /s/ Gillian Cassell-Stiga
                                                Gillian Cassell-Stiga