# APPENDIX A

# TABLE OF CONTENTS

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES TRAMSITTING RECOMMENDATIONS PERTAINING TO CIVIL RIGHTS ...................................................................................................1

PUBLIC LAW 86-449, 86TH CONGRESS, H. R. 860, TITLE III...........................4

HEARINGS BEFORE SUBCOMMITTEE NO. 5 OF THE COMMITTEE ON THE JUDICIARY – EIGHTY-SIXTH CONGRESS – FIRST SESSION ON H.R. 300, 351, 352, 353, 400, 430, 461, 617, 618, 619, 759, 913, 914, 1902, 2346, 2479, 2538, 2786, 3090, 3147, 3148, 3212, 3559, 4169, 4261, 4338, 4339, 4342, 4348, 4457, 5008, 5170, 5189, 5217, 5218, 5276, 5323, 6934, 6935 – MICSELLANEOUS BILLS REGARDING THE CIVIL RIGHTS OF PERSONS WITHIN THE JURISDICTION OF THE UNITED STATES (*EXCERPTS*) ..........................................................................11

HOUSE OF REPRESENTATIVES REPORT NUMBER 86-956 (*EXCERPTS*) .........................................................................................36

106 CONGRESSIONAL RECORD 5208 (1960).................................................. 50

106 CONGRESSIONAL RECORD 3683 (1960).................................................. 54

| 86TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | DOCUMENT No. 75 |
| --- | --- | --- |

## CIVIL RIGHTS

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

<mark>RECOMMENDATIONS PERTAINING TO CIVIL RIGHTS</mark>

FEBRUARY 5, 1959.—Referred to the Committee on the Judiciary and ordered to be printed

*To the Congress of the United States:*

Two principles basic to our system of government are that the rule of law is supreme, and that every individual regardless of his race, religion, or national origin is entitled to the equal protection of the laws. We must continue to seek every practicable means for reinforcing these principles and making them a reality for all.

The United States has a vital stake in striving wisely to achieve the goal of full equality under law for all people. On several occasions I have stated that progress toward this goal depends not on laws alone but on building a better understanding. It is thus important to remember that any further legislation in this field must be clearly designed to continue the substantial progress that has taken place in the past few years. The recommendations for legislation which I am making have been weighed and formulated with this in mind.

First, I recommend legislation to strengthen the law dealing with obstructions of justice so as to provide expressly that the use of force or threats of force to obstruct court orders in school desegregation cases shall be a Federal offense.

There have been instances where extremists have attempted by mob violence and other concerted threats of violence to obstruct the accomplishment of the objectives in school decrees. There is a serious question whether the present obstruction of justice statute reaches

34011

Page 1

**2**                                  CIVIL RIGHTS

such acts of obstruction which occur after the completion of the court proceedings. Nor is the contempt power a satisfactory enforcement weapon to deal with persons who seek to obstruct court decrees by such means.

The legislation that I am recommending would correct a deficiency in the present law and would be a valuable enforcement power on which the Government could rely to deter mob violence and such other acts of violence or threats which seek to obstruct court decrees in desegregation cases.

Second, I recommend legislation to confer additional investigative authority on the FBI in the case of crimes involving the destruction or attempted destruction of schools or churches, by making flight from one State to another to avoid detention or prosecution for such a crime a Federal offense.

All decent, self-respecting persons deplore the recent incidents of bombings of schools and places of worship. While State authorities have been diligent in their execution of local laws dealing with these crimes, a basis for supplementary action by the Federal Government is needed.

Such recommendation when enacted would make it clear that the FBI has full authority to assist in investigations of crimes involving bombings of schools and churches. At the same time, the legislation would preserve the primary responsibility for law enforcement in local law-enforcement agencies for crimes committed against local property.

Third, I recommend legislation to give the Attorney General power to inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection.

The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination. Until the enactment of the Civil Rights Act of 1957, the Government could protect this right only through criminal prosecutions instituted after the right had been infringed. The 1957 act attempted to remedy this deficiency by authorizing the Attorney General to institute civil proceedings to prevent such infringements before they occurred.

A serious obstacle has developed which minimizes the effectiveness of this legislation. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.

Fourth, I recommend legislation to provide a temporary program of financial and technical aid to State and local agencies to assist them in making the necessary adjustments required by school desegregation decisions.

The Department of Health, Education, and Welfare should be authorized to assist and cooperate with those States which have previously required or permitted racially segregated public schools,

and which must now develop programs of desegregation. Such assistance should consist of sharing the burdens of transition through grants-in-aid to help meet additional costs directly occasioned by desegregation programs, and also of making technical information and assistance available to State and local educational agencies in preparing and implementing desegregation programs.

I also recommend that the Commissioner of Education be specifically authorized, at the request of the States or local agencies, to provide technical assistance in the development of desegregation programs and to initiate or participate in conferences called to help resolve educational problems arising as a result of efforts to desegregate.

Fifth, I recommend legislation to authorize, on a temporary basis, provision for the education of children of members of the Armed Forces when State-administered public schools have been closed because of desegregation decisions or orders.

The Federal Government has a particular responsibility for the children of military personnel in federally affected areas, since armed-services personnel are located there under military orders rather than of their own free choice. Under the present law, the Commissioner of Education may provide for the education of children of military personnel only in the case of those who live on military reservations or other Federal property. The legislation I am recommending would remove this limitation.

Sixth, I recommend that Congress give consideration to the establishing of a statutory Commission on Equal Job Opportunity Under Government Contracts.

Nondiscrimination in employment under Government contracts is required by Executive orders. Through education, mediation, and persuasion, the existing Committee on Government Contracts has sought to give effect not only to this contractual obligation, but to the policy of equal job opportunities generally. While the program has been widely accepted by Government agencies, employers, and unions, and significant progress has been made, full implementation of the policy would be materially advanced by the creation of a statutory commission.

Seventh, I recommend legislation to extend the life of the Civil Rights Commission for an additional 2 years. While the Commission should make an interim report this year within the time originally fixed by law for the making of its final report, because of the delay in getting the Commission appointed and staffed, an additional 2 years should be provided for the completion of its task and the making of its final report.

I urge the prompt consideration of these seven proposals.

DWIGHT D. EISENHOWER.

THE WHITE HOUSE, *February 5, 1959.*

O

Public Law 86-449
86th Congress, H. R. 8601
May 6, 1960

## AN ACT

74 STAT. 86.

To enforce constitutional rights, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Civil Rights Act of 1960". Civil Rights Act of 1960.

## TITLE I

### OBSTRUCTION OF COURT ORDERS

SEC. 101. Chapter 73 of title 18, United States Code, is amended by adding at the end thereof a new section as follows: 62 Stat. 769.

"§ 1509. Obstruction of court orders

"Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime."

SEC. 102. The analysis of chapter 73 of such title is amended by adding at the end thereof the following:

"1509. Obstruction of court orders."

## TITLE II

### FLIGHT TO AVOID PROSECUTION FOR DAMAGING OR DESTROYING ANY BUILDING OR OTHER REAL OR PERSONAL PROPERTY; AND, ILLEGAL TRANSPORTATION, USE OR POSSESSION OF EXPLOSIVES; AND, THREATS OR FALSE INFORMATION CONCERNING ATTEMPTS TO DAMAGE OR DESTROY REAL OR PERSONAL PROPERTY BY FIRE OR EXPLOSIVES

SEC. 201. Chapter 49 of title 18, United States Code, is amended by adding at the end thereof a new section as follows: 62 Stat. 755.

"§ 1074. Flight to avoid prosecution for damaging or destroying any building or other real or personal property

"(a) Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody, or confinement after conviction, under the laws of the place from which he flees, for willfully attempting to or damaging or destroying by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center or educational institution, public or private, or (2) to avoid giving testimony in any criminal proceeding relating to any such offense shall be fined not more than $5,000 or imprisoned not more than five years, or both.

"(b) Violations of this section may be prosecuted in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement: *Provided, however,* That this section shall not be construed as indicating an intent on the part of Congress to prevent any State, Territory, Commonwealth, or possession of the United States of any jurisdiction over any offense over which they would have jurisdiction in the absence of such section."

Page 4

Pub. Law 86-449    -2-    May 6, 1960

74 STAT. 87.

SEC. 202. The analysis of chapter 49 of such title is amended by adding thereto the following:

"1074. Flight to avoid prosecution for damaging or destroying any building or other real or personal property."

62 Stat. 738.

SEC. 203. Chapter 39 of title 18 of the United States Code is amended by adding at the end thereof the following new section:

"§ 837. Explosives; illegal use or possession; and, threats or false information concerning attempts to damage or destroy real or personal property by fire or explosives

Definitions.

"(a)  As used in this section—

"'commerce' means commerce between any State, Territory, Commonwealth, District, or possession of the United States, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory, or possession of the United States, or the District of Columbia;

"'explosive' means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, and any chemical compounds or mechanical mixture that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound or mixture or any part thereof may cause an explosion.

Penalties.

"(b) Whoever transports or aids and abets another in transporting in interstate or foreign commerce any explosive, with the knowledge or intent that it will be used to damage or destroy any building or other real or personal property for the purpose of interfering with its use for educational, religious, charitable, residential, business, or civic objectives or of intimidating any person pursuing such objectives, shall be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both; and if personal injury results shall be subject to imprisonment for not more than ten years or a fine of not more than $10,000, or both; and if death results shall be subject to imprisonment for any term of years or for life, but the court may impose the death penalty if the jury so recommends.

"(c) The possession of an explosive in such a manner as to evince an intent to use, or the use of, such explosive, to damage or destroy any building or other real or personal property used for educational, religious, charitable, residential, business, or civic objectives or to intimidate any person pursuing such objectives, creates rebuttable presumptions that the explosive was transported in interstate or foreign commerce or caused to be transported in interstate or foreign commerce by the person so possessing or using it, or by a person aiding or abetting the person so possessing or using it: *Provided, however,* That no person may be convicted under this section unless there is evidence independent of the presumptions that this section has been violated.

"(d) Whoever, through the use of the mail, telephone, telegraph, or other instrument of commerce, willfully imparts or conveys, or causes to be imparted or conveyed, any threat, or false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to damage or destroy any building or other real or personal property for the purpose of interfering with its use for educational, religious, charitable, residential, business, or civic objectives, or of intimidating any person pursuing such objectives, shall be subject to imprisonment for not more than one year or a fine of not more than $1,000, or both.

Page 5

May 6, 1960      -3-      Pub. Law 86-449
74 STAT. 88.

"(e) This section shall not be construed as indicating an intent on the part of Congress to occupy the field in which this section operates to the exclusion of a law of any State, Territory, Commonwealth, or possession of the United States, and no law of any State, Territory, Commonwealth, or possession of the United States which would be valid in the absence of the section shall be declared invalid, and no local authorities shall be deprived of any jurisdiction over any offense over which they would have jurisdiction in the absence of this section."

SEC. 204. The analysis of chapter 39 of title 18 is amended by adding thereto the following:

"837. Explosives; illegal use or possession; and threats or false information concerning attempts to damage or destroy real or personal property by fire or explosives."

## TITLE III

### FEDERAL ELECTION RECORDS

SEC. 301. Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

SEC. 302. Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 301 to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

SEC. 303. Any record or paper required by section 301 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

SEC. 304. Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this title, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

SEC. 305. The United States district court for the district in which a demand is made pursuant to section 303, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.

SEC. 306. As used in this title, the term "officer of election" means any person who, under color of any Federal, State, Commonwealth, "Officer of election."

Pub. Law 86-449        -4-        May 6, 1960

74 STAT. 89.

or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

## TITLE IV

### EXTENSION OF POWERS OF THE CIVIL RIGHTS COMMISSION

SEC. 401. Section 105 of the Civil Rights Act of 1957 (42 U.S.C. Supp. V 1975d) (71 Stat. 635) is amended by adding the following new subsection at the end thereof:

"(h) Without limiting the generality of the foregoing, each member of the Commission shall have the power and authority to administer oaths or take statements of witnesses under affirmation."

## TITLE V

### EDUCATION OF CHILDREN OF MEMBERS OF ARMED FORCES

SEC. 501. (a) Subsection (a) of section 6 of the Act of September 30, 1950 (Public Law 874, Eighty-first Congress), as amended, relating to arrangements for the provision of free public education for children residing on Federal property where local educational agencies are unable to provide such education, is amended by inserting after the first sentence the following new sentence: "Such arrangements to provide free public education may also be made for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children."

(b)(1) The first sentence of subsection (d) of such section 6 is amended by adding before the period at the end thereof: "or, in the case of children to whom the second sentence of subsection (a) applies, with the head of any Federal department or agency having jurisdiction over the parents of some or all of such children".

(2) The second sentence of such subsection (d) is amended by striking out "Arrangements" and inserting in lieu thereof "Except where the Commissioner makes arrangements pursuant to the second sentence of subsection (a), arrangements".

SEC. 502. Section 10 of the Act of September 23, 1950 (Public Law 815, Eighty-first Congress), as amended, relating to arrangements for facilities for the provision of free public education for children residing on Federal property where local educational agencies are unable to provide such education, is amended by inserting after the first sentence the following new sentence: "Such arrangements may also be made to provide, on a temporary basis, minimum school facilities for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for

May 6, 1960   -5-   Pub. Law 86-449

74 STAT. 90.

such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children."

## TITLE VI

SEC. 601. That section 2004 of the Revised Statutes (42 U.S.C. 1971), as amended by section 131 of the Civil Rights Act of 1957 (71 Stat. 637), is amended as follows:

(a) Add the following as subsection (e) and designate the present subsection (e) as subsection "(f)":

"In any proceeding instituted pursuant to subsection (c) in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a), the court shall upon request of the Attorney General and after each party has been given notice and the opportunity to be heard make a finding whether such deprivation was or is pursuant to a pattern or practice. If the court finds such pattern or practice, any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application therefor, to an order declaring him qualified to vote, upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. Such order shall be effective as to any election held within the longest period for which such applicant could have been registered or otherwise qualified under State law at which the applicant's qualifications would under State law entitle him to vote. *Voting rights. Court action.*

"Notwithstanding any inconsistent provision of State law or the action of any State officer or court, an applicant so declared qualified to vote shall be permitted to vote in any such election. The Attorney General shall cause to be transmitted certified copies of such order to the appropriate election officers. The refusal by any such officer with notice of such order to permit any person so declared qualified to vote to vote at an appropriate election shall constitute contempt of court.

"An application for an order pursuant to this subsection shall be heard within ten days, and the execution of any order disposing of such application shall not be stayed if the effect of such stay would be to delay the effectiveness of the order beyond the date of any election at which the applicant would otherwise be enabled to vote.

"The court may appoint one or more persons who are qualified voters in the judicial district, to be known as voting referees, who shall subscribe to the oath of office required by Revised Statutes, section 1757; (5 U.S.C. 16) to serve for such period as the court shall determine, to receive such applications and to take evidence and report to the court findings as to whether or not at any election or elections (1) any such applicant is qualified under State law to vote, and (2) he has since the finding by the court heretofore specified been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. In a proceeding before a voting referee, the applicant shall be heard ex parte at such times and places as the court shall direct. His statement under oath shall be prima facie evidence as to his age, residence, and his prior efforts *Voting referees.* *23 Stat. 22.*

Pub. Law 86-449          -6-          May 6, 1960

74 STAT. 91.

to register or otherwise qualify to vote. Where proof of literacy or an understanding of other subjects is required by valid provisions of State law, the answer of the applicant, if written, shall be included in such report to the court; if oral, it shall be taken down stenographically and a transcription included in such report to the court.

*Transmittal of report and order.*

"Upon receipt of such report, the court shall cause the Attorney General to transmit a copy thereof to the State attorney general and to each party to such proceeding together with an order to show cause within ten days, or such shorter time as the court may fix, why an order of the court should not be entered in accordance with such report. Upon the expiration of such period, such order shall be entered unless prior to that time there has been filed with the court and served upon all parties a statement of exceptions to such report. Exceptions as to matters of fact shall be considered only if supported by a duly verified copy of a public record or by affidavit of persons having personal knowledge of such facts or by statements or matters contained in such report; those relating to matters of law shall be supported by an appropriate memorandum of law. The issues of fact and law raised by such exceptions shall be determined by the court or, if the due and speedy administration of justice requires, they may be referred to the voting referee to determine in accordance with procedures prescribed by the court. A hearing as to an issue of fact shall be held only in the event that the proof in support of the exception disclose the existence of a genuine issue of material fact. The applicant's literacy and understanding of other subjects shall be determined solely on the basis of answers included in the report of the voting referee.

"The court, or at its direction the voting referee, shall issue to each applicant so declared qualified a certificate identifying the holder thereof as a person so qualified.

*28 USC app.*

"Any voting referee appointed by the court pursuant to this subsection shall to the extent not inconsistent herewith have all the powers conferred upon a master by rule 53(c) of the Federal Rules of Civil Procedure. The compensation to be allowed to any persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

"Applications pursuant to this subsection shall be determined expeditiously. In the case of any application filed twenty or more days prior to an election which is undetermined by the time of such election, the court shall issue an order authorizing the applicant to vote provisionally: *Provided, however,* That such applicant shall be qualified to vote under State law. In the case of an application filed within twenty days prior to an election, the court, in its discretion, may make such an order. In either case the order shall make appropriate provision for the impounding of the applicant's ballot pending determination of the application. The court may take any other action, and may authorize such referee or such other person as it may designate to take any other action, appropriate or necessary to carry out the provisions of this subsection and to enforce its decrees. This subsection shall in no way be construed as a limitation upon the existing powers of the court.

*Definitions.*

"When used in the subsection, the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election; the words 'affected area' shall mean any subdivision of the State in which the laws of the State relating to voting are or have been to

May 6, 1960      -7-      Pub. Law 86-449

74 STAT. 92,

any extent administered by a person found in the proceeding to have violated subsection (a) ; and the words 'qualified under State law' shall mean qualified according to the laws, customs, or usages of the State, and shall not, in any event, imply qualifications more stringent than those used by the persons found in the proceeding to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist."

(b) Add the following sentence at the end of subsection (c) :    State as party "Whenever, in a proceeding instituted under this subsection any defendant. official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a), the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State."

## TITLE VII

### SEPARABILITY

SEC. 701. If any provision of this Act is held invalid, the remainder of this Act shall not be affected thereby.

Approved May 6, 1960.

