**No. 26-1225**

---

**In the
United States Court of Appeals for the Sixth Circuit**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

JOCELYN BENSON, in official capacity as Secretary of State of the State of Michigan, et al.,

*Defendants-Appellees*,

LEAGUE OF WOMEN VOTERS OF MICHIGAN, et al.,

*Intervenors-Appellees*.

_____

On Appeal from the United States District Court for the
Western District of Michigan at Grand Rapids
Hon. Hala Y. Jarbou
1:25-cv-01148

---

***Amici Curiae* Brief of Historians J. Morgan Kousser,
Orville Vernon Burton, and James Peyton McCrary
in Support of Defendants-Appellees and Affirmance**

---

CLARICK GUERON REISBAUM LLP

Gregory A. Clarick
David Kumagai
Ashley Hall
41 Madison Avenue, 23rd Floor
New York, NY 10010
Tel:  (212) 633-4310
gclarick@cgr-law.com

PROTECT DEMOCRACY PROJECT

Orion Danjuma
Jared Fletcher Davidson
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
orion.danjuma@protectdemocracy.org

Counsel for *Amici Curiae*

# **TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ......................................................................1

SUMMARY OF ARGUMENT...........................................................................3

ARGUMENT .......................................................................................................5

I.      Congress Enacted Title III in Response to State Efforts to Frustrate and
        Evade Enforcement of the 1957 CRA's Voting Rights Provisions..................5

        A.      The Civil Rights Act of 1957 ...............................................................6

        B.      Challenges Enforcing the 1957 CRA's Voting Rights Protections .......7

II.     The Overall Purpose of the 1960 Civil Rights Act Sheds Light on the
        Election Records Congress Intended Title III to Cover ...............................17

        A.      The 1960 CRA Focused on Racial Discrimination in Voting .............17

        B.      Title III Was Necessary to Prove a "Pattern or Practice" of Racial
                Discrimination in Voting Under Title VI.............................................19

III.    The Legislative History Shows Congress Intended Title III To Assist in
        Combatting Racial Discrimination in Voting ...............................................20

        A.      In Section 301, Lawmakers Were Contemplating the Individualized
                Voting Records Necessary To Substantiate Disparate Treatment
                Between Black and White Citizens.......................................................20

        B.      Congress Added the "Basis and Purpose" Language to Limit the
                Scope of Title III..................................................................................24

CONCLUSION ..................................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Edwards v. Aguillard*,
  482 U.S. 578 (1987)................................................................5, 6

*Larche v. Hannah*,
  176 F. Supp. 791 (W.D. La. 1959),
  *rev'd and remanded sub nom. Hannah v. Larche*, 363 U.S. 420 (1960) .......5, 16

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  472 U.S. 159 (1985)..................................................................5

*U.S. v. McElveen*,
  180 F. Supp. 10 (E.D. La. 1960)..................................................15

*U.S. v. Alabama*,
  171 F. Supp. 720 (M.D. Ala.)
  *aff'd*, 267 F.2d 808 (5th Cir. 1959),
  *vacated*, 362 U.S. 602 (1960) ......................................................13

*In re Wallace*,
  170 F. Supp. 63 (M.D. Ala. 1959) ................................................11

**Statutes**

28 U.S.C. §§ 506-507...................................................................6

42 U.S.C. §§ 1975-1975d ..............................................................6

Civil Rights Act of 1957,
  Pub. L. No. 85-315, 71 Stat. 634 (1957) .....................................*passim*

Civil Rights Act of 1960,
  Pub. L. No. 86-449, Title III, 74 Stat. 86 (1960)
  52 U.S.C. §§ 20701-20706 ......................................................*passim*

Civil Rights Act of 1960,
  Pub. L. No. 86-449, Title VI, 74 Stat. 86 (1960)................................18, 19, 20

Enforcement Act of Feb. 1871, 41st Cong. 3d Sess., Ch. 99 (1871) ........................19

**Other Authorities**

106 Cong. Rec. 5309-8499 (1960)...............................................................*passim*

*Civil Rights: Hearings before Subcomm. No. 5 of the H. Comm. on the*
　*Judiciary*, 86th Cong. (1959)............................................................*passim*

*Civil Rights – 1959: Hearings before Subcomm. on Constitutional Rights*
　*of the S. Comm. on the Judiciary,* 86th Cong., 1st Sess. (1959) ...........8, 21, 22, 24

*Federal Registrars: Hearings Before the Comm. on Rules and*
　*Administration, United States Senate*, 86th Cong., 1st Sess. (1960) ....8, 19, 21, 24

Hearings Before the U.S. Comm'n on Civil Rights – Voting – Montgomery,
　Alabama (1959) ..........................................................................................9

H.R. Rep. No. 86-956 (1959) ..........................................................................8, 23

Lawson, Steven F., *Black Ballots: Voting Rights in the South, 1944-1969*
　(1976)...............................................................................................6, 11, 12

Report of the United States Commission on Civil Rights (1959) ....................*passim*

## <u>INTEREST OF AMICI CURIAE[1]</u>

*Amici Curiae*—J. Morgan Kousser, Orville Vernon Burton, and James Peyton McCrary—are distinguished historians and leading experts on the history of civil rights and voting rights legislation in the United States.

