No. 26-1225

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

*Defendants-Appellees*,

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO

*Intervenors-Appellees*,

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION CASE NO. 1-25-cv-01148

_____

## BRIEF OF AMICUS CURIAE
## THE BIPARTISAN AMERICAN ELECTION PROJECT
## IN SUPPORT OF APPELLEES

_____

Mary R. O'Grady
Andrew G. Pappas
John S. Bullock
2929 North Central Ave., 20th Floor
Phoenix, Arizona 85012-2793
(602) 640-9000

*Attorneys for Amicus Curiae*
*Bipartisan American Election Project*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES .........................................................................3

INTEREST OF AMICUS CURIAE ..............................................................7

INTRODUCTION .........................................................................................8

BACKGROUND ...........................................................................................9

ARGUMENT ...............................................................................................13

I.     The Constitution strikes a delicate but foundational balance
       between state and federal authority, including in the elections
       context..............................................................................................13

       A.     Federalism secures Americans' fundamental liberties........13

       B.     The Elections Clause exemplifies the Constitution's
              federalist structure. ...........................................................15

II.    Applying federalism principles confirms that federal law does not
       authorize the United States' demand. ..............................................19

       A.     Title III's requirements do not encompass the electronic
              voter registration database the United States demands in this
              case. ....................................................................................20

       B.     Title III does not authorize the United States' demand for
              voter data that must be kept private under Michigan law. ...24

CONCLUSION............................................................................................27

CERTIFICATE OF COMPLIANCE.............................................................28

2

# TABLE OF AUTHORITIES

**Cases**

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015)................................................................17

*Arizona v. Inter Tribal Council of Ariz.,*
    570 U.S. 1 (2013)...........................................16, 17, 18, 22

*Atascadero State Hosp. v. Scanlon,*
    473 U.S. 234 (1985)..........................................................13, 26

*Clingman v. Beaver,*
    544 U.S. 581 (2005)................................................................16

*Foster v. Love,*
    522 U.S. 67 (1997)..................................................................16

*FTC v. Ticor Title Ins. Co.,*
    504 U.S. 621 (1992)................................................................15

*Garcia v. San Antonio Metro. Trans. Auth.,*
    469 U.S. 528 (1985) ...............................................................13

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991).....................................13, 14, 15, 26

*Kennedy v. Lynd,*
    306 F.2d 222 (5th Cir. 1962) ...............................................25

*Libertarian Party of Va. v. Alcorn,*
    826 F.3d 708 (4th Cir. 2016) ...............................................17

*Printz v. United States,*
    521 U.S. 898 (1997)........................................................14, 15

*Pub. Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024)...................................................25

*Pub. Int. Legal Found, Inc. v. N.C. State Bd. of Elections,*
    996 F.3d 257 (4th Cir. 2021) ...............................................25

*Pub. Int. Legal Found. v. Benson*,
  136 F.4th 613 (6th Cir. 2025) ........................................................19, 21, 23, 24, 27

*Sharma v. Hirsch*,
  121 F.4th 1033 (4th Cir. 2024) .............................................................16, 17, 18

*Ex Parte Siebold*,
  100 U.S. 371 (1879)..................................................................................18

*Smiley v. Holm*,
  285 U.S. 355 (1932)..................................................................................16

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) .............................................................................14, 18

*United States v. Amore*,
  No. 1:25-cv-00639, Dkt. 51 (D.R.I. Apr. 17, 2026) ..........................................13

*United States v. Benson*,
  No. 1:25-cv-01148 (W. D. Mich. Sep. 25, 2025) ...............................................10

*United States v. Davis*,
  588 U.S. 445 (2019)..................................................................................27

*United States v. Galvin*,
  No. 25-13816, 2026 WL 972129 (D. Mass Apr. 9, 2026) ...................................13

*United States v. Lopez*,
  514 U.S. 549 (1995) .......................................................................13, 15, 17, 26

*United States v. Oregon*,
  No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026).................13, 16, 17

*United States v. Weber*,
  No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ................13, 25

**Constitutional Provisions**

U.S. Const., art. I, § 4, cl. 1................................................................................15

**Statutes**

52 U.S.C. § 20701 .............................................................................19, 20, 21, 22

4

52 U.S.C. § 20703 ...............................................................................19, 20, 21

Mich. Comp. Laws § 15.243 ...................................................................25

