

ELIAS
LAW
GROUP

**250 Masachusetts Avenue NW, Suite 400  |  Washington, DC**

May 1, 2026

**VIA CM/ECF**

Kelly L. Stephens, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3988

**Re:    Rule 28(j) Letter Submitted in *United States v. Benson*, Case No. 26-1225**
***Case Calendared for Oral Argument May 13, 2026***

Dear Ms. Stephens:

Pursuant to Rule 28(j), Intervenor-Appellees advise the Court of a recent decision: *Public Interest Legal Foundation v. Nago*, No. 24-6629, 2026 WL 1144703 (9th Cir. Apr. 28, 2026) (**Exhibit A**). *Nago* interprets the National Voter Registration Act ("NVRA"), but its reasoning supports Intervenors' position that the Civil Rights Act of 1960 ("CRA") cannot be read to reach the information sought by DOJ. DOJ has already abandoned its NVRA claim in this case, for good reason. But under *Nago*'s reasoning, DOJ's CRA claim, too, cannot survive.

*First*, *Nago* reiterates that courts "'must give effect, if possible, to every clause and word of a statute.'" 2026 WL 1144703, at *12. DOJ's interpretation of the CRA ignores or reads out of that statute clauses and words that limit its reach and, therefore, must be rejected. *See* Intervenors' Br. at 23-24, 30-31. *Second*, *Nago* notes

May 1, 2026
Page 2

the disconnect between the NVRA's requirement that States maintain covered records for two years and the fact that statewide voter registration lists "constantly evolve," making it "unworkable and implausible" for States to preserve each iteration. 2026 WL 1144703, at *13. The court concludes that this tension makes clear "that statewide voter lists are not themselves 'records' that need to be disclosed." *Id.* Notably, this problem is even more significant in the CRA context, which expressly requires covered records to be retained and preserved for 22 months, and imposes *criminal liability* for failing to preserve or willfully altering a covered record. 52 U.S.C. §§20701, 20702; *see also* Intervenors' Br. at 18-21. *Lastly*, *Nago* concludes that the NVRA reflects Congress's judgment that "[e]ffective oversight" of a State's list-maintenance obligations "does not require disclosure of every registrant's personal information," 2026 WL 1144703, at *15, undermining DOJ's contention that excluding unredacted voter lists from the CRA would present "an obstacle to the accomplishment" of Congress's "purposes and objectives." DOJ's Br. at 47. *Contra* Intervenors' Br. at 33, 40-41.

May 1, 2026
Page 3

Respectfully submitted,

/s/ *Aria C. Branch*
Aria C. Branch
Joshua C. Abbuhl
Branden D. Lewiston
Derek A. Zeigler
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 968-4490
abranch@elias.law
jabbuhl@elias.law
blewiston@elias.law
dzeigler@elias.law

*Counsel for Intervenor-Appellees*

cc: All Counsel (via CM/ECF)

May 1, 2026
Page 4

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this letter complies with the word limit of Federal Rule

of Appellate Procedure 28(j).

/s/ *Aria C. Branch*
Aria C. Branch

# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION, INC., <br><br> *Plaintiff - Appellant*, <br><br> v. <br><br> SCOTT T. NAGO, in his official capacity as the Chief Election Officer for the State of Hawaii, <br><br> *Defendant - Appellee*. | No. 24-6629 <br><br> D.C. No. 1:23-cv-00389-LEK-WRP <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Hawaii
Leslie E. Kobayashi, District Judge, Presiding

Argued and Submitted October 6, 2025
Honolulu, Hawaii

Filed April 28, 2026

Before: M. Margaret McKeown, Michelle T. Friedland, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### National Voter Registration Act

The panel affirmed on different grounds the district court's dismissal of an action brought by Public Interest Legal Foundation, Inc. ("PILF"), a non-profit organization focused on election integrity, alleging that Hawaii's State Elections Office's refusal to provide statewide voter registration data violated the public inspection provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1).

Section 20507(i)(1) of the NVRA requires each state to, upon request, disclose records relating to the implementation of certain voter list maintenance activities.

In response to PILF's request for a statewide list of registered voters, Hawaii's State Elections Office declined to provide a list and recommended that PILF request separate county-level lists from each of Hawaii's four County Clerks.  PILF then filed suit in district court seeking injunctive and declaratory relief requiring Hawaii to provide a statewide voter list. The district court dismissed PILF's suit for lack of Article III jurisdiction.

The panel held that PILF had standing because the bare denial of a request for information under the NVRA causes an injury in fact sufficient to support Article III standing. PILF was not required to show that the denial of information interfered with its core business activities.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel next held that PILF's claim became constitutionally ripe when Hawaii's State Elections Office made it clear that it would not provide the information PILF requested. PILF's claim was prudentially ripe because it was fit for judicial review and there was no judicial interest in delaying review of PILF's challenge.

Turning to the merits of PILF's claim, the panel held that the NVRA does not give PILF a right to the information it seeks from the State because a statewide voter list is not a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" within the meaning of § 20507(i)(1) of the NVRA. Covered "records" are those about the implementation of efforts to ensure the accuracy of voter lists, not voter lists themselves.

Because the panel concluded that there was jurisdiction but that PILF's claim failed on the merits, the panel remanded to the district court with instructions to dismiss PILF's claim with prejudice.

---

## COUNSEL

Joseph M. Nixon (argued), Maureen Riordan, and Noel H. Johnson, Public Interest Legal Foundation Inc., Alexandria, Virginia; William A. Harrison, Harrison Law Center A Law Corporation, Honolulu, Hawaii; for Plaintiff-Appellant.

Aaron Schulaner (argued), General Counsel, Office of Elections, Pearl City, Hawaii; Jennifer H. Crum, Reese R. Nakamura, and Randall Nishiyama, Deputy Attorneys General; Anne E. Lopez, Hawaiʻi Attorney General; Office

of the Hawaii Attorney General, Honolulu, Hawaii; for Defendant-Appellee.

## OPINION

FRIEDLAND, Circuit Judge:

Public Interest Legal Foundation, Inc. ("PILF"), a non-profit organization focused on election integrity, asked Hawaii for a statewide list of registered voters, citing the public inspection provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1). Hawaii's State Elections Office declined to provide a list and recommended that PILF request separate county-level lists from each of Hawaii's four County Clerks. PILF filed suit in the United States District Court for the District of Hawaii seeking injunctive and declaratory relief requiring Hawaii to provide a statewide voter list. The district court dismissed the suit for lack of Article III jurisdiction.

