No. 26-1225

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

Defendants-Appellees

LEAGUE OF WOMEN VOTERS OF MICHIGAN; MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO

Intervenors-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION CASE NO. 1-25-cv-01148 The Honorable Hala Y. Jarbou

## PETITION FOR REHEARING EN BANC

*(See inside cover for continuation of counsel)*

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. MCGEE
AUDREY A. WEAVER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 616-9405

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION AND RULE 40 STATEMENT..................................1

BACKGROUND.........................................................................5

REASONS FOR GRANTING REHEARING............................................7

I.   The panel majority's interpretation of Section 301 distorts the plain meaning of the statute, creating an error of exceptional nationwide importance......................................7

    A.   The majority's holding conflicts with the plain text of Title III................................................................7

    B.   There is no conflict between Title III, the NVRA, and HAVA. ................................................13

    C.   The majority's interpretation of Section 301 would lead to absurd results. ....................................15

II.   The panel majority's single-document rule misreads Title III and creates a conflict with the Fifth Circuit. .......16

    A.   The sufficiency of the Attorney General's demand is unreviewable. ........................................16

    B.   Section 303 does not require that the statement of the basis and purpose for the demand be contained in one single document. ........................... 18

CONCLUSION .......................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT

# TABLE OF AUTHORITIES

**PAGE**

**CASES:**

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ..................................................................3

*Bryan v. United States,*
  524 U.S. 184 (1998) ................................................................15

*Coleman v. Kennedy,*
  313 F.2d 867 (5th Cir. 1963) ................................................18

*Fischerv. United States,*
  603 U.S. 480 (2024) ..............................................................14

*Kennedy v. Lynd,*
  306 F.2d 222 (5th Cir. 1962) ....................................7, 17, 18

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) ..............................................................19

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ....................................................................1

*Republican Party v. Degraffenreid,*
  141 S. Ct. 732 (2021) ..............................................................4

*Russello v. United States,*
  464 U.S. 16 (1983) ................................................................13

*Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs,*
  504 F.3d 634 (6th Cir. 2007) ................................................19

*United States Dep't of Just. v. Tax Analysts,*
  492 U.S. 136 (1989) ............................................................8, 9

*United States v. Markwood,*
  48 F.3d 969 (6th Cir. 1995) ..................................................17

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) ..............................................................18

*United States v. Powell,*
  379 U.S. 48 (1964) ................................................................17

*Voter Reference Found., LLC v. Torrez,*
  160 F.4th 1068 (10th Cir. 2025)...........................................15

## STATUTES:

26 U.S.C. 7602 ...................................................................... 17, 18

30 U.S.C. 1732(b) ...................................................................... 12

31 U.S.C. 3733 ............................................................................ 17

44 U.S.C. 3572(f) ........................................................................ 12

52 U.S.C. 20507 .......................................................................... 14

52 U.S.C. 20507(i)(1) ................................................................. 12

52 U.S.C. 20701 ................................................................... *passim*

52 U.S.C. 20702 ...................................................................... 14, 15

52 U.S.C. 20703 ................................................................... *passim*

52 U.S.C. 20705 ............................................................................ 2

52 U.S.C. 21083 .......................................................................... 14

52 U.S.C. 21083(a)(1)(A)(viii) ................................................... 16

## RULES:

Fed. R. App. P. 40(b)(2)(D) ......................................................... 3

6th Cir. R. 40(b) ........................................................................... 2

6th Cir. I.O.P. 40(b)(1) ................................................................ 3

- iii -

## INTRODUCTION AND RULE 40 STATEMENT

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). The United States brought this suit to protect that confidence and compel Michigan to produce an unredacted, electronic copy of its state voter registration list (SVRL) under Title III of the Civil Rights Act (CRA)—to investigate Michigan's compliance with the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA).

Section 301 of Title III requires "[e]very officer of election [to] retain and preserve . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. 20701. Michigan's SVRL fits comfortably within the plain and ordinary scope of that text.

So the Attorney General, acting through the Department of Justice (DOJ or the "Department") sent a demand to Secretary Benson to produce Michigan's SVRL (known in Michigan as a "qualified voter file"). Under Section 303 of Title III, "upon demand in writing by the Attorney General or his representative," the custodian of any such "record or paper" must

- 1 -

make the same "available for inspection, reproduction, and copying." 52 U.S.C. 20703. "This demand shall contain a statement of the basis and the purpose therefor." *Ibid.* Secretary Benson refused the DOJ's demand, and so the United States brought this lawsuit. 52 U.S.C. 20705.

The district court dismissed the United States' Complaint, and the United States appealed. On the United States' request, this Court expedited briefing (Order, C.A. R.20-1) and held a special oral argument session via video (Notice of Argument, C.A. R.49). *See* 6th Cir. R. 40(b).

A divided panel of this Court (Mathis, J., joined by Cole, J.; Nalbandian, J., dissenting) affirmed the district court's dismissal with two conclusions that each independently warrants en banc consideration. *First*, the panel majority held that Michigan's SVRL is not a record that "come[s] into [an election officer's] possession," 52 U.S.C. 20701, because it is "internally generated" and "not a record acquired from an outside source." Op.9; *see* Op.8-14 (Attached). In other words, the panel interpreted "come into . . . possession" as imposing an "external-source limitation." Op.18 n.3 (Nalbandian, J., dissenting).

*Second*, the panel majority held that the DOJ's demand to Michigan under Title III was inadequate because the "statement of the basis and

purpose," 52 U.S.C. 20703, was spread out over multiple letters to Secretary Benson. Op.15-16. According to the majority, the statement of the basis and purpose must be present in a single letter, even when the relevant parties are engaged in back-and-forth communications. *See ibid.*

Both of these conclusions were wrong and present legal issues of exceptional importance for which the panel majority made "precedent-setting error[s] of exceptional public importance." 6th Cir. I.O.P. 40(b)(1); *see* Fed. R. App. P. 40(b)(2)(D).

If allowed to stand, the decision will paralyze the United States' ability to ensure enforcement and compliance with various federal voting laws, including the list-maintenance requirements of the NVRA and HAVA. The United States has a compelling interest in ensuring the integrity of federal elections that "implicate a uniquely important national interest[,]" and where one state's choices "ha[ve] an impact beyond its own borders." *Anderson v. Celebrezze*, 460 U.S. 780, 794-795 (1983). The importance of the tools given to the Attorney General to investigate before an election cannot be overstated; "the postelection system of judicial review . . . is often incapable of testing allegations of systemic maladministration, voter suppression, or fraud that go to the

- 3 -

heart of public confidence in election results." *Republican Party v. Degraffenreid*, 141 S. Ct. 732, 737 (2021) (Thomas, J., dissenting from the denial of certiorari).

Moreover, because the panel opinion is the first appellate decision directly addressing whether the CRA reaches SVRLs, and twenty other pending cases (including one in this Circuit[1]) currently present similar issues, the panel opinion is likely to become the principal appellate authority on the issue. As it stands, the panel opinion provides other federal courts with erroneous circuit court precedent excluding, without basis in statute, internally generated records from the scope of the CRA.

The United States therefore respectfully requests en banc review of these questions of exceptional importance:

1. Whether the panel decision erred in holding that Michigan's SVRL is not a record that "come[s] into [an election officer's] possession," 52 U.S.C. 20701, because it is internally generated and not a record acquired from an outside source.

---

[1] *See United States v. Adams*, No. 3:26-cv-19 (E.D. Ky.).

2. Whether the panel decision erred in holding that the Attorney General's demand for Michigan's SVRL was inadequate because the "statement of the basis and purpose therefor," 52 U.S.C. 20703, was spread out over multiple letters.

## BACKGROUND

This case arose after Michigan Secretary of State Benson refused to provide the United States an electronic, unredacted copy of Michigan's SVRL upon demand by the Attorney General under Title III of the CRA. In the summer of 2025, the DOJ sent Michigan a series of written letters demanding a current, unredacted, electronic copy of Michigan's SVRL to determine whether Michigan was complying with its obligations under the NVRA and the HAVA. Op.2-3; U.S. Br.6-8. In response to Michigan refusing the DOJ's demand, the United States brought this suit seeking a declaratory judgment and an order requiring Michigan to turn over its full SVRL to the Attorney General. Op.3; U.S. Br.8-9.

In a published decision, a divided panel of this Court affirmed the district court's dismissal of the United States' Complaint on two alternative grounds. *First*, the panel majority held that Michigan's SVRL is not a record that "come[s] into [an election officer's] possession," 52

- 5 -

U.S.C. 20701, because it is "internally generated" and "not a record acquired from an outside source." Op.9; *see* Op.8-14. *Second*, the panel majority held that the DOJ's demand was inadequate because the "statement of the basis and the purpose," 52 U.S.C. 20703, was spread out over multiple letters from the Department to Secretary Benson demanding an unredacted copy of Michigan's SVRL. Op.15-16.

