RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 26-1225

JOCELYN BENSON, in her official capacity as Secretary of the State of Michigan; STATE OF MICHIGAN,

*Defendants-Appellees*,

MICHIGAN ALLIANCE FOR RETIRED AMERICANS; DONALD DUQUETTE; KEELY CRIMANDO,

*Intervenors-Appellees*.

————————————

On Petition for Rehearing En Banc

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-01148—Hala Y. Jarbou, Chief District Judge.

Argued:  May 13, 2026

Decided and Filed:  August 14, 2026

Before:  COLE, NALBANDIAN, and MATHIS, Circuit Judges.

————————————

**COUNSEL**

**ON PETITION FOR REHEARING EN BANC and MOTION TO EXPEDITE CONSIDERATION OF THE PETITION:** Kelsey E. McGee, David N. Goldman, Andrew G. Braniff, Jesus A. Osete, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. **ON RESPONSE:** Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Defendants-Appellees. Aria C. Branch, Joshua C. Abbuhl, Branden D. Lewiston, Derek A. Zeigler, ELIAS LAW GROUP LLP, Washington, D.C., Sarah Prescott, SALVATORE PRESCOTT PORTER & PORTER,

No. 26-1225          *United States et al. v. Benson et al.*          Page 2

Northville, Michigan, for Intervenors-Appellees. **ON BRIEF:** Jason B. Torchinsky, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, Washington, D.C., Abhishek Kambli, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, New York, New York, Ronald D. Coleman, COLEMAN LAW FIRM, PC, Newark, New Jersey, for Amici Curiae.

The court delivered an order denying the petition for rehearing en banc. MURPHY, J. (pp. 3–11), delivered a separate statement concurring in the denial of the petition for rehearing en banc, in which SUTTON, C.J., and LARSEN, J., concurred, and READLER, J., concurred in all but Part II.C. GRIFFIN, J. (pp. 12–19), delivered a separate opinion dissenting from the denial of the petition for rehearing en banc, in which BUSH, J., concurred. THAPAR, J. (pp. 20–30), delivered a separate opinion dissenting from the denial of the petition for rehearing en banc, in which GRIFFIN, BUSH, NALBANDIAN, and HERMANDORFER, JJ., concurred.

—————————————

## ORDER

—————————————

The court received a petition for rehearing en banc and a motion to expedite consideration of the petition. The motion to expedite is granted in part. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision. Judge Nalbandian would grant the petition for panel rehearing for the reasons stated in his dissent to the court's opinion of June 24, 2026. The petition was also circulated to the full court. Less than a majority of the judges voted in favor of rehearing en banc. Therefore, the petition is denied.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring in the denial of rehearing en banc.  This case involves important legal issues about the United States' ability to obtain voting records from the States under Title III of the Civil Rights Act of 1960.  *See United States v. Benson*, 179 F.4th 470, 474 (6th Cir. 2026).  And I likely would have agreed with much of Judge Nalbandian's dissent if I had sat on the panel.  So the legal issues may well justify en banc review at some point.  But now is not the proper time.  I read the panel opinion as denying relief to the United States based on curable procedural problems—not incurable limits on the United States' right to voter records.  In particular, the panel opinion and dissent primarily disagreed over how to interpret the specific letters that the Department of Justice (DOJ) sent to Michigan's Secretary of State: Did the DOJ request only the statewide voter-registration list?  Or did the DOJ's request impliedly include a demand for the underlying voter-by-voter records?  The majority interpreted the letters narrowly, while the dissent interpreted them broadly.  Yet nothing in the majority opinion prevents the DOJ from sending a fresh letter leaving no doubt that it demands the "individual voter records used to create the voter list."  *Id.* at 482.  That path strikes me as more efficient than an en banc rehearing in which some 17 judges might spend more time parsing the meaning of the letters than the meaning of the law.  On this understanding, I concur in the denial of rehearing en banc.

I

At the outset, I agree that two factors might well point in the direction of our full court's review.  For one thing, the United States serves "a compelling interest" when it seeks to ensure "the integrity" of federal elections.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).  "[I]nflated voter rolls" containing individuals who are ineligible to vote increase the risk of voter fraud and decrease the public's confidence in an election's validity.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196–97 (2008) (opinion of Stevens, J.).  Congress recognized this concern when it passed the National Voter Registration Act of 1993 (NVRA).  *See* 52 U.S.C. § 20501(b)(3)–(4).

The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists" of voters. *Id.* § 20507(a)(4); *see Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761–62 (2018). And Congress recognized the concern again when it passed the Help America Vote Act of 2002 (HAVA). HAVA compelled States to use "a single, uniform, official, centralized, interactive computerized statewide voter registration list[.]" 52 U.S.C. § 21083(a)(1)(A). It added that the States must establish "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from" this list. *Id.* § 21083(a)(4)(A). So both caselaw and legislation support the government's position that this case touches issues of "exceptional importance" to the country. Fed. R. App. P. 40(b)(2)(D).

For another thing, there is room for doubt over the panel opinion's interpretation of the phrase "come into his possession" in Title III. This title generally requires an "officer of election" to "retain and preserve" records that "come into his possession" relating to any action "requisite to voting in [a federal] election" for a period of twenty-two months "from the date of" that election:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian.

52 U.S.C. § 20701. According to the panel, "[a]n ordinary English speaker would not say that [Michigan's Secretary of State] has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. I might agree—at least in the abstract if the phrase has not developed a specialized legal meaning (as Judge Griffin suggests).

From there, though, the panel makes an unexplained logical leap: it treats *all* "Michigan officials" as a *single* "officer of election" and exempts records that any state actor creates even when the actor transfers the records to other officers. *Id.* at 478–79. Yet, as Judge Nalbandian explained, the language imposes a specific duty on an individual (each officer of election), not a general duty on the entire State of Michigan. *See id.* at 486–87 (Nalbandian, J., dissenting). That is, if a particular officer of election "come[s] into . . . possession" of a qualifying record, this specific person must "retain and preserve" it unless state law allows the person to transfer the record "to another officer of election" or the State has designated a "custodian" to keep all these records. 52 U.S.C. § 20701. And an "ordinary English speaker" would say that the Secretary of State "has come into possession" of records that (for example) a local official creates when that local official places the records in the Secretary's custody. *Benson*, 179 F.4th at 479. At the least, the Secretary of State "came into possession" of the voter-registration list when she assumed office in 2019. *Cf. Kennedy v. Lynd*, 306 F.2d 222, 230 (5th Cir. 1962).