# CIVIL RIGHTS

## HEARINGS

BEFORE

### SUBCOMMITTEE NO. 5

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

EIGHTY-SIXTH CONGRESS

FIRST SESSION

ON

**H.R. 300, 351, 352, 353, 400, 430, 461, 617, 618, 619, 759, 913, 914, 1902, 2346, 2479, 2538, 2786, 3090, 3147, 3148, 3212, 3559, 4169, 4261, 4338, 4339, 4342, 4348, 4457, 5008, 5170, 5189, 5217, 5218, 5276, 5323, 6934, 6935**

MISCELLANEOUS BILLS REGARDING THE CIVIL RIGHTS OF
PERSONS WITHIN THE JURISDICTION OF
THE UNITED STATES

---

MARCH 4, 5, 11, 12, 13, 18, 19; APRIL 14, 15, 16, 17, 22, 23, 24, 29, 30;
MAY 1, 1959

---

**Serial No. 5**

---

Printed for the use of the Committee on the Judiciary



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1959

42803

## COMMITTEE ON THE JUDICIARY
### HOUSE OF REPRESENTATIVES
#### EIGHTY-SIXTH CONGRESS
EMANUEL CELLER, New York, *Chairman*

FRANCIS E. WALTER, Pennsylvania
THOMAS J. LANE, Massachusetts
MICHAEL A. FIEGHAN, Ohio
FRANK CHELF, Kentucky
EDWIN E. WILLIS, Louisiana
PETER W. RODINO, JR., New Jersey
E. L. FORRESTER, Georgia
BYRON G. ROGERS, Colorado
HAROLD D. DONOHUE, Massachusetts
JACK B. BROOKS, Texas
WILLIAM M. TUCK, Virginia
ROBERT T. ASHMORE, South Carolina
JOHN DOWDY, Texas
LESTER HOLTZMAN, New York
BASIL L. WHITENER, North Carolina
ROLAND V. LIBONATI, Illinois
J. CARLTON LOSER, Tennessee
HERMAN TOLL, Pennsylvania
ROBERT W. KASTENMEIER, Wisconsin
GEORGE A. KASEM, California

WILLIAM M. McCULLOCH, Ohio
WILLIAM E. MILLER, New York
RICHARD H. POFF, Virginia
WILLIAM C. CRAMER, Florida
ARCH A. MOORE, JR., West Virginia
H. ALLEN SMITH, California
GEORGE MEADER, Michigan
JOHN E. HENDERSON, Ohio
JOHN V. LINDSAY, New York
WILLIAM T. CAHILL, New Jersey
JOHN H. RAY, New York

BESS E. DICK, *Staff Director*
WILLIAM R. FOLEY, *General Counsel*
WALTER M. BESTERMAN, *Legislative Assistant*
WALTER R. LEE, *Legislative Assistant*
CHARLES J. ZINN, *Law Revision Counsel*
CYRIL F. BRICKFIELD, *Counsel*
WILLIAM H. CRABTREE, *Associate Counsel*

---

### SUBCOMMITTEE No. 5
EMANUEL CELLER, New York, *Chairman*

PETER W. RODINO, JR., New Jersey
BYRON G. ROGERS, Colorado
LESTER HOLTZMAN, New York
HAROLD D. DONOHUE, Massachusetts
HERMAN TOLL, Pennsylvania

WILLIAM M. McCULLOCH, Ohio
WILLIAM E. MILLER, New York
GEORGE MEADER, Michigan

WILLIAM R. FOLEY, *General Counsel*

II

# CONTENTS

|  | Page |
|---|---|
| Text of bills | 1–146 |
| Statement of— | |
| Abbitt, Hon. Watkins M., Representative from Virginia | 659 |
| Addonizio, Hon. Hugh J., Representative from New Jersey | 432 |
| Alford, Hon. Dale, Representative from Arkansas | 522 |
| Alger, Hon. Bruce, Representative from Texas | 751 |
| Barnes, Rev. John, Hattiesburg branch, NAACP, Hattiesburg, Miss. | 783 |
| Blanshard, Mrs. Paul, executive director, Unitarian Fellowship for Social Justice | 458 |
| Bloch, Charles J., attorney at law, State of Georgia | 569 |
| Bookbinder, Hyman H., legislative representative of the AFL–CIO | 372 |
| Brown, Edgar A., president pro tem of the Senate of the State of South Carolina | 470, 514 |
| Brownfield, Lyman, General Counsel, Housing and Home Finance Agency | 421 |
| Caldwell, Hon. Millard F., former Governor, State of Florida | 667 |
| Campbell, Hon. Boyd, president, Mississippi School Supply Co., Jackson, Miss. | 653 |
| Celler, Hon. Emanuel, Representative from New York | 944, 950 |
| Cohelan, Hon. Jeffery, Representative from California | 868 |
| Colmer, Hon. William M., Representative from Mississippi | 607, 693 |
| Darden, Charles R., president, Mississippi State Conference of NAACP Branches, Meridian, Miss. | 801 |
| Davis, Hon. James C., Representative from Georgia | 919 |
| Dawson, Hon. William L., Representative from Illinois | 175 |
| Dingell, Hon. John D., Representative from Michigan | 197 |
| Dockhorn, Mrs. Wayne, member, national board, U.S. section, Women's International League for Peace and Freedom | 448 |
| Dollinger, Hon. Isidore, Representative from New York | 174 |
| Dorn, Hon. W. J. Bryan, Representative from South Carolina | 919 |
| Edelsberg, Herman, Director, Anti-Defamation League of B'nai B'rith | 273 |
| Elliott, Hon. Carl, Representative from Alabama | 860 |
| Engel, Irving M., President, American Jewish Committee | 940 |
| Flemming, Hon. Arthur S., Secretary, Department of Health, Education, and Welfare | 299 |
| Forrester, Hon. E. L., Representative from Georgia | 561 |
| Fowler, Andrew, director, Washington Bureau, National Fraternal Council of Churches, U.S.A., Inc. | 445 |
| Gallion, Hon. MacDonald, attorney general, Alabama | 755 |
| Gartin, Hon. Carroll, Lieutenant Governor of the State of Mississippi | 658 |
| Goodrich, Hon. Ernest W., Commonwealth's attorney for Surry County, Surry, Va. | 660 |
| Grant, Hon. George M., Representative from Alabama | 754 |
| Gravatt, Hon. J. Segar, attorney at law, Blackstone, Va. | 634 |
| Gressette, L. Marion, chairman, Senate Judiciary Committee, State of South Carolina | 470, 516 |
| Halpern, Hon. Seymour, Representative from New York | 467 |
| Hannah, Dr. John A., Chairman, Commission on Civil Rights | 251 |
| Hartnett, Al, secretary-treasurer, International Union of Electrical, Radio and Machine Workers, AFL–CIO | 281 |
| Hemphill, Hon. Robert W., Representative from South Carolina | 808 |
| Hollings, Hon. Ernest F., Governor of the State of South Carolina | 470 |
| Huddleston, Hon. George, Jr., Representative from Alabama | 776 |

III

IV                                    CONTENTS

|  | Page |
|---|---|
| Jones, Hon. R. E., Jr., Representative from Alabama | 671 |
| Kearns, Hon. Carroll D., Representative from Pennsylvania | 201 |
| Kiley, Robert R., president, U.S. National Student Association | 462 |
| Lechliter, Irvin, executive director, American Veterans Committee | 268 |
| Lindsay, Hon. John V., Representative from New York | 158 |
| Livingston, Hon. Willard W., chief assistant attorney general of Alabama | 777 |
| Masaoka, Mike M., Washington representative, Japanese American Citizens League | 948 |
| Maslow, Will, Esq., general counsel, American Jewish Congress | 350 |
| Mason, Hon. Norman P., Administrator, Housing and Home Finance Agency | 421 |
| Matthews, Hon. D. R. (Billy), Representative from Florida | 917 |
| Mills, Edward K., Jr., Deputy Administrator, General Services Administration | 260 |
| Minnick, Capt. John B., U.S. Marine Corps Reserve, retired | 620 |
| Mitchell, Clarence, director of the Washington Bureau, NAACP | 781 |
| Mitchell, Hon. James P., Secretary of Labor | 321 |
| Mounger, Breed C., president, Mississippi Bar Association | 608 |
| McCanless, Hon. George F., attorney general, Tennessee | 747 |
| McCray, John H., State chairman, South Carolina Progressive Democratic Organization | 546 |
| McCulloch, Hon. William, Representative from Ohio | 148 |
| McLeod, Hon. Daniel R., attorney general, South Carolina | 470 |
| McNair, Robert E., chairman, House Judiciary Committee, State of South Carolina | 470, 516 |
| McSween, Hon. Harold B., Representative from Louisiana | 870 |
| Nix, Hon. Robert N. C., Representative from Pennsylvania | 293 |
| Odum, Hon. Ralph, assistant attorney general of the State of Florida | 533 |
| O'Hara, Hon. Barratt, Representative from Illinois | 914 |
| Parker, Barrington D., Esq., D.C. Federation of Civic Associations, Inc. | 447 |
| Patterson, Hon. Joe T., attorney general of Mississippi | 693 |
| Patterson, Hon. John, Governor of Alabama | 675 |
| Perez, Hon. Leander H., district attorney, 25th Judicial District, Louisiana | 831 |
| Poff, Hon. Richard H., Representative from Virginia | 166 |
| Pope, Thomas H., chairman, South Carolina Democratic Party | 470, 516 |
| Powell, Hon. Adam C., Jr., Representative from New York | 169 |
| Rains, Hon. Albert, Representative from Alabama | 851 |
| Rauh, Joseph, vice chairman, Americans for Democratic Action | 892 |
| Rivers, Hon. L. Mendel, Representative from South Carolina | 469 |
| Roberts, Hon. Kenneth A., Representative from Alabama | 849 |
| Rogers, William P., Hon., Attorney General of the United States | 205 |
| Roosevelt, Hon. James, Representative from California | 286 |
| Roosevelt, John A., public member, President's Committee on Government Contracts | 453 |
| Selden, Hon. Armistead I., Jr., Representative from Alabama | 742 |
| Sifton, Paul, national legislative representative of the United Automobile Workers | 388 |
| Smith, Hon. Frank E., Representative from Mississippi | 519 |
| Tiffany, Gordon M., staff director, Commission on Civil Rights | 253, 904 |
| Tuck, Hon. William M., Representative from Virginia | 633 |
| Tuggle, Hon. Kenneth H., Chairman, Interstate Commerce Commission | 401 |
| Vandiver, Hon. Ernest, Governor of the State of Georgia | 562 |
| Vanik, Hon. Charles A., Representative from Ohio | 864 |
| Weitzer, Bernard, national legislative director, Jewish War Veterans | 435 |
| Whitehouse, Albert T., director, Industrial Union Department, AFL-CIO | 398 |
| Whitten, Hon. Jamie L., Representative from Mississippi | 852 |
| Wilkins, Roy, executive secretary, NAACP | 334 |
| Wilkinson, W. Scott, Esq., attorney at law, Shreveport, La | 874 |
| Williams, Hon. John B., Representative from Mississippi | 712 |
| Willis, Hon. Edwin E., Representative from Louisiana | 819, 873 |
| Winstead, Hon. Arthur, Representative from Mississippi | 919 |
| Zelenko, Hon. Herbert, Representative from New York | 196 |

CONTENTS                                  V

## DOCUMENTS

|  | Page |
|---|---|
| Letter to Hon. A. Paul Kitchen, Representative from North Carolina, from Hon. Luther H. Hodges, Governor of North Carolina | 891 |
| Letter of H. I. Bearden, president, Atlanta branch, NAACP | 949 |
| Statement of various national and local Jewish organizations | 940, 274 |
| Statement of International Longshoremen's and Warehousemen's Union | 953 |
| Letter of Amalgamated Meat Cutters' and Butcher Workmen of North America | 954 |
| Telegram of August Scholle, president, Michigan State AFL–CIO | 955 |
| Telegram of Paulsen Spence, Baton Rouge, La | 955 |
| Telegram of Roy Wilkins, NAACP, New York | 955 |
| Telegram of Margaret B. Wilson, St. Louis branch, NAACP | 956 |
| Telegram of Herbert L. Taylor, St. Louis, Mo | 956 |
| Statement of Liberal Party of New York State | 956 |
| Letter of Ross R. Barnett, Esq., Jackson, Miss | 957 |
| Report, Department of the Air Force, March 11, 1959 | 959 |
| Letter of Civil Aeronautics Board, March 4, 1959 | 960 |

# CIVIL RIGHTS

---

## WEDNESDAY, MARCH 11, 1959

House of Representatives,
Subcommittee No. 5 of the Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to recess at 10:05 a.m., in room 346, Old House Office Building, Hon. Peter W. Rodino presiding.

Present: Representatives Rodino (presiding), Rogers (Colorado), Holtzman, Donohue, Toll, McCulloch, Miller, and Meader.

Also present: William R. Foley, general counsel, and Richard C. Peet, associate counsel.

Mr. Rodino. The hearing on civil rights will resume at this time. There will be no further pictures taken during the course of the testimony and the presentation of testimony.

I would like to say that this morning we have as our first witness the Hon. William P. Rogers, the Attorney General of the United States.

General Rogers, I would like to state that the chairman of the committee, Mr. Celler, is unable to be here and he regrets very much that he is unable to preside at this meeting at which you are testifying, in view of the fact that his wife is ill, and it was impossible for him to come here. He asked me to extend to you his warm greetings.

During the course of part of your testimony, Mr. Rogers, would you kindly identify the gentlemen at your side?

## STATEMENT OF HON. WILLIAM P. ROGERS, ATTORNEY GENERAL OF THE UNITED STATES, ACCOMPANIED BY W. WILSON WHITE, ASSISTANT ATTORNEY GENERAL IN CHARGE OF CIVIL RIGHTS DIVISION, AND JOHN F. CUSHMAN, ACTING EXECUTIVE ASSISTANT TO THE ATTORNEY GENERAL

Attorney General Rogers. Yes, Mr. Chairman.

This is Wilson White, Assistant Attorney General in charge of the Civil Rights Division on my right, and on my left is John Cushman, acting executive assistant to the Attorney General.

Mr. Rodino. You may proceed.

Attorney General Rogers. Mr. Chairman, I appreciate the greeting from Mr. Celler, and I express regret that his wife is not feeling well.

I appreciate the opportunity to appear this morning to testify in support of H.R. 4457, which contains the legislative proposals recommended by the President in his special message of February 5, 1959.

This country is in a period of great progress in the field of civil rights. While there are, to be sure, starts, stops, and occasionally some backward steps, the overall picture is clearly one of forward

205

by over 8,000 officers representing 3,687 local law enforcement agencies. FBI representatives have discussed appropriate techniques for solving these bombings and have outlined the services the Bureau may offer local officials in their investigations.

However, there should be a clear and solid jurisdictional basis on which the FBI can proceed in these cases to make an investigation and to apprehend the persons involved. The fugitive felon approach reflects the basic principle, long maintained by the legislative and executive branches of the Federal Government, that the FBI is not a national police force and that it does not supersede local law enforcement agencies.

Our proposal would meet the situation in a moderate and practical manner. Since 1934 the Fugitive Felon Act, 18 U.S.C. 1073, has been the means for punishing persons who travel in interstate commerce with the intent to avoid prosecution under State law for certain listed felonies, or to avoid testifying in State felony proceedings. While the Fugitive Felon Act established such conduct as a Federal offense, its purpose was to supplement State law enforcement. Under the act, the FBI can and does locate and apprehend fugitives from State justice. When fugitives are arrested by the FBI, they are turned over for State prosecution and as a rule are not prosecuted for unlawful flight, except where for some reason State prosecution is impracticable or inadequate. During fiscal 1957, for example, 947 fugitives were located by the FBI proceeding under the Fugitive Felon Act. Of these only nine were prosecuted in the Federal Courts under the act.

The proposal here, the second proposal of H.R. 4457, proceeds on the same general principle and policy as the Fugitive Felon Act, to provide for Federal action as a supplement to, but not a substitute for, State and local action. It differs from the Fugitive Felon Act in some few particulars. While the Fugitive Felon Act applies to flight from prosecution for specified common law and statutory felonies our proposal would apply to flight from any prosecution for the willful destruction or damaging by fire or explosives of any educational or religious building, structure, facility or vehicle, or for attempting to do so. It would be immaterial whether the State prosecution would be for a felony or a misdemeanor. Finally, while a prosecution under the Fugitive Felon Act must be had in the judicial district from which the fugitive has fled, a prosecution under this bill could be maintained in the judicial district of apprehension.

Mr. Chairman, we believe this proposal will make it clear that this is a serious national problem. It will retain the primary responsibility for prevention and for the detection of crimes in the State, but it will give the FBI full authority to investigate and to assist in the apprehension of those responsible for these reprehensible types of crimes, and I might say in conclusion to this section of my remarks, Mr. Chairman, and members of the committee, that this proposal meets— has the entire support, full support of the Director of the FBI, Mr. J. Edgar Hoover.

I would like to turn now to part III of the proposal which concerns Federal election records.

The bill would vest in the Attorney General the authority to require the production of records and papers relating to any general, special, or primary election involving candidates for Federal office. It would also require the retention and preservation of such records

for 3 years. Willful failure to retain and preserve the records would be an offense punishable by fine or not more than $1,000 or imprisonment for not more than 1 year, or both, and their willful theft, destruction, concealment, mutilation, or alteration, by fine of not more than $5,000 or imprisonment for not more than 5 years, or both. In the event of nonproduction, jurisdiction would be conferred upon the Federal district courts to resolve any dispute which might arise in connection with the exercise of the authority conferred.

The purpose of the bill is to make possible more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This is also an important purpose of the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil proceedings for preventive relief from discriminatory denial of the right to vote. But the Attorney General's authority may be rendered relatively ineffective so long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of suit.

Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.

To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information—necessary for proper evaluation of complaints and in the preparation of cases—is the records of registrations or other action required for exercise of the franchise.

The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection. Its need is further shown by the recent experience of the Civil Rights Commission. The Commission, which does have the power to subpena such records—although not for the purpose of enforcing voting rights—has found it necessary to utilize its power to compel production. In the recent Alabama case, in the U.S. District Court for the Middle District of Alabama (*In re George C. Wallace et al.*, No. 1487–N), Judge Johnson, in enforcing the subpena power of the Civil Rights Commission, stated in his opinion of January 9, 1959, that the inspection of voting records "must be considered to be an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin."

Our purpose is the considered product of experience. Two of its provisions are of particular significance. The first of these is the provision which calls for production and inspection of the records

212                                    CIVIL RIGHTS

rather than for the issuance of a subpena. In actual operation, production would normally be at the usual place of custody of the voting records. Because of the importance of voting records and the frequent need to refer to them, we believe it preferable that the legislation should provide for inspection at their location rather than to have them removed by subpena to some other location.

The bill provides for inspection at the office of the local U.S. attorney as an alternative in the event that their usual location is unsuitable. In other words, we thought the subpena power might be construed as an interference with the State's power over voting, and we wanted to limit it merely to the right of inspection so we couldn't be accused of requiring the people to produce the records in Washington or somewhere else.

The second provision requiring retention of records for a period of 3 years is of the utmost importance. The practical need for such a provision has been sharply illustrated in the State of Alabama. After the commencement of a suit by the United States under the Civil Rights Act of 1957, the Alabama Legislature introduced a bill permitting destruction of the questionnaires of unsuccessful applicants for registration. Obviously, the purpose of this restriction was to obstruct the enforcement of the Civil Rights Act as passed by the Congress in 1957.

Immediately after the introduction of this bill, the Government applied for and obtained a temporary restraining order preventing destruction of the records in the county involved in the case. Within a matter of days the bill authorizing destruction of the records had been passed into law. Similar action in other States would frustrate Government inspection of the records if the preservation provision does not become law.

The Department feels that enactment of this proposal is essential to the effective enforcement of the provisions of the Civil Rights Act of 1957. It would supply the needed authority to make a reality of an underlying thesis of the act that the right of all qualified citizens to vote is the keystone of democratic government.

Turn now to the fourth provision, which refers to extending the life of the Civil Rights Commission, and I might say, Mr. Chairman, that the distinguished Chairman of that Commission, Dr. John A. Hannah, is in the room, and its Executive Director, Mr. Gordon Tiffany. I think they are going to testify following the conclusion of my statement.

But I want to refer to this because it is one of the President's proposals. It recommended that the life of the Civil Rights Commission should be extended for an additional 2 years.

I may say, Mr. Chairman, before I conclude this, as you know, the Civil Rights Commission is not in any way associated with the Department of Justice. It acts completely independently from us, and the only reason I am referring to it here is that it is in the administration's proposal.

I would not want to create the suggestion here in anyone's mind that there is any connection. We have cooperated with them when we were asked, but we have not in any sense of the word been involved in their activity.

We ask that section 104(b) of the Civil Rights Act be amended to provide that the Commission shall submit an interim report not later

# CIVIL RIGHTS

---

THURSDAY, APRIL 23, 1959

House of Representatives,
Subcommittee No. 5 of the
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to recess, at 10:05 a.m., in room 346, Old House Office Building, Hon. Byron G. Rogers presiding.