Dr. Kousser has a Ph.D. in History from Yale University and is a Professor of History and Social Science, Emeritus, at the California Institute of Technology. Dr. Kousser has authored many books and articles concerning the history of minority voting rights in the United States, including *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (Yale Univ. Press, 1974) and *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Univ. of North Carolina Press, 1999). Dr. Kousser has twice testified on the Voting Rights Act before the House Committee on the Judiciary and served as an expert witness or consultant in 56 federal or state voting rights cases.

Dr. Burton has a Ph.D. in history from Princeton University and is the Judge Matthew Perry Distinguished Professor Emeritus of History, Sociology, and Global Black Studies at Clemson University, and Professor Emeritus of History, African

---

[1] Counsel for the parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no other person contributed money intended to fund this brief.

American Studies, and Sociology at the University of Illinois.  Dr. Burton has authored and edited numerous publications on the history of civil rights, including the book *Justice Deferred: Race and the Supreme Court* (Belknap Press of Harvard Univ., 2021), which analyzed more than 200 Supreme Court cases addressing the civil rights of racial minorities.  Dr. Burton has served as an expert witness in multiple discrimination and voting rights cases.

Dr. McCrary has a Ph.D. in history from Princeton University and worked as an historian in the Voting Section of the Civil Rights Division of the United States Department of Justice for 26 years from 1990 to 2016.  Dr. McCrary has served as an expert witness in more than a dozen voting rights cases and taught courses on the history of voting rights at multiple universities, including the University of Minnesota, Vanderbilt University, the University of South Alabama, and George Washington University.

*Amici* respectfully submit this brief to explain the historical and legislative context in which Congress passed Title III of the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 (1960) ("1960 CRA").  *Amici* have a strong interest in ensuring courts, lawmakers, litigants, and the public have an accurate understanding of the 1960 CRA's historical and legislative context.

2

## SUMMARY OF ARGUMENT

The Department of Justice's request for Michigan's entire Qualified Voter File is unprecedented in terms of the scope of the demand and Appellant's asserted authority for it.  Since the passage of the 1960 Civil Rights Act, no administration previously has sought to compile sensitive, confidential voter information of this nature or on such massive scale, and none has sought to use the 1960 CRA to obtain it.  *Amici* write to provide the Court with important legislative history and historical context in order to elucidate the meaning of Title III of the 1960 CRA. As the district court recognized, the 1960 CRA was intended to protect citizens from being disfranchised on the basis of race, and Title III was Congress's response to state officials who had sought to frustrate federal voting rights investigations.  (*See* R. 67, Page ID # 911.)  Viewed in this context, the statute cannot support the DOJ's attempt to repurpose it here.

Congress passed Title III to address specific roadblocks that states had thrown up to prevent the Commission on Civil Rights from enforcing the Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (1957) ("1957 CRA"). Alabama and Louisiana officials were hiding and destroying individual voter registration applications to conceal mass disfranchisement of Black voters, while simultaneously asserting that the Commission had no authority to obtain the registration applications in the first place.  These challenges to enforcing the 1957

3

CRA's voting rights protections were so integrally connected with Title III's enactment that the provision cannot be understood without this historical context. (*See* Section I.)

The 1960 CRA's legislative history further confirms that Congress was focused on combatting racially discriminatory voting practices and that it conceived of Title III as a means to redress this injustice and protect the right to vote.  (*See* Section II.)

Lawmakers drafted Title III to serve as an evidence-gathering tool for the federal government, aimed at obtaining the types of individualized voter registration records necessary to show a "pattern or practice" of racial discrimination.  Moreover, congressional debate makes clear that lawmakers incorporated the requirement that the DOJ state the "basis and purpose" of any request in order to limit Title III's scope to records related to the CRA's overall purpose—protecting individuals' rights to vote.  (*See* Section III.)

Ultimately, Appellant's demands for state voter information far exceed the intended scope of Title III.  Accordingly, this Court should affirm the district court's order.

## ARGUMENT

### I.    Congress Enacted Title III in Response to State Efforts to Frustrate and Evade Enforcement of the 1957 CRA's Voting Rights Provisions

The historical context and legislative history of Title III are essential to understanding its purpose and scope. *See Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."); *see also Hannah v. Larche*, 363 U.S. 420, 434 (1960) (examining legislative history of 1957 CRA to interpret its scope).