Mich. Comp. Laws § 168.509 ................................................................24

**Websites**

AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET)..................................................................................10

Jude Joffe-Block, *The Justice Department Plans to Share Sensitive Voter Data with Homeland Security*, NPR (Mar. 27, 2026) ...............11

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Apr. 17, 2026)..................................................................10, 12

Nick Corasaniti & Richard Fausset, *Trump Wants to 'Take Over' Elections. These States Are Prime Targets*, N.Y. Times (Mar. 8, 2026................................................................................................12

Nick Corasaniti & Richard Fausset, *Fulton County in Georgia Challenges the F.B.I.'s Seizure of 2020 Ballots*, N.Y. Times (Feb. 4, 2026) ................................................................................................12

Nick Corasaniti, *Why is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026) .....................11

Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026)..................12

Ronald J. Hansen, *Trump expands 2020 election probe to include Arizona 'audit' records*, Ariz. Republic (Mar. 9, 2026) .....................12

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012)......................................22

Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Election*, 90 Fed. Reg. 14005 (Mar. 25, 2025) .................12

Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026).................12

The Federalist .................................................................................14, 17, 18, 26

## <u>INTEREST OF AMICUS CURIAE</u>[1]

Public trust in the electoral process has been dangerously weakened by a flood of litigation, regulatory battles, polarizing rhetoric, and, at least since the 2020 election, a broader movement premised on the narrative that elections are untrustworthy, despite evidence to the contrary. The line between legitimate disagreements over election laws and anti-democratic challenges to longstanding constitutional principles and norms has too often come to be lost in these conflicts.

To help courts draw that line, lawyers affiliated with both the Democratic and Republican parties have formed amicus curiae The Bipartisan American Election Project ("BAEP"). Led by Bob Bauer and Ben Ginsburg, veteran election lawyers and the former bipartisan co-chairs of the Presidential Commission on Election Administration, BAEP is committed to reinforcing principled constitutional positions, defending democratic norms, and repelling efforts to obstruct the lawful casting and tallying of votes or undermine public confidence in election outcomes. This case involves just such an effort—and it is brought in the name of the United States itself.

---

[1] All parties have consented to the filing of this amicus brief. No party's counsel authored the brief in whole or in part. Neither did any party contribute money to fund preparing or submitting the brief. No person other than these amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

This appeal presents a straightforward question with profound implications. Amid presidential aspirations to "nationalize" federal elections, the United States demands that the State of Michigan surrender its complete, unredacted electronic voter registration database, including voters' full names, dates of birth, residential addresses, and partial Social Security numbers. And not just Michigan. The federal government has made similar demands across the country, attempting to override state privacy protections and interfere with state-administered elections on a national scale. It makes this demand under Title III of the Civil Rights Act of 1960—a 66-year-old statute enacted before statewide computerized voter lists existed. The question is whether that statute authorizes the federal government's demand. It does not.

As the district court concluded, the text of Title III reaches records and papers that come into election officials' possession relating to applications, registration, and other acts requisite to voting. It does not reach a dynamic, state-created electronic database that is the product of ongoing list-maintenance activities rather than any individual voter's submission. The statute's context and purpose confirm this meaning: Title III was enacted to enable the federal government to determine whether States were unlawfully disenfranchising voters in the Jim Crow South, not to superintend or micromanage the voter-registration systems States have built to

8

administer their elections. And none of the statutes the United States invokes displaces Michigan's laws safeguarding the privacy of its voters' sensitive personal information—not Title III, not the National Voter Registration Act (NVRA), not the Help America Vote Act (HAVA).[2]

These conclusions follow not only from the statutory text but also from first principles. The Constitution divides power between the state and federal governments to secure Americans' liberty. It entrusts States with the primary responsibility for administering elections because state governments are closer to the people and more responsive to their needs. Congress's Elections Clause authority operates against this backdrop, and courts must read federal election statutes to mean what they say—not stretch them to intrude where Congress did not mean to go. Least of all may the Executive conscript those statutes into a campaign to nationalize elections and topple the state authority the Constitution established.

The United States' demand exceeds what any federal statute authorizes. This Court should affirm.