We hold that PILF has standing and that PILF's claim is ripe, so there is jurisdiction under Article III. But we affirm dismissal because PILF's claim fails on the merits.

## I.

## A.

Congress enacted the NVRA in 1993.[1] Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501-

---

[1] Because the NVRA requires each state to allow individuals to register to vote when applying for or renewing a driver's license, the statute is often called the "Motor Voter" bill. Helen Dewar, *Senate Approves*

20511).    The NVRA imposes on states programmatic requirements that balance maintaining the integrity of voter rolls with protecting the fundamental right to vote.    52 U.S.C. § 20507; *compare id.* § 20501(b)(1) (expressing in the NVRA's Preamble a purpose to "increase the number of eligible citizens who register to vote in elections for Federal office"), *with id.* § 20501(b)(4) (expressing in the NVRA's Preamble a purpose to "ensure that accurate and current voter registration rolls are maintained").    For example, it requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" a death or change in residence of the registrant.    *Id.* § 20507(a)(4). But it prevents a state from removing names from voter rolls "on the ground that the registrant has changed residence," unless certain confirmation procedures are followed.    *Id.* § 20507(d)(1).    The NVRA also specifies, more generally, that any state "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll" shall be "uniform [and] nondiscriminatory."  *Id.* § 20507(b), (b)(1).

The NVRA further requires each state to, upon request, disclose records relating to the implementation of certain voter list maintenance activities.    *Id.*  § 20507(i)(1). Specifically, the NVRA's public disclosure provision states:

> (1) Each  State  shall  maintain  for  at least 2 years and shall make available for public  inspection  and,  where  available, photocopying at a reasonable cost, all records

---

*'Motor Voter' Bill: GOP Forces Deletion of Key Provision*, Wash. Post, Mar. 18, 1993, at A1.

> concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices [of removal from voting rolls] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Id.* § 20507(i).

The public disclosure provision serves a transparency function, ensuring that the public may verify that list-maintenance activities are implemented lawfully and not in a manner that causes "poor and illiterate voters [to be] caught in a purge system which will require them to needlessly re-register." S. Rep. No. 103-6, at 18 (1993); *see also id.* at 32 ("The [Senate Committee on Rules and Administration] is mindful of the need to keep accurate and current voter rolls. The Committee is concerned that . . . programs [to ensure their accuracy] can be abused and may result in the elimination of names of voters from the rolls solely due to their failure to respond to a mailing. Abuses may be found

in the design of a program as well as in its implementation.").

Although the Department of Justice may enforce the NVRA, 52 U.S.C. § 20510(a), the statute also creates a private right of action allowing any person "aggrieved by a violation" of the NVRA to seek declaratory or injunctive relief, *id.* § 20510(b).

The Help America Vote Act, enacted in 2002, also regulates states' maintenance of voter registration records. Pub. L. No. 107-252, 116 Stat. 1666 (codified as amended at 52 U.S.C. §§ 20901-21145). That law specifies that each state "shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). The voter registration list "shall serve as the single system for storing and managing the official list of registered voters throughout the State," and it must contain "the name and registration information of every legally registered voter." *Id.* § 21083(a)(1)(A), (A)(i).

## B.

Hawaii law divides responsibility for election administration between the State Elections Office and the County Clerks. The State Elections Office, which is led by Chief Election Officer Scott T. Nago, promulgates voter registration regulations. *See* Haw. Rev. Stat. §§ 11-1.5, 11-4; Haw. Code R. § 3-177-50.[2] But Hawaii's four County

---

[2] Throughout this opinion, we reference the current versions of Hawaii statutes and regulations. The statutes and regulations relevant here have been substantively the same since this dispute began.

Clerks are responsible for carrying out voter registration.[3] Haw. Rev. Stat. § 11-11. The Clerks maintain each county's general register—a list that includes the identity and address of each registered voter. *Id.* § 11-14(a). They update the general register regularly by processing new voter registration requests and determining who is eligible to vote. *Id.* § 11-11; Haw. Code R. § 3-177-155. In addition, the Clerks are tasked with conducting a general program to remove ineligible voters, as required by the NVRA. Haw. Code R. § 3-177-157.

Under Hawaii law, the County Clerks also handle public requests for voter lists. Basic voter information—a registered voter's name, district or precinct, and whether a voter is active or inactive—is publicly available for any reason. Haw. Rev. Stat. § 11-97(a). But personal details like driver's license numbers, birth dates, addresses, and social security numbers are not available, except for official "election or government" purposes. *Id.*; Haw. Code R. § 3-177-160(c).

Although Nago generally supervises state elections, his office does not directly oversee the County Clerks. *See* Haw. Rev. Stat. § 11-2(a) ("The chief election officer shall supervise all state elections."). Instead, the County Clerks are appointed by and removable only by their respective elected county councils. *See, e.g.*, Charter of the County of Hawaii art. III, § 3-6(b) ("The council shall appoint the

---

[3] Hawaii functionally has four counties (the City and County of Honolulu, the County of Maui, the County of Hawaiʻi, and the County of Kauaʻi). Hawaii law recognizes a fifth quasi-county, Kalawao, which consists of a small portion of the island of Molokai. *See* Haw. Rev. Stat. § 326-34. But for purposes of election administration, "the county of Kalawao shall be deemed to be included in the county of Maui." Haw. Rev. Stat. § 11-1.

county clerk . . . .   The council, by a two-thirds vote of its membership, may remove the county clerk from office at any time."); Charter of the County of Maui art. V, § 5-2 ("The county clerk is appointed by the council . . . .   The council may remove the county clerk from office at any time for misfeasance, malfeasance, or nonfeasance.").

### C.

Plaintiff-Appellant PILF is a non-profit organization that "seeks to promote the integrity of elections nationwide through research, education, remedial programs, and litigation." [4]   PILF's advocacy focuses on ensuring that election officials act lawfully.