Judge Nalbandian dissented. *First*, he rejected the majority's "hunt[] for a nonexistent external-source limitation" in Section 301's "come into . . . possession" language. Op.18 n.3. "Title III covers at least some government-generated records—including Michigan's voter file." Op.20. Even if "come into . . . possession" provided an external-source limitation, Secretary Benson did not *herself* create the SVRL; because Title III looks at the individual officers of election and individual custodians, she would still have "come into . . . possession" of the SVRL "[e]ven on the majority's view." Op.21.

*Second*, Judge Nalbandian explained that the "majority strain[ed] to bifurcate the two letters into discrete 'demands'" under Title III when "common[]sense" dictated that the letters be read together. Op.22-23. In

any event, the DOJ's last letter to Secretary Benson "satisfie[d] the CRA's requirements." Op.23.

## REASONS FOR GRANTING REHEARING

I.     **The panel majority's interpretation of Section 301 distorts the plain meaning of the statute, creating an error of exceptional nationwide importance.**

A.     **The majority's holding conflicts with the plain text of Title III.**

1.     Section 301 of Title III imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added). No one "dispute[s] that Michigan's qualified voter file" (or SVRL) "is a 'record'" or "that the term 'relating to' has a broad meaning." Op.8. By any measure, an SVRL (again, a statewide voter registration list) is a "record[] . . . relating to any application[ or] registration . . . to vot[e]." 52 U.S.C. 20701.

This dispute boils down, then, to what it means to "come into . . . possession" of a document. According to dictionary definitions

- 7 -

contemporaneous with the CRA's passage, an officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). When officers within Secretary Benson's office aggregate individual voter records into an SVRL, they get or acquire a new document and retain it within their control—thus coming into possession of the SVRL. *See United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 145 (1989) ("By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties.").

2.   The panel majority's exclusion of all "internally generated" documents from this definition cannot withstand scrutiny. Op.9. The panel majority's interpretation impermissibly adds a limitation Congress did not write into the statute. *See* Op.18 n.3 (Nalbandian, J., dissenting). This added limitation rests on two words: "come into." According to the majority, those words must mean that the election official "acquire[d], obtain[ed], or receive[d] the qualified voter file from a third party" because "[a]n ordinary English speaker would not say that she has come

into possession of something that she created, established, and maintained." Op.9.

a. The majority relied on "[a]n example from oral argument" in which a baker "purchase[s] ingredients from a grocery store . . . and then proceed[s] to bake cakes." Op.9. According to the majority, the baker has come into possession of the ingredients, but "[i]t would be rather strange to say that the baker has 'come into' possession of the cakes after pulling them out of the oven." *Ibid.* But the relevant question is whether Congress could have used the phrase "come into . . . possession" to cover possession of *any* document—both self-generated and from an outside source.

The answer to that question is yes. Writing for a unanimous Court in *Tax Analysts*, Justice Marshall discussed (in the context of the Freedom of Information Act) materials that an agency "*either* create[s] *or* obtain[s]" and explained that these "materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties." 492 U.S. at 145 (emphasis added; citation omitted). There was nothing "strange" (Op. 9) about using the phrase "come into . . . possession" to capture a wider category of documents—both those generated internally

- 9 -

and those acquired from an outside source. So too, if the panel majority's baker is asked generally whether he has come into possession of any dessert, the answer surely does not depend on whether he pulled the cake out of the oven or off a supermarket shelf.

b. The majority also pointed to the example records and papers listed in Section 301. Op.9-10. According to the majority, "[e]lection officers do not create these kinds of records." Op.9. However, Section 301 is explicitly not limited to those example records; it covers "all records and papers . . . *relating to*" those example records. 52 U.S.C. 20701 (emphasis added). So this "statutory context" (Op.9) illuminates little.

And as Judge Nalbandian explained in his dissent, the historical context in which the CRA was passed makes clear that the CRA was aimed at covering "at least some government-generated records." Op.20.

> One practice in the Jim Crow South was the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them. *See* Rep. of the U.S. Comm'n on Civ. Rights 93 (1959) [(1959 CCR Report)]. And county boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant. *Id.*

Op.20; *see* 1959 CCR Report 75, 82, 87-89 (noting that the Commission had reviewed lists of registered voters).

Judge Nalbandian also pointed out another contextual clue. Under the majority's reading that Title III does not cover "any internally or self-generated record," the Attorney General would have no authority to demand records created by a county clerk tracking voters by race. Op.21 n.7 (dissenting opinion). At the time of the CRA's passage, such internally generated and inculpatory documents would have been among the most pertinent records the Attorney General could have sought to investigate rampant discriminatory practices.

c. The majority rejected a plain reading of Title III because, in its view, the government's reading of "come into . . . possession" would render that language "superfluous." Op.11. That is incorrect. The plain and ordinary meaning of the phrase "come into . . . possession" signals both "a temporal and custodial limitation" (Op.21 n.7 (Nalbandian, J., dissenting)): *how* the legal obligation is created ("possession") and marks the point in time *when* the legal obligation begins ("come into").

In fact, the absence of any origin source in the phrase "come into . . . possession" intentionally encompasses *any source* from which an official could come into possession of the relevant record. Thus, when elsewhere in federal law a legal obligation is created when one "comes

- 11 -

into possession of such information by reason of his or her being an officer[,]" 44 U.S.C. 3572(f), or within a certain time after "information comes into the possession of the Secretary[,]" 30 U.S.C. 1732(b), no source, origin, or author of said information is required. So too, in Title III, legal obligations to "retain and preserve" attach when (but only when) an election official gains possession of a document "during her tenure." Op.21 n.8 (Nalbandian, J., dissenting).

The majority contrasted the "come into . . . possession" formulation with the NVRA's public-inspection provision, which requires States to make available "all records concerning the implementation of [certain] programs and activities." Op.11 (quoting 52 U.S.C. 20507(i)(1)). But unlike the CRA, the NVRA's public-inspection provision imposes no *personal* liability—only a state government's obligation—so there is less reason to cabin when and how the duty to retain and preserve attaches. In any event, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute." *Russello v. United States*, 464 U.S. 16, 25 (1983). By the majority's own cross-statute superfluity analysis, it would appear that States are obligated under the NVRA to make available even those "records" *not* in their possession—a

- 12 -

result that makes little sense—because the NVRA does not use the word "possession" whereas the CRA does. *See* Op.11.

d. Finally, the panel majority ignored that, even under its reading, the SVRL "c[a]me into" Secretary Benson's "possession" when she received it from someone else in her office. *See* Op.21 (Nalbandian, J., dissenting). Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." Op.21 (Nalbandian, J., dissenting) (quoting 52 U.S.C. 20701) (second ellipsis in original; footnote omitted). So even "if Benson's employees generated the voter file—and therefore didn't 'come into . . . possession' of the list themselves—Benson nonetheless 'c[a]me into . . . possession' of the file when her employees sent it to her." *Ibid.* (quoting 52 U.S.C. 20701; alterations in original).

## B. There is no conflict between Title III, the NVRA, and HAVA.

The majority incorrectly held that its interpretation was necessary to avoid a "collision course" between Title III and the NVRA and HAVA.

Op.10-11. Title III prohibits "[a]ny person" from "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or alter[ing] any record or paper" covered by Section 301. 52 U.S.C. 20702. The NVRA and HAVA both require updates to States' SVRLs to "remove ineligible voters." Op.11; *see* 52 U.S.C. 20507, 21083. According to the majority, the NVRA and HAVA thus "*require* Michigan election officials to alter" the SVRL, counter to the CRA. Op.10.

The majority failed to acknowledge, much less grapple with, the associated words surrounding "alter" in Title III, which illustrate that verb's narrow meaning. *Fischer v. United States* interpreted a similarly worded criminal provision and explained that, under the canon of *noscitur a sociis*, each of these words must be understood as "actions that, by their nature, impair the integrity or availability of records, documents, or objects." 603 U.S. 480, 481 (2024). Performing list maintenance under the NVRA and HAVA is thus not "alter[ing]" the SVRL at all, 52 U.S.C. 20702; it is, rather, "retain[ing] and preserv[ing]" the SVRL, 52 U.S.C. 20701; *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1085 (10th Cir. 2025) (applying similar analysis to the NVRA's obligation that States "maintain" records). The panel majority's contrary conclusion

- 14 -

"contravenes the canon against implied repeal." Op.19 (Nalbandian, J., dissenting). Even if the statutes were truly inconsistent, the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in 52 U.S.C. 20702. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Finally, Title III's *willful* mens rea—also ignored by the majority—erases any doubt that list maintenance under the NVRA and HAVA could run afoul of Title III. 52 U.S.C. 20702; *see Bryan v. United States*, 524 U.S. 184, 191-192 (1998).