Keep in mind, too, that the panel's reading of "come into . . . possession" extends beyond this case's factual context: a request for voting records for list-maintenance purposes. 52 U.S.C. § 20701. That reading would also apply when the United States requests voting records to investigate allegations of voter discrimination. In both contexts, the DOJ now may lack the power to obtain "internally generated" records from the States. *Benson*, 179 F.4th at 479.

II

Despite my concerns with the panel's reasoning, several other factors convince me that this legal issue does not warrant en banc review at this time.

A

*First*, the difference between the panel opinion and Judge Nalbandian's dissent may turn out to be more semantic than real. As I read these opinions, their disagreement rests primarily on the meaning of the *three letters* that the DOJ sent—not on the United States' right to review Michigan's voter records. On the one hand, the panel nowhere disputes the dissent's main claim: that the United States is entitled to the "*underlying individual records*" that Michigan used to create its statewide voter-registration list. *Benson*, 179 F.4th at 485 (Nalbandian, J., dissenting)

(emphasis added).  The problem for the United States, according to the panel, is that none of its letters requested the "compilation of individual voter records used to create the voter list." *Id.* at 482 (majority opinion).  Noticeably absent from the majority's response to the dissent?  Any claim that the United States could *not* seek these individual voter records.  So the procedural defect that the panel identified with the dissent's reading of the letters has a simpler fix than en banc review: the DOJ may send a new letter unambiguously requesting these individual records.

On the other hand, the dissent does not seem to dispute the majority's main claim: that "the aggregate" list does not qualify as a record that the Secretary must preserve under § 20701. *Id.* at 485 (Nalbandian, J., dissenting).  Indeed, all panel members reconcile Title III with the NVRA and HAVA in similar ways.  Title III punishes officers of election who "willfully" violate its command to "retain and preserve" qualifying records, and it punishes "[a]ny person" who "willfully" "alters" those records.  52 U.S.C. §§ 20701–02.  These provisions ostensibly create a problem if the entire statewide list qualifies as a record that election officers must preserve: the NVRA and HAVA require those officials to "constantly change" the list whenever a voter moves into the State, leaves it, changes an address, dies, or the like.  *Benson*, 179 F.4th at 479.  The dissent viewed these changes as acceptable because the "current-eligibility snapshot" (the full list as it exists at any moment) does *not* qualify as a record that officers must preserve under § 20701—only the "*underlying* individual records" do.  *Id.* at 485 (Nalbandian, J., dissenting). In short, neither the majority nor the dissent treated the item that the DOJ requested—the "current snapshot of eligible voters" as of July 21, 2025—as subject to preservation under § 20701.  *Id.*  Rather, Judge Nalbandian disagreed with the majority over the meaning of the letters.  He read the United States' formal request for "the aggregate file" to encompass a request for the "individual records" that make up that file.  *Id.*  But again, this debate about the meaning of letters has a simpler solution: the DOJ may send a new letter.

B

*Second*, while I also have my doubts about the majority's second reason for affirming the district court, that issue appears even less worthy of en banc review.  Title III allows the Attorney General to "demand" covered records from an officer of election, but it then says that the written "demand shall contain a statement of the basis and the purpose therefor."  52 U.S.C.

§ 20703.  The panel read this text in a technical way as requiring a *single* letter to contain the required statement of the "basis" and "purpose" for the request.  *Benson*, 179 F.4th at 483.  It also read the word "basis" as requiring the letter to contain *both* a legal basis (Title III) *and* a factual basis (perhaps a suspicion of violating the law?) for the demand.  *Id.*  As Judge Nalbandian explained, however, the third letter likely included enough information.  *Id.* at 488 (Nalbandian, J., dissenting).  It made clear that the DOJ's demand was based on "Title III"; it referred to its earlier requests showing the factual concerns with Michigan's voter-registration lists; and it identified its purpose to "assess" the State's "compliance" with the NVRA's and HAVA's list-maintenance requirements.  Ltr., R.39-4, PageID 500–01; *cf. Lynd*, 306 F.2d at 229 n.6.

At the same time, I would not overread the panel opinion.  It nowhere disputed that the three letters *collectively* contained enough information to identify the DOJ's "basis" and "purpose" for its records request.  52 U.S.C. § 20703.  My colleagues also did not hold that the DOJ lacks the authority to investigate NVRA and HAVA violations using Title III.  They thus did not follow those courts that have suggested that an investigation into voter discrimination represents the only proper "purpose" for a Title III investigation.  *See United States v. Weber*, 816 F. Supp. 3d 1168, 1182–83 (C.D. Cal. 2026).  Although § 20703 requires the DOJ to identify the "purpose" for its demand, I see nothing in the statute's text that limits the purposes for which the DOJ may request the records.  So the district court's reading in this case (that the DOJ may investigate NVRA and HAVA violations using Title III) remains viable in this circuit.  *See United States v. Benson*, 819 F. Supp. 3d 753, 767–68 (W.D. Mich. 2026).  Here too, then, the panel's holding does not prevent the DOJ from sending a new letter with all the information contained across the three letters.

C

*Third*, the belated way in which Title III entered the picture in this controversy suggests that further percolation in the courts (and additional clarification by the DOJ) could serve a useful function.  Because the DOJ was investigating Michigan's general efforts to comply with the NVRA's and HAVA's list-maintenance requirements, it initially identified the NVRA as the source of authority to request the "current electronic copy" of Michigan's voter-registration list

*as of July 21, 2025*.  Ltr., R.39-2, PageID 492 (citing 52 U.S.C. § 20507(i)); *see* Ltr., R.39-3, PageID 497 (same).  On appeal, however, it did not renew its arguments that the NVRA or HAVA required this disclosure.  And the DOJ did not identify Title III as a source of authority for the request until it sent its third letter to the Secretary of State.  Ltr., R.39-4, PageID 501.  Yet that letter did not change the scope of the DOJ's demand: the voter-registration list as it existed at that time.

This fact creates a potential mismatch.  The NVRA and HAVA address the States' *general list-maintenance duties*.  Title III, by contrast, appears to have an *election-specific* focus. Section 20701 seems to create a (recurring) retention duty covering only the "records and papers" for a specific election on a specific date.  52 U.S.C. § 20701.  The retention duty starts "from the date of" that election.  *Id.*  And it runs "for a period of twenty-two months" after that date.  *Id.*  The duty covers only those "records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting *in such election*[.]"  *Id.* (emphasis added).  I read the phrase "in such election" as likely modifying all the words that proceed it—meaning that the statute covers only records about a *specific election*.  *Id.*; *see Lockhart v. United States*, 577 U.S. 347, 352, 355 (2016); *id.* at 362–68 (Kagan, J., dissenting); *United States v. Bass*, 404 U.S. 336, 339–40 (1971).  In legalese, the series-qualifier canon (not the last-antecedent rule) applies.  *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 147–53 (2012).