Present: Representatives Rogers and McCulloch.

Also present: William R. Foley, general counsel of the subcommittee, and Richard C. Peet, associate counsel.

Mr. Rogers. The subcommittee will come to order. The committee will continue its hearings on the civil-rights bills.

We have with us this morning the Honorable Bill Colmer, longtime Member of the House of Representatives, who will present our first witness. Mr. Colmer.

## STATEMENT OF WILLIAM M. COLMER, A REPRESENTATIVE IN CONGRESS FROM THE SIXTH CONGRESSIONAL DISTRICT OF MISSISSIPPI

Mr. Colmer. Mr. Chairman and members of the committee, it is my privilege this morning to present another witness in opposition to these proposals to further regiment not only my people of my great section of this country, but the people of all of these United States.

I am not going to take the time of this committee or my distinguished witness to make further comments, but I deem it a high privilege to present to you this morning a very learned gentleman from the great State of Mississippi, and, as I said on yesterday, the once sovereign State of Mississippi.

I present to you the attorney general, the Honorable Joe Patterson. I bespeak for him your patience and your understanding.

General Patterson.

Mr. Rogers. Come forward, Mr. Patterson, or should I say General Patterson.

I note the presence from the State of Mississippi the next witness, the Honorable John B. Williams.

We are delighted to hear from you, General Patterson.

## STATEMENT OF HON. JOE T. PATTERSON, ATTORNEY GENERAL, MISSISSIPPI

Mr. Patterson. Mr. Chairman, I want to thank my good friend from down in my home State, Congressman Colmer, for his kind

693

remarks, and I also want to thank this honorable committee for the privilege of coming back before this committee.

Mr. ROGERS. You have testified before this committee—what was it—2 years ago?

Mr. PATTERSON. Yes, sir, and I want to thank the committee for the privilege of permitting us to come back before this committee.

Mr. ROGERS. We are glad to have you back again.

Mr. PATTERSON. I appreciate the privilege of testifying on these highly controversial issues. It was my privilege to appear before this honorable committee in 1957 in opposition to the then pending civil rights bill and I wish to again thank the chairman of this committee for the attentive and courteous reception that I received at that time, as well as for the privilege of again appearing before this committee in opposition to similar bills.

I come before this committee at this time in the same spirit that I appeared before this committee in 1957. I come not in the spirit of resentment, not in the spirit of vindictiveness, certainly not in the spirit of defiance, but as a citizen and public official of the State of Mississippi who is interested in the problems that the pending bills propose to correct, as well as the problems that the enactment of the pending civil rights bills are destined to bring about not only in the State I represent, but in all other States that these bills are designed and intended to have the most direct effect upon.

I am opposed to all pending civil rights bills traveling under the title "Civil Rights Bills." However, I shall confine my remarks to H.R. 3147, commonly referred to in these hearings as the Celler bill, and H.R. 4457, commonly referred to in these hearings as the McCulloch bill.

I had hoped with the passage of the Civil Rights Act of 1957 and the now known result thereof that those who have so aggressively advocated such legislation would come to the realization that the end sought to be accomplished cannot be done by law. However, after reading the proposed bills now pending before this committee and reading the statements of ardent advocates of this legislation made before this committee in support of these bills, it appears that the sponsors of the so-called civil rights bills refuse to take cognizance of the failure of the Civil Rights Act of 1957 and the true reasons therefor and now want to proceed on the theory that the act of 1957 was not dictatorial enough and not harsh enough to accomplish the desired results and therefore they urge the passage of the bills now before this committee, especially the features of those bills that confer arbitrary and dictatorial powers in the Federal Government primarily in dealing with public school systems of those States who are not conducting their public school system in the way that the advocates of the civil rights legislation would have them conduct them, and, secondly, over elections in the States, and, thirdly, over employment in the States on Government contracts.

Reading the Celler bill, H.R. 3147, and the McCulloch bill, H.R. 4457, together in the light of what should be the guiding star of all legislation, and especially of such far-reaching legislation as that proposed here; that is, whether such legislation is for the common good of the Nation, we can come to only one conclusion and that is that the bills under discussion here are wholly unnecessary and, further,

in the union outside of the State of Mississippi to come to Mississippi for the specific purpose of doing this job. And I want it specifically understood that no citizen of Mississippi working for the telephone company or otherwise had anything to do with it. This is just another one of the many efforts on the part of the——

Mr. Rogers. Did I understand you to say there was criminal prosecution against communication workers for this bombing in Mississippi?

Mr. Patterson. Yes, sir, and that case was affirmed here recently by the U.S. Supreme Court.

Mr. Foley. Prosecuted in both State and Federal courts?

Mr. Patterson. They were prosecuted by the Federal Government down in Mississippi.

Mr. Foley. A State court?

Mr. Patterson. They walked into some court up in Chicago and pleaded guilty to some phase of the crime. They were not prosecuted in the State court of Mississippi, but there was a plea of guilty entered in one of the courts in the city of Chicago. They were later indicted in the southern district of Mississippi, where they were convicted of the crime and that case was recently determined here by the U.S. Supreme Court.

Mr. Rogers. They were tried in the Federal court in Mississippi?

Mr. Patterson. In the southern district of Mississippi; yes, sir.

Mr. Peet. May I ask a question? And they were convicted of the crime of bombing?

Mr. Patterson. They were convicted of the crime of destruction of communication facilities that the Federal Government was using there. That is the way I understood the indictment. It is under a special Federal statute covering that phase of crime whereby the Federal Government was using the facilities or obstructing the use of same by the Federal Government.

Mr. Peet. Did the FBI participate in that investigation?

Mr. Patterson. I think they did, yes, sir.

### TITLE III

This is just another one of many efforts on the part of the Federal Government to take over and supervise elections in the States.

I am going now to the election phase of the McCulloch bill. This section brings to life again and places before the Congress a question that has been argued many times; that is, whether the Federal Government or the States should supervise elections within the States. Certain groups have advocated for sometime that the Federal Government take over and completely dominate and control elections pertaining to Federal officers. This is in direct violation of the rights of the States. As long as the House of Congress and the U.S. Senate have it within their power to determine whether one of their Members was properly elected to that body, then I submit that such legislation as this is wholly unnecessary.

It is obvious that the framers of the Constitution did not intend for Congress to ever attempt to enact laws controlling Federal elections in the respective States. Proof of this is the fact that each House is the sole judge of the election and qualification of its Members and whether they are entitled to a seat therein.

42803—59——45

We have only to look back to the dark days of Reconstruction to see what Federal domination of elections within the State can result in. During the dark and trying days that followed the War Between the States, the Federal Government came into the State of Mississippi and took over supervision and control of elections. The result was the election of incompetents and misfits to public office, and in some instances outright racketeers who did nothing to try to help the State recover from the ravages of the recent war, but, on the other hand, plunged the State hopelessly in debt that took many years of trial and tribulation to come out from under.

It finally dawned upon those who brought about this said state of affairs that such would not work and they finally withdraw from the State of Mississippi and permitted the people of Mississippi to again take over the affairs of their government.

The enactment into law of title III of this act would only be a step backward toward those dark and trying years. This section, like other sections of the proposed bill, presupposes dishonest and unfair elections in the States to be affected thereby.

Title V. This section would extend the life of——

Mr. McCulloch. I would like to ask the witness a question there. Mr. Patterson, do you think that there is anything really wrong with a requirement that the records upon which is determined the right to vote should be preserved for a reasonable period of time as the law of the Federal Government when those elections affect the election of the President, Vice President, and Members of the Senate or Members of the House of Representatives?

Mr. Patterson. Insofar as my State is concerned, we already have a law like that, sir.

Mr. McCulloch. Then it will not unduly interfere with your procedures down there? The records which determine whether or not a person may vote are carefully preserved for a reasonable length of time?

Mr. Patterson. Yes, they are.

Mr. McCulloch. So, therefore, this provision would not have any greater effect in Mississippi than it would in Ohio where election records are preserved in accordance with the law for a reasonable time?

Mr. Patterson. The point I am making—no, I agree with you and, as I say, that already is the law in Mississippi. We already keep records, complete records and we have a most elaborate system of contesting elections in case anyone doubts whether it has been properly held or not. But, sir, it is under State law.

The point I am arguing here is that it is not for the Federal Government to attempt to supervise those State elections.

Mr. McCullough. It is not the purpose of title III to supervise State elections. The purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector and then to inspect those records, if need be, if reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right.

Now personally I see nothing wrong with that provision, and I believe, like the President of the United States, that the elective franchise is one of the real cornerstones of representative government. If

it cannot be ultimately assured to all those who are qualified to exercise it, in accordance with law executed without fear or favor, then ultimately our representative republic is going to fail.

Mr. ROGERS. Do I understand your chief objection is that you feel that the Federal Government has no right to supervise or regulate elections for a Federal officer to be elected?

Mr. PATTERSON. Not to the exclusion of the States: no, sir.

Mr. ROGERS. Are you familiar with article I, section 4 of our Constitution, which says that the time, place, and manner of holding an election for Senators and Representatives shall be prescribed in each State by the legislature thereof, but the Congress may at any time, by law, make or alter such regulations, except as to the place of choosing Senators?

Now what is your interpretation of section 4 of article I if it does not give to the Congress the right to make those regulations? Do you concede that they have a right even after the reading of this section?

Mr. PATTERSON. I think as long as the State makes an honest effort and prescribes a proper method for the holding of these elections that there is no need for Congress to exercise that authority, that it does have to step in and approve or disapprove. I think if a State should set up a system of elections that was manifestly unfair, certainly then perhaps the Congress should step in, but as long as the State does have a good system as my State does have and as I think most of the other States have, then why step in?

Mr. ROGERS. The point is you don't deny that what Congress has a right to do; your suggestion is that they should not because the States are fulfilling the duties and responsibilities necessary for free, open election of all citizens. That is your argument?

Mr. PATTERSON. That is right. We have already got it and you are going to bring about this dual responsibility and authority and put us right back where we were a good many years ago, and I hope never again, when this very conflict arose between State and Federal authorities in the management and control of elections.

Mr. McCULLOCH. Mr. Chairman, I have a question. Is there pending before the Mississippi Legislature, or has the Mississippi Legislature passed a bill which has become a law which would authorize the destruction of voting records or the evidence to determine the eligibility of voters in an unreasonably short time?

Mr. PATTERSON. No, sir. The last session of the Mississippi legislature, Congressman, was in 1958. We do not have a session now and will not have one this year, unless a special is called by the Governor.

Mr. McCULLOCH. Now, Mr. Chairman, I would like to comment on this question that the witness asked and, as I recall, I believe the question was why should the Federal Government go into this field when the States were insuring to those who were qualified to vote the right to vote whenever they desired to do so.

As I recall, Mr. Chairman, there is evidence in the record that certain people with considerable formal education, including degrees from recognized universities in the country, had been denied the right to vote in some of the States and I believe in the State of Mississippi, as I recall, Columbia University was one of the colleges named. And there is also evidence in the record that in some counties less than a

score of Negroes have voted and that applications for registration have been denied there. It is because of such information in the record in this session of Congress and similar evidence in the record in former Congresses, that the proposal for title III comes about. I would be very glad to have the attorney general comment upon whether or not in substance the evidence that has gone into the record is in accordance with the facts in his State.

Mr. PATTERSON. Going to your first question, Congressman in the first place I want to say that I take it that the Congress still concedes to the States the right to prescribe qualifications for electors.

Mr. McCULLOCH. In accordance with the Constitution, yes, sir.

Mr. PATTERSON. I think it will be a sad day in any State in this Union when just the fact that a man or woman is 21 years of age and, say, can read and write, that that alone entitles him to go in and become a qualified elector of that State. I frankly state to you, Congressman, that I think it the duty of the State legislatures to prescribe reasonable qualifications for voters in every State in the Union. It is only at the hands of an intelligent and enlightened electorate that our form of goverment can survive as I see it.

Mr. McCULLOCH. I think that statement has been made by many, many legislators, if not a substantial majority of the voters at the State and Federal level.

Mr. PATTERSON. And I even go further: I think the right to vote, although it is talked about sometimes as an inalienable and God-given right, I also think it is a privilege rather than just an outright matter of right.

Now going further to the Congressman's question, in the first instance with reference to denial of registration, I don't know of any instance of that kind down in Mississippi where those who are in fact qualified under the laws of the State of Mississippi to become qualified electors, and I think the registration books of the counties of our State will show my statement to be correct.

Now we had a lawsuit down in Mississippi not more than a year ago on this very question, where that same charge was made, but when called upon to support that charge with proof, they wholly failed.

Mr. ROGERS. Counsel, I think, would like to ask you some questions, General.

Mr. PEET. Mr. Attorney General, could you tell us how many people are registered to vote in the State of Mississippi?

Mr. PATTERSON. That I cannot. And my reason for that is that we have no central gathering agency, no central agency in the State government whereby the number of qualified electors are reported. The only way that question could be accurately answered—that is, the only way information can be obtained to accurately answer your question, sir, would be to call upon the circuit clerk of every one of the 82 counties and ask him to supply that information to you as pertains to that county, and then get them all together, which I have not done.

Mr. PEET. Do you know how many people are registered in your county in Mississippi?

Mr. PATTERSON. In my county of Calhoun, at present I do not because this is what we call the big election year down in Mississippi, when we are going to elect everything from constable to Governor and

I don't know what the status of registration even in my home county is right now.

Mr. PEET. Could you tell us do you have any idea whether or not there has been an increase in Negro voter registrations in recent years in your county?

Mr. PATTERSON. I sure could not.

Incidentally, my home county is up in the northeastern part of the State and of course now I am living in the capital city of Jackson and I am not in my home county very often.

Mr. PEET. Have you heard, sir, any instances of voting officials in the South or in your own State who have deliberately set out to substantially reduce the number of Negroes who are registered to vote?

Mr. PATTERSON. I speak only for my own State and in the case of my own State, no, sir.

Mr. PEET. Do you have any idea of how many counties in your State have more than 5 percent of the Negroes registered to vote?

Mr. PATTERSON. No, I do not, sir. And as I understand that question, sir, going further, and as the courts have held, mere numbers of a population in a county doesn't indicate a right to vote or an eligibility to vote—it is just mere numbers.

Mr. PEET. But would it not indicate, if a very small percentage of the Negroes passed qualifying tests, would it not indicate an inferior educational system?

Mr. PATTERSON. I don't think so, because we have a good educational system. I don't see how it could be attributed to that. Not at all.

I would like to point out, just to show you on that very question, we have a case pending right now that we hope to get before the U.S. Supreme Court, whereby a State conviction was reversed by the fifth circuit a few months ago on the proposition that there were no Negro names in the jury box nor on the grant jury that indicated and the petit jury that tried it. They didn't raise that question until after conviction in the State court, affirmance by the supreme court, and denial of certiorari in the U.S. Supreme Court, and then for the first time they raised that question; and then again in the Federal court and when it went back on a petition for habeas corpus on these allegations, they raised the question that Negroes had been systematically excluded from jury service. In order to be eligible to serve on a jury one of the qualifications is that the prospective juror be a qualified elector and it was charged that the system of registration necessary to become a qualified elector was so manipulated that it denied them the right of registration, thereby in turn denying eligibility for jury duty.

The courts were thrown wide open to the Chicago law firm that came down and took over this case, to make that proof in the U.S. District Court at Oxford, Miss. He brought five members of the Negro race into the courtroom from that county—good substantial Negro citizens of that county. They owned their farms; they lived there for years; they were obviously intelligent. He asked them were they qualified electors of that county, and they said "No." He asked them had they ever been called for jury duty and they said "No."

He asked them if they ever saw members of his race sitting on juries in that county, and they said "No."

I asked him had any public official of that county ever denied him the right to become a qualified elector of that county and he said "No." I asked him further had anyone ever threatened him or any member of his race in that county, to his knowledge, at any time if they did seek to become a qualified elector, and he said "No."

I said, "Has any citizen ever threatened you and told you that you couldn't become a qualified elector of your county if you wanted to?"

He said, "No."

I said, "Then the only reason you are not a qualified elector of your county, so far as you know, is that you have not tried to be."

He said, "That is right."

And every witness that was put on there, members of the Negro race, gave the same answer.

Now registration, as I understand it, to vote is not compulsory in any State in the Union, and why should the people of Mississippi be expected to go out and solicit registration. I don't know that they do it anywhere else.

Mr. PEET. May I pose one hypothetical question to you?

Mr. PATTERSON. Yes, sir.

Mr. PEET. If in your county 50 percent or less of the Negroes were registered to vote, would you consider that title 3 of the administration bill was warranted?

Mr. PATTERSON. I don't think it is warranted if 100 percent of them were registered to vote. Certainly the Federal Government shouldn't pass a statute here to go down into a State and compel registration for voting on the part of anyone—white or Negro.

Title 5—extending the life of the Civil Rights Commission. When I appeared before this committee in 1957 in opposition to the civil rights bills pending before the Congress at that time, I stated that in my judgment the ask assigned to the Civil Rights Commission could not be accomplished by six men regardless of ability in perhaps 8 or 10 years or longer. I further stated that the creation of this Commission for its stated purpose would set up in the executive branch of the Government a source of harassment to the States in the administration of their laws and a constant source of harassment to the executive branch of the Government by those who were going to feel that the Commission was being provided for their sole benefit, to the exclusion of all others.

I also predicted that if the President did not appoint members of the Commission who had previously demonstrated complete sympathy and accord with the views and wishes of those well organized groups who were responsible for the proposed legislation that the President would immediately have the wrath of those groups brought down upon his head and be accused of not being in sympathy with his own recommendation.

I think subsequent events have proven such predictions to be true. I do not know of any worthwhile accomplishment that the Commission can report to this Congress.

The ardent advocates of the creation of this Commission have been wholly disatisfied with the personnel the President saw fit to appoint thereon. The Commission has wholly failed to accomplish anything in any State in which it has tried to function. The Commission did go down to the State of Alabama and after considerable furor wound

up in the Federal Court of Alabama, but I again ask was anything worthwhile accomplished by this escapade? Of course it gave the extremist something to condemn the great State of Alabama about, but I still ask was anything worthwhile accomplished?

I submit that this Commission which should never have been created in the first instance should now be permitted to pass out of existence.

### TITLE 5

This section is just another effort to open the doors for an FEPC, another question which has been debated by the Congress on numerous occasions. I still think that an individual, a business or an industry has the constitutional, and I might say civil right, to determine whom it will hire and fire. I do not see how the most ardent advocates of this type of legislation can deny that this kind of law is not very similar to the law that prevails in communistic Russia where the government takes it upon itself to say who will work, where they will work and how they will work. I still think that free enterprise and private initiative is one of the greatest contributing factors to the progress of the United States of America and I further think that when the Government attempts to step in and take over in the field of employment and take away from the employer the unrestrained right to employ and dismiss employees, then that day the Government begins to destroy one of the prime factors in our great progress and development as a Nation.

### TITLE 6

I have no argument with this title; that is, if the Federal Government wants to provide schools on Federal property for children of members of the Armed Forces. I can see no reason why States or representatives of a State should object to this being done by the Federal Government.

### TITLE 7

This section deals with grants to assist States and local educational agencies to effectuate desegregation. What I have said with reference to Titles 2, 3, 4, 5, and 6 of H.R. 3447 are equally applicable to this section and I shall not repeat same here.

Mr. Chairman, I have read the statements of a number of witnesses who have appeared before this committee urging the enactment of the two bills here under discussion and some even seeking to go further than the two bills provide. It is interesting to note that those ardent advocates of these bills confine their advocacy to entering the public school systems of Southern States and confine their remarks to conditions alleged to exist in those States. They are very careful to urge that these bills be directed solely to what they are pleased to term deplorable conditions in certain States. They are also careful to urge the enactment of criminal statutes dealing solely with specific acts committed in those States.