Title III's purpose is illuminated by the events leading up to its enactment, Congressional reports, the comments of individual legislators, and the testimony provided during hearings before the House and Senate in 1959 and 1960. *See, e.g., Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 169-70 (1985) (recognizing weight afforded to Congressional reports and "comments of individual legislators . . . especially when they reflect a consensus as to the meaning and objectives of the proposed legislation.").

The historical and legislative records show that the experiences of the DOJ and Commission on Civil Rights in 1958 and 1959 were so integrally connected with Title III that it cannot be understood without first understanding (a) the 1957

5

CRA; and (b) the challenges the DOJ and Commission faced that ultimately led Congress to pass Title III.[2]

### A.    The Civil Rights Act of 1957

The 1957 CRA, signed into law on September 9, 1957, was the first federal civil rights law passed since 1875.  Although liberal lawmakers and activists initially sought a civil rights act that would combat school segregation and discrimination in public accommodations, housing, and employment, a threatened filibuster and the caution of the Eisenhower Administration reduced the 1957 CRA to a limited measure focused on voting rights.[3]

The Act contained five Parts:  Part I established the Commission on Civil Rights to *inter alia* "investigate allegations" that citizens were "deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin," 71 Stat. at 634-36 (codified at 42 U.S.C. §§ 1975-1975d); Part II established a new Assistant Attorney General position at the DOJ, heading what would become the DOJ's Civil Rights Division, 71 Stat. at 636-37 (codified at 28 U.S.C. §§ 506-507); Part III expanded federal courts' jurisdiction over civil rights

---

[2] "In determining the legislative purpose of a statute, courts consider the historical context of that statute" and the "specific sequence of events leading to the passage of the [statute]." *Edwards*, 482 U.S. at 595 (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977)).

[3] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969*, 140-202 (1976).

claims, 71 Stat. at 637; Part IV prohibited voter intimidation or suppression and authorized the Attorney General to seek injunctive relief to prevent such conduct, *id*.; and Part V provided for jury trials in contempt proceedings related to civil rights enforcement, *id*. at 637-38.

### B.    Challenges Enforcing the 1957 CRA's Voting Rights Protections

After the 1957 CRA was enacted, the new Commission on Civil Rights reported receiving a steady stream of affidavits from Black citizens in Alabama and Louisiana alleging the denial of their right to vote.[4]  In accordance with the 1957 CRA, the Commission began investigating these complaints in 1958, including by interviewing complainants and subpoenaing individual voter registration records from state and local election officials.[5]  As documented in the 1959 CCR Report, however, the Commission's investigations were met with extraordinary resistance and outright defiance from election officials in Alabama and Louisiana.[6]

In 1959 and 1960, while considering the proposed bills that would become the 1960 CRA, Congress heard testimony from the Commission about the

---

[4] *Report of the United States Commission on Civil Rights* (1959) ("1959 CCR Report") 69-106, https://www.usccr.gov/files/historical/1959/59-001-U.pdf; *see also* R. 67, Page ID # 911 (citing CCR Report 93).

[5] *Id.*

[6] *Id.*

challenges it faced in enforcing the 1957 CRA's voting rights protections.[7] The

accounts of the Commission's and DOJ's experiences in Alabama and Louisiana,

summarized below, were referred to repeatedly during House[8] and Senate[9]

deliberations about the 1960 CRA.

[7] *Civil Rights: Hearings before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ("1959 House Hearings") 251-57 (statements of Commission Chair John Hannah and Staff Director Gordon Tiffany); *Civil Rights – 1959: Hearings before Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ("1959 Senate Hearings") 251-52 (colloquy between Sen. Carroll and Staff Director Tiffany); *Federal Registrars: Hearings Before the Comm. on Rules and Administration, United States Senate*, 86th Cong. ("1960 Senate Hearings") 22-51 (statement and colloquies involving Commission Vice Chair Robert G. Storey).

[8] 1959 House Hearings 146-48 (statement of Rep. McCulloch); *id.*, 197 (statement of Rep. Dingell); *id.*, 213 (statement of Attorney General Rogers); *id.*, 216-17 (colloquy between Rep. Rodino and Attorney General Rogers); *id.*, 344 (statement of NAACP Executive Secretary Roy Wilkins); *id.*, 399-400 (statement of Paul Sifton, National Legislative Representative of United Auto Workers); *id.*, 679-80 (colloquy between Gov. John Patterson and Representatives Celler and McCulloch); *id.*, 760 (colloquy between Alabama Attorney General MacDonald Gallion and Rep. Byron G. Rogers); *id.*, 774-76 (colloquy between Attorney General Gallion and Judiciary Committee Counsel Peet); *id.*, 904-10 (statements of CCR Staff Director Gordon Tiffany and Vice-Chairman Robert Storey); *id.*, 942 (statement by American Jewish Committee); *see also* 106 Cong. Rec. 5309 (statement of Rep. Addonizio); *id.*, 8498 (statement of Rep. Celler); H.R. Rep. No. 86-956, at 8 (1959).