## BACKGROUND

In the spring of 2025, the United States Department of Justice launched an unprecedented nationwide campaign to compel States to surrender their complete,

---

[2] Because the Government does not challenge the district court's dismissal of its NVRA and HAVA claims, this brief does not address those claims. *See* Appellant's Br. Doc. 25 at 11 n.2.

unredacted electronic voter registration databases. In the year since, DOJ has sent demands to at least 48 States, with reported plans to extend those demands to all 50, seeking sensitive personal voter information, including full names, dates of birth, residential addresses, and partial Social Security numbers.[3] The vast majority of States have refused to comply, citing state privacy laws that protect this information from disclosure.[4]

DOJ's stated purpose in this endeavor is to assess Michigan's compliance with the list maintenance requirements of the NVRA and HAVA. *See United States v. Benson*, No. 1:25-cv-01148 (W. D. Mich. Sep. 25, 2025), Compl., R.1, Page ID ## 2, 3–4, ¶¶ 2, 7. But the federal government's actions tell a different story. The Assistant Attorney General for Civil Rights has said the Department's efforts will result in the removal of hundreds of thousands of voters from state rolls.[5] The Department

---

[3] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Apr. 17, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[4] *See* Martinez-Ochoa, O'Connor & Berry, *supra*.

[5] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (asserting that "[y]ou're going to see hundreds of thousands of people in some States being removed from the voter rolls").

apparently aims to achieve this before the 2026 midterm elections.[6] The then-Attorney General herself wrote to Minnesota's Governor suggesting that federal immigration enforcement actions in that State might be moderated if it turned over its voter data—a staggering use of federal power as leverage to obtain information that States are under no legal obligation to provide.[7] DOJ also acknowledged in a parallel case that it seeks voter registration data in part to transfer it to the Department of Homeland Security to determine whether non-citizens have registered or voted.[8] The Federal Bureau of Investigation has seized 2020 ballots in

---

[6] *See* United States' Emergency Motion to Expedite Briefing at 15–16 (arguing that the Sixth Circuit should expedite the United States' appeal in another voter roll case to "permit Michigan to properly conduct an election this fall without the specter of noncitizen and other ineligible voters remaining on its voter rolls").

[7] *See* Nick Corasaniti, *Why is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html.

[8] *See* Jude Joffe-Block, *The Justice Department Plans to Share Sensitive Voter Data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-datatrump-dojdhs.

Fulton County, Georgia,[9] and Maricopa County, Arizona.[10] Meanwhile, the President has called for Republicans to "nationalize" our elections[11] and "take over" voting procedures.[12] The President also has issued executive orders that purport to establish rules for mail-in voting, standards for the certification and decertification of voting equipment, and voter citizenship verification.[13] This suit is one of more than two dozen that DOJ has filed against States refusing to turn over their complete, unredacted voter registration data.[14] Four other federal courts have already dismissed the United States' parallel suits against Massachusetts, California, Rhode Island, and

---

[9] Nick Corasaniti & Richard Fausset, *Fulton County in Georgia Challenges the F.B.I.'s Seizure of 2020 Ballots*, N.Y. Times (Feb. 4, 2026), https://www.nytimes.com/2026/02/04/us/politics/fulton-county-fbi-raid-trump-gabbard.html

[10] Ronald J. Hansen, *Trump expands 2020 election probe to include Arizona 'audit' records*, Ariz. Republic (Mar. 9, 2026), https://www.azcentral.com/story/news/politics/elections/2026/03/09/trump-2020-election-probe-arizona/89069824007/

[11] *See* Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html

[12] Nick Corasaniti & Richard Fausset, *Trump Wants to 'Take Over' Elections. These States Are Prime Targets*, N.Y. Times (Mar. 8, 2026), https://www.nytimes.com/2026/03/08/us/politics/trump-elections-fulton-county-ballots.html.

[13] *See* Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025); Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026).

[14] *See* Martinez-Ochoa et al., *supra* n. 3.

Oregon, concluding that the federal government's demands exceed what Title III authorizes and that federal law does not preempt state privacy protections. *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *20 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129, at *6 (D. Mass Apr. 9, 2026); *United States v. Amore*, No. 1:25-cv-00639, Dkt. 51 (D.R.I. Apr. 17, 2026). The Court should affirm the district court's decision reaching the same result here.