In 2023, PILF requested from the Hawaii Office of Elections an opportunity to inspect or receive a copy of the State's full list of registered voters.   The office did not provide a list, instead responding: "For a list of registered voters, please contact the County Elections Divisions.   Any further related questions may be directed to the County Elections Divisions."   After PILF requested clarification as to whether the Office of Elections maintains a master file combining all county voter lists, the Office of Elections repeated the same instruction that PILF should contact the County Elections Divisions.

### D.

PILF filed suit in the United States District Court for the District of Hawaii against Nago in his official capacity as Hawaii's Chief Election Officer.   As relevant here, PILF

---

[4] Because this is an appeal from a motion to dismiss, we draw the facts from the allegations in the Complaint and construe the allegations in favor of PILF.   *Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 416-17 (9th Cir. 2020).

alleged that Nago's office's refusal to provide statewide voter registration data violated the NVRA's public disclosure requirement.  PILF requested declaratory and injunctive relief requiring Nago's office to disclose a statewide voter list.

Nago moved to dismiss.  He argued that PILF lacked Article III standing or that its claim failed for lack of ripeness because it had not properly requested the records from the County Clerks so had not suffered any final denial.  He further argued that the Complaint failed to state a claim because his office's responses complied with federal law.

The district court granted the motion to dismiss for lack of jurisdiction, holding that PILF's NVRA claim was unripe. The court reasoned that PILF could still request the records from the counties, and, if denied, then bring a ripe challenge to that denial.  The district court gave PILF four months to amend its Complaint, if its claims became ripe.  Believing that the NVRA mandated disclosure from the State itself, PILF declined to amend, so the district court proceeded to enter final judgment.  PILF timely appealed.

## II.

We evaluate issues of Article III jurisdiction de novo. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 673 (9th Cir. 2025) ("Standing is jurisdictional; we consider it de novo and sua sponte.").  We also review questions of statutory interpretation de novo. *Saloojas, Inc. v. Aetna Health of Cal., Inc.*, 80 F.4th 1011, 1014 (9th Cir. 2023).  We "can affirm . . . dismissal on any ground supported by the record, even if the district court did not rely on the ground." *Arakaki v. Lingle*, 477 F.3d 1048, 1057 n.1 (9th Cir. 2007).

### III.

"Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy.'" *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)).  The issues presented must be "definite and concrete, not hypothetical or abstract." *Ry. Mail Ass'n*, 326 U.S. at 93.  The parties and the district court focused their jurisdictional analysis on whether PILF's claims were ripe for adjudication.  But we must also decide whether PILF has standing.  We conclude that PILF has standing because the bare denial of a request for information under the NVRA causes an injury in fact sufficient to support Article III standing.  Further, PILF is not required to show injury to a core business activity just because it is an organizational plaintiff—interference with an organization's core business activity is a cognizable injury in fact, but it is not the *only* type of injury an organization can suffer.[5]  We also conclude that PILF's claim is ripe.

### A.

To establish Article III standing, a litigant must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). We focus only on the first prong, because if PILF suffered

---

[5] We ordered supplemental briefing from the parties on whether PILF suffered a cognizable injury in fact and whether it had organizational standing.

an injury in fact, it is clear that Nago's office caused the injury and that a favorable ruling would provide redress.

### 1.

The Supreme Court has long recognized that if a statute creates a broad public right to obtain information about the government, the denial of a request for information made pursuant to that statute causes an injury in fact.

In *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989), advocacy organizations requested access to the records of an American Bar Association ("ABA") Committee related to its evaluations of potential judicial nominees that the Committee had provided to the President. *Id.* at 443-47. After the ABA Committee denied the request, the organizations brought suit under the Federal Advisory Committee Act ("FACA"), seeking a declaration that the ABA committee was an "advisory committee"—a group used to give advice to the President, agencies, or officers of the United States that is subject to FACA's disclosure requirements. *Id.* at 446-47; 5 U.S.C. § 1001(2) (defining "advisory committee"). FACA requires that "records, reports, transcripts, minutes, . . . or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying." 5 U.S.C. § 1009(b). Under FACA, the plaintiffs argued, the ABA Committee had an obligation to "make its minutes, records, and reports available for public inspection and copying." *Pub. Citizen*, 491 U.S. at 447.

The Supreme Court held that the plaintiff organizations had standing to challenge the denial of access to the records, writing that the "refusal to permit [them] to scrutinize the ABA Committee's activities to the extent FACA allows

constitutes a sufficiently distinct injury to provide standing to sue." *Id.* at 449. That the plaintiff organizations had "sought and were denied specific agency records" was enough to satisfy Article III's injury in fact requirement. *Id.*

*Federal Election Commission v. Akins*, 524 U.S. 11 (1998), reaffirmed that principle. *Id.* at 21. There, plaintiff voters had invoked the Federal Election Campaign Act of 1971 to request information about, among other things, the lobbying of federal elected officials by the American Israel Public Affairs Committee ("AIPAC"). *Id.* at 16. The Federal Election Commission determined that AIPAC was not subject to the statute's disclosure requirements. *Id.* at 13. The plaintiffs challenged that determination, and the Supreme Court ultimately held that they had standing because they had been denied the requested information. The Supreme Court explained that the "'injury in fact' that [the plaintiffs] have suffered consists of their inability to obtain information . . . that, on [the plaintiffs'] view of the law, the statute requires that AIPAC make public." *Id.* at 21; *see also id.* ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." (quoting *Pub. Citizen*, 491 U.S. at 449)).

Such "[i]nformational injuries remain firmly embedded in both Supreme Court and circuit cases." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019). For example, our court has cited *Public Citizen* for the proposition that the "inability to obtain information subject to disclosure laws is sufficient" to establish an injury in fact. *Inland Empire Waterkeeper v. Corona Clay Co.*, 17

F.4th 825, 833 (9th Cir. 2021) (citing *Public Citizen*, 491 U.S. at 449).[6]

Nago asserts that under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), PILF must do more than allege the denial of information to satisfy Article III's injury in fact requirement.    But his reliance is misplaced, because *TransUnion* does not govern here.  In *TransUnion*, a class of plaintiffs sued a credit reporting company after receiving notifications under the Fair Credit Reporting Act in two letters instead of all at once as that statute required.  *Id.* at 420-21.  In response to arguments that those "formatting defects" amounted to an informational injury sufficient for Article III standing under *Akins* and *Public Citizen*, the Supreme Court held that the plaintiffs had not suffered an injury in fact.  *Id.* at 418; *see also id.* at 441-42.