## C.    The majority's interpretation of Section 301 would lead to absurd results.

Excluding government-generated documents from Title III's coverage would lead to absurd results. *See* Op.21 & n.7 (Nalbandian, J., dissenting). One of these results is that the SVRL is, since the passage of HAVA, an archetypal record of acts requisite to voting in an election kept by election officials. After all, the SVRL is not just any "record" of an "act requisite to voting," 52 U.S.C. 20701; it is a federally mandated record that "serve[s] as the official voter registration list for the conduct of *all elections* for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii)

- 15 -

(emphasis added). Federal elections cannot occur in any state without the SVRL, and it would seem absurd if the state election officials could hide behind pedantic distinctions to avoid revealing this list to federal officials under the CRA.

For all of these reasons, the panel's opinion warrants en banc reconsideration.

## II.    The panel majority's single-document rule misreads Title III and creates a conflict with the Fifth Circuit.

The panel majority separately held that the Department failed to comply with Title III because it failed to send one single "demand with a statement of the basis and purpose." Op.15. So "assum[ing] that the [earlier] letters indicate a basis for the government's request, they do not identify a purpose"; and the last letter "specifies the purpose" but "does not state a basis." *Ibid*. This was error.

### A.    The sufficiency of the Attorney General's demand is unreviewable.

As the Fifth Circuit held shortly after the CRA was enacted, the sufficiency of the Attorney General's demand "is virtually unreviewable by a federal court." Op.21 (Nalbandian, J., dissenting). A proceeding under Title III requires no more than "a simple statement by the

- 16 -

Attorney General that after a [52 U.S.C. 20703] written demand for inspection of records and papers covered in [52 U.S.C. 20701], the [custodian] has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Kennedy v. Lynd*, 306 F.2d 222, 225-226 (5th Cir. 1962) (quoting 52 U.S.C. 20703). "[T]he factual foundation for, or the sufficiency of" the statement of basis and purpose "is not open to judicial review or ascertainment." *Id.* at 226.

The majority dismissed the Fifth Circuit's precedent by pointing to "subsequent binding precedent from the Supreme Court and this court [that] carves out a role for the courts in reviewing civil investigative demands like the government's." Op.15 n.2 (citing *United States v. Powell*, 379 U.S. 48, 58 (1964); *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995)). Those precedents are inapposite. They provide courts a "limited" role in ensuring that an "agency has met the statutory requirements pertaining to the issuance and enforcement of [a] subpoena." *Markwood*, 48 F.3d at 976-977. And in those cases, the relevant statutes prescribed specific (and measurable) criteria that a subpoena must contain. *E.g.*, 31 U.S.C. 3733 (at issue in *Markwood*); 26 U.S.C. 7602 (at issue in *Powell*). In contrast, Title III provides no

- 17 -

meaningful standard against which to measure the sufficiency of the Attorney General's demand. 52 U.S.C. 20703; *see Lynd*, 306 F.2d at 225-226; *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam). Indeed, the majority's insistence on particular factual findings in the demand flies in the face of longstanding Supreme Court precedent that administrative agencies "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

**B.  Section 303 does not require that the statement of the basis and purpose for the demand be contained in one single document.**

Section 303 requires only that the Attorney General's "demand in writing . . . contain a statement of the basis and the purpose therefor." 52 U.S.C. 20703. It does not require the Attorney General to place every element of the demand in a single letter, repeat the same basis in each follow-up, or use any particular form of words to incorporate the content of prior letters.

The majority provided no explanation for its one-letter rule. It concluded that the written demand must have "a statement of the basis *and* purpose" (Op.15) but failed to respond to Judge Nalbandian's correct

- 18 -

assertion that nothing in the text of Section 303 forecloses reading together multiple letters as the relevant "demand" (Op.22). "Title III refers to retention and preservation obligations 'upon demand . . . by the Attorney General.' It doesn't refer to *a* demand." Op.22 (Nalbandian, J., dissenting) (citation omitted); *see ibid.* (contrasting *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021)). The majority "shun[ned] the common-sense inquiry of whether the DOJ put Michigan on notice." Op.23 (Nalbandian, J., dissenting).

Courts should consider the context of multiple related demands to determine their collective purpose and effect. The fundamental purpose of a demand or notice requirement is to provide the recipient with effective and timely notice that enables them to understand the basis for the complaint and take corrective action. *See* Op.22-23 (Nalbandian, J., dissenting). The key consideration is whether the notice contains sufficient information to permit the recipient to identify the alleged violations and bring itself into compliance. *See Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 644 (6th Cir. 2007).

Even under the majority's single-letter rule, though, the majority erred. The Department's August 14 letter to Secretary Benson:

invokes the CRA and explicitly states a purpose: "to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA." R.39-4 at PageID 501. As for basis, though the August 14 letter doesn't spell out the litany of questionable registration practices outlined in the July 21 letter, it refers to that earlier letter. *See* R.34 at PageID 500 . . . .

Op.23 (Nalbandian, J., dissenting). "The July 21 letter and its basis, then, are incorporated by reference into the August 14 letter." *Ibid.* Here, too, the majority offered no response. *See* Op.15-16.

## CONCLUSION

For the foregoing reasons, this Court should rehear this appeal en banc.

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant
  Attorney General

s/ David N. Goldman
ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. MCGEE
AUDREY A. WEAVER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 616-9405

- 21 -

## CERTIFICATE OF COMPLIANCE

This Petition for Rehearing En Banc complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3896 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f). This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ David N. Goldman
DAVID N. GOLDMAN
Attorney

Date: July 8, 2026

## CERTIFICATE OF SERVICE

On July 8, 2026, I filed this Petition for Rehearing En Banc with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

s/ David N. Goldman
DAVID N. GOLDMAN
  Attorney

**ATTACHMENT**

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

<table>
<tr><td>Kelly L. Stephens<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  June 24, 2026

Mr. Joshua Charles Abbuhl
Elias Law Group
250 Massachusetts Avenue, N.W.
Suite 400
Washington, DC 20001

Ms. Mairead Ahlbach
Wilmer Hale
350 S. Grand Avenue
Suite 2400
Los Angeles, CA 90071

Mr. Noah Bokat-Lindell
O'Melveny & Myers
1625 Eye Street, N.W.
Washington, DC 20006

Ms. Aria Branch
Elias Law Group
250 Massachusetts Avenue, N.W.
Suite 400
Washington, DC 20001

Mr. Andrew Braniff
U.S. Department of Justice
Appellate Section
P.O. Box 14403
Washington, DC 20044-4403

Mr. Lanny Arthur Breuer
Covington & Burling
850 Tenth Street, N.W., One CityCenter
Washington, DC 20001

Mr. Mark C. Brewer
Goodman Acker
Two Towne Square
Suite 444
Southfield, MI 48076

Mr. Taylor Austin Brown
Kentucky Registry of Election Finance
140 Walnut Street
Frankfort, KY 40601

Mr. Cory Michael Carone
Stoel Rives
101 S. Capitol Boulevard
Suite 1900
Boise, ID 83702-7705

Mr. Chris Casamassima
Wilmer Hale
350 S. Grand Avenue
Suite 2400
Los Angeles, CA 90071

Mr. Gillian Cassell-Stiga
Lawyers' Committee for Civil Rights Under Law
1500 K. Street, N.W.
Suite 900
Washington, DC 20005

Mr. Gregory Clarick
Clarick Gueron Reisbaum
41 Madison Avenue
23rd Floor
New York, NY 10010

Mr. Daniel J. Freeman
Democratic National Committee
430 S. Capitol Street, S.E., Suite 3
Washington, DC 20003

Mr. David N. Goldman
U.S. Department of Justice
Civil Rights Division, Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, DC 20044-4403

Mr. Erik A. Grill
Office of the Attorney General
of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Carmine Gennaro Iaccarino
Sturgill, Turner, Barker & Moloney
333 W. Vine Street
Suite 1500
Lexington, KY 40507

Ms. Sejal Parimal Jhaveri
Campaign Legal Center
1101 14th Street, N.W.
Suite 400
Washington, DC 20005

Mr. Jonathan Barrett Koch
Dickinson Wright
200 Ottawa Avenue, N.W.
Suite 900
Grand Rapids, MI 49503