Title III's apparent election-specific nature leads me to conclude that this case does not present the ideal vehicle for en banc review.  Did the DOJ's letters request records tied to *any* election?  If so, which one?  It did not say.  Even if an entire voter list could qualify as a "record" in the abstract, it is not obvious that Michigan's list *as it existed on July 21, 2025*, would relate to any election under § 20701.  And the Attorney General may request *only* a "record" "required by section 20701 . . . to be retained and preserved," not *all* voting records.  52 U.S.C. § 20703.

Perhaps the voter-registration list as it existed on July 21, 2025, relates to the *future* November 2026 election?  The Fifth Circuit once held that § 20701's retention duty covered records about "subsequent" "elections" and that a contrary view would read "the statute too narrowly."  *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (per curiam).  That reading

serves Title III's purpose by barring States from destroying records (say, rejected applications to register) before an election—as some state laws once permitted. *See* Rep. of the U.S. Comm'n on Civil Rights, at 95 (1959). But how can the text support this result? The Fifth Circuit did not explain. *See Lewis*, 325 F.2d at 212. And the retention duty seems to have a clear start date: it runs "for a period of twenty-two months *from* the date of" an election. 52 U.S.C. § 20701 (emphasis added). The duty thus does not seem to apply *before* an election. If Congress had instead written that election officials must retain records "[until] twenty-two months [after] the date of" a federal election, then the statute might imply that the duty begins on the date the officials first possess the records. *Id.* So if the date of possession came before the election (under this hypothetical text), the official would have to preserve the records up until the election and then for the following twenty-two months. But may we rewrite § 20701's text in this way to fulfill its purpose (even though Title III's criminal sanctions might trigger the rule of lenity)? *See id.* §§ 20701–02.

Or perhaps the voter-registration list as it existed on July 21, 2025, relates to a *past* election (say, the one from November 2024)? Between those two dates, however, officials likely would have updated this list countless times in preparation for the next election. Voters who moved out of state or who died since November 2024 would have been removed. And voters who moved in or registered for the first time would have been added. So if the entire statewide list qualifies as one "record," the list from July 2025 may well not "relat[e] to" the prior election. *Id.* § 20701.

All that said, this interpretive conundrum also may represent only a case-specific concern. Ostensibly, the concern would fall away as applied to a demand for a voter list used for a *specific* election (say, the Michigan primary from last week). The prior version of the statewide list that election officials used to distinguish eligible from ineligible voters for a specific election might qualify as a record "in such election" because it "relat[es] to" the "registration[s]" used then. *Id.* And this reading might reconcile Title III with the NVRA and HAVA in a different way. Title III would make clear that officials must "retain and preserve" for "twenty-two months from the date of" an election the official list that they used to determine voter eligibility during that election. *Id.* They cannot "alter[]" this *past* record for those twenty-

two months. *Id.* § 20702. But Title III would not prevent them from doing what the NVRA and HAVA require: develop an *updated* list for the next election by adding newly eligible voters and deleting newly ineligible ones.

Granted, the parties have not identified these interpretive issues. But they have raised the general question whether §§ 20701 and 20703 allow the DOJ to seek a statewide voter list as it existed in July 2025. So the issues could complicate our review at the en banc stage because they touch on that general question. Parties also typically cannot force courts to adopt a mistaken view of the law through their stipulations or waivers. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 304 n.9 (2023) (Gorsuch, J., concurring). And even if we found the legal argument forfeited on appeal, *cf. Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371 (2024), it still could complicate matters down the road. This appeal arises at the motion-to-dismiss stage. So Michigan may well be able to raise the issues at later stages. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. First Agency, Inc.*, 756 F.3d 954, 959 (6th Cir. 2014). This fact too leads me to conclude that denying en banc review at this time represents the better course.

D

*Fourth*, timing concerns do not justify immediate en banc review. At this point, I do not see how the United States could get the relief that it seeks in time for that relief to matter for the upcoming election in November 2026. One should keep in mind this case's procedural posture. The United States has appealed the grant of a motion to dismiss the case, not the denial of a motion for a preliminary injunction. Although the United States alleges that Title III suits trigger summary proceedings, it did not seek preliminary relief in the district court that would *immediately* compel Michigan to turn over the requested records. Nor has it moved for any type of emergency relief in this court or the Supreme Court. So even if we expedited an en banc rehearing, ultimately agreed with the United States on these issues, and quickly rendered an opinion to that effect, our decision would not entitle the United States to any records. It would instead simply overturn the district court's grant of the motion to dismiss and return this case to that court for further proceedings. The United States would then have to file a motion requesting

the production of the records.  Yet Michigan's Secretary of State and various intervenors have stated that they would raise other arguments about why the Secretary should not have to comply. *See* Appellee's Br. 58–66; Intervenor's Br. 51–53.  Those proceedings might take even more time.

Nor would the mere disclosure of the records immediately matter to the pending election. Rather, once the DOJ got the records, it would still need to review them.  If the DOJ found that Michigan's list-maintenance practices violated the NVRA or HAVA and Michigan's Secretary of State refused to cooperate (as she has to date), the United States would then have to bring a separate enforcement action under those laws.  *See* 52 U.S.C. §§ 20510(a), 21111.  Even here, the parties have debated how much these laws would allow Michigan to engage in any sort of systematic list-maintenance practices this close to the election.  *Compare* 52 U.S.C. § 20507(c)(2)(A), *with Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004).  And besides, the Supreme Court's cases have "repeatedly cautioned" against granting federal relief that changes a state's election framework close to an election.  *Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026) (per curiam); *see Purcell*, 549 U.S. at 4–5.  In sum, given the panel's narrow ruling, it is far from obvious that rehearing this case en banc would promote any efficiency goals more than staying our hand at this time.

\*  \*  \*

The parties have suggested that there are dozens of other cases pending throughout the country that raise similar issues under Title III.  So these issues are not going away.  And further percolation will enhance our court's—and ultimately the Supreme Court's—ability to decide the issues correctly.  For these reasons, I have concurred in the denial of en banc rehearing.

No. 26-1225                *United States et al. v. Benson et al.*                Page 12

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting from the denial of rehearing en banc.

This is an exceptionally important case, Fed. R. App. P. 40(b)(2)(D), impacting the integrity of federal elections in the State of Michigan.  In refusing to disclose Michigan's Qualified Voter File, defendant Secretary of State Jocelyn Benson asserts two meritless, technical defenses.  First, Benson argues that she never came into possession of the Qualified Voter File.  Second, she asserts that the federal government's repeated requests for the voting record were deficient because the basis and need for the requests were contained in two separate letters, not one.  For the reasons stated below and in the dissenting statement by Judge Thapar, I would grant the United States' petition for rehearing en banc and therefore respectfully dissent.