I have read the statement of the two spokesmen for the AFL–CIO, who have appeared before this committee. I notice that each of them have ardently advocated the enactment of provisions of the proposed bill whereby the Attorney General is given unlimited authority to enter into school integration controversies and to exercise all of the powers

Mr. LIVINGSTON. I realize what they said.

Mr. ROGERS. But you separate them.

Mr. LIVINGSTON. I am not conceding I agree with what they said.

Mr. ROGERS. As lawyers in application of the law, you have a problem of what to do about it. Now the State of Alabama, as I understand, passed placement of pupils or the Pupil Placement Act, which was upheld on its face.

Mr. LIVINGSTON. That is right, which has been upheld on its face so far.

Mr. FOLEY. Do you have any cases pending in regard to that now?

Mr. LIVINGSTON. We have some in Birmingham.

Mr. GALLION. We have four applicants at Graymont Elementary School in Birmingham and four applicants at Phillips High School in Birmingham.

Mr. FOLEY. Have they taken the cases to court as yet?

Mr. GALLION. It has not reached that stage. Speaking very frankly, I anticipate that.

Mr. ROGERS. Thank you very much, gentlemen—the attorney general as well as the assistant attorney general—for your appearance here. We appreciate your thoughts.

Now I would like the record to show that the Alabama delegation is pretty well represented here this morning—Mr. Boykin, from the southern part of the State; Carl Elliott, George Huddleston, Mr. Selden, and, of course, our friend George Grant, who not only appeared here, but also testified, so we thank you for your presentation from Alabama.

Mr. LIVINGSTON. Thank you.

Mr. GALLION. Thank you, sir.

Mr. ROGERS. The next witnesses are the Reverend and Mrs. John Barnes, Hattiesburg, Miss. Reverend and Mrs. Barnes please come forward.

Mr. MITCHELL. Mr. Chairman, if I may identify myself for the record as Clarence Mitchell, director of the Washington Bureau of the NAACP. We have three witnesses here from Mississippi and with your permission, Mr. Chairman, I would like for them to sit at the table.

Mr. ROGERS. That is Mr. Charles R. Darden?

Mr. MITCHELL. Yes.

Mr. ROGERS. Is he in the room?

Mr. MITCHELL. He is right here.

Mr. ROGERS. Have him come up and pull a chair up and be seated. Let the record show the presence of Mr. Clarence Mitchell of the Washington office of the NAACP, and he will present each witness.

Mr. MITCHELL. Thank you, Mr. Chairman.

Mr. ROGERS. If you have any statement to make in connection with it, you may proceed in your own manner.

## STATEMENT OF CLARENCE MITCHELL, WASHINGTON BUREAU OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

Mr. MITCHELL. Mr. Chairman, I would like to present these individuals to the committee, but before doing so I would like to direct

the committee's attention to some testimony which you already have in the 1957 hearing record, which is somewhat different from what the previous witness testified.

First, I think it is important to point out that in Alabama, the official ballot, as you will see on page 1041 of the 1957 hearings, has a chicken at the top of the column here and over the top of that chicken there are words "white supremacy." So quite obviously you couldn't have a fair election where whoever votes has to cast a ballot under that slogan.

Then, also, there was some reference to the number of Negroes who are participating in the voting process down in Alabama. I would like to point out that the figures given by the assistant attorney general are not substantially different from those he included in the hearing record back in 1957. That appears on page 1031 of the record and represents only about 10 percent of the Negro population of voting age.

I would also like to call your attention to the witness' testimony back in 1957, when you, Mr. Chairman, directed some questions to him concerning that board of registrars down in Macon County. You recall that today in his testimony he said that they resigned because the Civil Rights Commission was coming into the States, but on page 904 of the hearing record the same witness was asked the same question by you about why the board resigned at that time and he said that there was some tenseness and that is the reason why they resigned. He said they had not been out of office very long. As a matter of fact it was about a year since that time that the board has not registered anybody. Finally the question put by counsel with reference to the preservation of registration records is all-important because the sole purpose of that effort down in Alabama is to destroy the evidence before the Federal Government can get in and where most of the discrimination takes place is when the colored people seek an opportunity to register, Mr. Counsel, so your questions really, if it is pursued, will reveal that the whole purpose of that law is to destroy the evidence before the election takes place. Of course, if you can control who is eligible to vote, you don't need to bother about any subsequent investigations on whose name is on the voting books. It is just an amazing thing to me, Mr. Chairman, how different these gentlemen talk up here in Washington from the way they talk down there on their native heath, and the things that they do. I just wish sometimes some of those television cameras that the attorney general referred to could have pictures of what goes on and sound recordings of the way they talk. You would see that it is really a Jekyl and Hyde proposition with all ranting and raving down there at home, but up here nice and polite and acting in a very deceptive way.

These witnesses who are here will speak for themselves and the first is the Reverend Mr. Barnes. He is mentioned in your hearing record in 1957 as a person who was trying to get registered to vote and he will document what has happened.

Mrs. Barnes is with him.

Mr. ROGERS. Proceed.

# CIVIL RIGHTS

---

### WEDNESDAY, APRIL 29, 1959

House of Representatives,
Subcommittee No. 5 of the
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met, pursuant to recess, at 10:05 a.m., in room 346, Old House Office Building, Hon. Emanuel Celler presiding.

Present: Representatives Celler (chairman), McCulloch, and Rogers.

Also present: Representative Edwin E. Willis, Third District of Louisiana; William R. Foley, general counsel of the subcommittee, and Richard C. Peet, associate counsel.

The CHAIRMAN. Let the committee come to order.

We have within our presence the distinguished gentleman from Louisiana.

We also have the distinguished district attorney, from the 25th judicial district of Louisiana, Hon. Leander H. Perez, and also our very distinguished Member and colleague from South Carolina, Representative Robert W. Hemphill.

Brother Hemphill, we will be very glad to hear from you.

## STATEMENT OF HON. ROBERT W. HEMPHILL, REPRESENTATIVE FROM FIFTH DISTRICT, SOUTH CAROLINA

Mr. HEMPHILL. Mr. Chairman and members of the subcommittee, I have handed up a prepared statement. Please feel free to interrupt me at any time.

I appear today to oppose any and all civil rights legislation. I appreciate your allowing me to testify this morning. While I am sure that the members of this subcommittee have definite ideas on civil rights legislation, which are the exact opposite of my own beliefs, I do appreciate your giving me a hearing and listening to me. I deeply appreciate the opportunity of appearing before you today.

Two years ago, at the onset of the battle which culminated in the civil rights bill of 1957, you very courteously gave me a chance to testify before a subcommittee, composed of some of of the men who are on this subcommittee today. You were courteous to me at that time, and I deeply appreciate your courtesy, although I have disparaged the waste of time involved in the passage of that legislation, the bitternesses it inflamed, and the disheartening effect it had upon the southern people.

Has it not occurred to you that no Member of the congressional delegations of Virginia, North Carolina, South Carolina, Georgia,

808

Florida, Alabama, Mississippi, Louisiana, Arkansas, or Texas have appeared before your committee asking for any civil rights legislation? Have you thought of the fact that we are the representatives of the people, and we have been elected as representatives of the people, and we speak for our people? I do not recall one public office-holder, from the States most affected, who has spoken out in favor of civil rights legislation. You have worked here in Congress along with these men who represent the people of these States in the House and in the Senate. They have tried to tell you and impress upon you the fact that civil rights legislation will not improve race relations in their States. I will tell you now that it will not improve race relations in your own States, and all it does is keep the pot boiling, stir up feeling, give vent or opportunity to people to express hatred, or feelings which might be lived down.

I could tell you about the race relations in my own State. My own Governor has come here to tell you that, and I know you were impressed by Governor Hollings and those fine men who came up with him when you so kindly gave an audience on April 14. I want to thank you now for the manner in which you listened to his testimony. Some months ago when I was talking to him in his office in Columbia, about coming up here and appearing before the subcommittee, he asked if there was any use. He asked me if you had prejudged the cause. I hope you have not. If you have, even holding hearings is the ultimate in hypocrisy.

The CHAIRMAN. May I ask a question?

Mr. HEMPHILL. Certainly, sir.

The CHAIRMAN. What might give you a reason for the Subcommittee on Judiciary holding some hearings? Here we have a situation where the Supreme Court ruled—now, I am not going to enter the question whether you agree or disagree with the Supreme Court decision—the Supreme Court ruled that the principle or doctrine of separate but equal as applied to the school system is not in accordance with the provision of the Constitution, namely, the 14th amendment. Now, that being the case, what shall I ask you—I ask you more or less for advice, kindly advice—what shall the Judiciary Committee do under circumstances of that sort?

Mr. HEMPHILL. Well, as——

The CHAIRMAN. What shall we do, do something, or do nothing, or what?

Mr. HEMPHILL. Well, I think the proof of the pudding, sir, is in the eating. The Judiciary Committee evidently felt, and I will presume its sincerity, that it was necessary to implement that decision with some sort of legislation. At least certain people felt so. As a result of that, your committee started hearings in February, my recollection is, of 1957. I remember I appeared, I think, on February 4. At that time I told you that the civil rights legislation which you proposed or which was proposed before this committee would not do what you expect it to do. It would cause more harm than good.

As I point out in my statement here, we spent months on that legislation wasting time when we had other problems in this Nation we could have attended. We spent months in the House—I mean weeks in the House—arguing it. A Civil Rights Commission was set up, and when I read in the daily papers today and see how much

strife there is, I am just wondering why we ever started it, because I am satisfied that some of the difficulties which presently are upon us in the form of differences between the races were inspired by the fact that some thought because of civil rights legislation they could get away with some things or demand some things, and others thought because of civil rights legislation and the injustice of it, it was necessary to take the matter in their own hands. I have been distressed, sir, at the bombings and the violence, and I am going to lay part of it right here because I was convinced at that time and I am convinced today that the longer you meddle with this thing in this particular time, you are going to keep stirring it up, and my proposal to you today, when I finish this statement, is that you use your own judgment and your power to give us a moratorium, and I am going to point out to you the reasons, if I may. Perhaps my reasons are fallacious, but the facts are not fallacious, and the facts are what I am going to point out to you because I feel this way, Mr. Chairman—you have a terrific responsibility. Now, you not only have a responsibility to whatever your ideas and beliefs are, you are chairman of one of the great committees of a great Congress, and I respect your power and your judgment, and you have the power, if you want to, as chairman of that committee, to recognize the evils which can come from civil rights legislation, and to say to these people who are asking that you give us a chance, give us a chance to see if we can't work things out.

The CHAIRMAN. Then I understand your answer to it is that there should be a delay or moratorium?

Mr. HEMPHILL. Yes, sir.

The CHAIRMAN. Now, permit me to say this: I would be perfectly willing to grant a moratorium if I felt that the delay or the moratorium would be constructive. Now, the decision was adopted in 1954. We are now in 1959, and 3 years, probably or 4½ years have gone by already. If I could get assurances that the delay wouldn't be merely for delay's sake and that the delay would be for the purpose of working out something that would be constructive, I certainly would not object to delay, but thus far I wonder whether or not we have had evidence of a desire to bring about some sort of solution during a period of moratorium. I don't know whether that has been made manifest. I doubt it, but I would be very glad to hear your statement, and forgive my intrusion.

Mr. HEMPHILL. I am delighted to answer that, sir.

Mr. McCULLOCH. I would like to ask one question. Do I properly construe your statement to mean that it covers everything in the field of civil rights; that you think there should be a moratorium on the implementation of the right of proper use of the elective franchise, or are you speaking only of the school integration?

Mr. HEMPHILL. I am speaking of interference in the franchise at this time and school integration and the whole picture.

Mr. McCULLOCH. You are even objecting to any implementation on the part of the Federal Government insuring the full and complete use of the elective franchise in accordance with the Constitution of the United States?

Mr. HEMPHILL. I don't think the implementation is necessary, because I will tell the distinguished gentleman from Ohio and the distinguished minority leader on the subcommittee, the longer you med-

dle with this picture from a purely political standpoint, which is what is being done today, you are stirring up the situation, and there are many people, as I point out in my statement, there are many people of both races in my part of the country and in your part of the country who have worked for years to improve race relations and to give the people a right to vote. I pointed out in my statement in my State of South Carolina every man enjoys a right of franchise. As a matter of fact, he can belong to the Democratic Party; there is no poll tax or anything else but, if you keep on saying to people: "You are being trampled upon and your rights are being trampled upon," instead of saying to people, "now, listen, it is American to try to work out your problems, see if you can't work them out." We have tried a Civil Rights Commission, and it didn't work, but maybe some of you people think it did work. We tried a Civil Rights Commission, and it didn't do any good. The members are resigning. Down in South Carolina you can't even get a man of decency or consequence to serve on the Commission and that, of itself, is significant.

What you are doing is, you are just stirring up a fire which could die out, and let our people make the progress they have been making, and that is what we want to do, and that is what we have been trying to do, but you keep on interfering and some of these politically inspired bills come up and they are badgered back and forth, and then we pick up the paper and read some horrible catastrophe and somebody makes a comment about that, and then the next thing you know we have another bitter, inflammatory fight.

Mr. McCulloch. Yes, sir.

Mr. Chairman, I would just like to make this statement. I would like to join in the statement of the chairman saying that we would be glad to countenance every proper delay for the solution of one of the troublesome problems of our time. I, however, very strongly feel that we should take every proper step to implement the right of the elective franchise in America, and to me there has been no satisfactory explanation of why people in certain sections of the United States of a certain single class in some precincts and in some wards, and even in some counties, cast not a single vote in the selection of the officials of a representative government, and I am awaiting with interest the comment and the explanation of that phenomena.

Mr. Hemphill. Well, I might say to the distinguished gentleman that I hold the ballot box as sacred as he does, and since I live in a section where race is not an issue in voting, I certainly can join in the gentleman's philosophy that everybody ought to be entitled to vote. But I think that regardless of what laws you pass there are going to be some abuses. Every law on the statute books is violated at sometime during the day or night and you can't just pick out single abuses to try to justify some legislation which is not necessary.

Now, I might also point this out, that even though you might legislate all you want to, and you might put on the statute books as many laws as you want to, the problem that—some people can't see the forest for the trees—the problem here is race relations, and if you give these people a chance, these intelligent people I will tell you they will work things out, and we have been working ours out, and we are proud of our progress, but as you go along and stir this thing up and

42803—59——52

accuse people who are innocent and trying, finally you put a stigma on anybody who tries to work something out, and you have done it to such an extent that in my own State you can't get anybody on the Civil Rights Commission, and that is something to think about. When people say, well, no, sir; we won't be associated with something that Congress has said is a creature of the Congress, the Commission, it is something to think about.

The CHAIRMAN. I would like to ask you, Mr. Hemphill, whether or not there has been made manifest an intention of good faith to solve these problems and whether or not a moratorium would help in solution, and in that connection I draw your attention to certain legislation passed by your own State of South Carolina.

In November 1952 South Carolina voters approved the constitutional amendment repealing that section of the State's basic law requiring the general assembly to provide for "a liberal system of free public schools for all children between the ages of 6 and 21 years." The amendment was given final legislative endorsement in March 1954. In 1955 the legislature adopted six proposals of the South Carolina School Committee, among them the following: "1. Repeal of compulsory school attendance laws," and so forth. I need not read them all.

Well, now, if there was such an intention that you had in mind, or is such an intention, why was it necessary to pass these kinds of statutes?

Mr. HEMPHILL. Mr. Chairman, the facts speak for themselves. In South Carolina, since 1952 and to today, every person of school age that wants an education gets an education, and an equal education. So far it has been a separate, and I hope it continues to be separate, but the facts speak for themselves, and the fact that we have good race relations. We have good education, we employ in the school systems of South Carolina Negro educators and Negro teachers who do a good job, and we have by virtue of the fact that we have worked on it, despite all of the inflammatory propaganda, we are working on it, and we have built the best schools for the Negroes in South Carolina in this Nation, and the white schools are hardly on a par with them.

The CHAIRMAN. They were separate and segregated schools?

Mr. HEMPHILL. Yes, sir; they are.

The CHAIRMAN. Now, I mention 1952. Of course, I can go on. I can speak of the following: In April 1955 your general assembly wrote into the State's permanent law an amendment to the General Appropriations Act for 1955 and 1956 the following provision:

Appropriations of State aid for teachers' salaries and all other school district, county, and State appropriations for the operation of the public school system shall cease and become inoperative for any school from which and for any school to which any pupil may transfer pursuant to or in consequence of an order of any court for the time that the pupil shall attend the school other than the school to which he was assigned before the issuance of such court order.

and other restrictive provisions have been passed. So that after the 1954 decision you passed these statutes, I take it, to somewhat circumvent the decision. What would be the reason otherwise for those kinds of statutes?

Mr. HEMPHILL. The reason, sir, was to carry out the wishes of the people of South Carolina, white and black, to have separate schools.

The CHAIRMAN. Then the people of South Carolina wish apparently to get around and circumvent the Supreme Court decision.

| 86TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT No. 956 |
| --- | --- | --- |

## CIVIL RIGHTS

AUGUST 20, 1959.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. RODINO, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 8601]

The Committee on the Judiciary to whom was referred the bill (H.R. 8601) to enforce constitutional rights, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE OF THE LEGISLATION

The bill is designed primarily to provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States. In furtherance of that objective, the bill proposes to strengthen the penal law with respect to the obstruction of court orders in public school desegregation cases. It proposes to make criminal flight in interstate or foreign commerce to avoid prosecution or punishment for damaging or destroying any building or other real or personal property. The bill provides for preservation of Federal election records and authorizes their inspection by the Attorney General. It amends the Civil Rights Act of 1957 so as to extend the existence of the Civil Rights Commission for 2 years. Finally, it contains a proposal to enable the Federal Government to provide for the education of all children of the members of our Armed Forces, whether they are or are not residents on Federal property, when public schools have been closed because of desegregation decisions or orders.

### HISTORY OF THE LEGISLATION

Shortly after the convening of the 86th Congress, many bills concerning civil rights were introduced and referred to the Committee on the Judiciary.

★

**2**                                    CIVIL RIGHTS

On February 5, 1959, the President of the United States transmitted to the Congress a message of recommendations pertaining to civil rights (H. Doc. No. 75, 86th Cong., 1st sess.). On the same day executive communications which implemented the message of the President were forwarded to the Congress by the Attorney General, Secretary of Labor, and the Secretary of Health, Education, and Welfare.

A Judiciary Subcommittee conducted hearings on the 39 bills which had been referred to it. These proposals related to almost every aspect and facet of civil rights, including such topics as voting, antilynch, fair employment practices, equal protection of the laws, crimes involving discrimination and deprivation of civil rights, school desegregation, Civil Rights Commission, Joint Congressional Committee on Civil Rights, and authorization for the Attorney General to institute civil actions to protect and enforce civil rights.

The hearings were held on March 4, 5, 11, 12, 13, 18, 19; April 14, 15, 16, 17, 22, 23, 24, 29, 30; May 1, 1959 (civil rights hearing before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 86th Cong., 1st sess., serial No. 5).

During the course of those hearings, the testimony—while it related to all the subjects of the legislative proposals—was devoted primarily to two bills, H.R. 3147 and H.R. 4457, introduced by Representatives Celler and McCulloch, respectively. The witnesses represented all of the various interests concerned with the legislation; the witnesses included the congressional authors of the proposals, other Members of Congress, the Attorney General, the Secretaries of Labor and of Health, Education, and Welfare, representatives of the Civil Rights Commission and of the President's Committee on Government Contracts, State officials—Governors, attorneys general, members of State legislatures, local officials—private citizens as well as representatives of various organizations concerned with the legislation. The subcommittee afforded to all who were interested a reasonable opportunity to present their views and interests on the proposals. Those who did not appear personally were given the opportunity to submit for the record any relevant matter.