[9] 1959 Senate Hearings 58 (statement of Sen. Carroll); *id.*, 159-65 (statement of Sen. Clark); *id.*, 173-84 (colloquy between Senators Carroll and Clark); *id.*, 191-92 (statement of Attorney General Rogers); *id.*, 296 (colloquy between Senator Carroll and Roy Wilkins); *id.*, 496 (statement of Sen. Case of N.J.); *id.*, 597-98 (statement of American Jewish Committee); 1960 Senate Hearings 5 (statement of Sen. Keating); *id.*, 60 (statement of Sen. Javits); *id.*, 99 (statement of Sen. Hart);

### i.    Alabama Officials Defied Requests for Voting Records Under the 1957 CRA and Passed a Law to Encourage Record Destruction

In September 1958, the Commission received its first set of sworn affidavits from 14 Black citizens in Macon County, Alabama, who "affirmed that they had been denied registration because of their race or color."[10]  At the time, Macon County had the highest proportion of Black citizens in the country and, as the home of the Tuskegee Institute, the highest percentage of Black college graduates in Alabama; however, from 1951 through 1958, only 32 percent of the 1,585 Black citizens who applied to register to vote succeeded.[11]  At the rate at which Black citizens were registered from 1951 through 1958, activists calculated that it would take 203 years to register all eligible Black citizens in Macon County.[12]

As part of its investigation, Commission staff scheduled an appointment to inspect Macon County's individual voter registration records, but when the staff

---

*id.*, 162-66  (colloquy between Senators Keating and Sparkman); *id.*, 172, 182 (statement of Thomas E. Harris, Associate General Counsel, AFL-CIO); *id.*, 192 (colloquy between Sen. Henning and Alabama Attorney General Gallion); *id.*, 194-96 (correspondence between Sen. Hennings and William P. Mitchell of Tuskegee Civic Assn.); *id.*, 227-41 (statement of Gov. John Patterson of Ala.); *id.*, 341 (statement of Attorney General Rogers); *id.*, 310 (statement of Sen. Thurmond); *id.*, 383-473 (reprint of chapters 4-8 of Part 2 of 1959 CCR Report).

[10] 1959 CCR Report 69-70.

[11] *Id.* 75-83, 91-92.

[12] *Hearings Before the U.S. Comm'n on Civil Rights – Voting –Montgomery, Alabama* (1959) ("CCR Montgomery Hearings") 28.

arrived at the courthouse on the appointed date, the chairman of the Board of Registrars told them that, by order of Alabama Attorney General John Patterson, the records would not be made available to the Commission.[13]  This marked the first of many acts of "official resistance" to the Commission's "attempt to carry out the task assigned to it by the Congress" under the 1957 CRA.[14]

In preparation for its first set of public hearings in Montgomery, Alabama, the Commission subpoenaed individual voter registration records from officials in multiple Alabama counties.[15]  In response, state officials, including then-State Circuit Court Judge George C. Wallace, impounded the records to deny the Commission access.[16]  Judge Wallace publicly asserted:  "they are not going to get the records.  And if any agent of the Civil Rights Commission comes down here to get them, they will be locked up."[17]  The Commission, through the DOJ, filed suit in federal court to enforce the subpoenas against three counties, and Judge Frank M. Johnson Jr. ordered local registrars to give the Commission access to the requested records.  Judge Wallace "responded with an elaborate game of hide and

---

[13] 1959 CCR Report 70-71.

[14] 1959 CCR Report 70-71.

[15] *Id*.

[16] *Id*.

[17] *Id.* 71 (citing *The Montgomery Advertiser*, Dec. 6, 1958).

seek, delaying obedience to the court order by turning the records over to grand juries."[18]

The Commission was not permitted to examine any records from Dallas, Wilcox, or Lowndes Counties where, it was reported, a total of only two Black citizens had managed to register in the three counties from 1953 through 1958, even though at least 65 percent of the citizens in each county were Black.[19] By contrast, from 1954 to 1958, no white applicant for registration in Lowndes County was denied.[20]

During the Montgomery hearings, on the orders of Alabama Attorney General Patterson, the registrars of Macon and other Alabama counties refused to testify about their official actions.[21] When Macon County Probate Judge William Varner, to whom some Macon County records had been passed, testified at the Montgomery hearing, he informed the Commission that he preserved no records of unsuccessful attempts to register.[22] According to Barbour Probate Judge Marshall

---

[18] *Id.* 88; *In re Wallace*, 170 F. Supp. 63 (M.D. Ala. 1959).

[19] 1959 CCR Report 89-95.

[20] CCR Montgomery Hearings 200 (testimony of Lowndes County Registrar Dorothy Woodruff).

[21] 1959 CCR Report 81-84.

[22] CCR Montgomery Hearings 125-27, 141, 159-70 (statements of John Patterson, William Varner, and Macon County Registrars Grady Rogers and E.P. Livingston); *see also* 1959 House Hearings 679 (statement of John Patterson); 1959 CCR Report 75-83; Lawson, *Black Ballots*, 203-15.