## ARGUMENT

**I.     The Constitution strikes a delicate but foundational balance between state and federal authority, including in the elections context.**

### A.     Federalism secures Americans' fundamental liberties.

The Constitution "establishes a system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), a design that was "adopted by the Framers to ensure the protection of 'our fundamental liberties,'" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (quoting *Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528, 572 (1985) (Powell, J., dissenting)). "[I]t was the insight of the Framers that freedom was enhanced by the creation of two governments, not one." *United States v. Lopez*, 514 U.S. 549, 576 (1995) (Kennedy, J., concurring). As a result, Americans are citizens of two governments, "one state and one federal, each protected from incursion by the other"

and imbued with its "own set of mutual rights and obligations to the people who sustain it and are governed by it." *Printz v. United States*, 521 U.S. 898, 920 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)).

As James Madison explained, diffusing power between state and federal governments provides "a double security . . . to the rights of the people. The different governments will control each other; at the same time that each will be controlled by itself." The Federalist No. 51, at 270 (James Madison) (G. Carey & J. McClellan eds., 2001). Or as Alexander Hamilton put it, "[i]t may safely be received as an axiom in our political system, that the state governments will, in all possible contingencies, afford complete security against invasions of the public liberty by the national authority," with "[p]ower being almost always the rival of power." *Id.* No. 28, at 138–39 (Alexander Hamilton).

Federalism provides "numerous advantages" for the American public. *Gregory*, 501 U.S. at 458. It creates governments "more sensitive to the diverse needs of a heterogeneous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* Federalism also carves out "two distinct and discernible lines of political accountability: one between the citizens and the Federal

Government; the second between the citizens and the States." *Lopez*, 514 U.S. at 576 (Kennedy, J., concurring). This constitutional structure thus "serves to assign political responsibility, not to obscure it." *Id.* (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)).

Our federalism "is one of the Constitution's structural protections of liberty." *Printz*, 521 U.S. at 921. That is because it serves as "a check on abuses of government power." *Gregory*, 501 U.S. at 458. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id*. And "[i]n the tension between federal and state power lies the promise of liberty," *id.* at 459.

## B.    The Elections Clause exemplifies the Constitution's federalist structure.

The Constitution's Elections Clause is a feature of this federalist design. Its text provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const., art. I, § 4, cl. 1. The Elections Clause thus operates as "a default provision" that gives States the primary responsibility for administering congressional elections but authorizes Congress to supersede

15

conflicting state laws. *Foster v. Love*, 522 U.S. 67, 68 (1997). It confers no authority on the Executive to regulate the times, places, or manner of elections.

The States' default authority under the Elections Clause is broad. The Clause empowers States "to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). "[I]n short," the Elections Clause empowers States "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved," *id.*—that is, the fundamental right to vote.

The Framers deliberately located this "broad," "flexibl[e]" power in the States in the first instance. *Sharma v. Hirsch*, 121 F.4th 1033, 1037–38 (4th Cir. 2024) (Wilkinson, J.) (citing *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). "The Framers of the Constitution chose to entrust the states with administering elections because local governments are best acquainted with the situations of the people they govern." *Oregon*, 2026 WL 318402, at *1. "State governments operated closer to the ground and could devise electoral regulations responsive to the different geographic and demographic character of their populaces." *Sharma*, 121 F.4th at 1038; *see also Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 41 (2013) (Alito, J., dissenting)

16

("the States are closer to the people," so "the Framers thought that state regulation of federal elections would 'in ordinary cases . . . be both more convenient and more satisfactory'" (quoting The Federalist No. 59, at 360 (Alexander Hamilton) (C. Rossiter ed. 1961))). Furthermore, "local administration . . . allows for great individual input and accountability," *Oregon*, 2026 WL 318402, at *1 (quoting *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715–16 (4th Cir. 2016))—core federalism values, *see Lopez*, 514 U.S. at 576 (Kennedy, J., concurring).