In doing so, the Supreme Court expressly explained why the plaintiffs in *TransUnion* had not demonstrated standing under the doctrine established by *Akins* and *Public Citizen*. First, unlike the plaintiffs in *Akins* and *Public Citizen*, the plaintiffs in *TransUnion* "did not allege that they failed to

---

[6] Our decision in *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), does not deviate from that understanding of informational injury. In *Rey*, the plaintiffs had sued to compel the U.S. Forest Service to follow a set of notice and comment (and appeal) procedures.  *Id.* at 1253.  They alleged that they were deprived of notice of certain proposed actions by the U.S. Forest Service due to its failure to follow those procedures.  *Id.* at 1257-58.  Although we recognized that "notice, of course, is a form of information," *id.* at 1259, we understood the plaintiffs' injury as merely procedural in nature and held that the plaintiffs had not suffered a cognizable informational injury, *id.* at 1259-60, as required by a then-recent Supreme Court decision interpreting the same statute.  *Id.* at 1260 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009)). Importantly, we distinguished that procedural injury from the substantive informational injuries at issue in *Public Citizen* and *Akins*.  *Id.* at 1258.

receive any required information." *Id.* at 441.  The Court emphasized that the plaintiffs had received the information, just not in the format the statute required.  *Id.*; *see also Laufer v. Naranda Hotels*, 60 F.4th 156, 170 (4th Cir. 2023) (explaining that "the informational injuries in *Public Citizen* and *Akins* (the 'fail[ure] to receive *any* required information')" are distinguishable "from the purported informational injury [in *TransUnion*] (receipt of the required information '*in the wrong format*')" (quoting *TransUnion*, 594 U.S. at 441)).[7]

Second, *TransUnion* did not involve a sunshine law—a statute that entitles all members of the public to information about government activities, like the Freedom of Information Act ("FOIA") and the public disclosure statutes at issue in *Akins* and *Public Citizen*.  *TransUnion*, 594 U.S. at 441 (distinguishing *Akins* and *Public Citizen* by explaining that "[t]his case does not involve such a public-disclosure law").  Rather, *TransUnion* involved a right of action against private entities under the Fair Credit Reporting Act.  That statute mandates certain disclosures by credit reporting companies about private consumer information, not about the government, and it gives a right

---

[7] PILF alleges an outright denial by Nago's office of its request for information.  As a result, the standing analysis here is controlled by *Akins* and *Public Citizen*, not by *Animal Legal Defense Fund v. Department of Agriculture*, 935 F.3d 858 (9th Cir. 2019).  In *Animal Legal Defense Fund*, there was no indication that the plaintiffs were not receiving the requested information; they just did not receive the information precisely *how* or *when* they wanted it.  *Id.* at 867.  That Nago's office suggested that PILF file its request with the counties does not change that conclusion, because the County Clerks are not under Nago's control.  *Cf.* Haw. Rev. Stat. § 11-14.5(c) (describing that County Clerks have the final decision-making power over making certain voter records confidential).

16　PUBLIC INTEREST LEGAL FOUNDATION V. NAGO

to that information only to the relevant consumers, not to the general public. *TransUnion*, 594 U.S. at 418-19; 15 U.S.C. § 1681g(a) (outlining the private consumer information that credit reporting companies must "disclose *to the consumer*" (emphasis added)).

Nago points to subsequent language in *TransUnion* to argue that PILF lacks standing here. After the Supreme Court explained in *TransUnion* that *Akins* and *Public Citizen* did not control the standing analysis there, it went on to write:

> Moreover, the plaintiffs have identified no downstream consequences from failing to receive the required information. They did not demonstrate, for example, that the alleged information deficit hindered their ability to correct erroneous information before it was later sent to third parties. An asserted informational injury that causes no adverse effects cannot satisfy Article III.

*TransUnion*, 594 U.S. at 442 (citation modified). In the view of Nago and some of our sister circuits, that "moreover" passage shows that *TransUnion* established an "adverse effects" or "downstream consequences" requirement for all informational injuries. *See, e.g.*, *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935-37 (5th Cir. 2022); *id.* at 938 ("[E]ven in public disclosure-based cases, plaintiffs must and can assert 'downstream consequences,' which is another way of identifying concrete harm from governmental failures to disclose."); *Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 570-71 (6th Cir. 2023) (opining that "in *TransUnion*, the Supreme Court adopted [the] principle"

that "a plaintiff claiming an informational injury must have suffered adverse effects," a requirement that "applies across all cases").

We are not persuaded, however, because the "moreover" passage in *TransUnion* discussed why the plaintiffs did not have standing under an alternate theory, apart from the informational injury doctrine established by *Akins* and *Public Citizen*. Although the plaintiffs in *TransUnion* had obtained all of the information required by the statute, they still would have had standing if the "formatting violations" had caused real "adverse effects." *TransUnion*, 594 U.S. at 440-41. The Supreme Court emphasized that there were no such adverse effects, explaining that the plaintiffs had presented "no evidence" that they "so much as *opened* the dual mailings, nor that they were confused, distressed, or relied on the information in any way." *Id.* at 440 (citation modified). The plaintiffs also failed to show that they "would have tried to correct their credit files—and thereby prevented dissemination of a misleading report—had they been sent the information in the proper format." *Id.* The Supreme Court accordingly concluded that, "[w]ithout any evidence of harm caused by the format of the mailings, these [we]re 'bare procedural violation[s],'" insufficient for Article III standing. *Id.* (third alteration in original) (quoting *Spokeo*, 578 U.S. at 341). And, again, the "moreover" passage came only *after* the Court had concluded that *Akins* and *Public Citizen* did not control. We agree with the Fourth Circuit that this conveyed that the adverse effects requirement "does not extend to the type of informational injury presented in *Public Citizen* and *Akins*." *Naranda Hotels*, 60 F.4th at 170.

Adverse effects are needed to turn many forms of legal injury into an injury in fact sufficient for Article III standing.