Mr. Zachary C. Larsen
Clark Hill
215 S. Washington Square
Suite 200
Lansing, MI 48933

Mr. Branden D. Lewiston
Elias Law Group
250 Massachusetts Avenue, N.W.
Suite 400
Washington, DC 20001

Ms. Kelsey E. McGee
U.S. Department of Justice
Civil Rights Division, Appellate Section
Ben Franklin Station, P.O. Box 14403
Washington, DC 20044-4403

Ms. Heather S. Meingast
Office of the Attorney General of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Jonathan Benjamin Miller
Public Rights Project
490 43rd Street
Suite 115
Oakland, CA 94609

Mr. Oluwalani Oisamoje Oisaghie
Wilmer, Cutler, Pickering, Hale & Dorr
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037

Mr. William Jeffrey Olson
Law Office
370 Maple Avenue, W.
Suite 4
Vienna, VA 22180-5615

Honorable Jesus A. Osete
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Andrew George Pappas
Osborn Maledon
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012

Mr. Michael John Pattwell
Clark Hill
215 S. Washington Square
Suite 200
Lansing, MI 48933

Ms. Sarah S. Prescott
Salvatore, Prescott, Porter & Porter
105 E. Main Street
Northville, MI 48167

Mr. Charles R. Spies
Dickinson Wright
1825 I Street, N.W.
Suite 900
Washington, DC 20006

Mr. James Thomas Tucker
U.S. Department of Justice
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Derek Anthony Zeigler
Elias Law Group
250 Massachusetts Avenue, N.W.
Suite 400
Washington, DC 20001

  Re: Case No. 26-1225, *USA v. Jocelyn Benson, et al*
    Originating Case No. 1:25-cv-01148

Dear Counsel,

 The court today announced its decision in the above-styled case.

 Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

        Yours very truly,

        Kelly L. Stephens, Clerk

        Cathryn Lovely
        Deputy Clerk

cc: Ms. Ann E. Filkins


Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0180p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

*Defendants-Appellees*,

MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO,

*Intervenors-Appellees*.

No. 26-1225

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-01148—Hala Y. Jarbou, District Judge.

Argued: May 13, 2026

Decided and Filed: June 24, 2026

Before: COLE, NALBANDIAN, and MATHIS, Circuit Judges.

---

### COUNSEL

**ARGUED:** David N. Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Defendants-Appellees. Aria C. Branch, ELIAS LAW GROUP LLP, Washington, D.C., for Intervenors-Appellees. **ON BRIEF:** David N. Goldman, Andrew G. Braniff, Jesus A. Osete, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Defendants-Appellees. Aria C. Branch, Joshua C. Abbuhl, Branden D. Lewiston, Derek A. Zeigler, ELIAS LAW GROUP LLP, Washington, D.C., Sarah Prescott, SALVATORE PRESCOTT PORTER &

PORTER, Northville, Michigan, for Intervenors-Appellees.  Zachary C. Larsen, Michael J. Pattwell, CLARK HILL PLC, Lansing, Michigan, Jonathan R. Koch, DICKINSON WRIGHT PLLC, Grand Rapids, Michigan, Charles R. Spies, DICKINSON WRIGHT PLLC, Washington, D.C., William J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Jonathan Miller, PUBLIC RIGHTS PROJECT, Oakland, California, Daniel J. Freeman, DEMOCRATIC NATIONAL COMMITTEE, Washington, D.C., Noah B. Bokat-Lindell, O'MELVENY & MYERS LLP, Washington, D.C., Mark Brewer, GOODMAN ACKER P.C., Southfield, Michigan, Sejal Jhaveri, CAMPAIGN LEGAL CENTER, Washington, D.C., Cory M. Carone, STOEL RIVES LLP, Boise, Idaho, Gillian Cassell-Stiga, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., Carmine G. Iaccarino, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, Taylor A. Brown, KENTUCKY STATE BOARD OF ELECTIONS, Frankfort, Kentucky, Gregory A. Clarick, CLARICK GUERON REISBAUM LLP, New York, New York, Andrew G. Pappas, OSBORN MALEDON, Phoenix, Arizona, Christopher T. Casamassima, Mairead C. Alhbach, WILMER CUTLER PICKERINGT HALE AND DORR LLP, Los Angeles, California, Olu O. Oisaghie, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Lanny A. Breuer, COVINGTON & BURLING LLP, Washington, D.C., for Amici Curiae.

MATHIS, J., delivered the opinion of the court in which COLE, J., concurred. NALBANDIAN, J. (pp. 17–23), delivered a separate dissenting opinion.

_____

**OPINION**

_____

MATHIS, Circuit Judge.  Congress enacted Title III of the Civil Rights Act of 1960 to help end voting discrimination.  Title III of the Act gave teeth to prior civil-rights legislation by empowering the U.S. Attorney General to obtain certain state voting records so that he could investigate potential violations and enforce federal election law.  Back then, the government used this power to ensure that everyone who had the right to vote could freely exercise that right.  But today, the government invokes Title III for an inverse purpose—to ensure that some people have not voted.

Over the summer of 2025, the United States demanded election records from nearly every State and the District of Columbia.  As part of this endeavor, the government insisted that Michigan Secretary of State Jocelyn Benson produce her state's voter rolls.  Three weeks later, the government doubled down—it demanded not only the names on Michigan's voter rolls, but also the dates of birth, partial social security numbers, and driver's license numbers of every

registered voter in the state.  Benson provided the government with the public version of Michigan's statewide registered voter list but refused to go any further; she believed the federal government had no statutory authority to demand the sensitive, unredacted voter information it sought.  So the government filed suit to compel Benson to produce those records.  The district court dismissed the suit, concluding that Title III's narrow text cannot withstand the weight of the government's broad request.  We agree and affirm.

## I.

States do most of the heavy lifting in overseeing federal elections.  They receive this authority from the U.S. Constitution's Elections Clause, which charges State legislatures with regulating "[t]he Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const. art. I, § 4, cl. 1.  The "manner" of holding elections "encompasses matters like notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."  *Cook v. Gralike*, 531 U.S. 510, 523–24 (2001) (citation modified).    The Framers entrusted the States with this "broad power," *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986), because "state governments" are "best acquainted with the situation of the people," *United States v. Gradwell*, 243 U.S. 476, 484 (1917) (quotation omitted).

But Congress also has a role to play.  "Congress may at any time by Law make or alter such [state] Regulations."  U.S. Const. art. I, § 4, cl. 1.  The Framers thus reserved for "Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States."  *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation modified).  So Congress can add to state voting regulations, alter them, or displace them altogether.  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  "This grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress."  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013).  "In practice, the [Elections] Clause functions as a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices."  *Id.* at 9 (citation modified).

## A.

This case implicates three federal laws that impact the States' manner of conducting federal elections: Title III of the Civil Rights Act of 1960 (Title III), the National Voter Registration Act of 1993 (NVRA), and the Help America Vote Act of 2002 (HAVA). We briefly discuss each.

## 1.

*Title III.* In response to de jure discrimination against black voters in the South, Congress passed the Civil Rights Act of 1957, the first federal civil-rights law since Reconstruction. Pub. L. No. 85-315, 71 Stat. 634. It established a Commission on Civil Rights responsible for investigating allegations that American citizens were "being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin." *Id.* at 635. It also empowered the Attorney General to "seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966).

The Civil Rights Act of 1957 did not, however, arm the Attorney General with the tools necessary to investigate allegations of voting discrimination. The government could institute proceedings, but it lacked the power pre-suit to compel the production of documents and records from States to build a discrimination case. And with state and local authorities motivated to withhold their voting records from the federal government, efforts under the Act were largely ineffective. *See* Rep. of the U.S. Comm'n on Civil Rights, at 87–94 (1959).

Enter the Civil Rights Act of 1960. Pub. L. No. 86-449, 74 Stat. 86. Title III of that law requires States to keep certain voting records and give the Attorney General access to those records. *Katzenbach*, 383 U.S. at 313; *United States v. Mississippi*, 380 U.S. 128, 134 (1965). Specifically, Title III commands every election officer to retain "for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into [the official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. And it authorizes criminal penalties for

No. 26-1225                    *United States, et al. v. Benson, et al.*                    Page 5

"[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* § 20702.

Records and papers subject to Title III must be "made available for inspection, reproduction, and copying" if the Attorney General makes a "demand in writing" that specifies "the basis and the purpose" for the inspection. *Id.* § 20703. The federal "district court for the district in which a demand is made" has "jurisdiction by appropriate process to compel the production of" the voting records. *Id.* § 20705. The Attorney General and his employees may not divulge voting records produced under Title III "except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." *Id.* § 20704.