The unredacted records that the federal government seeks contain voters' unique identifying numbers, which are "necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections."  *United States v. Benson*, 819 F. Supp. 3d 753, 768 (W.D. Mich. 2026) (citation modified).  In other words, without the unredacted records, the federal government cannot effectively verify Michigan's compliance with the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 20901 *et seq*.

The NVRA generally directs States to implement programs that "[(1)] increas[e] voter registration and [(2)] remov[e] ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (citing 52 U.S.C. § 20501(b)). HAVA, for its part, expands the NVRA's framework and requires States to establish a "single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).  It also requires designated election officials to regularly maintain the list, which includes removing ineligible voters.  *Id.* § 21083(a)(2).

Against that backdrop, when construing a statute, our task is to identify the "single, best meaning" of its text. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In so doing, courts must give the text the meaning it bore at the time of its enactment. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). As explained, the single, best reading of Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq.*, is that it covers all qualifying records in an election official's possession—including those self-created by an election official. At the very least, it captures some government-created records, including the Qualified Voter File here. In this regard, historical usage suggests "comes into possession" signals commencement of a duty and had nothing to do with a record's source of origin or who created it.

To begin, the panel majority's interpretation assigns the phrase "come into his possession" more legal significance than contemporaneous readers seemingly understood it to bear. By 1960, "come into" possession or custody was a familiar legal expression. Courts and legislatures regularly used it to describe when a person lawfully assumed possession of property through an office, employment, or other legal authority. *See, e.g.*, *United States v. Northway*, 120 U.S. 327, 330–31 (1887); *Rife v. Ruble*, 107 F.2d 84, 85–86 (6th Cir. 1939). The phrase marked the commencement of lawful possession and the legal duties or liabilities that followed. *See Moore v. United States*, 160 U.S. 268, 270–72 (1895). But it did not distinguish property according to its source. And because no such distinction existed, here, records that come into an official's possession could include self-created records.

Early decisions construing Title III reinforce that understanding. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 227 (5th Cir. 1962); *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). Although they did not directly interpret the phrase "come into his possession," they are significant because of how they naturally described the statute. Both *Lynd* and *Gallion* quoted or referenced § 20701's requirement that election officers retain records that "come into" their possession. Yet, when describing the statute's operation, both courts stated that the election official's duty to preserve and retain records applied to records "in" an election official's possession or "in" the official's custody. *Lynd*, 306 F.2d at 227 ("Since the statute specifies 'all records and papers' *in the officer's custody* 'relating to any application [. . .] or other act requisite

to voting [. . . ],' in such elections held within twenty-two months, the custodians' duty to retain and preserve and the Attorney General's right of inspection and copying extend as far back as the earliest date of any such record or paper which bears on the eligibility of any currently listed voter to vote in such election." (emphasis added)); *Gallion*, 187 F. Supp. at 855 ("There is nothing uncertain about that part of the Act requiring the preservation and production of all records and papers which are *in the possession* of an election official . . . if those records and papers relate to the acts requisite to voting." (emphasis added)).  That is, they moved among those formulations without suggesting that "come into" and "in" possession of described a different category of records.

That pattern is revealing.  Had contemporaneous courts understood "come into his possession" to impose the source-of-origin limitation the majority identifies, one would expect them to preserve that distinction when describing the statute's reach.  Instead, they described the statute as applying to records in an election official's possession or custody without suggesting that the phrase "come into" carried an additional limitation based on where a record originated. The more natural inference is that they understood "come into possession" as a familiar legal formulation identifying when the statutory duty attached, not as creating a separate substantive limitation on the records covered.

Later judicial usage reflects the same understanding.  In *United States Department of Justice v. Tax Analysts*, for example, the Supreme Court explained that agency records include records "created or obtained" by an agency and then described agency control as requiring that the materials "have come into the agency's possession in the legitimate conduct of its official duties." 492 U.S. 136, 144–45 (1989).  To be sure, the Court was not interpreting § 20701, and *Tax Analysts* does not resolve the question presented here.  But its formulation is nonetheless instructive.  The Court used the phrase "come into the agency's possession" while discussing a category of records that expressly included agency-created documents, suggesting that the phrase naturally describes the assumption of official custody regardless of whether the records were created within or received from outside the agency.  At bottom, the relevant distinction in *Tax Analysts* was between official agency records and an employee's personal papers—not between internally created and externally received documents.

This understanding also answers the majority's surplusage argument.  The majority reasons that if "come into possession" merely identifies possession, Congress could have referred to records "in" an election official's possession.  But that reasoning assumes the phrase was newly coined rather than an established legal formulation.  We have recognized, however, that the canon against surplusage does not require every component of a stock legal language to perform independent substantive work.  *See Doe v. Boland*, 698 F.3d 877, 882 (6th Cir. 2012).  In any event, the phrase still performs meaningful work by identifying the commencement of official possession—that is, the point at which the statutory duty to retain and preserve attaches.

And the statutes that the district court cited to show that Congress often employs "come into possession" when contemplating materials received from an external source do not change the calculus.  *Benson*, 819 F. Supp. 3d at 768.  Some of those statutes expressly limit their reach to materials received from outside the government.  *See, e.g.*, 44 U.S.C. § 3572 (covering confidential information that comes into an employee's possession after being submitted to the agency).  Yet § 20701's text contains no comparable limitation.  The remaining statutes fare no better because their subject matter inherently involves materials originating outside the official's office, such as letters entrusted to the Postal Service, abandoned property, entrusted property, and the effects of a deceased seaman.  *See* 18 U.S.C. § 1703(a); 50 U.S.C. § 217; 18 U.S.C. § 654; 46 U.S.C. § 10705.  So in those statutes, any external-source limitation flows from the nature of what is being regulated—not from the phrase "come into possession."  By contrast, § 20701 applies broadly to "*all* records and papers which come into [an election official's] possession *relating to* any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701 (emphasis added).  Nothing in that language inherently limits the statute to records created by someone other than the election official.

In sum, the majority asks the phrase to do more work than contemporaneous legal usage supports.  It reads "come into his possession" as though Congress had written "come into his possession from another" or "received from outside the office."  But Congress imposed no such limitation.  The proper reading is the one contemporaneous readers would have assigned the phrase:  "come into his possession" identifies the commencement of an election official's lawful

official possession of a covered record and, with it, the beginning of the statutory duty to preserve. It does not exclude records based on where they originated.