After the hearing, the subcommittee met in executive sessions to consider the bill H.R. 3147: It struck out of that proposal all after the enacting clause and inserted in lieu thereof an amendment in the nature of a substitute. The substituted proposal consisted of a combination of the legislative provisions contained in the bills, H.R. 3147 and H.R. 4457, and the amended version was recommended to the full Judiciary Committee.

The substitute version of the legislation before the full Judiciary Committee contained nine titles. Briefly, these were:

    1. Obstruction of Court Orders in School Desegregation Cases.
    2. Flight To Avoid Prosecution for Destruction of Educational or Religious Structures.
    3. Authorization to the Attorney General To Institute Civil Proceedings To Protect the Right to Equal Protection of the Laws.
    4. Preservation of Federal Election Records.
    5. Extension of the Civil Rights Commission for 2 Years.
    6. Creation of a Commission on Equal Job Opportunity Under Government Contracts.

7. Provision for the Education of Children of Members of the Armed Forces.

8. Provision for Grants To Assist State and Local Educational Agencies To Effect Desegregation.

9. A General Separability Provision.

The full Judiciary Committee, in its deliberation and consideration of the amended bill H.R. 3147, adopted six of the recommendations of the subcommittee, namely, the obstruction of court orders, flight to avoid prosecution with a broadened provision to include the destruction of any building or other real or personal property, preservation of Federal election records, extension of the Civil Rights Commission for 2 years, education of children of members of the Armed Forces and, finally, a separability title. Certain other amendments were made in each of these titles with the exception of that title relating to the education of children of members of the Armed Forces. Thus eliminated were the titles relating to the authorization to the Attorney General and the Commission on Equal Job Opportunity Under Government Contracts and grants to assist State and local educational agencies to effectuate desegregation. After the full committee had approved this substitute version of H.R. 3147, the chairman introduced a clean bill, H.R. 8601 which contained the titles as amended and approved by the full Judiciary Committee. That bill, H.R. 8601, was referred to the Committee on the Judiciary and the full committee then ordered it reported without amendment.

## GENERAL STATEMENT

Since May 17, 1954, the date in which the Supreme Court of the United States rendered its opinion in the school segregation cases, the principle has been recognized that racial segregation sanctioned by law is not equality under the law. This Nation has been cognizant of its moral responsibility of protecting the constitutional rights of all within the jurisdiction of the United States. By the enactment of the Civil Rights Act of 1957, Congress, for the first time since the days of Reconstruction, placed upon the statute books a law designed to implement the constitutional rights provided in the 14th and 15th amendments.

While it is true that over the past 4 years some progress has been made toward achieving the American goal of providing equal opportunity for all and elimination of discrimination because of race, creed, color or national origin, the problem is far from being solved and the ultimate goal still far distant. The hearings conducted on this legislation clearly indicate the need for additional legislation to implement the enforcement of civil rights. There have been instances and incidents of disorder and violence in the field of desegregation in public education, many State statutes have been enacted designed to impede and obstruct the ruling of our Federal courts in desegregation cases as well as examples of interference with the fundamental American right to vote.

H.R. 8601 is designed to assist in the achievement of the great American goal of equal rights for all under the law by strengthening the law enforcement functions of the Federal government. Its objective is to make more certain that the rights guaranteed under the Constitution and the laws of the United States will be enjoyed by all,

**4** CIVIL RIGHTS

regardless of race, creed, color or national origin. It is not directed at any particular section of the country or segment of our population. but its scope is national and its applicability general. It is the opinion of the committee that the enactment of this legislation would provide adequate tools for the protection of rights and privileges guaranteed by the Constitution and the laws of the United States, particularly with regard to the right to vote.

### A SECTIONAL ANALYSIS OF THE LEGISLATION

*Title I (obstruction of court orders)*

Section 101 of the bill proposes to amend chapter 73 of title 18 of the United States Code with respect to obstruction of court orders in school desegregation cases. Accordingly, it amends that title by adding at the end of the chapter a new section. The measure would make it a Federal offense to willfully use force or threats of force to obstruct or impede court orders for school desegregation purposes; upon conviction, the offender could be punished by a fine of not more than $1,000 or imprisonment for not more than 60 days or both.

It further provides that other injunctive or civil relief against the type of conduct made criminal by this proposal is not to be denied on the grounds that such conduct is a crime. In this regard, provision is made that any fine or imprisonment imposed for the violation of such an injunction shall not be in addition to that imposed for a violation of this section.

It further provides for the exemption of the acts of the student, officer, or employee of a school when the act is done at the direction of or is subject to discipline by an officer of the school.

The need for this particular legislation is amply demonstrated by the experience of the occurrence in Little Rock in 1957. While it is true that this section properly covers individual actions, it is contemplated that its use would be principally in coping with concerted action. It is impossible for a democracy to function if mob violence replaces our tested methods of free expression either in judicial or political processes. The Federal Government must have authority to act effectively whenever the execution of the decrees of the Federal court are obstructed by force or threats of force.

It is the opinion of the Department of Justice that there is doubt as to whether the existing authority of Federal courts is sufficient to impose effective sanctions against the members of a mob who, by threats or force, willfully prevent, obstruct, impede, or interfere with the exercise of rights or the performance of duties under a school desegregation order of a Federal court. The objective of this proposal is to remove that doubt. Under Federal procedure, an individual cannot ordinarily be held in contempt of court unless he was either a party against whom the decree was issued or was acting in concert with such a party. Thus it is clear that in an ordinary situation a mob is not in concert with those named in a school desegregation order. The only alternative the Government would have in such a case of mob action would be to return to the court for a new injunction against its leaders and then prove subsequent acts on their part violating the order so as to establish a contempt.

The present obstruction of justice statute (18 U.S.C. 1503) also appears to be inadequate for such a situation. The particular provi-

sion of that section, namely 4, dealing with one who corrupts or by threats of force endeavors to impede "due administration of justice" would be applicable only if it could be considered that the action involved obstructed or impeded the "due administration of justice." That particular phrase has been a subject of narrow interpretation by the courts and while it is not possible to state categorically that a desegregation decree is beyond the reach of the existing statute, there is much doubt as to whether or not a prosecution of mob leaders could be sustained. The Department of Justice has recommended the enactment of this provision as a specific and firm responsibility of the proven need for effective Federal action to preserve the lawfully determined rights of individual citizens and the integrity of our Federal judicial system.

*Title II (flight to avoid prosecution for damaging or destroying any building or other real or personal property)*

The proposal would make it a felony, punishable by a fine of not more than $5,000 or imprisonment of not more than 5 years or both, to move in interstate or foreign commerce, to avoid local prosecution, custody, or confinement after conviction for willfully damaging or destroying or attempting to damage or destroy by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center, or educational institution, public or private. Flight to avoid testifying in criminal proceedings relating to such offenses would likewise be punishable. Such criminal offenses as these bombings present very difficult investigation and detection problems for local law enforcement agents, for it is one of the most difficult types of crime to solve. Clues and evidence are ordinarily destroyed by the explosive and more often than not there are very few clues, such as are ordinarily available in other crimes, which would assist in the apprehension of the offender. It is the type of crime that requires scientific equipment and investigation. Moreover, the interstate aspects of the offenses demand utilization of the resources and powers of the Federal Government. It is believed that the Federal Bureau of Investigation can provide the much needed experience and scientific investigative technique to assist—as it has done in the past—local law enforcement officials. The fugitive felon approach is not new, for the Fugitive Felon Act was enacted in 1934 (18 U.S.C. 1073) and has been the means of punishing persons who travel in interstate commerce with the intent to avoid prosecution of the State law for certain enumerated felonies, or to avoid testifying in State felony proceedings. This proposal is consistent with that provision as well as with the principle that local crimes are the responsibility of local law enforcement agencies and that in such cases the Federal Bureau of Investigation is not a national police force but acts to supplement State law enforcement. It is not designed as a substitute for State or local action.

The proposal differs from the Fugitive Felon Act in certain particulars. While the Fugitive Felon Act applies to flight from prosecution in enumerated common law and statutory felonies, this proposal applies to flight from any prosecution of the willful destruction or damaging by fire or explosive of any building or other real or personal property. Whether the State prosecution would be for a felony or misdemeanor is immaterial.

**6** CIVIL RIGHTS

Prosecutions under this proposal would be had in the Federal judicial district in which the original crime was alleged to be committed or in which the person is held in custody or confinement. It also contains a specific proviso the purpose of which is to make clear that this section shall not be construed to prevent any State or local body from prosecuting an offense over which they have jurisdiction in the absence of this new section.

The Department of Justice, in its recommendations for the enactment of this section, limited its applicability to those instances of flight to avoid prosectuion for the destruction of educational or religious structure only. However, it was the opinion of the committee that this proposal should be broadened so as to encompass flight to avoid prosecution for the destruction of any building or other real or personal property.

*Title III* (*Federal election records*)

Section 301 would require the retention and preservation for a period of 2 years of any general, special, or primary election records involving candidates for Federal office. The Federal offices are the Office of the President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner of Puerto Rico. It would include all records and papers in the possession of election officers relating to application, registration, payment of poll tax, or any other act requisite to voting in such elections. Provision is made, however, that where such records are required by State law to be deposited with a custodian, such election records may be so deposited and the duty of retention and preservation then devolves upon that custodian. A willful failure to retain and preserve the records is made an offense punishable by a fine of not more than $1,000 or imprisonment for not more than 1 year or both.

Section 302 provides that any person, whether or not an officer of election or custodian, willfully steals, destroys, conceals, mutilates, or alters any of the records required to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than 1 year or both.

Section 303 provides that such records as required to be preserved by this title shall, upon the written demand of the Attorney General or his representative to the party having custody, possession, or control of them shall be made available for inspection, reproduction and copying by the Attorney General or his representative. Demand, however, must contain a statement of the basis and the purpose therefor.

Section 304 provides that when a demand is made by the Attorney General, the record shall be reproduced either at the principal office of the person upon whom the demand is made or at the office of the U.S. attorney in the district in which the records and papers are located.

Section 305 provides that unless ordered by a court of the United States, neither the Attorney General nor his representative nor any employee of the Department of Justice should disclose any record or paper produced pursuant to this title except to the Congress and any of its committees, governmental agencies, or in the presentation of a case or proceeding before a court or grand jury.

Section 306 provides that in the event of nonproduction, jurisdiction would be conferred upon the Federal district courts to resolve any dispute which might arise in connection with the exercise of the authority conferred upon the Attorney General by this title including appropriate process to compel the production of the record or paper.

Section 307 defines the term "officer of election" to include any person who under color of the law performs or is authorized to perform any function, duty or task with any application, registration, payment of poll tax or other act requisite to voting at any one of the enumerated elections at which votes are cast for candidates for the specified Federal offices.

The Department of Justice has recommended the enactment of the substances of this proposal.

The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This is the same purpose contained in the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil proceedings for preventive relief from the discriminatory denial of the right to vote. Experience has shown the need for this legislation. So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.

Moreover, such information is mandatory for a proper evaluation of complaints. The Department of Justice has no existing power in civil proceedings to require the production of these records during any investigation it may conduct on complaints of a denial to vote because of race. The need for this legislation is evident from the refusal of some State and local authority to permit such inspection. Moreover, the Civil Rights Commission, which does have the power to subpena such records, has found it necessary to utilize its power to compel production. As was said in the recent Alabama case in re *George C. Wallace et al.* (170 F. Supp. 63, 1959), the inspection of voting records—

> must be considered to be an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin.

The constitutionality of the provisions contained in title III of the bill is beyond question of a doubt under the authority of *United States v. Classic* (313 U.S. 299), wherein the authority of Congress to legislate concerning any and all elections affecting Federal offices, whether general, special, or primary, as long as they are "an intricate part of the procedure of choice or where in fact the primary effectively controls their choice."

The Department of Justice has recommended the substance provisions of title III of the proposal.

*Title IV (Civil Rights Commission extended for 2 years)*

Section 401 would extend the life of the Civil Rights Commission for an additional 2 years. Under the Civil Rights Act of 1957, the

8                                    CIVIL RIGHTS

Commission is required to submit its final report not later than September 9, 1959.  Provision is made in this section also for an interim report to be submitted to the President and the Congress not later than September 1, 1959.

Because of circumstances beyond its control, the Civil Rights Commission was not able to commence operations for a number of months following the enactment on September 9, 1957, of the Civil Rights Act.  Termination of the existence of the Commission by September of this year would not provide a full opportunity to meet the statutory responsibility imposed upon it by Congress.  There is a definite need for further extension in order to make the study and analysis of the problems involved in this complex and difficult field.  Moreover, in attempting to carry out the duties imposed upon it by the Congress, the Commission has encountered extensive litigation as indicated by the examples in Alabama and more recently in Louisiana. in these instances, the Commission was concerned with the inspection of election records relative to its study of the question of voting rights.

The Commission has also undertaken programs of research, study, and investigation in the fields of education and housing.  Thus the extension of the life of the Commission would permit it to continue its work in these three particular fields as well as new programs in other related fields dealing with equal protection of the laws.  It is the opinion of the committee that the best interests of the country would be served by the extension of the life of the Commission.

Section 402 of title III would remove any doubt as to the authority of the members of the Commission to administer oaths.  Some questions have been raised as to the power of the Commissioner to administer oaths to witnesses, and it is the purpose of the proposed amendment to remove such doubt.  Since existing law requires that complaints submitted to the Commission be under oath of affirmation, it is only proper that the subsequent investigation of that complaint should also be in the form of sworn testimony.  The authority provided by this section would facilitate the handling of these complaints particularly during the course of hearings.

Section 403 would amend the Civil Rights Act of 1957, section 105(a), by striking all the words "in accordance with Civil Service and Classification Laws" and inserting "without regard to the provisions of the Civil Service Laws and the Classification Act of 1945, as amended."  The Commission, which is a temporary Government agency, has experienced difficulty in obtaining the services of an adequate number of fully qualified personnel for part-time and short tenure employment.  This has been true not only on the clerical level but also among professional personnel.  It is the opinion of the committee that, as has been done with other commissions of a temporary nature, the requirements for employment under the Civil Service Laws and Classification Act should be removed in order to facilitate the work of the Commission.  The Department of Justice has recommended substantive provisions of this title.

*Title V (education of children of members of the Armed Forces)*

Title V would amend Public Laws 815 and 874, 81st Congress, as amended, which authorize Federal payments to school districts which provide free public education to children whose parent resides or works on Federal property which is not subject to State or local taxation.

This title recognizes the unique responsibility of the Federal Government with respect to the education of children of military personnel. Since the members of the Armed Forces serve in communities under orders, their children receive public education as it is provided in the community in which they reside.

The recent closure of certain secondary schools in Norfolk, Va., involved approximately 2,500 school-age children whose parent was on active duty with the Armed Forces in the area. Of that number, 350 children who resided on Federal military posts would have been the only ones for which the Federal Government could have provided schooling if the schools had remained closed. The purpose of this title is to permit the Government to provide for those other children of military personnel who live off Federal property. It is estimated that the proposed legislation could possibly affect the education of some 70,000 children of military personnel situated in States where the closure of schools is a possibility.

Section 6(a), Public Law 874, now requires the Commissioner of Education to make arrangements to provide free public education for children residing on Federal property if the State and its subdivisions may not spend tax revenues for their education or if no local public educational agency is able to provide suitable free public education for them.

Section 501 of the bill would amend section 6(a) to permit the Commissioner to make arrangements also for children of members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually provide free public education for them are made unavailable to them by official action of State or local governmental authority and no local public educational agency is able to provide them with suitable free public education.

Subsection (b) of 501 provides complementary amendments to section 6(d) of Public Law 874. The existing provision permits the Commissioner, when he makes the arrangements for provision of education for the federally connected children, to make such arrangements only with a local educational agency or with the Federal agency having jurisdiction over the property on which they reside. Where this new category of children of Armed Forces personnel are involved, arrangements could also be made with the head of the Federal department or agency having jurisdiction over the parents of some or all of the children.

Section 6(d) of Public Law 874 limits the arrangements to those which provide for the use of either facilities situated on Federal property or facilities belonging to a local educational agency. The amendment provided in subsection (b) of section 501 would make this limitation inapplicable where the Commissioner is required to make these arrangements for the new category of children.

Section 502 of title IV of the bill amends Public Law 815, 81st Congress, as amended. The proposal of the bill would authorize the Commissioner of Education to acquire possession of any school building constructed with the aid of Federal funds after the enactment of the proposed amendments contained in this section, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education for children of military personnel or for other children who reside on Federal property. While the school remains

in Federal possession, the Commissioner would pay the local district a rental fee proportionate to its share of the cost of constructing the building.

Section 6(b), Public Law 815, 81st Congress, as amended, now requires applications of local educational agencies for the approval of construction projects, which must be filed before the agencies may receive payments to help finance such projects, to contain or be supported by various assurances relating to the authority of the local agency, and other relevant matters. The amendment proposed in section 502 of the bill would add to this provision the requirement of an assurance that any facilities constructed with aid under this law, the application for which is approved after the enactment of the bill, will be made available to the Commissioner in case they are not being used to provide free public education and that the Commissioner need them to provide facilities for the education of children who reside on Federal property or whose parent is on active duty with the Armed Forces. Subsection (b) of section 502 would amend section 10 of Public Law 874.

Subsection (b) of section 502 would amend section 10 of Public Law 815. Existing law now requires the Commissioner to make arrangements for the constructing or otherwise providing the minimum facilities necessary for the education of children who will be residing on Federal property at the end of the next fiscal year if the State and its subdivisions may not spend tax revenues for their education or if no local educational agency is able to provide suitable free public education for them.

Section 502(b) of the bill would amend this section to permit the Commissioner to make such arrangements to provide, on a temporary basis, such facilities for children of the members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually providing free public education for them are made unavailable to them by official action of State or local governmental authority and no local educational agency is able to provide them with suitable free public education.

Section 502(c) of the bill further amends section 10 of Public Law 815 by adding a new subsection which authorizes the Commissioner of Education to take possession of facilities constructed with the aid of funds provided for by Public Law 815, under an application approved after the enactment of the bill, if they are not being used for free public education and are needed by the Commissioner, as minimum facilities necessary for the children residing on Federal property or children of the Armed Forces personnel on active duty. Possession would be taken under the terms and conditions prescribed in regulations of the Commissioner of Education. Payment by the Commissioner of a reasonable rental on the portion of the facilities financed with non-Federal funds would be required. Provision is also made for the return of those facilities to the school district when the district reopens those schools and makes them available to the federally connected children or when the Commissioner no longer needs the facilities for direct Federal operation purposes. However, the best interests of the federally connected children, the objectives of this proposal, and the commitments to the personnel employed in the direct Federal operation would be factors to be considered in determining the appropriate time for the return of the facilities.

## ADDITIONAL VIEWS

No subject before this Congress is of greater importance than the civil rights bill which is the subject of this report. The need for full understanding of what this legislation does, and does not, do, has led us to state these additional views. We fully subscribe to the majority report; but we also feel that this bill could have provided, and ought to provide, an even firmer basis for Federal efforts to obtain equal protection of the laws. The problem is national in scope. If denials of equal protection of the laws occur in one local community, the fiber of our national community is weakened.

The bill is a moderate, balanced approach to several of the most urgent civil rights problems.

Title I makes it a misdemeanor—not a felony—to obstruct court orders.

Title II will permit Federal authorities to assist in the apprehension of those who have willfully bombed or destroyed by fire any building or other real or personal property, or who flees to avoid testifying in criminal proceedings relating to such acts. Introduced into the hearings was a chart of the bombings and attempted bombings of recent years. The chart shows close to 100 such incidents, in every area of the United States.