11

J. Williams and Lowndes County Probate Judge Harrell Hammonds, also testifying at the Montgomery hearings, it was standard practice in the state to discard records of unsuccessful attempted registrants.[23]

Even the limited set of individual voter registration records that the Commission was able to obtain helped to corroborate the dramatic testimony of disfranchised Black citizens. For example, the Commission reported that Barbour County registrars had routinely corrected errors in registration applications from white but not Black citizens, and they typically destroyed the application forms within 30 days.[24] Likewise, in Macon County, officials had required 51 Black applicants, but only 3 white applicants, to copy the lengthy Article 2 of the U.S. Constitution to demonstrate literacy.[25] Such evidence, available to the Commission under the 1957 CRA, provided exactly the sort of detailed, individualized comparisons between the treatment of white and Black voters that the DOJ would need to bring civil lawsuits under the 1957 CRA.

Armed with evidence that the Commission was able to gather, the DOJ filed suit in federal court against individual registrars, the Macon County Board of Registrars, and the State of Alabama under Part IV of the 1957 CRA to restrain

---

[23] CCR Montgomery Hearings 175, 186.

[24] 1959 CCR Report 88-89.

[25] *Id.* 87-88.

them from denying Black citizens the right to vote on account of their race or color.[26]  However, because the individual registrars had previously resigned and left the positions vacant to avoid complying with the Commission's investigation, the court dismissed the claims against them and dismissed the remaining claims against the Board and State on the grounds that the 1957 CRA allowed civil suits against "persons" only, not government bodies.[27]

Alabama lawmakers reacted defiantly to the Commission's and DOJ's efforts to enforce the 1957 CRA:  The Alabama legislature unanimously passed a law empowering registrars to destroy voting registration applications and questionnaires of rejected applicants within 30 days. [28]  *The Montgomery Advertiser* newspaper cheered the law's passage under the headline "Alabama Legislature Hurls Legal Punch at U.S. Vote Probe."[29]

---

[26] *See U.S.A. v. Alabama*, 171 F. Supp. 720, 722 (M.D. Ala.) *aff'd*, 267 F.2d 808 (5th Cir. 1959), *vacated*, 362 U.S. 602 (1960).

[27] *Id.*, at 730.

[28] 1959 CCR Report 95.

[29] *Id*.

### ii. Louisiana Barred Federal Officials from Accessing Individual Voter Registration Records, Threatened Federal Officials With Criminal Prosecution, and Enjoined the Commission's Hearings

If Alabama officials were defiant, Louisiana officials put up what the Commission termed the "Louisiana Roadblock."[30]

In 1958, the Commission received multiple affidavits from Black citizens in Louisiana attesting to being denied the right to vote on account of their race or color.[31] The Commission conducted preliminary studies that indicated extreme discrepancies in voter registrations of Black and white citizens in multiple parishes.[32] Accordingly, the Commission moved to examine individual voter registration records from specific parishes.[33] However, state and local officials refused to provide the Commission access to the records, citing a Louisiana law allowing only a registered voter from an individual parish to examine election records, and the copying of records only upon the presentation of a petition of 25 citizens of the parish.[34]

---

[30] *Id.* 98-106.

[31] *Id.* 98.

[32] *Id.*

[33] *Id.* 98-99.

[34] *Id.*

In response to the Commission's attempts to investigate claims by Black citizens of discrimination in voting, the counsel for the state legislature threatened to prosecute Commission staff members if they did not disclose the names of Black citizens who had complained to the Commission.[35]  In addition, a Louisiana state senator circulated to parish registrars a pamphlet, under the imprimatur of the White Citizens' Council, titled "Voter Qualification Laws In Louisiana – The Key To Victory In The Segregation Struggle," outlining methods of preventing Black citizens from registering to vote.  In Washington Parish in 1959, the White Citizens' Council was behind a purge of 1,377 of 1,517 Black citizens who had been on the voter rolls.[36]  One affidavit successfully challenged a Black voter who, the challenger asserted on a form reproduced in the CCR Report, made an "Error in Spilling."[37]  Because a federal government lawsuit against registration officials in Washington Parish allowed the DOJ to obtain "registration cards" that white and Black applicants had submitted, DOJ attorneys were able to show that 60 percent of white applicants made mistakes similar to those that caused the names of Black applicants to be purged.[38]

---

[35] *Id.* 99.

[36] *Id.* 103-04.

[37] *Id.*

[38] *U.S. v. McElveen*, 180 F. Supp. 10 (E.D. La. 1960).