Given these interests, when Congress legislates under the Elections Clause, its statutes must be construed in light of that authority's "historical purpose." *Sharma*, 121 F.4th at 1038. The Supreme Court repeatedly has explained that the Clause's "grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *ITCA*, 570 U.S. at 8; *accord Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). Hamilton defended this power on the grounds that "'every government ought to contain in itself the means of its own preservation,' and 'an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy.'" *ITCA*, 570 U.S. at 8 (quoting The Federalist No. 59, at 362–63 (Alexander Hamilton) (C. Rossiter ed. 1961)). Yet, critically, he also viewed the authority granted Congress by the Elections Clause as a power of

17

"last resort." The Federalist No. 59, at 305 (Alexander Hamilton) (G. Carey & J. McClellan eds. 2001).

Congress's Elections Clause authority, like that of the States, has limits. "[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *U.S. Term Limits, Inc.*, 514 U.S. at 833–34 (concluding that a state congressional term limits measure exceeded Arkansas's Elections Clause authority). And for a century and a half, the Supreme Court has confirmed that Elections Clause legislation displaces state laws only as far the statutory text goes, and only to the extent the state and federal laws actually conflict. In *Ex Parte Siebold*, for example, the Court explained that, when Congress exercises its Elections Clause authority, "the action of Congress, *so far as it extends and conflicts with the regulations of the State*, necessarily supersedes them." 100 U.S. 371, 384 (1879) (emphasis added); *see also id.* at 392 ("[S]o far as [Congress exercises its power], *and no farther*, the regulations effected supersede those of the State which are inconsistent therewith." (emphasis added)). Courts should therefore "read Elections Clause legislation simply to mean what it says." *ITCA*, 570 U.S. at 14–15. Courts and litigants should not, in other words, "strain the intent and meaning of . . . election laws." *Sharma*, 121 F.4th at 1039.

18

## II.    Applying federalism principles confirms that federal law does not authorize the United States' demand.

Granting the United States' demand for Michigan's entire state voter registration list would require the Court to stretch federal statutes far beyond their reach. The United States invokes a sweeping power to obtain these records under Title III of the Civil Rights Act of 1960, for the asserted purpose of "assessing [Michigan's] compliance with the requirements of the NVRA and HAVA." *Benson*, Compl., R.1, Page ID ## 3–4, ¶ 7. Because Congress has not authorized this federal incursion into Michigan's election administration, this Court should reject it.

At the outset, BAEP agrees with a core argument that Secretary Benson and the Intervenors have advanced: the United States' Title III claim falters at the threshold because the United States fails to state a valid "basis" or "purpose" for its sweeping demand for records, as Title III requires. 52 U.S.C. § 20703 (requiring that the Attorney General's written demand for "[a]ny record or paper required . . . to be retained and preserved" under § 20701 "contain a statement of the basis and the purpose therefor"); *see* Defendants-Appellees' Br. at 41–57; Intervenors-Appellees' Br. at 33–41. The federal government's assertion that it requires Michigan's complete voter file to assess list maintenance compliance is further undermined by this Court's recent holding that Michigan's program for removing deceased individuals is "reasonable" under the NVRA. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624-25 (6th Cir. 2025), *cert. denied*, Mar. 2, 2026. But we write to

19

emphasize two additional points: first, the electronic voter registration database the United States demands here is not one of the "records or papers" that Title III covers; and even if it were, nothing in Title III would require Michigan to produce voter information that state law protects as private.

Fundamental textualism and federalism principles lead to both conclusions. Statutes must be read to mean what they say, without straining their text to expand federal authority. And because the Constitution entrusts the States with primary responsibility for administering elections and safeguarding their citizens' sensitive personal information, that responsibility remains with Michigan absent a clear congressional command to the contrary, a command that appears nowhere in the text of Title III.

### A.    Title III's requirements do not encompass the electronic voter registration database the United States demands in this case.

Title III requires election officials to retain and preserve, for 22 months following a federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Upon a written demand that adequately states its "basis" and "purpose," "[a]ny [such] record or paper . . . [must] be made available for inspection, reproduction, and copying at the principal office of [its] custodian by the Attorney General or his representative." *Id.* § 20703. Here, the Attorney General invokes these provisions to demand that Michigan hand over

20

an unredacted "current electronic version" of its state voter registration list. *Benson*, Compl., R.1, Page ID ##10-11, 13–14, ¶¶ 35, 46–47. But by its plain terms, Title III does not authorize this demand for at least two independent reasons.