But total denial of information under a sunshine statute, as in *Akins* and *Public Citizen*, is itself already a concrete injury in fact.  Neither *Akins* nor *Public Citizen* required a showing of adverse effects.  Although the Supreme Court in *Public Citizen* mentioned that the plaintiffs had identified intended uses for the requested information, it emphasized that its "decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records.  There is no reason for a different rule here."  491 U.S. at 449 (citations omitted); *see also Hajro v. U.S. Citizenship & Immigr. Srvs.*, 811 F.3d 1086, 1105 (9th Cir. 2016) ("To be injured under FOIA, [a plaintiff] does not need to have a personal connection to the information he is requesting.").  Likewise, in *Akins*, the Court mentioned the plaintiff's intended uses for the information but articulated a broad rule that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."  524 U.S. at 21; *see also Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 835 (7th Cir. 2019) (Barrett, J.) (citing *Akins* and *Public Citizen* to explain that "an informational injury occurs when the defendant refuses to provide the plaintiff with information that a law— typically, a sunshine law—entitles him to obtain and review for some substantive purpose" and that "[i]n such cases, a plaintiff need not allege any *additional* harm beyond his failure to receive information" (citation modified)).

The Supreme Court's indication that adverse effects are required for standing premised on "formatting defects" in the conveyance of information does not disrupt its prior holding that no such showing is required for standing based on the denial of requests for information under public disclosure

statutes. For us to conclude otherwise would be to treat *TransUnion* as having abrogated *Akins* and *Public Citizen* sub silentio, which we are not permitted to do. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Grae*, 57 F.4th at 574 (Gibbons, J., dissenting) ("Rather than assume that the Supreme Court silently overruled *Public Citizen* . . . , I would adopt the reading of *TransUnion* that avoids conflict with the Supreme Court's longstanding precedent: *Public Citizen* and *Akins* govern when plaintiffs seek information pursuant to a public right of access, while *TransUnion* governs certain other theories of informational injury.").

Indeed, the Supreme Court has elsewhere emphasized that *Akins* and *Public Citizen* remain good law. In *Spokeo*, the Court stated that *Akins* and *Public Citizen* reflected that the denial of a request for information under a public disclosure statute was "sufficient . . . to constitute injury in fact" and that "a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." 578 U.S. at 342. Even more recently, in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Supreme Court again acknowledged that *Akins* continues to govern the standing analysis when a plaintiff alleges informational injury under a "federal law [that] requires [an agency] to disseminate . . . information upon request by members of the public." *Id.* at 396.

Because *Akins* and *Public Citizen* remain binding, a denial of access to information that a plaintiff alleges must

be disclosed pursuant to a public disclosure or sunshine provision causes a concrete injury sufficient for standing. No additional adverse effects need be shown.

**2.**

Section 20507(i)(1) of the NVRA is such a sunshine provision. The NVRA creates a broad public right to information about government activities, similar in many ways to the archetypal public disclosure statute, FOIA, as well as to the disclosure provisions in the statutes at issue in *Akins* and *Public Citizen*. The NVRA requires states to "make available for public inspection" all records concerning the implementation of certain voter list maintenance programs. 52 U.S.C. § 20507(i)(1). That text parallels FOIA's requirement that, subject to certain exceptions, agencies "shall make [records] available for public inspection" or, upon request, "make the [requested] records promptly available to any person." 5 U.S.C. § 552(a)(2)-(3). It is also similar to the wording of the Federal Election Campaign Act at issue in *Akins*, and of the Federal Advisory Committee Act at issue in *Public Citizen*. *See* Federal Election Campaign Act, 52 U.S.C. § 30104 (a)(11)(B) ("The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public."); FACA, 5 U.S.C. § 1009(b) ("[T]he records . . . which were made available to or prepared for or by each advisory committee shall be available for public inspection."). These statutes all share common characteristics—they make disclosure mandatory through the use of imperatives such as the word "shall"; they describe specific kinds of information that must be disclosed (records, statements, reports, and the like); they confer the right of access to the general public at large; and they provide

information about the workings of the government.   The NVRA shares each of those traits and is thus a "public-disclosure or sunshine law[] that entitle[s] all members of the public to certain information." *TransUnion*, 594 U.S. at 441.

The   Third   Circuit   recently   concluded   otherwise, reasoning that public disclosure is not the "essence" of the NVRA, so a denial of a request for information under the NVRA is not the type of sunshine statute denial that supports standing under *Akins* or *Public Citizen*. *See Pub. Int. Legal Found. v. Sec'y of the Commonwealth of Pa.*, 136 F.4th 456, 464 (3d Cir. 2025), *cert. denied*, – U.S. –, 2026 WL 568366 (Mar. 2, 2026).   Specifically, the Third Circuit held that "it is insufficient for Article III standing purposes for a plaintiff asserting an informational injury from a violation of a statute that contains *a public disclosure aspect as part of [a larger] overall scheme* to allege only that he has been denied information." *Id.* at 465 (emphasis added).   We respectfully disagree.   Regardless of whether a disclosure provision appears within a larger statutory scheme or as a stand-alone law, the provision reflects that Congress chose to create a right to information.   Indeed, *Akins* and *Public Citizen* both involved statutes with provisions and purposes that went beyond pure disclosure of information.   *See, e.g.*, FACA, 5 U.S.C. § 1002(a)-(b) (describing an overarching purpose of increasing   the   standardization   and   efficacy   of   advisory committees); Federal Election Campaign Act, 52 U.S.C. § 30116 (establishing substantive limitations on campaign contributions   and   expenditures,   unrelated   to   public disclosure of campaign finances).

**B.**

PILF argues that Hawaii's denial of access to the requested information is an informational injury under *Akins*

and *Public Citizen*, and therefore that PILF need not allege any additional harm or diversion of organizational resources to establish Article III standing. Nago counters that something more is required because PILF is an organization rather than an individual. Specifically, Nago argues that under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), an organization must also allege harm to its "core business activities," and that PILF has failed to do so. *All. for Hippocratic Med.*, 602 U.S. at 395. We disagree that PILF is required to make such an additional showing here.

*Havens* addressed one path for an organization to establish standing based on interference with one of its core business activities, but it did not foreclose other paths for organizations to establish standing. In *Havens*, the plaintiff, a housing advocacy and direct services organization, alleged that it had been impeded by the "defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and that the organization "had to devote significant resources to identify and counteract the . . . racially discriminatory steering practices." *Id.* at 379. In concluding that the organization had standing, the Supreme Court held that the "demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" was sufficient to satisfy Article III. *Id.*

Here, by contrast, PILF does not seek to establish standing based on interference with a core business activity. Rather, PILF seeks to vindicate its own right to receive information under a sunshine provision in the NVRA. Organizations may "seek judicial relief from injury to [themselves] and to vindicate whatever rights and immunities [they] may enjoy." *Warth v. Seldin*, 422 U.S.