**2.**

*NVRA.* In 1993, Congress passed the NVRA. Pub. L. No. 103-31, 107 Stat. 77. The NVRA was primarily designed to "increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). But Congress also sought "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). So the NVRA "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).

The NVRA requires States to take certain actions to ensure that they have accurate voter rolls. States must make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4). The law also allows States to remove voters from voter rolls at their request or, "as provided by State law, by reason of criminal conviction or mental incapacity." *Id.* § 20507(a)(3)(A)–(B). To ensure compliance, the NVRA contains a public-disclosure provision requiring States to "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1).

No. 26-1225                *United States, et al. v. Benson, et al.*                Page 6

Further, each State must "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." *Id.* § 20509.

**3.**

*HAVA*.  Congress passed HAVA following the contentious 2000 presidential election. Pub. L. No. 107-252, 116 Stat. 1666.  HAVA aimed "to alleviate a significant problem voters experience"—eligible voters being turned away at the polls because their names were missing from voter registration lists.  *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004) (per curiam) (citation modified).  To that end, HAVA requires States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State."  52 U.S.C. § 21083(a)(1)(A).  And "[i]f an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993." *Id.* § 21083(a)(2)(A)(i).

HAVA also requires individuals to provide their driver's license number or the last four digits of their social security number to register to vote in a federal election.  *Id.* § 21083(a)(5)(A)(i).  If an applicant has neither, she is identified through the unique identifier alone. *Id.* § 21083(a)(5)(A)(ii).

**B.**

On March 25, 2025, the President issued an executive order titled "Preserving and Protecting the Integrity of American Elections."  Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025).  The order directs the Attorney General to "prioritize enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting" and to "take appropriate action with respect to States that fail to comply with the list maintenance requirements" of the NVRA and HAVA. *Id.* at 14007.

On July 21, 2025, the Attorney General sent Benson a letter "seeking information regarding Michigan's compliance with the NVRA." R. 1, PageID 10.  The letter requested: (1) a

No. 26-1225                     *United States, et al. v. Benson, et al.*                     Page 7

list of Michigan's election officials responsible for maintaining the voter registration list; (2) a description of steps taken to comply with the NVRA; and (3) "[t]he current electronic copy of Michigan's computerized statewide voter registration list." R. 39-2, PageID 492. It also sought information about Michigan's efforts to remove ineligible voters from registration rolls and its processes for identifying and addressing duplicate registrations, among other concerns.

Less than three weeks later, on August 8, 2025, the Attorney General sent Benson a second demand letter. The letter refused to extend the deadline for responding to most of the government's inquiries and again demanded production of Michigan's statewide voter registration list by August 18, 2025.

The Attorney General sent her a third letter on August 14, 2025. The August 14 letter demanded Michigan's unredacted statewide voter registration list under the NVRA, HAVA, and Title III. The Attorney General's stated purpose for the request was "to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA." R. 39-4, PageID 501.

Benson declined to provide the Attorney General with Michigan's unredacted statewide voter registration list, which includes the driver's license numbers, dates of birth, and the partial social security numbers for every registered voter. She instead provided the "public version" of Michigan's list with voters' personal identifying information redacted. R. 1, PageID 13–14; R. 39-5, PageID 505. Michigan refers to its statewide voter registration list as its qualified voter file. Mich. Comp. Laws §§ 168.509m(2)(b), 168.509o(1).

## C.

On September 25, 2025, the government sued Benson and the State of Michigan under Title III, the NVRA, and HAVA. It sought declaratory relief and an order requiring the Michigan Defendants to provide an unredacted electronic copy of Michigan's qualified voter file. The district court permitted the Michigan Alliance for Retired Americans, along with two registered Michigan voters, Donald Duquette and Keely Crimando, to intervene as defendants.

No. 26-1225              *United States, et al. v. Benson, et al.*              Page 8

All the defendants moved to dismiss the complaint.  The district court granted the motions and dismissed the complaint for failure to state a claim.

The government appeals.  It challenges only the dismissal of its Title III claim.  We review the district court's decision de novo.  *Mich. First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 425 (6th Cir. 2024).

## II.

This case calls on us to construe provisions of Title III.  We interpret statutes "based on the traditional tools of statutory construction."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024).  The goal, of course, is to determine a statute's "single, best meaning."  *Id.* at 400.  If a statute does not define a term, we give the term its ordinary meaning.  *EPA v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 638 (2025).  We read a statute's words "in their context and with a view to their place in the overall statutory scheme."  *Id.* at 643 (quotation omitted).  Contemporaneous dictionaries are an effective tool in the interpretive toolbox for determining the ordinary meaning of an undefined term.  *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 (2024).

## A.

We first consider whether Michigan's qualified voter file is subject to Title III.  Recall that Title III requires election officers like Benson to "retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . [1] all records and papers which [2] come into h[er] possession [3] relating to [4] any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.

Start with what the parties do not contest.  First, they do not dispute that Michigan's qualified voter file is a "record."  And second, they acknowledge that the term "relating to" has a broad meaning—"to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quotation omitted).  But does the qualified voter file "come into [Benson's] possession"?  And is the qualified voter file a record that Benson must "retain and preserve"?

No. 26-1225                    *United States, et al. v. Benson, et al.*                    Page 9

Title III does not define "come into . . . possession," so we must determine its ordinary meaning.  Around the time that Congress enacted Title III, this term meant to "acquire," "obtain," or "receive."  *See Honeycutt v. United States*, 581 U.S. 443, 449 (2017); *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire").

Benson did not acquire, obtain, or receive the qualified voter file from a third party. Instead, Michigan officials created it themselves.  Indeed, Michigan law directs the secretary of state to "*establish*[]" and maintain the qualified voter file.  Mich. Comp. Laws § 168.509o(1) (emphasis added).  So it is an internally generated electronic database, not a record acquired from an outside source.  An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained.  Thus, the qualified voter file did not "come into [Benson's] possession" as that term is ordinarily understood.

An example from oral argument helps to prove the point.  A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes.  It would be rather strange to say that the baker has "come into" possession of the cakes after pulling them out of the oven.  True, the baker did "come into" possession of the ingredients she used to make the cakes by acquiring those items from the grocery store.  But the baker did not "come into" possession of the cakes—she created them.

And the statutory context confirms our conclusion.  Election officers must preserve records that come into their possession relating to "any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  Election officers do not create these kinds of records.  Rather, they obtain them from third parties—generally voters or prospective voters.

Take the payment of poll taxes. At first glance, a "payment of poll tax" may seem dissimilar to "application" and "registration," thereby leading to a capacious reading of § 20701. But the history of poll taxes tells a different story. In 1959, five States (Alabama, Arkansas, Mississippi, Texas, and Virginia) still required voters to pay poll taxes. Rep. of U.S. Comm'n on Civil Rights at 34, 36–38. In many of these States' counties, a voter would go to the sheriff's office to pay her poll-tax bills. *See, e.g.*, *id.* at 59–60. The sheriff would give the voter a receipt reflecting the payment of the poll tax, and the voter had to give that receipt to election officials to vote. *See, e.g.*, *id.* at 32, 36–37; *see also State v. Old*, 34 S.W. 690, 690–91 (Tenn. 1896). After the passage of Title III, election officers would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had. *See* 52 U.S.C. § 20701. In Arkansas and Texas, for example, the payment of the poll tax was "equivalent" to registering to vote. Rep. of U.S. Comm'n on Civil Rights at 42, 51. Accordingly, poll-tax receipts qualify as records that election officers "come into" possession of. 52 U.S.C. § 20701.

That Michigan election officials and others must constantly change information in the qualified voter file further shows that it is not subject to Title III. The government may prosecute anyone who "willfully steals, destroys, conceals, mutilates, or alters" any record that Title III requires election officers to retain and preserve. *Id.* § 20702. But the NVRA and HAVA *require* Michigan election officials to alter the qualified voter file routinely as part of their "reasonable effort[s]" to ensure accuracy. *See id.* §§ 20507(a)(4), 21083(a)(4)(A). To that end, the qualified voter file consists of "[a]n electronic network that allows participating designated executive departments, state agencies, and county, city, and township clerks to electronically add, change, or delete records." Mich. Comp. Laws § 168.509p(b). So the secretary of state and other public officials can add individuals to the qualified voter file. *See id.* §§ 168.493a(2), 168.509o(3), 168.509ii. And they can also change information about individuals in the qualified voter file or remove them entirely. *See id.* §§ 168.493b, 168.509o(4).