Even assuming the majority correctly interprets the phrase "come into possession" to require that an election official acquired, obtained, or received the relevant record from another person rather than having personally created it, the majority still erred in concluding that the Qualified Voter File falls outside § 20701. *United States v. Benson*, 179 F.4th 470, 478 (6th Cir. 2026). True enough, under that understanding, an election officer who personally creates a document does not ordinarily acquire, obtain, or receive it. To use the majority's analogy, one would not say that a baker acquired a cake she baked when she removed it from the oven, even if she first acquired the ingredients. *Id.* at 479.

But the majority extends that premise one step too far. It transforms a limitation on who creates the record into a limitation on where the record originates. The majority reasons that Benson never "acquire[d], obtain[ed], or receive[d]" the Qualified Voter File because "Michigan officials created it themselves." *Id.* at 478–79. Under that reasoning, a record cannot "come into" an election officer's possession unless it first crosses an organizational boundary. Returning to the majority's analogy, the rule becomes that a baker comes into possession of a cake delivered from another bakery but not of a cake handed to her by another baker working in the same bakery.

Yet nothing in § 20701 draws that distinction. Even accepting the majority's understanding of the phrase "come into possession," the statute asks only whether the particular election officer acquired, obtained, or received the record. It does not ask whether the record originated outside that officer's office. That distinction matters because § 20701 regulates individual election officers, not election offices as institutions; its preservation duty applies to "[e]very officer of election." 52 U.S.C. § 20701.

Under the majority's premise, then, the relevant question is whether Benson acquired the Qualified Voter File from someone other than herself—not whether the Qualified Voter File crossed an organizational boundary before reaching her. Michigan law makes clear that Benson does not personally create, maintain, or update the Qualified Voter File. Rather, she is tasked

with directing and supervising its establishment and maintenance.   Mich. Comp. Laws § 168.509o(1).   The Qualified Voter File is created and maintained through the work of subordinate election officials and employees acting under her supervision.

The fact that those employees act under Benson's supervision does not mean that she personally creates every record they prepare.   Public officials routinely acquire reports, databases, memoranda, and other work product generated by subordinate officials even though those employees act on behalf of the office.   Thus, even under the majority's understanding of "come into possession," when the completed work product comes under Benson's official custody and control through the actions of those subordinates, it comes into her possession.   Put simply, directing the creation and maintenance of a record is not the same as personally creating or maintaining it.

And this reading does not render the phrase "come into" superfluous.   Even under the majority's interpretation, those words distinguish possession from the transition into possession. They identify the point at which the statutory preservation duty attaches to the particular election officer.

Finally, HAVA and the NVRA do not compel a different result.   The majority reasons that those statutes require election officials to update statewide voter-registration lists, while § 20702 makes it a crime to willfully "alter" records covered by § 20701.   But that conflict depends on reading "alter" too broadly.   Under § 20702, a person who "willfully steals, destroys, conceals, mutilates, or alters" a covered record is subject to criminal penalties.   As the government argues, applying the canon of *noscitur a sociis*, "alter" takes meaning from its surrounding terms.   *Fischer v. United States*, 603 U.S. 480, 487 (2024).   "Steals," "destroys," "conceals," and "mutilates" describe varying degrees of interference with the availability and integrity of a record.   *Id.* at 489–90 (noting that "by their nature," the terms "alter[], destroy[], mutilate[], [and] conceal[]" are acts that "impair the integrity or availability of records, documents, or objects").   Read in that company, then, "alters" likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list.   Properly read, the statutes work together.   HAVA and the NVRA require election officials to keep voter rolls accurate and current; § 20702 prohibits one from

willfully interfering with the integrity or availability of covered records.  Thus, by giving "alter" a breadth its statutory context does not support, the majority creates a conflict that does not exist.

In the end, even accepting the majority's understanding of the phrase "come into possession," the Qualified Voter File falls within § 20701.  The statute at most requires only that the relevant election officer acquire, obtain, or receive the record; it does not require that the record originate outside the officer's own office.  Benson did not personally create the Qualified Voter File.  She assumed official custody of a record created and maintained by subordinate election officials acting under her supervision.  That is enough to satisfy even the majority's flawed textual premise.

\* \* \*

Benson's second ground for refusing to disclose the unredacted voter file is likewise meritless.  Title III requires that "upon demand in writing by the Attorney General or his representative," requested voting records must be disclosed so long as the Attorney General specifies a "basis and purpose."  52 U.S.C. § 20703.  The statute thus imposes two substantive requirements:  (1) the Attorney General must proceed by written demand, and (2) such demands must state both their basis and their purpose.  It imposes no third requirement that both appear within a single document.

The text confirms as much.  The operative clause begins with the indefinite phrase "upon demand in writing," not "upon the demand" or "upon a single demand."  The following sentence—"[t]his demand shall contain a statement of the basis and the purpose therefor"— simply refers to written demands described in the preceding sentence.  It does not transform an otherwise open-ended course of written correspondence into a single-document requirement.  When Congress intends to require a single document containing specified information, it knows how to say so.  *See Niz-Chavez v. Garland*, 593 U.S. 155, 163–68 (2021) (holding that a statute requiring "a notice" containing specified information could not be satisfied through multiple documents).  Congress chose no comparable language here.

Neither does the statute authorize courts to add procedural requirements Congress omitted.  *See Dean v. United States*, 556 U.S. 568, 572 (2009) ("[W]e ordinarily resist reading

words or elements into a statute that do not appear on its face." (citation modified)). It specifies the information the Attorney General must provide. It says nothing about how that information must be organized or whether it must appear within the four corners of a single writing.

Even if § 20703 required a single written demand, the government's August 14 letter satisfied that requirement. The letter stated the purpose of the government's request—to assess Michigan's compliance with the NVRA and HAVA—and explained that it was clarifying the government's existing demand. Although it did not expressly refer to the July 21 letter, it necessarily referred to that demand. A clarification presupposes the request it clarifies. Read in that context, the August 14 letter incorporated the earlier correspondence, which supplied the factual basis for the government's request by identifying irregularities in Michigan's Election Assistance Commission's Election Administration and Voting Survey submissions and a complaint alleging noncompliance with HAVA. Benson's own correspondence confirms that understanding, describing the August 14 letter as "supplement[ing]" the July 21 request. Read together, the government's written demand stated both its basis and its purpose.

In short, the majority's contrary interpretation adds a procedural requirement Congress did not enact. The statute requires only that the government communicate the basis and purpose of its demand in writing. It does not require that both appear in a single document. Because the federal government satisfied those requirements, it complied with § 20703.

For these reasons and those stated by Judge Thapar, I would grant the United States' petition for rehearing en banc and therefore respectfully dissent.