Title III is a necessary supplement to part IV of the Civil Rights Act of 1957, which prohibits threats or intimidation designed to prevent persons from exercising their right to vote. The new proposal would implement Federal enforcement of this protection by requiring State elections officials to retain for 2 years voting and registration records for all Federal elections, and to make them available for examination by the U.S. Attorney General.

Title IV of the bill would extend the life of the Civil Rights Commission, scheduled presently to expire next month, until September 1961. The need for full-time study and investigation of alleged denials of equal protection of the laws in every corner of the country has been demonstrated. We approve of the strict impartiality and reasonable approach of the Commission, which has conducted significant investigations in both North and South. Its services are still needed.

The final title (title V) of the bill is based upon the need to prevent children of Armed Forces personnel stationed in communities which have closed their public schools from being made the innocent victims of such actions. Present laws relating to children of servicemen stationed on bases would be broadened to make provision for all children of servicemen, whether or not living on bases, if public schools which they normally attend are closed down by State or local authorities.

Hon. Arthur S. Flemming, Secretary of the Department of Health, Education, and Welfare, has testified that there are approximately 70,000 such children living in the 6 States which, by reason of their laws, may close their public schools.

26

The foregoing is what the bill does. As far as it goes, it is good. But it is a bare minimum. Here is what it does not do:

The original bill reported out by the subcommittee contained three titles which did not survive the full-committee deliberation. The most important, in our opinion, was title VIII, the so-called technical-assistance provision. It represented a sensible, fair, and effective approach to the problems that may accompany the initial stages of school desegregation. It is a recognition of Government responsibility to share in the solution of such problems. The best description of this provision was provided by Secretary Flemming in his letter of February 5, 1959, to the Congress, forwarding the legislative proposal:

*A. Grants and technical assistance*

The first draft bill would establish an affirmative role for the Federal Government in helping those States which have previously required or permitted racially segregated public schools, and which must now develop programs of transition to desegregation. Such States established their school systems in good faith and in reliance upon earlier Supreme Court rulings that public school racial segregation was lawful, provided that separate but equal facilities were maintained. Now, in carrying out their duty to comply with the present ruling of the Court, these States and their communities are required to make adjustments which may impose temporary but serious financial and educational burdens on their existing school systems.

The bill would authorize appropriations for grants to States which required or permitted segregation in their public elementary and secondary schools as of May 17, 1954, the date of the first Supreme Court decision declaring such segregation to be unlawful. Funds appropriated would be allotted to the States proportionately according to their May 17, 1954, school population in segregated public school systems on that date. The bill would authorize appropriations only for the fiscal years 1960 and 1961. In January 1961, the Secretary would be required to report to Congress his recommendations as to the extension or modification of the legislation.

Federal grants would be available to pay half the costs borne by local educational agencies in providing the additional nonteaching professional services required by their desegregation programs. Included would be the services of supervisory or administrative personnel, pupil-placement officers, social workers and visiting teachers, and similar professional staff members needed to help resolve adjustment problems arising in the course of desegregation.

In addition, part of the State's allotment could be used to pay half of its expenditures at the State level for developing and carrying out State desegregation policies and programs, including the provision of technical assistance to local educational agencies.

To receive funds under this bill, a State would submit to the Commissioner of Education a plan setting forth its methods and criteria for approving applications of local

28                                    CIVIL RIGHTS

educational agencies, and describing the State-level activities for which the State would use grants. If in any year an approvable State plan is not filed, the Commissioner could, if the State consents or indicates it has no responsibility in the matter, make grants directly to local educational agencies in the State.

The draft bill would also authorize the Commissioner of Education to collect and disseminate information on the progress of public school desegregation, and, at the request of the States or local agencies, to provide technical assistance in the development of desegregation programs and to initiate or participate in conferences called to help resolve educational problems arising as a result of efforts to desegregate.

We believe this measure to be of tremendous importance and we will support its restoration to the bill on the floor of the House.

The original bill, as reported to the full committee, contained a title (title III) which would have authorized the Attorney General (a) to initiate civil injunctive proceedings against individuals depriving a person of the equal protection of the law by reason of race, color, religion, or national origin, upon the Attorney General's receiving a complaint from such person so alleging and upon the Attorney General's certifying the inability of such person to obtain legal protection himself; (b) to seek civil injunctive relief against persons hindering Federal or State officials from according equal protection of the laws or from carrying out court orders; and (c) to seek civil injunctive relief, on complaint received, against individuals endeavoring under color of State authority to deprive persons of rights guaranteed by the 14th amendment. Civil action thus instituted could be brought in U.S. district courts, without abiding the exhaustion of State or administrative remedies.

The Attorney General and the administration recommended such a measure in 1957. The Judiciary Committee did likewise. We see no reason not to do so in 1959. The reasons for title III were well said by the Attorney General of the United States in 1957, as follows:

> In such a civil proceeding the facts can be determined, the rights of the parties adjudicated, and future violations of the law prevented by order of the court without having to subject State officials to the indignity, hazards, and personal expense of a criminal prosecution in the courts of the United States. * * * At the present time section 1985 of title 42, United States Code, authorizes civil suits by private persons who are injured by acts done in furtherance of a conspiracy to prevent officers from performing their duties, to obstruct justice, or to deprive persons of their rights to equal protection of the laws and equal privileges under the laws.
>
> So we think that a subsection could be added to that statute which would give authority to the Attorney General to institute a civil action for preventive relief whenever any person is engaged or about to engage in acts or practices which would give rise to a cause of action under the present provisions of the law.
>
> I think it would be simpler, I think it would be more flexible, and I think it would be more reasonable, and I think it

would be more effective than the criminal sanctions which are the only remedy now available.

We think the same reasoning applies now.

Finally, the original bill also contained a title VI, which would have given legislative sanction to the President's Committee on Government Contracts. This committee, under Executive sanction, polices Government contracting practices to promote the elimination of discrimination in employment based on race, creed, color, or national origin in the performance of Government contracts or subcontracts. The Secretary of Labor, Hon. James P. Mitchell, said this at the hearings:

> * * * if a Commission of this type is to do its job fully and effectively, its basis in law should be clear and un-equivocal. If the task of Government to advance equal job opportunities is worth doing, it is worth doing right, and it is worth doing with the full weight of Congress behind it. An agency of this kind should be strengthened with congressional approval (hearings, p. 322, Mar. 12, 1959).

We concur with his sentiment. The measure should be restored.

JOHN V. LINDSAY.
WILLIAM T. CAHILL.

civil rights legislation. I believe it to be unconstitutional, unneeded, and it will serve no purpose except to impose upon all of the people of our Nation a degree of Federal intervention and control that was never intended by our Founding Fathers. I will say to my colleagues, the people of my State of Louisiana and of my district in southwest Louisiana are an enlightened, progressive, and most tolerant people. Our people are becoming educated more and more to keep pace with our great industrial expansion. They are becoming trained more and more to fill technical jobs which have been created and which I plan will be created as the years go by. These jobs are filled by people of our areas who are qualified to hold them, regardless of race, creed, or color. The economy of our area and the standard of living and incomes of all families are rising, both Negro and white. It is my aim to continue to work to see that our standards of living continue to rise, and we need no Federal intervention to accomplish this.

Of course, there are always those people who, through no fault of their own, suffer reverses and must be given a helping hand. In my work in Congress over the past four terms in increasing acreage allotments for farmers, there has been no discrimination or thought of discrimination because of race or color. In my work toward qualifying people who reside in areas where disaster has struck for farm loans, Small Business Administration loans, all who were eligible were given help and never have I had one complaint to the contrary. In the distribution of surplus commodities to the many small farmers or others of our good people who find themselves in unfortunate circumstances, distribution is made in accordance with need and not heritage. In the case of our great national disaster which occurred largely in my district, which was Hurricane Audrey of 1957, I helped to secure and coordinate assistance from Federal and State Governments and I assure you that great suffering was alleviated by these efforts. I observed rescue squads in their untiring, heroic efforts and they had neither the time nor the inclination to check for differences in color, and the results of the efforts of our people were commended by the Nation. And there was no discrimination, as some in this Chamber would imply.

When our rivers and harbors are dredged and improved for navigation to create more commerce and more jobs, there is no thought of special groups who would benefit, and there is no discrimination when flood control and irrigation projects are improved and expanded. No one here has ever heard me express views in the Public Works Committee, of which I am a member, or in this House, other than that all of our people deserve and should get these added services, and you have favored me with many. When Federal funds and authorizations which flow through the House Subcommittee on Roads, of which I am a member, are obtained, these highways are built to accommodate everyone. And when the fight we have made on

tidelands, which historically belong to our State, is won, that will be a victory for all of our people.

In my district, 20 percent of the 150,000 registered voters are Negroes who are thoroughly eligible to vote. As a result of publicity given to hearings of various Commissions in the past few years, the Nation at large has been given the impression that very few Negroes in the South are allowed to vote. Nothing could be further from the truth. Louisiana has more than 150,000 registered Negro voters and some States in the South have even more registered Negro voters. It has come to my attention that not one single disorder has ever occurred in my district at polling booths or other election or political meeting-places which was caused by racial differences. In one of the cities of my district, two of the city councilmen elected by the people have been Negroes and they have worked harmoniously in their duties.

Louisiana has wonderful schools. Our school facilities for colored students in Louisiana are among the most modern in the United States, and there are no differences in the treatment of Negro and white students.

I am now in my 26th year of Government service, 18 years of which were spent in the State government. As State budget director in Louisiana, I have worked with and assisted all of our State colleges, two of which are Negro colleges which now enjoy thoroughly adequate facilities, staffed with well-trained career people in all fields of education. Southern University in Baton Rouge, headed by Dr. Felton Clark, who succeeded his father as president of Southern University, is, I believe, now the Nation's largest land-grant Negro university. Grambling College, whose president, Ralph W. E. Jones, has been mentioned prominently in national publications for his achievements, has an ever-expanding plant and curriculum. Only recently Grambling College's basketball team was named in the list of the 13 top small college basketball teams of the Nation. Others among these top 13 colleges were 2 white colleges in Louisiana—Northwestern State College at Natchitoches and Louisiana Polytechnic Institute at Ruston.

It might be interesting to know that a joint annual meeting of many of the civic clubs of Shreveport, Minden, Ruston, and other north Louisiana cities of the areas adjacent to Grambling College is held at Grambling College. The home economics department of the college provides the meals and the meeting-place.

Why should the U.S. Congress, under the guise of great concern for these people, the relationship of which they apparently know nothing, attempt to secure an Eastern bloc vote at the expense of destroying human understanding and development between white and colored which has been built up over the years? This type of nefarious action can end in nothing except the fomenting of racial strife and misunderstanding where none should exist.

Why are there those who would even subject a schoolchild to the inconvenience and hazards of being transported from his own home area where adequate schools exist to faraway areas merely to force integration into other schools and strange atmospheres, such as have occurred in the city of New York? This is nothing but a cruel imposition on the child, done, in my opinion, to accomplish political aims.

As has been said by my learned colleague, the Honorable E. E. WILLIS, this is a devil's brew, diabolically concocted to be fed to the South and which is intended to poison both Negroes and whites. I would say in closing that every individual in my State is privileged to pursue gainful endeavor and to succeed in conformance with his ability and ambition. The people of my district have always been helpful to those who endeavor to improve themselves, and we are all happy when our younger people attain greater education, whether they be white or Negro. It is my hope that such carpetbagger legislation will not be forced through this Congress.

Mr. McCULLOCH. Mr. Chairman, I yield myself such time as I may desire.

Mr. HALLECK. Mr. Chairman, will the gentleman yield for a brief statement before he begins his remarks?

Mr. McCULLOCH. I am glad to yield to the gentleman from Indiana, the minority leader.

Mr. HALLECK. First of all, I should like to express my own gratification at the very fair and aboveboard manner in which the debate on this very controversial matter is beginning. I am sure it will be continued in that fashion. I say it is to the credit of the House of Representatives that it is so proceeding.

Earlier in the debate on the rule I referred to the fact that in recent weeks there has been a lot of contention about who among us wanted this bill considered. Principally that was because of a discharge petition that had been filed on the Speaker's desk. I said a long time ago that, speaking for the Republican side, we would have a good bill on the floor of the House, and that we would write meaningful civil rights legislation that would be supported by the overwhelming number of the Republicans of the House.

I would just like to report that I have had a check made on the vote on the rule, which of course provides for the consideration of this very important measure. The report now is that 136 Republicans voted for the rule and only 9 against it. I think that is ample evidence of our desire to consider this legislation and to act properly upon it.

Mr. McCULLOCH. I thank the gentleman from Indiana for his statement and that information.

Mr. Chairman, I rise to speak in support of and to explain, as best I can, H.R. 8601, a bill to enforce certain basic constitutional rights, and for other purposes. I realize that the statements I make and the conclusion I reach may be controversial. Likewise, I am certain that some Members may wish to interrogate me on specific aspects of the pending omnibus measure and the

proposed amendment thereto which has been made in order by the rule, just adopted. While I stand ready to answer, to the very best of my ability, each question which may be addressed to me, in the interest of an orderly presentation of the remarks I have prepared, I request that I be permitted to speak without interruption. At the conclusion of my explanation and comments, I shall stand ready to answer any inquiries which my colleagues may address to me regarding any of the provisions of the measure before us.

Just over a year ago President Eisenhower transmitted to the Congress a special message on civil rights, in which he stated:

Two principles basic to our system of government are that the rule of law is supreme, and that every individual, regardless of his race, religion, or national origin, is entitled to the equal protection of the laws. We must continue to seek every practicable means for reenforcing these principles and making them a reality for all.

The United States has a vital stake in striving wisely to achieve the goal of full equality under law for all people. On several occasions I have stated that progress toward this goal depends not on laws alone but on building a better understanding.

It was in this spirit of building a better understanding that the President offered a seven-point program designed to continue the substantial progress that has been made in the past few years.

Believing in the goal of equality under law for all Americans, I lent my wholehearted support to implementing the President's recommendations. Thus it was that, in close consultation with the Attorney General, Mr. William P. Rogers, and other Cabinet members, an omnibus civil rights bill was drafted which I introduced on February 12, 1959.

I chose that date deliberately. I thought it particularly appropriate that President Eisenhower's proposals be introduced on the 150th anniversary of the birth of Abraham Lincoln.

For almost a century the failure to provide political equality for all qualified citizens has been nagging the conscience of the people, and now we are obliged to consider and pass legislation to insure and implement such rights to all qualified citizens, which rights so long ago, were extended to all, only to be lost or taken away, in a substantial number of States or lesser political subdivisions of our country.

There is no easy way to guarantee civil rights to everyone. There is no unanimity of opinion on how or how rapidly it can be done. Unwise and unworkable proposals calculated for political, rather than constitutional, meaningful gains, will only further aggravate a regrettable condition and prolong the date of final settlement.

If we are to achieve a measure of success in our actions, success equal to that realized by other programs, in the field of civil rights, instituted within the past decade, we must reject radical solutions which promise magical, but produce illusory, results. Only by the adoption of a program of the "golden mean" can we hope to maintain the progress we

have been making while, at the same time, we build a better understanding.

This, in my opinion, would have been the way in which President Lincoln would have solved the problem. In any event, it is the American way. It is because I have such faith in the final result, if we adopt this course, that I introduced the omnibus bill, H.R. 4457, which would implement each of the seven recommendations of the President contained in his message to the Congress on February 5, 1959. H.R. 4457 was carefully studied by the committee vested with jurisdiction—the Committee on the Judiciary.

Endless hours and days were consumed by the committee in considering the proposals before it. Testimony or statements were received from more than 100 persons representing all shades of opinion. In the deliberations that followed, a score or more of proposals were carefully examined.

Finally, in August, after 6 months of study and legislative compromise, a clean bill was reported by the committee. Embodying, in substance, five of President Eisenhower's seven recommendations, the new bill was designated H.R. 8601. It is the bill now before the Committee of the Whole House on the State of the Union.

Momentous progress has been made in the last decade in the field of civil rights. No other period in our history has witnessed such remarkable progress toward the goal of full equality under the law for the Negro. Segregation in the District of Columbia was outlawed, and segregation in the Armed Forces eliminated. The first civil rights bill, in almost a century, was enacted into law; and a vigorous and effective program to protect and extend civil rights was undertaken by an enlightened and determined Chief Executive.

While the record of recent years is not a perfect one, no one can fairly minimize the tremendous strides which have been made. Advances were recorded on every front and, it is safe to say, we have reached the end of the real beginning of the march toward full political and economic equality under the law, for all of our people.

The miracle of this accomplishment, is in the relative absence of recrimination, violence, discord and bitterness. Regrettably, there have been incidents which mar the record, but, in the main, this great progress in racial relations has been effectuated with a minimum of misunderstanding.

While our record of recent years is good, we cannot afford to rest upon our oars.

At the same time, however, since we search for a just and lasting solution of the problem, it is our duty to extend to those citizens whose way of life we would remake, a sympathetic understanding. The wrongs we seek to redress did not arise overnight; and they will not be righted overnight. The Attorney General has said:

The broad outline is plainly hopeful. The fact that there are tensions does not indicate that progress is not occurring. If things were allowed to remain as they were, there

would, of course, be no tension, no problems, and few incidents.

In most of the communities involved there is a growing body of informed and enlightened opinion urging the community to look for reasonable solutions. More and more the people affected are showing their acceptance of the principle that they must respect the lawfully determined rights of others. The proposals of the administration have been formulated with the idea of accelerating this attitude of acceptance and of providing the most effective means to insure greater progress in this field.

Then, too, their enactment would be a striking demonstration—and I believe this would be of incalculable value—that the executive and legislative branches of our Government give their full support to the judicial branch in making equality under law a reality for all people everywhere in the United States.

With the foregoing in mind, I now proceed to the consideration of specific provisions of the proposed Civil Rights Act of 1960.

### TITLE I

The Brown decision, which held that separate but equal facilities were inherently unequal, was handed down by the Supreme Court in 1954. Its implementation did not come however, until 1955 at which time the Court declared that the process of desegregation was to be carried out "with all deliberate speed."

To people of the South, yes, even to some people in the North, this was a revolutionary doctrine, but one which law-abiding people everywhere realized must ultimately be complied with. Many resisted until all legal alternatives had been exhausted. When this point was reached, however, the mandate of the Supreme Court was obeyed and desegregation of the schools proceeded, in most States, in accordance with the mandate. Arkansas, Delaware, Florida, Kentucky, Maryland, Missouri, North Carolina, Oklahoma, Tennessee, Texas, Virginia, and West Virginia, all of which maintained segregated school systems, to some extent before the decision, have been integrated in whole or part.

Progress in 5 years in all but a few of the States has been remarkable. This progress furnished no grounds for complacency in seeing the job through; it does show that the policy of deliberate speed, decreed by the Court, has been effective.

Although peaceful compliance with the Brown decision has been the rule, there has been at least one exception which brought trouble and sorrow to the Nation.

It was to avoid such a reoccurrence that I sponsored in the House, and favor enactment of at this time, title I of H.R. 8601. I am convinced that the addition of this provision to the legal arsenal of the Federal Government will mitigate against future Little Rocks by providing a satisfactory alternative to the use of troops to restore order.

Title I would make the willful obstruction of court orders in school-desegregation cases a crime. It would enable Federal marshals instead of Federal troops to preserve law and order where local authorities had either failed or were unable to do so.