Finally, in advance of the Commission's public hearing in Shreveport, Louisiana Attorney General Gremillion filed suit against the Commission seeking a temporary restraining order to enjoin the Commission's investigation and block the hearings.[39]  Parish registrars joined the suit, challenging the constitutionality of the 1957 CRA.  Less than 16 hours before the scheduled start of the hearing, a federal district court granted the restraining order against the Commission.[40]

\* \* \*

These largely successful efforts by Louisiana and Alabama officials to frustrate the 1957 CRA illustrate the shortcomings of that law that Congress sought to address in Title III of the 1960 CRA.  Congress was well aware of these events in Alabama and Louisiana—hearing testimony about them from the chair, vice chair, and staff director of the Commission and often referring to the events during consideration of the legislation.[41]  Indeed, these events provided the impetus for Title III and the bill as a whole.  As the author of the 1957 CRA and co-author of the 1960 CRA, Representative Emmanuel Celler, explained:

> From the experience of the Attorney General in enforcing the Civil Rights Act of 1957 and the activities of the Civil Rights Commission, it is clear that means of more effective enforcement of our constitutionally guaranteed rights, and in particular the

---

[39] 1959 CCR Report 100; *see Larche v. Hannah*, 176 F. Supp. 791 (W.D. La. 1959), *rev'd and remanded sub nom. Hannah v. Larche*, 363 U.S. 420 (1960).

[40] *Id.*

[41] *See supra* nn.7, 8, and 9.

16

right to vote, is necessary. I am firmly convinced that the legislation before us will provide such a means . . .[42]

Title III cannot be understood today without appreciating these specific challenges that Congress had in mind—and was responding to—when it drafted and passed the 1960 CRA.

## II.   The Overall Purpose of the 1960 Civil Rights Act Sheds Light on the Election Records Congress Intended Title III to Cover

### A.   The 1960 CRA Focused on Racial Discrimination in Voting

On February 5, 1959, President Eisenhower urged Congress to protect the right to vote, which he called "the keystone of democratic self-government," without discrimination.[43]  President Eisenhower referred to the events in Alabama and Louisiana while emphasizing the need to pass what became Title III:

> I recommend legislation to give the Attorney General power to inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection. . . .
>
>  . . . A serious obstacle has developed which minimizes the effectiveness of [the 1957 CRA]. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to

---

[42] 106 Cong. Rec. 8498 (April 21, 1960) (statement of Rep. Celler).

[43] H.R. Doc. No. 86-75, at 2 (1959).

permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.[44]

Introducing the Administration's proposal (H.R. 4457) for what would become the 1960 CRA, Rep. William McCulloch of Ohio warned of bills pending or proposed in Southern states that would authorize the destruction of election records:

> Title III of my bill would nip these plans in the bud by requiring State election officials to retain and preserve all records and papers relating to elections involving candidates for Federal office for a period of 3 years. Such records would be made available to the Attorney General for investigative purposes with criminal penalties provided for in the event of their being withheld or destroyed.[45]

On the day that the House first passed its version of the legislation (H.R. 8601), Rep. Samuel S. Stratton of New York stated its purpose succinctly: "Basically this bill does only one thing, Mr. Speaker, and that is to guarantee the right to vote to all citizens of our country regardless of their race, creed, or color."[46]

---

[44] *Id.*

[45] 1959 House Hearings 151-52.

[46] 106 Cong. Rec. 6513 (March 24, 1960) (statement of Rep. Stratton); *see also id.*, 8499 (April 21, 1960) (statement of Rep. Brown).

18

### B.    Title III Was Necessary to Prove a "Pattern or Practice" of Racial Discrimination in Voting Under Title VI

The 1960 CRA's legislative record shows hard-fought debates over the appropriate procedural mechanism to overcome racial discrimination and foster an increase in Black voter registration.

The Commission recommended a process under which it would launch investigations in any county or other subdivision of a state where it received at least nine affidavits from individuals alleging that their voter registration applications were denied on account of race or color; if the Commission's investigation substantiated the complaints, the President would appoint federal registrars to administer the state's voter registration process.[47]

Southern lawmakers and witnesses in congressional hearings bitterly objected to the Commission's proposed procedures—likening federal registrars to the election supervisors appointed to enforce the Fifteenth Amendment during Reconstruction.[48]  In response to this and other criticisms, the Eisenhower Administration proposed and Congress eventually adopted a "referee" procedure

---

[47] 1959 CCR Report 141-42.

[48] 106 Cong. Rec. 5357 (statement by Rep. Blitch); *id.*, 5198 (statement of Rep. Colmer); 1960 Senate Hearings 245-46 (statement of Sen. Talmadge); *id.*, 293-96 (statement of CCR member Battle); *id.*, 316-19 (statement of Frank J. Looney); *id.*, 327-332 (statement of Asst. Attorney General of Florida Ralph E. Odum); 1959 House Hearings 700 (statement of Miss. Atty. General Joe E. Patterson); *see also* Enforcement Act of Feb. 1871, 41st Cong. 3d Sess., Ch. 99 (1871).