First, Title III covers "records and papers" that election officials "retain and preserve[] for a period of twenty-two months" after an election. 52 U.S.C. §§ 20701, 20703. Michigan's electronic voter registration list is not such a record. It is dynamic and in a near-constant state of flux, due to Michigan's "rigorous list maintenance practices." Defendants-Appellees' Br. at 13. A single "snapshot in time" of Michigan's list, *id.* at 40, therefore is not a record "requisite to voting in" the last federal election under § 20701; rather, it is a product of everything that has happened to the list since that election. *See* Intervenors-Appellees' Br. at 26. It thus falls outside Title III's preserve-and-retain requirement entirely.

Second, as the district court aptly explained, an electronic "voter registration list is not a 'record' that 'c[a]me into [Michigan's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.'" Opinion, R.67, Page ID # 909 (quoting 52 U.S.C. § 20701). The statute's phrase "come into his possession" most "naturally refers to a process by which someone *acquires* an item from an external source," and "Congress frequently uses [the phrase] to refer to items that a person *obtains* rather than *creates*." *Id.* at Page ID # 910 (collecting statutes). To "give effect to [this] phrase," as every court must,

21

the district court concluded the statute reaches "only those documents that state election officials *receive* from prospective voters." *Id.* at Page ID #911 (emphasis added).

The statute's subsequent words confirm this reading. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* 167 (2012) (discussing the whole-text canon, "which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts"). The statute explicitly limits its scope to documents "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. As the district court reasoned, these categories of documents "refer[] to something that the voter submits or does as part of the registration process"—that is, "records that election officials *receive*, rather than *create*." Opinion, R. 67, Page ID #911. By spelling out the types of documents to which § 20701 applies—registration documents and documents "requisite to" the act of "voting in [an] election"—Congress built a limiting principle into Title III. The district court properly interpreted Title III "simply to mean what it says," *ITCA*, 570 U.S. at 15, and rejected DOJ's atextual attempt to treat Title III as a general discovery tool.

Focusing on the statutory words "application" and "registration" leads to the same interpretation: both are documents that a state *receives*, and application and registration records are distinct from a voter registration *list*. As the district court

explained, a "voter registration list is not assembled purely from information in voter registration applications"; rather, "it includes information that election officials obtain about individual voters from other" sources. Opinion, R. 67, Page ID # 912. Indeed, as Secretary Benson stated in her response to DOJ's records request, Michigan's electronic voter registration list "is constantly updated whenever a new voter registers, a voter updates their registration information (such as an address), the State or local clerk's office obtains information of a voter's death, or a voter's registration is cancelled" by the State. *Benson*, Benson Mot. to Dismiss Ex. E, R. 39-6, Page ID # 508. Michigan's list, therefore, is not merely a collection of registration documents submitted by voters; it is an internal "live database" built on information from multiple sources. Defendants-Appellees Br. at 16.

Moreover, the district court's textual analysis drawing a "distinction between applications and a voter list" is consistent with the purpose of Title III: ensuring "a voter application can be examined to determine whether it was unlawfully *rejected*, whereas a list of those who *successfully* registered to vote would be little help in such an investigation." Opinion, R. 67, Page ID # 912. Title III was enacted "to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter registration applications" and illegally thwarting citizens' fundamental right to vote. *Id.* That "a statewide computerized voter list was not foreseeable to the Congress of 1960" only bolsters

23

the conclusion that such a list is not a record that a State like Michigan must preserve or disclose under Title III. *Id.* at Page ID # 913.

**B.    Title III does not authorize the United States' demand for voter data that must be kept private under Michigan law.**

Even if Title III reached Michigan's electronic voter registration list, it would not require the State to disclose sensitive voter information that must be kept private under state law. Federalism and Elections Clause principles require courts to read statutes to mean what they say—not to strain the text, manufacture conflicts between state and federal law, or aggrandize federal power at the States' expense. Here, nothing in the text of Title III suggests that it displaces Michigan's voter-privacy protections. Indeed, reading Title III to override state privacy law would require the Court to find that Congress silently preempted state voter-privacy protections—a result that inverts the federalism principles animating the Elections Clause. No canon of statutory interpretation permits this approach.