490, 511 (1975).   Just as organizations may directly vindicate their own First Amendment rights, *see ACLU of Nev. v. Heller*, 378 F.3d 979, 984-85 (9th Cir. 2004), so too may they directly invoke their statutory rights to information, *see Friends of Animals v. Jewell*, 828 F.3d 989, 991-92 (D.C. Cir. 2016) (discussing informational injury under *Akins* and *Public Citizen* as the type of injury an organization could use to establish standing to sue in its own right).

The Supreme Court's reasoning in *FDA v. Alliance for Hippocratic Medicine* makes clear that *Havens* and *Akins* establish different paths for organizations to demonstrate standing.   602 U.S. at 393-96.   In *Alliance for Hippocratic Medicine*, several medical associations challenged the Food and Drug Administration's policies related to mifepristone, an abortion drug.   *Id.* at 372-73.   The medical associations argued that they "themselves ha[d] organizational standing" under *Havens* because the challenged FDA policies had "forced the associations to expend considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* at 393-94 (citation modified).   The Supreme Court rejected that argument, holding that *Havens* did not allow a plaintiff organization to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action" but instead required a showing that the defendant's actions "directly affected and interfered" with the organization's "core business activities."   *Id.* at 394-95.   After doing so, the Court separately analyzed the possibility of standing under *Akins*. The Court distinguished injuries based on interference with core business activities from "informational injur[ies]."   *Id*. at 395.   To explain why the medical association plaintiffs

had not established standing under *Akins*, the Court suggested that the government did not possess any of the information that the plaintiffs sought and stated that "in any event the associations ha[d] not suggested that federal law requires FDA to disseminate such information upon request by members of the public." *Id.* at 395-96; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 1003 (9th Cir. 2025) (Nelson, J., dissenting) ("*Hippocratic Medicine* also leaves open the possibility that an organization could establish standing without relying on *Havens*. . . . [T]he Court suggested that the medical associations may have had standing if they adequately alleged an informational injury *apart from* Havens' *'core business activities' test*." (emphasis added)).

Because an organization that has established standing under *Akins* is not required to also establish standing under *Havens*, and because PILF has demonstrated standing under *Akins*, *see supra* Section III.A, PILF is not required to show that the denial of information interfered with its core business activities.

## C.

We turn now to evaluating the ripeness of PILF's challenge to Hawaii's denial of its request for a voter list. "The ripeness doctrine precludes federal courts from exercising their jurisdiction over an action that is filed before a real dispute exists between the parties." *Haw. Newspaper Agency v. Bronster*, 103 F.3d 742, 746 (9th Cir. 1996). Ripeness has constitutional and prudential components. We conclude that both components are satisfied here.

**1.**

Constitutional ripeness requires that a case "present issues that are definite and concrete, not hypothetical or abstract." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017)).

PILF's alleged informational injury occurred when Nago's office made the final determination that it would not provide the requested information. Nago's office clearly communicated to PILF the State's position that it had no obligation to provide a voter list, leaving PILF with no way to obtain the information from the State.

The fact that Nago's office advised PILF to make a request of the counties instead does not make PILF's injury speculative, because PILF was still left without the information it claims the State itself is statutorily required to provide. As the parties agree, the State and the counties function as separate entities for the purpose of requests for voter information. State regulations instruct that the County Clerks—not the State Elections Office—are ultimately responsible for handling such requests. *See* Haw. Code R. § 3-177-160(c); Haw. Rev. Stat. § 11-14(b). And Nago's office never ordered the counties to produce any information, nor would the counties have had the obligation to obey such an order. The County Clerks are not accountable to Nago's office, given that they are removable only by their elected county councils. Indeed, at oral argument, Nago represented that his office had no control over the counties' decisions regarding the production of voter lists.

The alleged invasion of a legally protected interest occurred, and the alleged informational injury therefore became "definite and concrete, not hypothetical or abstract," when Nago's office made it clear that it would not provide the requested information. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). Nothing more is required for PILF's claim to be constitutionally ripe. *Id.* (holding that an injury is ripe when it is no longer "imaginary" or "speculative" (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

## 2.

Prudential ripeness is a two-part inquiry that considers "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Pizzuto v. Tewalt*, 997 F.3d 893, 899 (9th Cir. 2021) (quoting *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007)).[8]

As to the first prong, fitness for judicial review, "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Skyline*, 968 F.3d at 752 (alteration in original) (quoting *Stormans, Inc. v. Selecky*,

---

[8] Although the Supreme Court has stated that prudential ripeness is in "some tension" with federal courts' obligation to exercise jurisdiction where that jurisdiction exists, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)), the Supreme Court has not overruled the prudential ripeness doctrine, and our court has continued to apply that doctrine, *see, e.g.*, *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 751-52 & n.9 (9th Cir. 2020).

586 F.3d 1109, 1126 (9th Cir. 2009)). PILF's challenge to the State's denial is primarily legal and can be decided by interpreting federal law. Further factual development about whether PILF could successfully request voter data from the County Clerks would not help resolve PILF's claim that Nago's office must itself grant PILF's request. And the State's denial was definitive and final.

The second prong, hardship to the parties, "serves as a counterbalance to any interest the judiciary has in delaying consideration of a case." *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012). Because there is no judicial interest in delaying review of PILF's challenge, the hardship analysis is "not relevant" here. *Id.* at 839.

Accordingly, PILF's claim is prudentially ripe.

## IV.

Having assured ourselves that we have jurisdiction, we now turn to the merits of PILF's claim.[9]

PILF's request invoked the section of the NVRA that states:

---

[9] We generally refrain from deciding issues that the district court did not resolve. *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020). But we may exercise our discretion to reach an issue in the first instance, *id.*, where, as here, the issue "is purely one of statutory interpretation that would not 'benefit from further factual development of the issues presented,'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1241 (9th Cir. 2001).