Thus, construing § 20701 in a manner that subjects the qualified voter file to Title III would place Title III on a collision course with the NVRA and HAVA. This runs afoul of the harmonious-reading canon of statutory interpretation. That canon guides us, whenever possible,

to "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *see also Dep't of Agric. Rural Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (stating that courts should "approach federal statutes touching on the same topic with a strong presumption they can coexist harmoniously" (citation modified)).  Title III tells election officials to retain and preserve certain records and papers that come into their possession, and the NVRA and HAVA tell election officials to remove ineligible voters from statewide voter registration lists.  We should not adopt a reading that would place election officials in violation of one federal law for trying to comply with others.

The surplusage canon of construction confirms that Michigan's qualified voter file is not subject to Title III.  "Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are superfluous or void of significance." *Kirtz*, 601 U.S. at 53 (citation modified).  This canon "can be meaningful when a competing interpretation would avoid superfluity." *Bufkin v. Collins*, 604 U.S. 369, 387 (2025).

A construction that makes all voting records and papers in the election officers' possession subject to Title III would render "come into" superfluous.  After all, Congress could have designed Title III to cover all records broadly, as it did in the NVRA.  The NVRA requires States to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."   52 U.S.C. § 20507(i)(1).   Congress used the narrower language—"all records and papers which come into h[er] possession"—in Title III. *Id.* § 20701.  Reading Title III in a way that requires election officers to retain and preserve voting records and papers that they obtain, acquire, or receive allows "come into [her] possession" to do real work.

The government makes several counterarguments.  None of them persuade us.

*First*, the government argues that the qualified voter file is a record under Title III because other courts have determined that statewide voter registration lists are "records" under the NVRA.  *See Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019).  But identical statutory terms may carry different meanings in different statutory schemes, or even within different sections of the same statute.  *See Yates v. United States*, 574 U.S. 528, 537

(2015). Accordingly, that statewide voter registration lists may qualify as records under the NVRA tells us nothing about whether such lists are records that come into the possession of election officers under Title III.

*Second*, the government argues that it is entitled to the qualified voter file under Title III because Benson would have acquired records from voters and then relied on those records in creating the qualified voter file. The problem for the government is that it has not requested the records or papers that Benson obtained in creating the qualified voter file—the government has requested the qualified voter file itself.[1] Nothing in Title III allows the government to obtain something that the secretary of state created and established. *See* Mich. Comp. Laws § 168.509o(1). Not only that, but the qualified voter file contains information from diverse sources, many of which have nothing to do with "act[s] requisite to voting." *See* 52 U.S.C. § 20701. It includes information gathered from state health-department records as well as the Social Security Death Index, to name just two examples. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 626 (6th Cir. 2025).

---

[1]The qualified voter file contains the following information for qualified voters:

> (a) The name; residence address including house number and street name or rural route and box number, and the apartment number, if any; city; state; zip code; and date of birth.

> (b) The driver license number or state personal identification card number or similar number issued by a designated voter registration agency.

> (c) Jurisdictional information including county and city or township; village, if any; metropolitan district, if any; and school district.

> (d) Precinct numbers and ward numbers, if any.

> (e) Any other information that the secretary of state determines is necessary to assess the eligibility of qualified electors or to administer voter registration or other aspects of the election process.

> (f) Voting history for a 5-year period.

> (g) Before June 30, 2025, the most recent digitized signature of an elector if captured or reproduced by the secretary of state or a county, city, or township clerk from a voter registration application under section 509hh, or captured or reproduced by the secretary of state under section 307 of the Michigan vehicle code. Beginning June 30, 2025, and subject to section 493b(7), the digitized signatures of an elector if captured or reproduced by the secretary of state or a county, city, or township clerk from a voter registration application under section 509hh, or captured or reproduced by the secretary of state under section 307 of the Michigan vehicle code.

Mich. Comp. Law § 168.509q(1) (citation modified).

No. 26-1225                *United States, et al. v. Benson, et al.*                Page 13

*Third*, relying on *United States Department of Justice v. Tax Analysts, Inc.*, 492 U.S. 136 (1989), the government argues that a person can come into possession of documents that she creates. The government's reliance on *Tax Analysts* is misplaced. The Court considered whether certain materials were "agency records" under the Freedom of Information Act. *Id.* at 141. The Court construed "agency records" broadly to include materials that an agency "either create[s] or obtain[s]." *Id.* at 144 (quotation omitted). That expansive term captures self-generated materials. But *Tax Analysts* provides no insight about the narrower term "come into h[er] possession," as Title III uses it.

*Fourth*, the government argues that the term "come into h[er] possession" imposes a temporal obligation such that election officers must retain any voting records or papers that they obtain or create for 22 months after a federal election. Even if we accept this as a correct interpretation of Title III (it is not), this interpretation does not entitle the government to the qualified voter file. In response to the NVRA's enactment, the Michigan legislature directed the Michigan secretary of state to create the qualified voter file, which became the official voter file by 1998. Mich. Comp. Laws §§ 168.509n–p (1995). Thus, even under the government's strained interpretation, Benson did not come into possession of the qualified voter file within 22 months after the 2022 federal election—the time period subject to the government's requests. The qualified voter file had existed for decades before that election. And nothing in the statute requires the production of a preexisting database that long predates the election at issue. The better construction of Title III requires election officials to retain and preserve any voting records or papers that they obtain, acquire, or receive for 22 months after a federal election.

The notion of a temporal distinction between *coming into possession* and *being in possession* falls apart when considered in a different context. For instance, federal law makes it a felony for a "Postal Service officer or employee" to destroy or open mail "which shall come into his possession, and which was intended to be conveyed by mail." 18 U.S.C. § 1703(a). This statute criminalizes destroying or opening mail that a postal-service worker has acquired, obtained, or received in the course of their employment—not self-generated mail. Yet under the government's rationale, a postal-service worker would commit a crime by opening or destroying her own mail. But that cannot be right. And nothing in this statute suggests a temporal

No. 26-1225                 *United States, et al. v. Benson, et al.*                 Page 14

component—if at any time a postal-service worker destroys or opens another's mail, that worker has violated the statute.

*Fifth*, the government's contention that our interpretation would "paralyze the United States' ability to enforce various federal voting laws" is unpersuasive.  D. 25 at p.33.  "Pure policy considerations, of course, do not constitute a proper method of statutory interpretation." *Reichert v. Kellogg Co.*, 170 F.4th 473, 487 (6th Cir. 2026).

*Sixth*, the government points to an opinion from the Department of Justice Office of Legal Counsel (OLC), which concludes that Title III covers statewide voter registration lists such as Michigan's qualified voter file.  Courts may accord "due respect to Executive Branch interpretations of federal statutes." *Loper Bright*, 603 U.S. at 385.  That respect is "especially warranted" when the Executive Branch issues its interpretation around the time of a statute's enactment and the interpretation remains "consistent over time." *Id.* at 386.  But that is not the kind of interpretation we have here.

OLC issued the opinion the day before oral argument here, roughly 66 years after Title III's enactment.  So the interpretation is, of course, not contemporaneous with the passage of Title III.  And the government has not shown that OLC's opinion adheres to some earlier Executive Branch interpretations of Title III.  Not only that, for the reasons we have explained, OLC's opinion conflicts with the plain language of Title III.  So we reject OLC's interpretation of Title III.

The dissent's arguments fare no better as they largely rest on a mismatch between what the government actually requested from Benson and what the dissent thinks the government requested.  The government sought Michigan's unredacted voter list, and it said so plainly in its August 8 and August 14, 2025 letters.  And in its complaint, the government protests that Benson provided only the public version of the voter list "without crucial identifying information" such as "full date of birth, as well as driver's license number and/or last four digits of social security numbers."  R. 1, PageID 14.  The dissent, however, believes that the government requested a compilation of individual voter records used to create the voter list.  But that is wrong.  And it taints the dissent's entire analysis.

No. 26-1225                 *United States, et al. v. Benson, et al.*                 Page 15

## B.

The government's Title III claim falters for another reason—the government failed to comply with § 20703.  That provision requires election officers to produce "[a]ny record or paper required by section 20701 . . . upon demand in writing by the Attorney General or his representative."  52 U.S.C. § 20703.  "This demand shall contain a statement of the basis and purpose therefor."  *Id.*[2]

The government sent three letters to Benson requesting Michigan's unredacted qualified voter file.  The July 21 letter and the August 8 letter reference the NVRA and HAVA as the authority entitling the government to the unredacted qualified voter file.  Those letters did not mention Title III.  And even if we assume that the letters indicate a basis for the government's request, they do not identify a purpose for the request.  The August 14 letter, by contrast, mentions Title III and specifies the purpose for the government's request for Michigan's qualified voter file.  But that letter does not state a basis for the request.