---------------

**DISSENT**

---------------

THAPAR, Circuit Judge, dissenting from the denial of rehearing en banc.  It should be common ground that fair elections—with rules ensuring all "citizens" eligible to vote can "cast ballots that carry appropriate weight"—are worth protecting.  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).  But it wasn't always that way.  During the heyday of voter disenfranchisement, African American residents of Tuskegee, Alabama turned to the U.S. Commission on Civil Rights for help securing their fundamental right to vote.  U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights, 1959*, at 69 (1959) [hereinafter CCR Rep.].  Teachers, students, farmers, and public servants had all tried to exercise that right but were "denied registration because of their race or color."  *Id.* at 69–70.  So the Commission started an investigation and traveled to Alabama to examine the state's voter-registration records.  *Id.*  But when the Commission's investigator arrived at the courthouse, the local election official refused to hand over those records.  *Id.* at 70.  Meanwhile, a state-court judge impounded the voter-registration records of other counties.  *Id.* at 70–71.  That judge told the press, "They are not going to get the records.  And if any agent of the Civil Rights Commission comes down here to get them, they will be locked up."  *Id.* at 71.

A few years earlier, Congress had given the federal government the power to enforce "statutes relating to election frauds."  *Id.* at 128; *see also* Civil Rights Act of 1957, Pub. L. No. 85-315, § 131, 71 Stat. 634, 637–38.  So what was the problem?  The Civil Rights Act of 1957 didn't empower the federal government to examine states' election records.  States like Alabama seized on that silence to resist the federal government's attempts to uphold voting rights.  *See, e.g.*, CCR Rep., *supra*, at 69–70; *In re George C. Wallace*, 170 F. Supp. 63, 66–67 (M.D. Ala. 1959).  And that resistance kneecapped the federal government's enforcement of election laws.  CCR Rep., *supra*, at 137.  After all, the federal government couldn't know whether or how states were violating those laws without examining their records.  *See id.*  As a result, the federal government's enforcement of election laws was so underwhelming that the 1957 Act didn't seem to have made much of a difference.  *Id.* at 131.

What did the government need to fix its dismal record?  The power to "require the production for inspection of records and papers relating to any general, special, or primary election involving candidates for Federal office."  *Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 86th Cong. 191 (1959) (statement of William P. Rogers, Att'y Gen. of the U.S.).  So Congress gave the Attorney General the sweeping power he needed in Title III of the Civil Rights Act of 1960.  Congress began by tagging every election official with the personal duty to preserve all federal election records that come into her possession.  Civil Rights Act of 1960, Pub. L. No. 86-449, § 301, 74 Stat. 86, 88.  Then, it gave the Attorney General the power to demand those records and ask a court to compel their production if officials ignored his demand.  *Id.* §§ 303, 305, 74 Stat. 86, 88.

With time, these new powers helped the federal government sweep the widespread voter disenfranchisement of the Jim Crow era into the ash heap of history.  But concerns surrounding the integrity of our elections remain today.  Just this summer, we learned that a software glitch at a state's department of motor vehicles added thousands of aliens to that state's voter registry.[1]  As a result, aliens illegally voted in our elections.[2]  Another state discovered tens of thousands of dead people on its voter rolls.[3]  And a Homeland Security review found hundreds of thousands of potentially ineligible registrants in other states.[4]

Given these concerns of voter fraud, the Attorney General broke out an old tool:  Title III.  Relying on the powers in that statute, the Attorney General requested Michigan's voter file, which includes the list of registered voters and their personally identifiable information.[5]  But Secretary of State Jocelyn Benson refused to comply.  So the Attorney General turned to the

---

[1]Joey Fox & Daniel Han, *Thousands of Non-Citizens Registered to Vote in NJ Due to Software Error, Governor Says*, Politico (July 21, 2026).

[2]*Id.*

[3]*State Board Identifies Deceased Individuals on Voter Rolls Through Federal Database Comparison*, N.C. State Bd. of Elections (Apr. 27, 2026).

[4]*DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls*, U.S. Dep't of Homeland Sec. (July 17, 2026).

[5]The Attorney General requested "Michigan's computerized statewide voter registration list."  R. 39-2, Pg. ID 492.  Under Michigan law, this document is called the qualified voter file.  Mich. Comp. Laws §§ 168.509q, 168.509r.  So I use the terms voter file and voter list interchangeably.

courts for help. Yet the panel majority concluded that Michigan's voter-registration list fell outside the Attorney General's powers to obtain voter-registration records. Under the panel's opinion, the Attorney General can get the underlying voting records, but he can't get the list of registered voters. So he will have no way of knowing whether ineligible individuals are on the state's voter rolls. That gap will, in turn, hamper efforts to enforce federal laws aimed at limiting voter fraud and protecting the rights of eligible voters in our elections.

We're already seeing the ripple effects of the panel's error. Since the panel's decision, district courts in our circuit have been forced to bless other states' defiance of Title III's plain command. *See, e.g.*, *United States v. Adams*, No. 3:26-CV-19 (CHB), 2026 WL 2123871 (E.D. Ky. July 23, 2026). We should have reheard this case en banc to correct our court's error. I respectfully dissent from our decision not to do so.

I.

The law is clear, and the facts are undisputed. So this should have been a straightforward case of statutory interpretation.

Title III requires every election official in the country to "retain and preserve" all federal election records "which come into his possession" for almost two years following every such election. 52 U.S.C. § 20701. And it gives the United States, through the Attorney General, the power to request and inspect those records upon stating "the basis and the purpose" for its demand. *Id.* § 20703.

Relying on those provisions, the Attorney General asked Benson for Michigan's voter file. *United States v. Benson*, 179 F.4th 470, 477 (6th Cir. 2026). Why? To ensure the state was complying with federal election laws. For example, Michigan was required to "make[] a reasonable effort to remove the names of ineligible voters," such as those who had passed away or moved to another state. 52 U.S.C. § 20507(a)(4). To verify Michigan had done so, the Attorney General requested Michigan's unredacted voter file, which—like many other states'—included the list of registered voters as well as their dates of birth, addresses, driver's license numbers, and partial social security numbers. *Benson*, 179 F.4th at 477, 481 n.1. The Attorney General then planned to compare the voter file to federal databases to ensure that only eligible

voters were voting in our elections. *See* Exec. Order No. 14248, § 2(e), 90 Fed. Reg. 14005, 14007 (Mar. 25, 2025). And the request to Michigan wasn't unique. The Attorney General made this same request of nearly every other state—many of which happily complied and worked with the Attorney General to protect the voter rolls.[6] That's not surprising. After all, everyone—states included—should want to protect the integrity of our elections.