As a practical matter, Federal authorities do not now have the authority necessary to do the job. The contempt power is too restrictive, while the obstruction-of-justice statutes are too limited. The dilemma of Federal authorities at Little Rock was described by Attorney General Rogers at the committee hearings last year. Regarding the contempt power, he had this to say:

A mob was incited to resist the orders of the court concerning the operation of the school. This conduct did not involve contempt of the decree which ordered the school desegregated, since the persons responsible were not parties to that decree, and there was no proof that they acted in concert with those named in the decree.

The limited authority of our present obstruction-of-justice statutes was also commented on by the Attorney General, as follows:

There is so much doubt as to the scope of the present law that arrests of mob leaders or others by Federal authorities would be precarious and their prosecution probably unsuccessful.

Enactment of title I of H.R. 8601 would serve to fill this enforcement gap. I, therefore, urge favorable consideration for this valuable enforcement tool upon which the Government could rely in dealing with those who would use force and threats of force to obstruct orderly and deliberate school desegregation.

### TITLE II

Title II of H.R. 8601 seeks to deal with another facet of potential lawlessness in the emotionally charged area of civil rights. In recent years, the Nation has been both shocked and outraged by a rash of bombings of churches and schools. While local law enforcement officials have been diligent in their attempts to apprehend and stamp out this type of crime, their efforts have not always been successful. The reason for such failure is that bombings present extremely difficult problems of investigation and detection. Unlike the ordinary type of offense that authorities have to deal with, clues and other evidence are ordinarily destroyed in a bombing. Furthermore, the offenders sometimes flee across State lines to avoid prosecution.

With the best will in the world, local officials have, therefore, been unable to cope with the problem in some States, both North and South. The reason is that they usually do not possess the scientific equipment and training essential to do the job.

Enactment of title II would bring into action the Nation's leading law enforcement organization, the Federal Bureau of Investigation, in partnership with local officials. The Bureau's tremendous resources and scientific skills could be utilized to stamp out this most heinous offense.

Specifically, title II would amend the Criminal Code, title 18, chapter 49, so as to make it a felony to move or travel in interstate or foreign commerce to avoid prosecution for willfully destroying or attempting to destroy real or personal property, public or private, by fire or explosion.

As originally recommended by President Eisenhower, this proposal was limited to bombings of religious and educational institutions. Our hearings last year brought out the fact, however, that the problem of bombings and the difficulties in solving them was not limited to the field of civil rights.

The committee, therefore, objected to restricting the application of the proposal to schools and churches—and I must say, I fully supported their reasoning.

No logical argument was presented, and none occurs to me now, which would justify restricting the coverage of this proposal based upon the type of facility involved. Bombings are universally reprehensible. Since they are all equally difficult of solution, they are all worthy of Congressional cognizance.

A majority of the committee was of the opinion that all citizens are entitled to the protection of life and limb where they live, where they worship, where they learn and where they earn.

The approach of the flight provision is neither new nor novel. It was long ago adopted to deal with the very special problems of law enforcement arising out of our Federal-State system. The Fugitive Felon Act (18 U.S.C. 1073) was enacted in 1934. It outlaws travel in interstate commerce to avoid State prosecution for certain more serious criminal offenses.

The intervening quarter century has shown that this approach works, and works well, to maintain effective law enforcement while, at the same time, keeping responsibility where it belongs, on the local level.

Far from supplanting State enforcement machinery, Federal activities under the act have been complementary in nature—the FBI serving as an adjunct of, rather than as a replacement for, the local agency.

Thus it is, that fugitives apprehended out of the State where the offense was committed, in an overwhelming percent of cases, are returned with dispatch for trial and punishment to the jurisdiction where the offense was committed. In 1957, for example, of the 947 fugitives located by the Bureau, only 9 were ever prosecuted in the Federal courts.

### TITLE III

The subject of voting has been much in the news of late. Universally recognized as the very cornerstone of representative government, few Americans will condone the arbitrary denial of the elective franchise to a qualified citizen. President Eisenhower, in his message to the Congress last year, said:

The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination.

In 1957, this body acted to insure that all Americans would be secure in the elective franchise. The Civil Rights Act, passed that year, was directly aimed at protecting the right of all eligible citizens to vote. But events brought to light in the intervening period have shown that our efforts have not been fully effective.

State voting records have, in some instances, been withheld from Federal au-

thorities investigating alleged denial of the elective franchise to qualified citizens. Certain States have condoned or authorized the destruction of election records and have adopted devices calculated to keep qualified Negroes from expressing their will at the polls. Proposed, pending, or passed in the legislatures of some States are measures authorizing the destruction of voting records soon after elections in order to prevent their inspection and use by Federal investigators.

The dilemma faced by law enforcement officials attempting to investigate allegations that the right to vote has been denied was sketched clearly and succinctly by Attorney General William P. Rogers at hearings of the Judiciary Committee last Spring. I should like to quote a brief exerpt from his testimony. It appears on page 211 of the printed transcript:

Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.

To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information, it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information—necessary for proper evaluation of complaints and in the preparation of cases—is the records of registrations or other action required for exercise of the franchise.

The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection.

Title III is designed to fill this need. It would require that Federal election records be preserved by the States for a period of 3 years. General, special or primary elections in which Federal candidates were involved would be covered by the provision.

Willful failure to preserve such records by duly appointed officers, or their willful theft or destruction by any person, would be punishable by a $1,000 fine, a year imprisonment, or both.

Voting records preserved under title III would be subject to inspection and copying upon demand made by the Attorney General or his representative in the district in which said papers were located.

Local U.S. district courts would have jurisdiction to compel the production of demanded documents by appropriate process.

To insure that this provision will be used and not abused, records procured

under it would be for official use of authorized governmental agencies only.

It is noteworthy that under the proposed title III, no power of removal by subpena is authorized to the Attorney General. Such power was withheld deliberately so that such records would always be available to local officers for official use.

I shall have more to say on the subject of protection of the elective franchise at a later time in this debate.

### TITLE IV

Turning now to title IV of H.R. 8601, I have only a few remarks to make relating to the Commission on Civil Rights.

As reported by the Judiciary Committee last year, title IV of H.R. 8601 not only provided for the extension of the Commission for an additional 2 years, but, in addition, it contained two amendments aimed at assisting it in its assigned duties.

The first amendment would remove any doubt, and doubt apparently exists, as to the authority of members of the Commission to administer oaths. Since the original act setting up the Commission requires that complaints submitted to it be by oath or affirmation, it seems reasonable that we confer such power upon the Commissioners.

The second amendment approved by the committee related to the staffing problems experienced by the Commission as a result of the legislative requirement that personnel be selected in accordance with civil service and classification laws.

The record shows that partisanship in appointments to the Commission have been nonexistent. If anything, the administration has "leaned over backward" to avoid even the appearance of partisan motivation in the selection of personnel.

Therefore, granting this authority can reasonably be supported by everyone interested in seeing that the Commission continues the excellent job it has begun.

### TITLE V

The final provision of H.R. 8601, title V, deals with the important problem of providing education for children of military personnel where State administered schools are closed because of desegregation decisions or orders. President Eisenhower made this compelling observation:

The Federal Government has a particular responsibility for the children of military personnel in federally affected areas, since armed services personnel are located there under military orders rather than of their own free choice.

Under existing statutes, the Commissioner of Education is empowered to provide for the education of children of members of the Armed Forces when local facilities are inadequate or nonexistent. But the law, as it stands contains a serious limitation. Only children of personnel residing on Federal property are eligible for benefits. Such an exclusion from coverage is not justified under present conditions.

Enactment of title V would remedy this defect. Specifically, it would amend the act of September 30, 1950—Public Law 874, 81st Congress—so as to authorize the Commissioner of Education to provide schools for servicemen's children where local schools are closed as a result of official State or local action. Temporary facilities would then be set up, without regard to whether or not the children affected reside on or off the base.

Additionally, future grants to federally impacted areas would be conditioned upon assurance that if schools constructed with such funds were closed, they would be delivered to the Commissioner of Education, upon request, in order that a temporary educational program could be established.

During the period of Federal occupancy a reasonable rental would, of course, be paid. And when the facilities were no longer needed, that is when the local schools had reopened, they would be returned to local authority upon a request approved by the Commissioner.

I believe that enactment of title V is warranted at this time. While the Supreme Court's program of school integration is proceeding satisfactorily, it is far from completed. New crises may arise in the future—some of them affecting children of members of the services.

Title V would provide, in the words of Secretary of Health, Education, and Welfare, Dr. Arthur Flemming, "a practical and promptly usable method, on a standby basis, for meeting a serious problem if it arises." It would give "assurance that military personnel ordered to duty in certain States will not be placed in the impossible situation of having to undertake emergency and makeshift arrangements for the education of their children, with the Federal Government powerless to assist."

The rule which we have just adopted has, in effect, made in order the voting-referee bill, H.R. 10035, which I introduced on January 28, 1960. So that this bill and the improved version thereof, H.R. 10625, which I introduced on February 23, 1960, which will be offered as an amendment or substitute at the proper time, will be on each Member's desk tomorrow, I shall ask unanimous consent in the House that both bills be incorporated in the RECORD at this point:

#### H.R. 10035

*A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2004 of the Revised Statutes (42 U.S.C. 1971), as amended by section 131 of the Civil Rights Act of 1957 (71 Stat. 637), is amended as follows:

(a) Add the following as subsection (e) and designate the present subsection (e) subsection "(f)":

"In any proceeding instituted pursuant to subsection (c) of this section, in the event the court finds that under color of law or by State action any person or persons have been deprived on account of race or color of any right or privilege secured by subsection (a) or (b) of this section, and that such deprivation was or is pursuant to a pattern or practice, the court may appoint one or more persons (to be known as voting referees) to receive applications from any person claiming such deprivation as to the right to regis-

ter or otherwise to qualify to vote at any election and to take evidence and report to the court findings as to whether such applicants or any of them (1) are qualified to vote at any election, and (2) have been (a) deprived of the opportunity to register to vote or otherwise to qualify to vote at any election, or (b) found by State election officials not qualified to register to vote or to vote at any election.

"Any report of any person or persons appointed pursuant to this subsection shall be reviewed by the court and the court shall accept the findings contained in such report unless clearly erroneous. The court shall issue a supplementary decree which shall specify which person or persons named in the report are qualified and entitled to vote at any election within such period as would be applicable if such person or persons had been registered or otherwise qualified under State law. The Attorney General shall cause to be transmitted certified copies of the original decree and any supplementary decree to the appropriate election officials of the State, and any such official who, with notice of such original or supplementary decree, refuses to permit any person, named as qualified to vote in such original or supplementary decree, to vote at any election covered thereby, or to have the vote of any such person counted, may be proceeded against for contempt.

"The court may authorize such person or persons appointed pursuant to this subsection to issue to each person named in the original decree or any supplementary decree as qualified and entitled to vote at an election, a certificate identifying the holder thereof as a person qualified and entitled, pursuant to the court's original decree or supplementary decree to vote at any such election.

"The court may authorize such person or persons appointed pursuant to this subsection (or may appoint any other person or persons) (1) to attend at any time and place for holding any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any such person has been denied the right to vote, and (2) to attend at any time and place for counting the votes cast at any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any vote cast by any such person has not been properly counted.

"Any person or persons appointed by the court pursuant to this subsection shall have all the powers conferred upon a master by rule 53 (c) of the Federal Rules of Civil Procedure. The compensation to be allowed to any person or persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

"The court shall have authority to take any other actions, consistent with the provisions of this subsection, reasonably appropriate or necessary to enforce its decrees."

(b) Add the following sentence at the end of subsection (c):

"When any official of a State or subdivision thereof has resigned or has been relieved of his office and no successor has assumed such office, any act or practice of such official constituting a deprivation of any right or privilege secured by subsection (a) or (b) hereof shall be deemed that of the State and the proceeding may be instituted or continued against the State as party defendant."

#### H.R. 10625

*A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes*

*Be it enacted by the Senate and House of Representatives of the United States of*

3682 CONGRESSIONAL RECORD — SENATE *February 27*

*Georgia registration statistics—Continued*

| County | Total population, 1950 | 1950, whites over 18 | Whites registered, 1958 | Percent whites over 18 registered | 1950, non-whites over 18 | 1958, non-whites registered | Percent non-whites over 18 registered |
|---|---|---|---|---|---|---|---|
| Twiggs | 8,308 | 2,027 | 2,517 | 100.0 | 2,583 | 348 | 14 |
| Union | 7,318 | 4,245 | 4,944 | 100.0 | 0 | | |
| Upson | 25,078 | 11,698 | 5,437 | 47.0 | 3,827 | 466 | 12 |
| Walker | 38,198 | 22,463 | 23,324 | 100.0 | 1,401 | 1,127 | 80 |
| Walton | 20,230 | 9,024 | 6,873 | 76.0 | 3,199 | 805 | 25 |
| Ware | 30,289 | 13,940 | 11,418 | 82.0 | 4,495 | 2,318 | 52 |
| Warren | 8,799 | 2,152 | 2,006 | 93.0 | 2,823 | 195 | 7 |
| Washington | 21,012 | 8,934 | 6,696 | 79.0 | 6,389 | 1,704 | 27 |
| Wayne | 14,248 | 6,659 | 7,931 | 100.0 | 1,649 | 1,439 | 87 |
| Webster | 4,081 | 949 | 934 | 98.0 | 1,296 | 0 | 0 |
| Wheeler | 6,712 | 2,808 | 3,157 | 100.0 | 1,084 | 435 | 40 |
| White | 5,951 | 3,296 | 3,932 | 100.0 | 193 | 189 | 98 |
| Whitfield | 34,432 | 20,291 | 15,920 | 79.0 | 865 | 857 | 99 |
| Wilcox | 10,167 | 4,003 | 3,059 | 76.0 | 1,836 | 230 | 13 |
| Wilkes | 12,388 | 3,634 | 3,364 | 93.0 | 3,734 | 290 | 8 |
| Wilkinson | 9,781 | 3,260 | 3,041 | 93.0 | 2,619 | 411 | 16 |
| Worth | 19,357 | 5,975 | 5,855 | 98.0 | 4,802 | 296 | 6 |
| Total | 3,444,578 | 1,554,784 | 1,127,939 | 72.5 | 623,458 | 158,082 | 25.3 |

Mr. JAVITS. Mr. President, I should like to finish my remarks, and then I will yield to my colleague from Illinois.

Mr. President, all this shows a pattern, in a number of our States, of deprivation of the right to vote. This, occurring in this day and age, is intolerable and unacceptable, in my opinion, to the American people.

I believe the outcome of this debate must be, inevitably, a law which will eliminate that kind of situation from our body politic. I deeply hope the Senators from each of the States affected will read carefully what is to be printed in the RECORD, again with a view toward telling us how they account for what has happened and what they think ought to be done about it, from their own points of view.

I now yield to my colleague from Illinois.

Mr. DOUGLAS. Would it be appropriate to put in the RECORD at this point a quotation from page 52 of the report of the President's Commission on Civil Rights, as follows:

The figures showing 16 counties where Negroes constituted a majority of the voting-age population in 1950 but where not a single Negro was registered at last report, and showing 49 other Negro-majority counties with a few but less than 5 percent of voting-age Negroes registered, indicate something more than the lower status and level of achievement of the rural southern Negro.

Mr. JAVITS. Mr. President, I wish to invite attention to the pertinent fact that in Alabama in 1950 the Negro voting age population of 516,245 comprised about 30 percent of the total voting age population.

According to the best information we can get, some 73,000 Negroes were registered to vote in 1958, or about 14 percent. Alabama has 67 counties. In 12 counties Negroes constituted a majority of the 1950 voting age population. In two of these counties no Negroes were registered to vote in 1958. In 7 of the other 10 counties, the number of Negroes registered to vote in 1958 was fewer than 5 percent of the county's 1950 voting age population.

At the time of the Alabama hearing before the Federal Civil Rights Commission, a total of 91 legally sufficient complaints had been received from 6 counties, all of which, except Montgomery County, contained majority Negro populations.

Mr. President, I have put that information into the RECORD to provide some color and climate to the nature of our debate and to indicate the urgency, in the fundamental interests of our people, of passage of a bill in regard to what we are discussing.

Mr. DOUGLAS. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. Will the Senator permit me to quote some figures from page 50 of the report of the President's Commission on Civil Rights. The Commission states that of the total 1950 voting age population of 1,208,063, 497,354, or 41 percent of the voting population, were nonwhite. In 1954, the total of nonwhite registered voters in Mississippi was 22,000, and this represented in that year 3.89 percent of the total 1950 population of voting age nonwhites. So approximately 4 percent of the nonwhites of voting age were registered.

Mr. JAVITS. I thank my colleague for bringing that to my attention.

Mr. KEATING and Mr. HART addressed the Chair.

Mr. JAVITS. I yield first to my colleague from New York, and then I will yield to my colleague from Michigan.

Mr. KEATING. It may well be what I mention is included in the compilation which the Senator is making a part of the RECORD, but whether it is or not, I think two of these items deserve special emphasis.

The first is the voucher system, which is in use at least in Alabama in cases even where registrars are properly functioning.

Under this system a person cannot vote unless he is accompanied by an already registered voter. So this process feeds upon itself. A registered voter can vouch for only two applicants a year; and in at least one county, Macon County, the evidence shows that in recent years not a single white elector has vouched for a Negro applicant.

That is the site of Tuskegee Institute, one of the fine educational institutions of this country, where the proportion of Negroes of age 25 and over who have at least a high school education is the highest of any in the State, and where the percentage of Negro residents holding college degrees is the highest in any of the States.

Let me touch upon one other matter, having to do with the State of Tennessee. In Tennessee, it is true that the intimidation of Negroes in voting has taken place in only three counties, which is a comparatively creditable performance. But I believe the evidence showed that in Fayette County in 1958 there existed a condition which should cause all of us, no matter what our position is on this issue, to be pretty disturbed.

When 12 Negro war veterans endeavored to register they were so intimidated when they appeared to vote that only 1 of the 12 actually voted, and he expressed doubt that his ballot was counted, because he believed that he had handed it to someone instead of dropping it in the box. Two of them were frightened away when some deputy sheriffs approached them. One was told by his banker that something might happen to him if he tried to vote. Another, who was in the hauling business, lost all his customers, and the police threatened to arrest any of his drivers found on the highway in his trucks.

These were men who had fought for their country, men who had fought side by side with their white brothers. When they sought to exercise their franchise they were deprived of that privilege.

I believe that that really distressing situation lends emphasis to the need for some Federal legislation to insure that those who fight for their country and are ready to die for their country should have the right to vote for those who are to conduct the affairs of their country.

Mr. JAVITS. I thank my colleague for his very eloquent and affirmative contribution.

Mr. HART. Mr. President, will the Senator yield?

Mr. JAVITS. I yield to the Senator from Michigan.

Mr. HART. First, let me express the belief that the statement made today by the senior Senator from New York is all to the good in the development of an understanding of the basic issues.

However, with respect to the point he now proposes, and is developing in preliminary fashion, namely, the best and most effective approach to the development of an instrument which will insure

the broadest possible participation at the ballot box by all our citizens, would it not be fairer to those of us who advocate civil rights legislation to insist at this point, at the very outset, that while we seek a device which is wholly constitutional and efficient, we seek a device aimed at mass disenfranchisement. What we are looking for is a device which will permit mass enfranchisement.

I ask these questions because early in the debate I sensed the development of the thought that if we could find a very refined, precise, and procedurally lengthy system, we would have found the ideal answer.

Is it not the belief of the senior Senator from New York that what we most need is the very simplest approach, which will permit mass enfranchisement, in the face of the figures which the senior Senator from New York and the Senator from Illinois introduced only a few minutes ago?

Mr. JAVITS. I think the Senator is absolutely correct, in that we need that element as one of our elements, but I am not satisfied that we need only that. Certainly we need a technique for mass enfranchisement, in view of the fact that mass enfranchisement has not been afforded by the States. But we also must take account of the fact that we have met mass resistance and mass disenfranchisement, which implies a determination to deny the right to vote somewhere along the line. Therefore we need a piece of machinery which will give us the degree of authority which will enable us to surmount the hard core of the problem.