(*see* Title VI of the 1960 CRA), which required the DOJ to establish in federal court that there existed a "pattern or practice" of discrimination in a locality; if the court found that the DOJ had established such "pattern or practice," the court would appoint and oversee referees to register voters in the relevant area.[49] *See* Pub. L. No. 86-449, tit. VI, 74 Stat. 86, 90-92 (1960).

The co-author of the 1960 CRA, Rep. Celler, called Title VI of the Act targeting "patterns or practices" of racial discrimination in voting "the main purpose of this bill."[50] The choice of the referee mechanism for increasing Black voter registration heightened the importance of Title III, making Title III the essential means of effectuating Title VI, because it enabled the DOJ to collect the types of evidence needed to establish a "pattern or practice" of racial discrimination.

III. **The Legislative History Shows Congress Intended Title III To Assist in Combatting Racial Discrimination in Voting**

A. **In Section 301, Lawmakers Were Contemplating the Individualized Voting Records Necessary To Substantiate Disparate Treatment Between Black and White Citizens**

Section 301 of Title III commands every election officer to retain and preserve "all records and papers which come into his possession relating to any

---

[49] 1960 House Hearings 41-45 (statement of Asst. Attorney General Lawrence E. Walsh).

[50] 106 Cong. Rec. 5773 (statement of Rep. Celler).

20

application, registration, payment of poll tax, or other act requisite to voting." Pub. L. 86-449, Title III, § 301 (codified at 52 U.S.C. § 20701). Every draft of the bill that eventually became the 1960 CRA contained this same language and set of enumerated records.[51]

The experiences of the Commission and the DOJ in Alabama and Louisiana, detailed above, shed light on the specific records listed in Section 301. To determine whether individual Black citizens were discriminated against in attempting to register to vote, federal officials needed to be able to compare documents that Black and white applicants for registration had filled out and provided to local registrars.

As U.S. Attorney General William P. Rogers put it in his appearance before the House Judiciary Committee in 1959:

> Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.

---

[51] H.R. 4338 (Celler); 1959 House Hearings 91-92; H.R. 4457 (McCulloch); 1959 House Hearings 93-94; S. 957; 1959 Senate Hearings 13-14; S. 2722 (Morse); 1960 Senate Hearings 15; S. 2785 (Javits); 1960 Senate Hearings 17-18; H.R. 8601; 106 Cong. Rec. 6509-11 (March 24, 1960); 52 U.S.C. § 20701.

21

> To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information -- necessary for proper evaluation of complaints and in the preparation of cases -- is the records of registrations or other action required for exercise of the franchise.

> The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection. Its need is further shown by the recent experience of the Civil Rights Commission. . . .

> The Department feels that enactment of this proposal is essential to the effective enforcement of the provisions of the Civil Rights Act of 1957. It would supply the needed authority to make a reality of an underlying thesis of the act that the right of all qualified citizens to vote is the keystone of democratic government.[52]

The House Report on the bill (H.R. 8601) further explained Congress's

rationale for Title III:

> The purpose of Title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race. . . . *So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to*

---

[52] 1959 Senate Hearings 210-12.

*assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.*[53]

Likewise, Republican Minority Leader Charles Halleck of Indiana remarked of Title III:

This provision realistically recognizes that voting records are important evidence in most voting rights cases and that only Federal law can overcome the reluctance of some State officials to make such records available.[54]

Bill co-sponsor William McCulloch of Ohio agreed with Halleck: "This very essential provision makes possible the discovery and use in court of evidence of voting violations."[55]

This legislative history confirms that Congress intended Section 301 to cover records relevant to claims of racial discrimination against Black voters. In particular, the record elucidates Section 301's use of the phrase "come into [] possession" and its enumeration of specific records related to voter registration: Congress—in response to the Commission's and DOJ's struggles to collect evidence in Alabama and Louisiana—focused on ensuring that local registrars preserved the records needed to prove claims of disparate treatment on account of race or color in voter registrations. In other words, Congress drafted Section 301

---

[53] H.R. Rep. No. 86-956, at 7 (emphasis added).

[54] 106 Cong. Rec. 8499 (April 21, 1960) (statement of Rep. Halleck).

[55] *Id.* 8500 (statement of Rep. McCulloch).

23

to cover voter registration documents applicants submitted to local election registrars so that the DOJ could assess the documents for evidence of racial discrimination.

### B.   Congress Added the "Basis and Purpose" Language to Limit the Scope of Title III

Section 303 of Title III provides:

Any record or paper required by section 301 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. *This demand shall contain a statement of the basis and the purpose therefor*.

Pub. L. 86-449, Title III, § 301 (codified at 52 U.S.C. § 20703) (emphasis added).

The initial drafts of what would become Section 303 did not include the final sentence requiring "a statement of the basis and the purpose."[56]  Rep. William Cramer, a Florida Republican, proposed this language through an amendment introduced in the House Judiciary Committee.