Michigan law safeguards the privacy of voters' data in numerous ways: it exempts from public disclosure, among others, driver's license numbers, dates of birth, phone numbers, an elector's "digitized signature," and any information showing "that an individual declined to register to vote." Mich. Comp. Laws § 168.509gg(1)–(2); *see also* Defendants-Appellees' Br. at 30–38; *Benson*, League of Women Voters Mot. to Dismiss, R. 34, Page ID ## 82–83 (collecting statutes). Michigan law also exempts from public disclosure any information that "would

constitute a clearly unwarranted invasion of an individual's privacy" and "records that would disclose the Social Security number of an individual." Mich. Comp. Laws § 15.243(1)(a), (w).

Nothing in Title III displaces these protections. The statutory text communicates no congressional intent to supersede these state-law privacy protections. Nothing in the statutory text suggests that it forbids keeping private data private. And the few cases in this area point in the opposite direction: *Kennedy v. Lynd* determined that Title III encompasses only "public records which ought ordinarily to be open to legitimate reasonable inspection," and not "confidential, private papers and effects" like the private voter data the United States seeks here. 306 F.2d 222, 231 (5th Cir. 1962); *accord Weber*, 2026 WL 118807, at *9.

Decisions interpreting the NVRA—another statute whose text is silent regarding privacy protections—confirm that Title III should not be read to preempt state privacy laws. The First Circuit, for example, recently held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" in a state voter list. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). "Nor does the NVRA prohibit the redaction of personal information that can be particularly sensitive in certain circumstances," as with individuals "subject to criminal investigation." *Id.* (citing *Pub. Int. Legal Found, Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021)). As

25

the district court correctly noted, every circuit court to consider this issue has held that the NVRA "does not require states to disclose voters' sensitive information." Opinion, R. 67, Page ID # 897 (collecting cases). Neither does Title III, which (like the NVRA) evinces no congressional intent to preempt state privacy laws.

Reading Title III not to preempt Michigan's privacy laws isn't just faithful to its text. It also advances the federalism principles that inform the Constitution's diffusion of election authority among the federal government and the States. As explained at the outset, federalism aims to "ensure the protection of 'our fundamental liberties.'" *Atascadero State Hosp.*, 473 U.S. at 242; *see* The Federalist No. 51, at 271 (James Madison) (G. Carey & J. McClellan eds., 2001) (by dividing power, "a double security arises to the rights of the people"). To that end, federalism helps to keep government responsive and accountable to the people. *See Gregory*, 501 U.S. at 459; *Lopez*, 514 U.S. at 576 (Kennedy, J., concurring). Through its laws, Michigan safeguards its citizens' privacy and thus their liberty, and it is from Michigan that its citizens must expect that protection. Absent a clear congressional command to dismantle those guardrails—and none exists—our federalist Constitution demands that they remain intact.

Finally, there is an additional and independent reason to avoid reading federal law to require disclosure of sensitive voter information: doing so would risk burdening the constitutional right to vote. Requiring voters to disclose private data

to the federal government as a condition of registration creates precisely such a burden. Regardless of voters' party preference, "the risk of having one's personal information misused will deter people from registering to vote," so reading the relevant statutes to mandate such disclosure would risk rendering them unconstitutional. *Benson*, 2026 WL 362789, at *3–4. Because courts should "interpret ambiguous statutes to avoid rendering them unconstitutional," *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019), this concern is yet another reason to reject the United States' demand. Michigan's privacy protections are not an obstacle to federal law; they safeguard the fundamental right to vote that federal election law exists to protect.

## CONCLUSION

No federal statute compels the State of Michigan to surrender millions of voters' sensitive personal information to the federal government. The United States' contrary assertion, advanced in the context of a move to "nationalize" federal elections, flouts foundational constitutional principles. This Court should affirm.

RESPECTFULLY SUBMITTED this 20th day of April, 2026.

OSBORN MALEDON, P.A.

By s/Andrew G. Pappas
    Mary R. O'Grady
    Andrew G. Pappas
    John S. Bullock
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona  85012

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains no more than 6,500 words (one-half the length of a principal brief). This document contains 4,937 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

RESPECTFULLY SUBMITTED this 20th day of April, 2026.

OSBORN MALEDON, P.A.


By s/ Andrew G. Pappas
    Mary R. O'Grady
    Andrew G. Pappas
    John S. Bullock
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona  85012