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1). The specific question here is whether a statewide voter list is a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" within the meaning of the NVRA. *Id.* We hold based on the text and statutory structure of the NVRA that the answer is no, because covered "records" are those about efforts to ensure the accuracy of voter lists, not voter lists themselves. Therefore, the NVRA does not give PILF a right to the information it seeks from the State.[10]

---

[10] Our conclusion that PILF has standing is not undermined by our conclusion that the information PILF seeks is not covered by the NVRA's public disclosure provision, because "standing in no way depends on the merits of the plaintiff's [claim]." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Indeed, in *Public Citizen*, the Supreme Court determined that the plaintiffs had standing to assert an informational injury under FACA, but it ultimately held on the merits that FACA did not give the plaintiffs a right to the requested records. *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 467 (1989); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25-29 (1998) (holding that plaintiffs had standing to assert an informational injury under the Federal Election

### 1.

"[T]he starting point for interpreting a statute is the language of the statute itself." *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)). "[W]e should usually give words their plain, natural, ordinary and commonly understood meanings." *United States v. Romo-Romo*, 246 F.3d 1272, 1275 (9th Cir. 2001). Additionally, we are guided by the "superfluity canon," which instructs that "Congress did not intend to make any portion of a statute superfluous, and [that] therefore 'we must give effect to every word of a statute wherever possible.'" *In re Pangang Grp. Co.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004)).

In PILF's view, section 20507(i)(1) requires disclosure of "records concerning . . . official lists of eligible voters," which includes voter lists. But PILF's interpretation disregards the limiting phrase that comes between "concerning" and "official lists": section 20507(i)(1) requires disclosure only of records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists." 52 U.S.C. § 20507(i)(1). That intervening phrase narrows the scope of materials subject to public disclosure.

We "must give effect, if possible, to every clause and word of a statute," *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (citation modified), so we need to consider whether the statewide voting list is a record "concerning the

---

Campaign Act, but, on the merits, remanding for a determination of whether the Act created a right to the information in question).

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists." The phrase "concerning the implementation of" provides an initial limitation. Contemporaneous dictionaries state that "implement" connotes execution or administration—"to give practical effect to." *See Implement*, Webster's Third New International Dictionary (1993); *see also Implement*, Webster's Dictionary of English Usage (1989) (stating that "implement" "typically describes the taking of concrete measures to carry out an official policy or program"). The inclusion of that word suggests that covered records are those that describe measures to maintain the accuracy and currency of voter lists, not the lists themselves. *See United States v. Benson*, – F. Supp. 3d –, 2026 WL 362789, at *6 (W.D. Mich. Feb. 10, 2026) ("[A] natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself."). "Concerning" does have a "broadening effect," *see Patel v. Garland*, 596 U.S. 328, 339 (2022), but its sole object here is the word "implementation," not "all records." The category of "records concerning . . . implementation" therefore encompasses materials documenting each step a state undertakes when actively implementing relevant programs. Examples of records that would "concern[] implementation" might include duplicate-removal reports, procedural manuals about list maintenance tasks, or correspondence with voters, but not the very voter-registration lists that the implemented efforts seek to update and maintain. *See* 52 U.S.C. § 20507(d)(1)-(2) (requiring states to send confirmation notices before removing voters for changing their residence); *id.* at § 20507(c)(2)(A).

The next clause—"programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"—further cabins the disclosure requirement.   A "program" is "a proposed project or scheme," *Program*, Webster's Third New International Dictionary, and an "activity" is a "natural or normal function or operation," *Activity*, Webster's Third New International Dictionary.  Both terms relate to active processes or the plan for carrying them out, not the outcome of those processes.

Moreover, the phrase requiring that each state maintain covered records "for at least 2 years," makes even clearer that statewide voter lists are not themselves "records" that must be disclosed.   That requirement reinforces that Congress was focused on historical documentation of how states conduct list maintenance, not on the voter lists themselves, which constantly evolve as voters are added or removed, or as their data are updated.  Were any "official list[] of eligible voters" itself a "record" subject to section 20507(i)(1), states would be obliged to preserve every interim version of the ever-changing lists for two years—a plainly unworkable and implausible result that we must avoid.  *See Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) ("[S]tatutory interpretations which would produce absurd results are to be avoided.").   Section 20507(i)(1) of the NVRA is not a sprawling voter-data-preservation mandate; it is a transparency provision targeted at list-maintenance activities.

PILF places much weight on the provision's use of the phrase "all records."   It is true that the modifier "all" broadens the scope of records subject disclosure.  *See Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998) ("[T]he use of the word 'all' . . . suggests an expansive meaning because 'all'

is a term of great breadth."). But we construe statutory language in context and "limit otherwise capacious terms when that context 'tug[s] . . . in favor of a narrower reading.'" *Arconic, Inc. v. APC Inv. Co.,* 969 F.3d 945, 953 (9th Cir. 2020) (alteration in original) (quoting *Mellouli v. Lynch*, 575 U.S. 798, 812 (2015)). Here, Congress drafted a nuanced disclosure provision that includes qualifying language. If Congress had wanted to require that states make a statewide voter list public, it could have just said so. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote.").

The final clause of section 20507(i)(1) does not cast doubt on that interpretation. It exempts from disclosure any information "relate[d] to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). One might initially think that clause, which exempts certain voter registration information, suggests that registration details in general—and thus voter lists—are otherwise covered records. As we read it, however, that clause merely reinforces a separate programmatic restriction on the use of registration-related data. The NVRA requires that government agencies and offices that provide public assistance or services to people with disabilities be designated as Voter Registration Agencies ("VRAs"). *Id.* § 20506(a). When an agency is designated as a VRA, it must provide its clients a form that includes the question: "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" *Id.* § 20506(a)(6)(B)(i). That form must have "boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote." *Id.*

§ 20506(a)(6)(B)(iii).      Importantly, NVRA   section 20506(a)(7) instructs that "[n]o information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration." *Id*. § 20506(a)(7).    The final clause of section 20507(i)(1) merely reinforces that limitation.  As the House Report on the  Act  discussed,  Congress  wanted  to  ensure  that "information not be made public as to [which] voters" were interacting  with  which  "agency,  such  as  a  welfare  or unemployment office."  H.R. Rep. No. 103-9, at 19 (1993).