"Shall" and "and" are important words in § 20703.  "The use of the word 'shall'" in a statute "creates an obligation impervious to judicial discretion."  *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (quotation omitted).  The word "and" is a conjunction "whose function is to connect specified terms."  *Pulsifer v. United States*, 601 U.S. 124, 133 (2024).  It means "along with or together with."  *Id.* (quotation omitted).

The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose.  None of the three letters contains both a statement of the basis along with the purpose of the government's request for Michigan's qualified voter file.  The statutory context suggests that any demand must contain both.  For example, the Supreme Court concluded that several federal agencies complied with their obligation under the Administrative Procedure Act to "incorporate in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c), where the agencies' final rules "explain[ed] that the rules were necessary to

---

[2]The dissent suggests that the question of whether the government has complied with § 20703 is "virtually unreviewable by a federal court."  Dissent at 21.  For support, the dissent relies on 60-year-old out-of-circuit caselaw such as *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).  But subsequent binding precedent from the Supreme Court and this court carves out a role for the courts in reviewing civil investigative demands like the government's.  *See, e.g., United States v. Powell*, 379 U.S. 48, 58 (1964); *United States v. Markwood*, 48 F.3d 969, 976 (6th Cir. 1995).

protect sincerely held moral and religious objections and summariz[ed] the legal analysis supporting the exemptions," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 686 (2020) (citation modified).  Because the government did not comply with its mandatory statutory obligation to submit a demand to Benson containing a statement of both the basis and purpose of its request, Benson did not violate Title III by refusing to produce the unredacted qualified voter file.

### III.

For these reasons, we **AFFIRM** the district court's judgment.

----

**DISSENT**

----

NALBANDIAN, Circuit Judge, dissenting.    This complicated case turns on three questions.  The first asks us to distinguish between types of "records":  Must compilation records like Michigan's qualified voter file meet Title III's requirements themselves, or is it enough that their constituent parts satisfy the statute?  The second asks us to parse Title III's "come into . . . possession" requirement:  Assuming that Michigan's voter file must itself "come" into Benson's "possession," does it meet that requirement?  52 U.S.C. § 20701.  And the third asks us to determine whether the DOJ adequately stated its basis and purpose in seeking Michigan's voter list.  Because my answer to these questions differs from the majority's, I respectfully dissent.

First, I'll explain why Michigan's qualified voter file is a record that meets Title III's requirements because its constituent parts "c[a]me into" Benson's "possession."  *Id.*  Second, I'll explain why Title III covers some government-generated documents and doesn't impose a strict source-of-origin limitation.  Thus, even if Michigan's voter file must *itself* "come into" Benson's "possession" (as the majority demands), that requirement is met here.  And third, I'll briefly address the majority's conclusion that the Attorney General's demand lacked a proper basis and purpose.

**I.**

Title III's text and structure clarify that the statute pertains to individual records.  So Michigan's voter file is a record that needn't itself "come into" Benson's "possession" so long as the file's constituent records come into her possession.  *Id.*  And they do.

Title III's "come into . . . possession" requirement refers to *individual* records—not to compilations like Michigan's voter file.  The statute requires an election officer to retain "all records and papers which come into [her] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [an] election."  *Id.*  So "relating to" and the subsequent list of voting acts modify the statute's "come into . . . possession" limitation.  *Id.*  That enumerated list—applications, registrations, and poll tax payments—describes *individual*

No. 26-1225                 *United States, et al. v. Benson, et al.*                 Page 18

actions.**1**  What's more, the word "any" provides the statute's unit of coverage:  the *individual* application, the *individual* registration, the *individual* poll-tax payment.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("any" means "*one or some . . . of whatever kind*" (citation modified)).

And here, the voter file's component, individual records satisfy Title III.  The file is a compilation of externally sourced information—whether from state agencies, other states, the federal government, or voters themselves.  The district court said as much.  *See United States v. Benson*, 819 F. Supp. 3d 753, 769 (6th Cir. 2026) (noting that the file includes information from "other state agencies," "data from the . . . Social Security Administration," "information shared by other states," and "information in voter registration applications").**2**

Michigan's voter file assumes the quality of being a record *only* because it's composed of individual records that independently satisfy Title III's "come into possession" requirement.**3**  Therefore, the aggregate file needn't come into Benson's possession as a thing-in-itself.**4**  The individual records meet the requirement, and that's enough.**5**

The majority's contrary holding is inconsistent with our responsibility to "make sense rather than nonsense out of the *corpus juris*."  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991).  It blesses Benson's invocation of two modern statutes (the NVRA and HAVA) to

---

**1**Applying the canon of *ejusdem generis*, the "other act" catch-all applies to individual actions as well.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (citation modified)).

**2**Individual voting histories aren't externally sourced.  But Benson admits that the Attorney General didn't request voting histories.  Michigan Br. 32.  Perhaps because the Attorney General didn't consider them to be part of the qualified voter list.

**3**The majority parses Title III's enumeration of "application[s], registration[s], [and] payment[s] of poll tax[es]" to conclude that Title III covers only records "from third parties—generally voters or prospective voters." Maj. Op. at 10.  In so doing, the majority hunts for a nonexistent external-source limitation but fails to recognize the statute's heavy-handed textual and structural hints that its limiting language applies to individual records—not to compilations of the individual records.

**4**This reading doesn't render "come into . . . possession" superfluous because Michigan's voter list is composed of documents which satisfy that requirement.  52 U.S.C. § 20701.

**5**The majority confuses this conclusion with an assertion that the DOJ requested a compilation of individual records used to create the voter list, rather than the list itself.  Not so.  The DOJ requested the list itself, but—as I explained—the list's constituent parts satisfy the CRA's "come into . . . possession" requirement.

shirk her obligations under an older one (Title III).  On the majority's view, the NVRA and HAVA impose list-maintenance requirements that run afoul of Title III's preservation obligations, so Benson can comply with two statutes but simply ignore the third.  I disagree.

The NVRA, HAVA, and Title III form one harmonious arrangement—just not in the way the majority assumes.  As I explained, the qualified voter file is a record only because it consists of individual records that came into Benson's possession.  So when the Attorney General requested the file, she requested its constituent individual records—which Michigan must preserve under Title III.  52 U.S.C. § 20701.  But Michigan also generates a current snapshot of eligible voters.  Title III's preservation obligations run to the underlying individual records—*not* to that current-eligibility snapshot.  And though the NVRA and HAVA require Michigan to keep that snapshot current through regular list maintenance, *see id.* §§ 20507(a)(4), 21083(a)(4)(A), they don't require Michigan to destroy the underlying records.  So there's no conflict.  To see why, note that the current-voter snapshot isn't synonymous with the underlying records (which form the list that the Attorney General seeks).  Benson may update the snapshot at any time, but she may not willfully "destroy[], conceal[], mutilate[], or alter[]" the *underlying* individual records for the duration of Title III's "twenty-two month[]" preservation period.  *Id.* § 20701–02. For example, she may add new voters to the list.  That doesn't "alter[]" an existing individual record.  *Id.* § 20702.  Indeed, adding a new registration doesn't touch existing records at all, as the Attorney General observes.  *See* Reply Br. 15–16 ("[U]pdating the list is supplementing it, not 'willfully' altering it in a punishable sense.").  And Benson may update an existing voter's status or remove him from the current-voter list—if she preserves the underlying records.  To cite the Attorney General's low-tech example, that's akin to "inserting a new hardcopy voter-registration card . . . in a binder-file that contains all the hardcopy voter-registration cards." *Id.* at 16.

The majority's reading also contravenes the canon against implied repeal.  Courts are loath to conclude that subsequently enacted statutes impliedly repeal earlier ones unless "provisions in two statutes are in irreconcilable conflict." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citation modified).  And no such conflict exists here for the reasons I explained:  Benson can comply with HAVA and the NVRA by updating the voter file and comply with Title III by

No. 26-1225              *United States, et al. v. Benson, et al.*              Page 20

preserving the underlying individual records that "c[a]me" into her "possession."  52 U.S.C. § 20701.

Thus, the Attorney General is entitled to the voter file as the aggregated form of documents which are themselves subject to Title III disclosure.  Benson can't insulate individual records from Title III disclosure by pointing to their present (and HAVA-mandated) aggregated form.[6]

## II.

But even on the majority's view that an aggregate record must *itself* "come into" Benson's "possession," Title III covers at least some government-generated records—including Michigan's voter file.