But instead of cooperating to achieve that goal, Benson refused to comply with the Attorney General's reasonable demand. Instead, she handed over only a redacted version of the state's file with voters' personally identifiable information removed. *Benson*, 179 F.4th at 477. So the Attorney General sued, seeking a declaratory judgment and an injunction to compel Benson's compliance with Title III. Benson moved to dismiss, the district court granted that motion, and a divided panel of this court affirmed. *Id.* at 478, 483.

## II.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). When there's a risk that a state's voter rolls may contain ineligible voters, this essential confidence is eroded. That's because voter fraud waters down every citizen's right to vote by diluting legitimate ballots with illegitimate ones. And the Supreme Court has warned that diluting votes can "just as effectively" deny citizens' voting rights as "wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

The majority's opinion risks turning these grave concerns into reality. How? By gutting one of the federal government's most important tools to inspect states' election records, ensure they comply with federal law, and thus protect the integrity of our elections.

To see how the majority's opinion crippled Title III, begin with how the statute is supposed to work. Title III gives the Attorney General the power to demand from *any* election official in the country *every* record relevant to federal elections. 52 U.S.C. § 20703. All the Attorney General needs to do is send a written demand, stating the basis and purpose for his

---

[6]Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 6, 2026).

request.  *Id.*  But that power wouldn't mean much if election officials could just discard or destroy their records before the Attorney General could request them.  So Title III also requires every election official to preserve federal election records that have come into her possession for nearly two years following any federal election.  *Id.* § 20701.  Any election official who "willfully fails to comply" with that provision faces a fine and jail time.  *Id.*

The majority's opinion defanged that statutory scheme in at least two critical ways.  First, it excluded from Title III's coverage any document that a state agency "internally generate[s]" and thus imposed an "external-source limitation" on the statute that has no basis in its text.  *Benson*, 179 F.4th at 479; *id.* at 485 n.3 (Nalbandian, J., dissenting).  Second, it flyspecked the Attorney General's demand for Michigan's records even though Title III doesn't impose any judicially reviewable limits on the form that the request must take.  *Id.* at 483 (majority opinion).  We should have reheard this case en banc to correct those errors.

A.

First, the panel majority shrank Benson's duty to comply with the Attorney General's demand for election records that "c[a]me into [her] possession."  52 U.S.C. § 20701.  According to the panel majority, the unredacted voter file never came into Benson's possession because her office created it.  *Benson*, 179 F.4th at 478–79.  But we can't read "come into . . . possession" in a vacuum.  That phrase is tied to the underlying voting records:  "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in [an] election."  52 U.S.C. § 20701.  And no one disputes that the records used to create the voter file came into Benson's possession.  *See Benson*, 179 F.4th at 480–81 (conceding this point).  True, Benson's office did some work by matching and aggregating the data it received to create the voter file.  But that file reflects the individual, Title III-covered records that Benson received from other sources.  *See id.* at 484–85 (Nalbandian, J., dissenting).  In other words, the aggregate file, by definition, comprises records that have separately come into Benson's possession.  So the aggregate file seemingly satisfies the panel majority's external-source requirement on that basis alone.

Even if the voter file were a new, separate record, Benson would still have to turn it over. Plainly, a list of registered voters and the basis for their registration "relat[es] to" an "application," "registration," or an "act requisite to voting in [an] election." 52 U.S.C. § 20701. And in Benson's case, the voter file also satisfies the statute's "possession" requirement. *Id.* That's because Title III applies individually to "every officer of election" and requires the preservation of records that "come into *his* possession." *Id.* (emphasis added). Likewise, "*any person*" who "perform[s] any function" related to voter applications and registrations for federal elections is an "officer of election." *Id.* § 20706 (emphasis added). Congress's choice to speak in the singular matters. It imposes an officer-specific duty to preserve election records. As secretary of state, Benson oversees more than 1,500 employees. Mich. Civ. Serv. Comm'n, *Forty-Sixth Annual Workforce Report: Fiscal Year 2024–25*, at 1-6 (2025). Her responsibilities range from elections to motor-vehicle registration to driver's licenses to notaries. *See Secretary of State Jocelyn Benson*, Mich. Dep't of State (2026). Given all her duties, Benson surely didn't create the voter file herself. Instead, her subordinates likely created that file and passed it on to her. The panel majority conceded as much. *Benson*, 179 F.4th at 478–79 ("Michigan officials created [the voter file] themselves."). So Benson "c[a]me into . . . possession" of the voter file when her employees sent it to her. 52 U.S.C. § 20701. And that means the plain text of Title III requires her to hand it over to the Attorney General.[7]

In response, Benson argues that she doesn't have a duty to preserve or produce the voter file because it's a "living database that hundreds if not thousands of people simultaneously have access to." Resp. to En Banc Pet. at 12. In essence, Benson contends that because many people can access the voter file, no one possesses it. But she's wrong. Today, documents are often shared through platforms like Google Drive and Dropbox with many other people who can view and edit them. And no one doubts that these documents come into the possession of everyone

---

[7]The panel majority argues that this interpretation of Title III runs headfirst into other federal election statutes. *Benson*, 179 F.4th at 479–80. Those statutes require state election officials to continually update the voter file to remove ineligible voters. *Id.* Yet Title III criminalizes the alteration of any record it covers. *Id.* Hence the majority's concern: If Michigan's voter file falls under Title III, Benson could be subject to prosecution every time she updates the voter file to remove ineligible individuals. *Id.* But the statutes aren't in conflict. Title III is tied to each federal election and requires state officials to maintain *that* election's records for 22 months. *See* 52 U.S.C. § 20701. This requirement prohibits Benson from going back and altering the voter file used in a past federal election. But if she updates the voter file to remove ineligible voters—as other federal statutes require—in preparation for a *future* election, she isn't violating Title III. That means there's no tension among the statutes.

with access.  *See, e.g.*, *Heidi Grp., Inc. v. Tex. Health & Hum. Servs. Comm'n*, 138 F.4th 920, 935 (5th Cir. 2025) (explaining that an entity "can assert 'ownership' and 'possession' in its documents on Dropbox").  Michigan's voter file is no different.  In short, the meaning of "comes into . . . possession" doesn't change just because technology allows that term to now encompass many more people and records than when it was first enacted into law.

Benson then falls back on policy concerns about divulging voters' private information. *See* Defendants-Appellees' Br. at 38.  But those concerns are misplaced because all agree that the Attorney General is entitled to the underlying records containing that same private information.  And to the extent the voter list reflects information about registered voters who lack underlying registration records, those people shouldn't be on the voter list in the first place. So, rather than fighting the Attorney General, Benson should be cooperating with him to ensure the accuracy of Michigan's voter list.  And at the end of the day, Benson's mistaken policy concerns can't displace the clear statutory command of Title III.