I believe that the only wise solution, in which the remedy meets the difficulty, is the solution which has been proposed, of some capability for doing either, dependent upon the particular situation.

Mr. HART. I did not want the senior Senator from New York to take a final, ultimate position on the question of devices, but I wished to introduce very early the point that what we face is mass resistance and mass disenfranchisement, and that in evaluating the devices we should welcome one which would permit mass enfranchisement, and not reject it because it proposes mass enfranchisement.

Mr. JAVITS. I thank my colleague.

Mr. President, I was about to call attention to the activities of the Civil Rights Division of the Department of Justice, which were brought into issue last night by the distinguished Senator from Georgia [Mr. TALMADGE]. I shall address myself to that subject in a few minutes. I hope the attachés of the Senate will notify him, so that he may be present to hear what I have to say on the subject.

We have already discussed the matter of an official registrar, a device based upon widespread denials of voting opportunity. I should like to address myself to one other question which has arisen in this respect, and that is the destruction of voting records, which apparently needed the attention of the Civil Rights Commission, and also the Civil Rights Division of the Department of Justice.

As an example of what has occurred in that connection, although there is ample reference to it in the report of the Civil Rights Commission, I am informed of an Alabama law, 17 Alabama Code, 31, providing that voting registration records are not public records, and that registrars might dispose of records pertaining to unsuccessful applicants. We all know what that means. It means that it will be impossible ever to find the evidence of denial of a voting opportunity.

The administration's bill on this subject provides for the retention and preservation of voting records by Federal officials for 3 years, and makes it a crime willfully to destroy any such records. It would also give the Attorney General the right to inspect and copy such records upon written demand. This has been a very serious obstacle even to the administration of the Civil Rights Act of 1957.

Again I point to the general feeling, even among those most opposed to civil rights legislation, that the voting right should be assured. I can hardly see how the destruction of voting records can be condoned, or how anyone could condone denying to the Attorney General, or to a proper Government agency, the right to inspect them. So I believe that the case for this particular provision of the Dirksen substitute is absolutely unquestionable.

Mr. President, I shall wait until the close of my remarks to address myself to the questions raised by the two Senators from Georgia, and shall move on now to two of my final points on the whole question of legislation, one being the Commission on Equal Job Opportunity Under Government Contracts.

This was a part of the recommendations of the President of the United States to the Congress in his message of February 5, 1959. It is a part of the administration's package, and it should be enacted into law.

It seems elementary that where employment is afforded as a result of expenditure by the United States of money of the taxpayers, employment opportunities should be afforded equally, without regard to race, creed, or color.

Unless it be thought that this is a small matter, let us note that the United States executes about 3½ million prime contracts a year, expending about $15 billion in the process. I am informed that since August 1953, when the present Committee on Equal Job Opportunity Under Government Contracts—now headed by Vice President NIXON—was created, it has received about 1,000 complaints.

It has endeavored to do its best by adjusting complaints, largely through the process of conference and mediation.

The lack of a statutory base results in the committee having no real staff of investigators or attorneys, and must rely for its compliance work almost solely upon the contracting agencies, and having a status which can always be questioned by anyone who deals with it. There are no sanctions for noncompliance insofar as the committee is concerned, except the potential risk of a noncomplying contractor being barred from any Government business.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. TALMADGE. I regret that I was not on the floor throughout the Senator's address this morning. The Senator stated that he would be prepared to submit this morning in his address the names of people who were legally qualified to vote, had attempted to assert that right in either State or Federal courts, or both, and had been denied their right to do so. Is the Senator prepared to submit any names this morning?

Mr. JAVITS. I am glad the Senator from Georgia is on the floor. I should like to read his question, and then I shall answer it. I refer now to page 2870 of the CONGRESSIONAL RECORD for February 18, 1960, in which the Senator from Georgia asked:

> At this time I should like to ask, if the Senator will permit me to do so, one more question of the Senator from New York: Does the Senator from New York know the name of any qualified individual, anywhere—North, South, East, or West—who claims the right to vote, and has instituted an action in the courts, either State or Federal, and has not been protected in the exercise of that right?

I should like to refer my colleague to the following matters:

In *Sellers* v. *Wilson* (123 F. Stat. 917), decided in Alabama in 1954, four Negroes sued the county board of registrars for a judgment declaring their alleged policy, custom, and usage in refusing to register them because of race or color was unlawful, and asking for a permanent injunction and money damages.

The finding of the court is as follows:

> The supreme law of this Republic is that no tests can be required of a Negro applicant as a prerequisite to registration as a voter that is not required of a white applicant; therefore, let no board of registrars try to devise any scheme or artifice to do otherwise.
>
> The plaintiffs have proven no money damages on account of the illegal and wrongful accounts of these defendants and therefore no award of money damages is made.
>
> By virtue of their resignations as members of the Board of Registrars of Bullock County, Ala., these defendants are now beyond the vale of an injunctive directive from this court in this matter; however, the court retains jurisdiction of the case and will grant the injunctive relief prayed for in plaintiff's petitions in the event either or all of these defendants again become members of this board.

Therefore, Mr. President, I state that, as shown by the case of Sellers against Wilson in these particular pleadings, four Negroes, fully qualified to vote, were frustrated in their right to vote because the court process could not reach an election board which resigned rather than give them the right to vote.

If the Senator wishes me to stop at each case, I will be glad to stop, or I will submit the other cases for the RECORD.

Mr. TALMADGE. The Senator points out, as I understand, in that particular observation, four cases. And the reason therefor is because no registrars are

available to be sued? Is that the Senator's statement?

Mr. JAVITS. That is correct.

Mr. TALMADGE. Does the Senator have any more than these four individuals, of the 180 million Americans, who come in the same category?

Mr. JAVITS. It seems to me, if I might answer, that I have already fully complied when I named one, because the Senator from Georgia said "Does the Senator from New York know the name of any qualified individual anywhere"— "any qualified individual anywhere," and my answer was that I knew that there were such cases, and that I would dig into them. Now I have produced four qualified individuals. I will go further; but that is enough.

Mr. TALMADGE. 4 out of 180 million.

Mr. JAVITS. It does not make any difference whether it is 4 out of 2½ billion. The Senator has asked for it, and I have produced it.

Mr. TALMADGE. I am very happy the Senator has produced the four. Would the Senator take the position, because there are four rapists or four murderers or four citizens anywhere in America who have violated the law, that we ought to see that the law is enforced there to send the U.S. Marines up there to see that the law is enforced?

Mr. JAVITS. The Senator from New York has just put into the RECORD facts and figures, of which the Senator from Georgia is fully aware, as is also the Senator from New York, of the widespread disenfranchisement in other areas of the South of Negroes by various devices, as found by the Civil Rights Commission to be recorded in many cases.

The Senator from New York was only addressing himself to this particular point, to this one question, which he tried to answer in all honesty, where the Senator from Georgia affirmed that I could not find the answer. I do not know whether the Senator really believed I could not find a case in which qualified voters were denied the right to vote. But I have produced such a case, for whatever it means. I think what it means is that it bears upon the fact, and I think it bears upon the fact with reasonable importance, though I believe the Federal Civil Rights Commission's findings are much more important, and cover much more ground; but I think it bears upon the fact that here is an example of how the right to vote was frustrated, though it is an individual case.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I will be happy to yield in just a minute.

True, it is an individual case. True, there are four people. But I was addressing myself to the particular challenge which the Senator from Georgia made. And I respectfully submit, citing even one case, though I have a few others, I have met the issue which was posed to me by the Senator from Georgia.

Mr. TALMADGE. Mr. President, will the Senator yield at this point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator also deal in his statement this morning with the alleged hundreds or thousands of Puerto Ricans in New York State who have been disenfranchised?

Mr. JAVITS. I am very happy to state to the Senator that the Senator from New York would be willing to restate what he had discussed with the Senator from Georgia on a previous occasion about Puerto Ricans in New York, and to point out that they are not disenfranchised, but that they are enfranchised equally with whites; and that the only complaint which we can make as the basis for legislation by the Congress is the fact that the laws of the States are not being equally applied. That is what the Federal Civil Rights Commission found. So that I, as a matter of fact, took the precaution, when I introduced the parts of the Federal Civil Rights Commission's report, to introduce the material about New York at the same time.

Mr. TALMADGE. Is it the position of the distinguished Senator from New York that New York State is competent to handle its qualifications statutes?

Mr. JAVITS. I believe New York is competent to handle its qualification statutes. But I believe that New York, like any other State, should be subject to Federal law and scrutiny by the Federal Government where it denies equal opportunity under its own laws to any of its citizens, whatever may be their color. I would accept it for New York, just as I would hope that every southern Senator would accept it for his State, where a violation of basic civil rights is so clearly shown.

Mr. TALMADGE. I agree with the distinguished Senator that New York State is thoroughly competent to handle its qualification of voters. But I would like to state that the other 49 States are equally competent to do so. Is it the Senator's premise that some States are denying this right and, because of that fact, the Federal Government ought to move in and take charge of their election machinery and control it?

Mr. JAVITS. It is my contention that the Federal Government has a right to see that the 15th amendment and the 14th amendment are living and expressive bodies of law, and also that in the elections of Federal officials, like Senators and Representatives, then give every individual who has the qualifications the right to vote. I think that is a duty of the Federal Government, and I do not believe that that constitutes taking over the elective machinery or putting the United States in the place of the States. I believe it refers only to that balance between the powers of the Federal and the State governments, powers which are inherent in the whole security of our Nation.

Mr. TALMADGE. Mr. President, will the Senator yield further at that point?

Mr. JAVITS. Certainly.

Mr. TALMADGE. Would the Senator under that premise think, then, that it was appropriate and proper, if there were a pattern of crime or violence in any particular area of our country, and law and order had broken down, for the Federal Government to move in and take charge of the situation?

Mr. JAVITS. Again the Senator refers to the degree of balance between the Federal and State Governments, and I should like to point out to the Senator that the Federal Government did send troops into Little Rock to suppress a situation of disorder and anarchy. But even the great heroes of the Southern States, like some of our former Presidents, were compelled to use Federal troops in situations of this character, in the South and elsewhere, when problems had gotten beyond the control of local officials.

Again, this is one of the prices which the State pays for the Federal Union. And this involves the balance of powers we all talk about. We accordingly accept it as part of our great democracy, and that is what I am talking about in regard to this voting legislation.

Mr. TALMADGE. Would the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator think, under that premise, if a pattern of rape or violence or suicide or murder were existing in public schools anywhere in our country, to the extent that it required armed police to protect the teachers and to protect the pupils, that the President ought to send the U.S. Marines to preserve order in such a school?

Mr. JAVITS. The Senator knows very well, being a very competent lawyer, just what are the requirements for the invocation of the Federal power with respect to public disorder or anarchy in a particular community. I think I have made my views on that subject very clear. The Senator knows, as well as I do, that we cannot make the generic decisions such as he would like to have me make upon this subject, because it depends strictly upon the extent to which public order is broken down and whether it has reached the point where the constitutional authority of the United States would be properly applicable.

Mr. TALMADGE. What I am trying to say to the Senator is that I feel that no area of our great country is completely free of crime. We do not live in a utopia. No laws are enforced 100 percent.

But if we are to start casting stones at one great region of our country, when that region has proven itself capable of self-government, I say the Senator lives in a glasshouse, and he ought to be the last man on the floor of the Senate to cast stones of aspersion at any other region of the country about the lack of law enforcement in that area of the Nation.

Mr. JAVITS. The Senator from New York will state that he has no desire to cast either stones or aspersions, but only to look at the record. The record is very clear. And, for whatever it means, I have invited individual Senators from the States which are affected, and the facts about which are set forth in the Federal Civil Rights Commission's report, to tell us what they think ought to be done about the conditions. And I point out to my colleague from Georgia that the 15th amendment, which was adopted

by the United States as a very hallowed part of our Constitution, specifies voting, speaks of it in so many words. And it does seem to me that we, as a Congress, are here to see that the promises of our Constitution are redeemed. And I certainly made a promise to the people of the United States of the most solemn kind in respect to voting rights.

Mr. TALMADGE. Would the Senator permit me at this point again to ask for unanimous consent to insert in the RECORD 10 full pages of laws, in addition to the Civil Rights Act of 1957, which afford the Federal law guaranteeing the right for any citizen of America to vote under any conditions?

Mr. JAVITS. I have no objection whatever to the introduction by the Senator of that material.

Mr. TALMADGE. There are laws in abundance on that subject. If anyone has been illegally denied his right to vote, he has a remedy in the State court, and he has a remedy in the Federal Court. Those courts are adequate and afford penal remedies, such as fines, and civil remedies, as well.

If in any area of our country any citizen has been deprived of the right to vote, all the Attorney General needs to do is to invoke criminal penalties and move into the case, and action can be obtained immediately.

The Senator from New York is an able lawyer. I believe he knows that these 10 pages of laws, plus the Civil Rights Act of 1957 afford any citizen in this great country adequate remedies to protect his right to vote.

Mr. JAVITS. Obviously the remedies are inadequate, because hundreds of thousands of Americans are denied their right to vote. The Attorney General himself has asked for additional law. The President has asked for additional law. If once we take the position that all the statutes on the books are sufficient, what are we doing here? We are passing laws every day to deal with matters which appeal to us as requiring law, notwithstanding the fact that there is other law on the statute books.

Mr. President, I should like to include three cases relating to the idea that an individual who is qualified to vote only has to sue to get his right to vote. Another case is the *United States* v. *Raines* (172 F. Supp. 552), a case in which the Civil Rights Act of 1957 itself was declared unconstitutional. In that case, four school teachers in the Georgia school system, all graduates of Georgia colleges, and one having a master of arts degree from New York University, were declared unable to pass the literacy tests of the State of Georgia. That matter is before the Supreme Court of the United States.

The third case——

Mr. TALMADGE. Mr. President, will the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Mr. President, I ask unanimous consent to have printed at this point in the RECORD the complete decision of the Federal district judge holding that particular phase of the Civil Rights Act of 1957 unconstitutional.

Mr. JAVITS. I have no objection to that.

There being no objection, the decision was ordered to be printed in the RECORD, as follows:

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF GEORGIA, AMERICUS DIVISION—UNITED STATES OF AMERICA, PLAINTIFF *v.* JAMES GRIGGS RAINES, DIXON OXFORD, ROSCOE RADFORD, REGISTRARS OF TERRELL COUNTY, GA.; F. LAWSON COOK, SR., AND MRS. F. LAWSON COOK, SR., DEPUTY REGISTRARS, DEFENDANTS—CIVIL ACTION No. 442

ORDER DISMISSING COMPLAINT

In accordance with the opinion filed in the above stated case on this date, it is hereby ordered and adjudged that the complaint in said cause be and the same is hereby dismissed. Costs are taxed against the United States.

This the 16th day of April 1959.

T. HOYT DAVIS,
*U.S. District Judge.*

District Judge DAVIS. This is an action instituted by the Attorney General of the United States in the name of and on behalf of the United States under the provisions of the Civil Rights Act of 1957. The complaint is one seeking preventive relief against the alleged deprivation of voting rights of certain named persons on account of their race or color. The action is brought against James Griggs Raines, Dixon Oxford, Roscoe Radford, registrars of Terrell County, Ga., F. Lawson Cook, Sr., and Mrs. F. Lawson Cook, Sr., deputy registrars of Terrell County, Ga. It is alleged that these defendants have engaged in wrongful acts and practices, which will deprive otherwise qualified persons of the right to vote because of their race or color. No attack is made upon any State law, but rather, it is alleged that the wrongful deprivation of voting rights will result from the improper and wrongful administration of the Georgia registration laws by the named defendants. It is against this allegedly wrongful administration of the registration laws that this complaint seeks relief.

The complaint was filed on September 4, 1958. On September 23, 1958, a motion to dismiss said action was filed on behalf of all named defendants. This motion was set down for hearing in Americus, Ga., on January 26, 1959. Briefs were subsequently filed by counsel for all parties. Reply briefs and supplemental briefs were likewise filed. The court has given careful consideration so the pleadings, oral arguments and extensive and exhaustive briefs filed with the court.

The motion to dismiss is based primarily upon four main grounds. The first is the unconstitutionality of the section authorizing the Attorney General to file this action. This contention is grounded on two arguments. The defendants argue that the sections involved are not appropriate legislation within the meaning of Section 2 of the 15th amendment to the Constitution of the United States. Secondly, they urge that Congress had no authority to authorize the Attorney General to file a suit of this nature, since it is neither an action in law or equity. This deals in part with the authority of Congress to authorize the grant of an injunction without regard to exhaustion of other available remedies. The second main ground of the motion to dismiss is the failure of the complaint to state a cause of action under the Civil Rights Act of 1957, even if constitutional. The third ground asserts that the cause should be dismissed by the court in the exercise of its sound discretion. Because of the court's ultimate judgment in this matter and to facilitate clarity of presentation, these grounds will be considered in reverse order.

In the third ground of their motion, the defendants argue that the court should exercise its discretion and deny the relief sought, even though it be decided that the act under which it is brought is constitutional and the complaint states a cause of action under the statute. In support of this ground, it was pointed out that no emergency existed, such as that contemplated by Congress when this act was enacted. Though a general election was held in Georgia in November 1958, this complaint did not seek a temporary restraining order, or any other remedy which might have enabled the allegedly wronged parties to vote in that election. It seeks instead to secure an injunction at a time when the next scheduled election is over a year in the future. The defendants argue that the State can afford the desired remedy prior to any election and that no such emergency exists as would justify this court's intervention.

While some of the language of the congressional hearings does indicate that this remedy was primarily designed for emergency use, the wording of the statute imposed no such limitation. This court cannot so limit the applicability of the statute. Similarly, the failure of the complaint to seek such relief as might have protected the voting rights of the allegedly wronged parties prior to the November election does not impede the operation of the statute. It may raise some question as to the motive of the litigation, but the court without hearing any of the evidence would not be disposed to dismiss the proceedings in the exercise of its discretion. It is true that equitable relief may be denied in the exercise of the court's discretion, but it should be a discretion informed by evidence. The court is of the opinion that, based on the complaint alone, it is not in possession of sufficient facts to dismiss the complaint in the exercise of its sound discretion.

The Court next comes to a consideration of the question of whether or not this complaint states a cause of action under the provisions of 42 U.S.C. 1971. The complaint alleges that the defendants, as individuals, acting in the exercise of their State given authority as registrars and deputy registrars of Terrell County, Ga., engaged in certain acts and practices, designed and intended to deny otherwise qualified persons the right to vote because of their race and color. It is alleged that they delayed handling of Negro applications for registration, arbitrarily refused to register Negroes who demonstrated their qualification to vote, and for purposes of discrimination, applied more difficult and stringent registration standards to Negro applicants than to white applicants.

It is further alleged that registration is a legal prerequisite to voting in Georgia, and that this discrimination in administration of registration procedures was on account of the race of the applicants.

There can be no question but that these allegations are sufficient to bring the allegedly wrongful conduct of the defendants within the coverage of 42 U.S.C. 1971. Whether that statute be construed as one limited to State action, as argued by the United States, or as extending to purely individual action, as contended by the defendants, the language of the complaint would state a cause of action. It alleges that these defendants have engaged in certain acts or practices which will deprive others of their right to vote, when otherwise qualified, without distinction as to race or color. The acts and practices alleged are those of the defendants while acting (even though wrongfully) in the exercise of State given authority. Thus, under any reading of the statute, the facts alleged make out a cause of action.

So it is, that this is not a case such as *Collins* v. *Hardyman* (341 U.S. 651) where the