On March 23, 1960, Rep. Cramer explained his amendment:

I think the legislative record that has been written will be extremely helpful and enlightening to those, if this bill becomes

---

[56] H.R. 4338 (Celler); 1959 House Hearings 91-92; H.R. 4457 (McCulloch); 1959 House Hearings 93-94; S. 957; 1959 Senate Hearings 13-14; S. 2722 (Morse); 1960 Senate Hearings 15; S. 2785 (Javits); 1960 Senate Hearings 17-18; H.R. 8601; 106 Cong. Rec. 6509-11 (March 24, 1960).

24

law, who will have the responsibility of carrying this bill into effect. . . .

 Mr. Chairman, . . . I want to point to language in the bill to which I had originally intended to offer an amendment – on page 5, lines 22 and 23, section 303 – dealing with the inspection of records. I have felt there is no definite limitation contained in Title III as to when the Attorney General can make such an inspection upon demand. . . . Having that in mind and being concerned, I offered in the full Committee on the Judiciary an amendment which now appears on lines 22 and 23, and I quote: "This demand (for such records) shall contain a statement of the basis and the purpose therefor."

 I offered it because I felt the registrar or custodian was entitled to be put on notice as to why such an inspection was being made and as to what law or what constitutional provision, right, or immunity might be involved. It was for that reason that I was considering offering an amendment which would add to line 23, the following "and shall state its relation" – that means the demand – "to a right, privilege, or immunity secured or protected by the Constitution or laws of the United States."

 My discussion of this matter with many Members of the House leads me to believe the present wording could be so interpreted and properly so. It was my intention in considering the amendment in the full committee that the Attorney General in making such a demand should advise the local registrar as to the intent and purpose of such a demand and as to the immunity, privilege, or the right that is intended to be involved in any investigation that might be under way and under what Federal law or constitutional provision. I trust this legislative record, particularly in view of the Attorney General's statement itself as evidence for the justification for that section in the bill, as it is contained on page 212 of the hearings at which place the Attorney General said: "The Department feels the enactment is essential to the effective enforcement of the provisions of the civil rights act of 1957."

25

I do not mean to imply that my interpretation of title III issuing powers on demand is that narrow and thus limited to the 1957 Act because it is not.   But at least it should have some relationship to the title and purpose of the bill, the title of the bill being "*to enforce constitutional rights.*"[57]

Rep. Cramer's explanation of the "basis and purpose" provision of Section 303 shows that it was intended (i) to ensure fair notice to state and local officials subject to document requests and (ii) to limit the types of demands the Attorney General could make—*i.e.*, to demands related to the Act's overall purpose of protecting individual constitutional rights, specifically, the right to vote of Black citizens.

Moreover, an amendment requiring a request under Title III to be explicitly related to the protection of individual constitutional rights would have been superfluous, according to Rep. Cramer, because House members believed the Act's text, title, and purpose already made clear that the "basis and purpose" of any document request had to relate to the 1960 CRA's overall purpose.

## CONCLUSION

Concurring in a decision that rejected an attempt to stretch a federal law further than judges deemed proper, Second Circuit Judge Guido Calabresi expressed what seems to *Amici* the proper way to interpret the words of Title III: "[T]exts must always be read in context, and context includes not only the whole

---

[57] 106 Cong. Rec. 6392 (March 23, 1960) (statement of Rep. Cramer).

26

of the statute [. . . ] but also the 'mischief' the law was enacted to address.  This is not the same as legislative history."[58]

The "mischief" that the 1960 CRA and Title III in particular sought to address was the denial of the equal right of individuals of different races to vote, which had been facilitated by the withholding of individual records of registration that would allow courts to determine, by explicitly comparing how election registrars had treated the attempts to register by persons of different races, whether there had been unlawful racial discrimination in voting.

Dated: April 20, 2026

CLARICK GUERON REISBAUM LLP

By: /s/ *Gregory A. Clarick*

Gregory A. Clarick
David Kumagai
Ashley Hall
41 Madison Avenue, 23rd Floor
New York, NY 10010
Tel:  (212) 633-4310
gclarick@cgr-law.com
dkumagai@cgr-law.com
ahall@cgr-law.com

PROTECT DEMOCRACY PROJECT

By: /s/ *Orion Danjuma*

Orion Danjuma
Jared Fletcher Davidson
82 Nassau Street, #601
New York, NY 10038

---

[58] *U.S. v. Aleynikov*, 676 F.3d 71, 82 (2d Cir. 2012).

Tel: (202) 579-4582
orion.danjuma@protectdemocracy.org
jared.davidson@protectdemocracy.org

*Attorneys for Amici Curiae*
*J. Morgan Kousser, James Peyton*
*McCrary, and Orville Vernon Burton*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,203 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: April 20, 2026          /s/ *Gregory A. Clarick*
                              Gregory A. Clarick