Section 20507(i)(2), the final paragraph of the NVRA's public  disclosure  provision,  also  reinforces  our  textual analysis.  Section  20507(i)(2)  states  that  covered  records "shall include lists of the names and addresses of all persons to whom notices [of removal from voting rolls] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records  is  made."    52  U.S.C.  § 20507(i)(2).    Those  are administrative  records  relating  to  a  discrete  program  for "ensuring the accuracy and currency" of the voter lists, *id.* § 20507(i)(1),  which  suggests  that  other  covered  records would  also  concern  the  active  implementation  of  such programs.

Another reason not to read voter lists as records subject to disclosure under the NVRA is that voter lists are governed by a later-enacted, separate statute—the Help America Vote Act.  The Help America Vote Act mandates that each State maintain  a  single,  uniform,  computerized  statewide  voter-registration  list  for  use  by  election  officials.     *Id.* § 21083(a)(1).  The Help America Vote Act does not have a public disclosure provision, nor does it create a private right of action for enforcement.  We decline to read the NVRA to

provide a right for the public to access statewide voter lists when Congress chose not to establish that right in the statute specifically addressing the creation of statewide voter lists.

## 2.

We are not persuaded by PILF's remaining arguments that the NVRA's disclosure provision covers a statewide voter list.

PILF invokes the First Circuit's decision in *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), where the court concluded that a statewide voter registration list was subject to disclosure under section 20507(i)(1).[11]  There, the First Circuit reasoned that because such lists record the "end result of [list maintenance] activities," which are conducted to ensure accuracy of the lists, the lists necessarily "concern[]" the "implementation" of those activities.  *Id.* at 47.  Respectfully, that reading seems inconsistent with the statutory text and structure to such an extent that we must reach a different outcome, though we do not do so lightly.  *See United States v. Anderson*, 46 F.4th 1000, 1005 (9th Cir. 2022) (explaining that in "cases requiring statutory interpretation, . . . [o]ur analysis is informed by decisions from other circuit courts

---

[11] The Tenth Circuit recently expressed its agreement with *Bellows* but did not address the argument we address here: whether a voter file concerns the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists.  *See Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084 (10th Cir. 2025) ("[T]he parties focus their arguments not on whether the requested voter data in fact concerns the implementation of relevant program and activities but on whether 'record' includes dynamic, electronic documents and whether they encompass data that is allegedly 'newly created.'" (footnote omitted)).

that have interpreted the statute, and we will not create a circuit split unnecessarily").

The First Circuit's approach treats a statewide voter list as inherently a record concerning list-maintenance programs. To the contrary, as we explain above, the best reading of the statute is that such lists are not records concerning the implementation of those programs, which are covered by section 20507(i)(1), but rather the *objects* of the implemented programs, which are not. The First Circuit's interpretation collapses the textual distinction between administrative records reflecting implementation of list-maintenance activities and the lists those programs maintain. Its interpretation gives too much weight to the words "all" and "concerning," failing to take account of the surrounding limiting context. *Bellows,* 92 F.4th at 47-49.[12]

PILF also relies on *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), but that decision is not inconsistent with ours. There, the Fourth Circuit held that voters' registration applications were covered by the public disclosure provision because they were direct evidence of the implementation of registration procedures. *Id.* at 336-37. Importantly, though, the court did not hold that entire statewide voter lists fall within section 20507(i).

---

[12] PILF also points to several district court decisions reaching its preferred outcome, none of which persuade us. *See, e.g.*, *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1212 (D.N.M. 2024), *aff'd*, 160 F.4th 1068 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Knapp*, 749 F. Supp. 3d. 563, 568-69 (D.S.C. 2024); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022). Similar to *Bellows*, the cases fail to address the key textual distinction Congress drew between records documenting *how* a state implements its programs for ensuring accuracy and the lists ultimately modified or updated by those programs.

That distinction is crucial: an application and its processing relate to the implementation of a program to ensure currency and accuracy of voter lists, whereas a statewide list of registered voters is a continuously updated product of those activities.[13]

We are also not persuaded that our interpretation will frustrate public oversight. Section 20507(i) ensures access to the records necessary to verify whether states conduct confirmation mailings, removals, and list updates lawfully. Effective oversight does not require disclosure of every registrant's personal information; it requires transparency about how list-maintenance programs are implemented.[14]

Indeed, other policy concerns underlying the balance struck by the NVRA caution against an expansive reading. As described above, section 20507(i)(1) explicitly prohibits disclosure of "the identity of a voter registration agency through which any particular voter is registered." Congress thereby recognized the need to protect the privacy of

---

[13] The Fourth Circuit has since recognized that "the [NVRA's] disclosure provision does not encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021).

[14] For PILF's purposes, Hawaii state law appears to provide an avenue for requesting the voter information that PILF states it needs to ensure Hawaii complies with the NVRA's requirements. Haw. Rev. Stat. § 11-97(a); *see also United States v. Benson*, – F. Supp. 3d –, 2026 WL 362789, at *6 (W.D. Mich. Feb. 10, 2026) (recognizing that "state voter registration lists were often already subject to public disclosure under state law when the NVRA was enacted" so there was "no need for the NVRA to require disclosure of voter registration lists").

personal information even while mandating oversight of maintenance procedures.  Especially given that Congress wrote a provision making private where certain voters registered, it is unlikely that Congress would have required states to publicly disclose information that could include every voter's name, address, partial social security numbers, and voting history—information that could be used for harassment, intimidation, or commercial exploitation— without so much as a word about redaction, security, or permitted use.   The better inference is that section 20507(i)(1) was aimed at transparency regarding processes, not at disclosure of the personal data of millions of voters.

## V.

For the foregoing reasons, we affirm dismissal of PILF's claim.  But the district court dismissed without prejudice for lack of jurisdiction.  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (dismissal for lack of jurisdiction is generally without prejudice).   Because we conclude that there is jurisdiction but that PILF's claim fails on the merits, we remand with instructions to dismiss the claim with prejudice.  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 686 (9th Cir. 2005) ("Final judgment on the merits is synonymous with dismissal with prejudice." (citation modified)).[15]

**AFFIRMED and REMANDED for judgment to be entered with prejudice**.

---

[15] Because we hold that the scope of section 20507(i)(1) presents lawful grounds for Nago's office to decline PILF's request, we do not address PILF's other arguments about the NVRA's effects.