Let's go back to the text.  Title III requires "[e]very officer of election" to "retain and preserve . . . all records and papers which come into [her] possession relating to any application, registration, payment of poll tax, or other act requisite to voting."  *Id.*  Our job is to "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute."  *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (citation modified).

So which "records . . . relating to . . . act[s] requisite to voting" might contemporaries have understood to "come into" an election officer's "possession"?  52 U.S.C. § 20701. Contemporary problems provide the answer.  One practice in the Jim Crow South was the use of "voucher" systems, whereby municipalities required prospective voters to find registered voters who could vouch for them.  *See* Rep. of the U.S. Comm'n on Civ. Rights 93 (1959).  And county boards of registrars maintained internal indices that tracked the number of times each registered voter "vouched" for an applicant.  *Id.*  So if a county board sent a voucher index to a state election official, this index would have "come" into the state official's "possession."  52 U.S.C. § 20701.  Even though government officials created the index, it came from an external source. The same result obtains as a purely linguistic matter.  The county board compiled voter-supplied

---

[6]Indeed, one district court rejected any form-based distinction between a voter file and its underlying records and noted that the plaintiff's request for a state's voter file reflected the aggregated form of the underlying records—not a request for the voter file as a thing of itself.  *See Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 440–41 (D. Md. 2019) ("[A] voter list is simply a pared down compilation of voter registrations.").

No. 26-1225                 *United States, et al. v. Benson, et al.*                 Page 21

information, aggregated it into an index, and passed it up the ladder.  So the state official came into possession of the index.  Look no further than the majority's own sources.  *See, e.g.*, *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of").

So too here.[7]   Even on the majority's view that the aggregate record must come into Benson's possession, if Benson's employees generated the voter file—and therefore didn't "come into . . . possession" of the list themselves—Benson nonetheless "c[a]me into . . . possession" of the file when her employees sent it to her.[8]   52 U.S.C. § 20701.  Text and structure drive the point home.  Title III focuses on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]."  *Id.* §§ 20701, 20703.  As long as even one "officer[] of election"[9] (i.e., Benson) "comes into . . . possession" of the voter list, Title III applies.  *Id.* § 20701.

### III.

Finally, the Attorney General has stated a proper basis and purpose.

To start, at least one of our sister circuits has held that this question is virtually unreviewable by a federal court:  There's "no place for any . . . procedural device . . . to ascertain the factual support for, or the sufficiency of, the . . . basis and [] purpose [] set forth in the written demand."  *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962); *see also Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("[T]he Attorney General [need only] identify in

---

[7]For what it's worth, Benson and amici argue, based on their reading of "comes into . . . possession," that the statute doesn't cover any internally or self-generated record.  So if a county clerk were to keep track of anyone, by race, who paid a poll tax or was given a literacy test or otherwise tried to register to vote, that record could not be obtained by the DOJ.  Broadly speaking, I'm skeptical that "comes into possession" is anything more than a temporal and custodial limitation—not a broader limitation on the source of origin of a record.

Regardless, I don't see a categorical restriction against "self-generated" records in the statute.  And even under Benson's reading, such a document could be sent from one official to another and therefore come into the recipient's possession.

[8]Nor does this reading render "come into . . . possession," 52 U.S.C. § 20701, superfluous because at a minimum, that language cabins an election official's liability to documents she received during her tenure.

[9]Title III defines "[o]fficer of election" broadly to include any person who, under color of law, "performs or is authorized to perform any function . . . in connection with any application, registration, payment of poll tax, or other act requisite to voting."  52 U.S.C. § 20706.

No. 26-1225                  *United States, et al. v. Benson, et al.*                  Page 22

a general way the reasons for his demand.  Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute.  No showing even of a prima facie case of a violation of Federal law need be made." (citation modified)).[10]

But in any event, the DOJ's letters establish a proper basis and purpose.  The DOJ's July 21, 2025 letter referred to Michigan's NVRA[11] and HAVA obligations.  It explained that the DOJ received a complaint alleging HAVA violations by Michigan, and it cited various anomalies in Michigan's voter registration data.  The letter cited the NVRA but didn't mention Title III. Then, the DOJ sent a follow-up letter on August 14,[12] which clarified that it's "empowered by" Title III to assess "Michigan's compliance with the list maintenance requirements of the NVRA and HAVA."  R.39-4, Letter, PageID 501.  The majority strains to bifurcate the two letters into discrete "demands" and concludes that neither passes muster.  On its view, the July 21 letter articulated a basis (purported anomalies in Michigan's voter data) but no purpose.  And while the August 14 letter invoked a "purpose" ("to ascertain Michigan's compliance with . . . the NVRA and HAVA," *id.*), it failed to recount the basis.

---

[10]Cases like *United States v. Markwood*, 48 F.3d 969, 976–77 (6th Cir. 1995), aren't to the contrary because the DOJ has met the "statutory requirements pertaining to the issuance and enforcement of the subpoena" by providing a basis and purpose.

[11]Intervenors-appellees cite *Public Interest Legal Foundation (PILF) v. Benson*, 136 F.4th 613, 628 (6th Cir. 2025), to suggest that the DOJ's basis is inadequate given our recent characterization of Michigan's list-maintenance efforts as "more than reasonable" under the NVRA.  True, we held there that the NVRA's "reasonable effort" requirement demands only a "serious attempt that is rational and sensible," not a "perfect, or even optimal," attempt to remove all ineligible voters," and that Michigan's program met the requirement.  *Id.* at 625.  But in *PILF*, a private organization sued Benson alleging that Michigan failed to conduct list maintenance.  *Id.* at 624.  The parties sparred over discovery, *see id.* at 623, and our holding was cabined by the record developed in that case— which uncovered low numbers of unremoved ineligible voters, *id.* at 626–29.  But we didn't hold that the DOJ is foreclosed from developing a different (and better) record of Michigan's NVRA non-compliance.  And for good reason.  Like other investigative statutes, the CRA doesn't deprive the DOJ of investigative authority when a private plaintiff secures a favorable merits ruling on a different (and perhaps less-developed) record.  The DOJ "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 F.3d 632, 642–43 (1950).  And here, the DOJ cited statistics that paint a very different picture of Michigan's compliance with the NVRA.  *See* R.39-2, Letter.

[12]The DOJ sent another letter on August 8, 2025 informing Benson that her request for "another 88 days to respond . . . is not acceptable."  R.39-3, Letter, PageID 497.  That letter isn't relevant here.

The majority concludes that the DOJ must provide its basis and purpose in one communication. But it shuns the common-sense inquiry of whether the DOJ put Michigan on notice.

To start, the Attorney General needn't articulate a basis and a purpose in a single communication. Title III refers to retention and preservation obligations "upon demand . . . by the Attorney General." 52 U.S.C. § 20703. It doesn't refer to *a* demand. So the statute doesn't require that a single communication contain both a "basis" and a "purpose," because two (or more) communications could amount to one "demand." *Id.* The provision's sole use of the indefinite article "a" is its requirement that "[t]his demand . . . contain *a* statement of the basis and purpose therefor." *Id.* (emphasis added). That's consistent with my reading because, again, two communications could compose one demand. *Cf. Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021) (concluding otherwise because, unlike here, the indefinite article "a" preceded the word "notice").

And regardless, the August 14 letter satisfies the CRA's requirements. It invokes the CRA and explicitly states a purpose: "to ascertain Michigan's compliance with the list maintenance requirements of the NVRA and HAVA." R.39-4 at PageID 501. As for basis, though the August 14 letter doesn't spell out the litany of questionable registration practices outlined in the July 21 letter, it refers to that earlier letter. *See* R.39-4 at PageID 500 ("clarify[ing] the DOJ's existing "request"); *id.* ("[w]e have requested Michigan's [voter list]"). So any common-sense reading of the DOJ's "purpose"—which invokes its CRA authority to enforce the NVRA and HAVA—also contains a "basis" because (1) the DOJ referred to the earlier letter, which specified the potential NVRA/HAVA violations, and (2) the DOJ referred to the NVRA and HAVA in explaining its purpose. The July 21 letter and its basis, then, are incorporated by reference into the August 14 letter.

**IV.**

For these reasons, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 26-1225


UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

      v.

JOCELYN BENSON, in her official capacity as Secretary of
the State of Michigan; STATE OF MICHIGAN,

      Defendants - Appellees,

MICHIGAN ALLIANCE FOR RETIRED AMERICANS;
DONALD DUQUETTE; KEELY CRIMANDO,

      Intervenors - Appellees.


Before:  COLE, NALBANDIAN, and MATHIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.


**ENTERED BY ORDER OF THE COURT**


_____

Kelly L. Stephens, Clerk