To recap, Benson must hand over Michigan's voter file because it's an aggregation of records that came into her office's possession.  What's more, Benson personally came into possession of the voter file from her subordinates.  So no matter how you slice it, Title III requires Benson to give the Attorney General the state's voter file.

B.

Second, the panel majority held that the Attorney General hadn't properly stated the demand's basis and purpose because that information was spread across two letters instead of one.  *Benson*, 179 F.4th at 483.  Yet nothing in Title III says the demand needs to be made in one letter.  *Id.* at 488 (Nalbandian, J., dissenting).  And nothing in Title III gives courts a judicially manageable standard to apply in reviewing the demand's format.  That means the panel majority's quibbling with the Attorney General's demand exceeded the proper scope of review under the statute.  *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962); *see also Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam).

The panel majority justified its granular second-guessing by asserting that a Title III demand is a "civil investigative demand," which is reviewable. *Benson*, 179 F.4th at 483 n.2 (citing *United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)). But these demands are different.

A "civil investigative demand" (CID) is a term of art, and a Title III demand simply doesn't fit the bill. Every time Congress authorizes CIDs, it does two things. First, it uses that precise term in its entirety; it doesn't use "demand" as shorthand. Second, it gives district courts broad jurisdiction to "hear and determine the matter . . . presented, and to enter such order or orders as may be required to carry out the provisions of this section." 31 U.S.C. § 3733(j)(5); *see also* 18 U.S.C. § 1968(j) (same); 15 U.S.C. § 57b-1(h) (same); 12 U.S.C. § 5562(h)(1) (same). Congress didn't do either of these things in Title III. It didn't use the words "civil investigative demand." And it didn't give district courts sweeping jurisdiction. Instead, it gave them only a sliver of jurisdiction "to compel the production of such record or paper" as the Attorney General demands. 52 U.S.C. § 20705. Such cabined language doesn't permit the nitpicking that the panel majority engaged in here.

The panel majority resists this conclusion by relying on a case in which the Supreme Court reviewed the adequacy of an Internal Revenue Service summons. *United States v. Powell*, 379 U.S. 48, 58 (1964). But that case isn't on point because an IRS summons is meaningfully different from a Title III demand.

First, a summons is directed at a private party with constitutional rights, not at a state official in her official capacity. Second, a summons can demand everything from the recipient's personal appearance and testimony to all his papers and records. *See* 26 U.S.C. § 7604(a). That's far more intrusive than a demand for federal election records. And third, a summons is self-executing, so it triggers criminal contempt liability if the recipient ignores or disobeys it. *See id.* § 7604(b). By contrast, a Title III demand has no teeth of its own. If the Attorney General's demand is ignored, he must seek a court order compelling the election official to produce the records. Only a violation of *that* order triggers contempt. Given the critical differences between an IRS summons and a Title III demand, *Powell* doesn't apply here.

So without any authority or judicially manageable standards to guide its review, the panel majority rejected the adequacy of the Attorney General's demand. But that's not the scheme Congress envisioned. When it wanted to empower more sweeping judicial review, it knew how to do so. Congress didn't do so here, yet our court disregarded that choice.

### III.

Going forward, the Attorney General is left with no way to verify the accuracy of Michigan's voter list. It's true he can send Benson a new demand letter that states the basis and purpose for his request. And even under the panel majority's reading, he can demand all the underlying voting records.[8] *See Benson*, 179 F.4th at 482. But without Michigan's voter file, the Attorney General will have nothing to compare the underlying records with. So he can't tell whether ineligible individuals have, in fact, made it onto Michigan's voter rolls. That means, without en banc review, the Attorney General will have no ability to ensure the integrity of our elections.

To see why, consider a simple example. Imagine someone applies to vote, but provides a false name, address, driver's license number, and social security number. That fraudulent application is a record the Attorney General can demand. But did that voter make it onto the state's voter list? The Attorney General can't know without having the list.

Now change things up a bit. Imagine an alien goes to the department of motor vehicles and applies for a driver's license. On his application, he truthfully declares that he isn't a U.S. citizen. A coding bug marks him down as a citizen and automatically registers him to vote, adding him to the state's voter list. If that sounds too far-fetched, it isn't. That's exactly what happened in New Jersey. And it took an entire year before anyone caught on.[9] What would the underlying records show about this incident? That an alien said on a form that he was an alien. Without the voter list, the Attorney General couldn't know whether the state properly screened that incoming application and blocked the alien from being added to the voter list.

---

[8]Title III covers records of all acts "requisite to voting" in a "primary election" for a "Member of the Senate." 52 U.S.C. § 20701. Michigan had primary elections for the U.S. Senate last week. So Title III entitles the Attorney General to all the state's voter records as of last week.

[9]*See* Fox & Han, *supra* n.1.

Handicapping the Attorney General like this also hurts states in two ways.  First, he can't identify those states that *are* fulfilling their list-maintenance obligations and thus spare them from further federal investigations.  Second, the Attorney General can't help states find blind spots in how they maintain their voter lists.

In sum, the panel majority's reading of Title III leaves the Attorney General with a futile system that Congress never designed.  Title III's text and history show that Congress sought to give the federal government broad power to inspect election records and neutralize states' resistance.  But now, the Attorney General has practically no ability to ensure states' voter lists contain the names of only eligible voters, a necessary step to protecting the integrity of our elections.  If that isn't an issue of exceptional importance worthy of en banc review, I don't know what is.

*     *     *

In the leadup to Title III's passage, southern officials "resisted turning over election records to prevent fishing expeditions by the Federal authorities."  *Hearings Before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary*, 86th Cong. 454 (1959) (statement of Ernest F. Hollings, Gov. of S.C.); *see id.* at 620 (statement of John M. Patterson, Gov. of Ala.).  Taking a page from that timeworn manual, Benson decries the Attorney General's request for her state's voter file as a "fishing expedition[]."  Defendants-Appellees' Br. at 42, 45.  But Congress enacted Title III to ensure that recalcitrant state officials weren't compromising the integrity of federal elections.

Over six decades later, the panel majority unwound Congress's solution.  Congress never said the Attorney General couldn't demand records compiled by an election official's subordinates.  And it never invited courts to nitpick the Attorney General's demand.  Yet the panel majority now imposes both of these newfound, extratextual limitations on the Attorney General.  In doing so, it rewards states for the very obstruction that Title III was meant to break through.

I respectfully dissent.

**ENTERED BY ORDER OF THE COURT**

_____

Kelly L. Stephens, Clerk